No. 24-2533

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT
AUTHORITY, et. al.,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, et al.,

*Defendants-Appellees*,

and

NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, et al.,

*Intervenor-Defendants-Appellees*.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF ALASKA,

No. 3:21-cv-00245-SLG (Honorable Sharon L. Gleason)

———————————

## APPELLANTS' OPENING BRIEF

James H. Lister
David Karl Gross
Brian V. Gerd
Zoe A. Eisberg
Birch Horton Bittner & Cherot
1150 Connecticut Avenue, NW, Suite 350
Washington, DC 20036-4142
Phone: (202) 659-5800

*Attorneys for Plaintiffs-Appellants*

## RULE 26.1(a) DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1(a), Appellants Alaska Industrial Development and Export Authority ("AIDEA"), North Slope Borough ("NSB"), Arctic Slope Regional Corporation ("ASRC"), and Kaktovik Iñupiat Corporation ("KIC") submit the following Corporate Disclosure Statement.

AIDEA is a public corporation of the State of Alaska, constituting a political subdivision under the laws of the State. AIDEA was created by the Alaska Legislature in 1967 to "promote, develop and advance the general prosperity and economic welfare of the people of Alaska, to relieve problems of unemployment, and to create additional employment." A.S. § 44.88.070. AIDEA is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

The North Slope Borough is the regional government entity managing eight villages spread across northern Alaska spanning from the United States-Canada border to the Western Boundaries of Alaska. Its jurisdiction includes the Arctic National Wildlife Refuge ("ANWR"), the Coastal Plain, and the Village of Kaktovik. As a governmental entity NSB is not subject to disclosure requirements.

Arctic Slope Regional Corporation is one of the 12 land-owning Alaska Native Corporations formed under the Alaska Native Settlement Claims Act. Congress created Alaskan Native Corporations for the purpose of providing

benefits to shareholders, who are Alaska Natives or descendants of Alaska Natives and to promote the health, education, and welfare of those shareholders. ASRC is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

Kaktovik Iñupiat Corporation is a Village Corporation established pursuant to the Alaska Native Claims Settlement Act. KIC is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

503357\285\1747246

# TABLE OF CONTENTS

**RULE 26.1(a) DISCLOSURE STATEMENT** ......................................1

**TABLE OF CONTENTS** ..........................................................3

**TABLE OF AUTHORITIES** ....................................................4

**STATEMENT OF JURISDICTION**.............................................5

**STATEMENT OF ISSUES** ......................................................7

**STATEMENT REGARDING ADDENDUM**.................................8

**STATEMENT OF THE CASE**..................................................8

  **A. Congress opens part of ANWR to oil and gas production and directs DOI to create an oil and gas program for the Coastal Plain.** .........................8

  **B. Appellants Challenge the Lease Suspension and the Moratorium.** .........13

  **C. Post-judgement proceedings and subsequent DOI actions.** .....................15

**SUMMARY OF ARGUMENT** ..................................................19

**STANDARD OF REVIEW** ......................................................24

**ARGUMENT** ........................................................................25

  **A. This Court should grant Plaintiffs' motion to hold the appeal in abeyance and temporarily stay these proceedings.**..........................................25

  **B. DOI and the District Court erred in concluding the EIS's downstream GHG emissions analysis justified the moratorium and lease suspension.**......30

  **C. Tax Act § 20001(b) incorporates into the ANWR Program a statute requiring DOI to act "expeditious[ly]."** .........................................41

**CONCLUSION**......................................................................50

**CERTIFICATE OF COMPLIANCE** .........................................53

**CERTIFICATE OF SERVICE** ................................................54

**STATUTORY ADDENDUM**.....................................separate PDF

503357\285\1747246

## TABLE OF AUTHORITIES

**Cases**

*Alaska Indus. Dev. & Exp. Auth. v. Biden*, 685 F. Supp. 3d 813 (D. Alaska 2023) 14

*Alaska Wilderness League v. Jewell*, 788 F.3d 1212 (9th Cir. 2015).......... 37, 38, 39

*Califano v. Sanders*, 430 U.S. 99 (1977) .................................................................5

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020)....... passim

*Dept. of Transp. v. Public Citizen*, 541 U.S. 752 (2004)................................. passim

*Gen. Motors v. United States*, 496 U.S. 530 (1990) ......................................... 47, 48

*In re Natural Res. Def. Council, Inc.*, 956 F.3d 1134 (9th Cir. 2020)......... 42, 44, 49

*In re PG&E Co. Securities Litigation*, 100 F.4th 1076 (9th Cir. 2024) .................29

*Independence Mining Co. v. Babbitt,* 105 F.3d 502 (9th Cir. 1997) .......................47

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)..........47

*Landis v. North American Co.,* 299 U.S. 248 (1936) .............................................26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..............................................................................................................24

*Nw. Env't Advocs. v. U.S. Env't Prot. Agency,* 537 F.3d 1006 (9th Cir. 2008) .......25

*San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014)...24

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739 (D. Alaska 2021)............................................................................... 30, 35, 36

*Telecommunications Research and Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ....................................................................................................................42

*Warren v. U.S. Parole Commission*, 2023 WL 5348825 (9th Cir. Aug. 21, 2023)..47

**Other Authorities**

Daniel T. Shedd (Congressional Research Service), Administrative Agencies and Claims of Unreasonable Delay: Analysis of Court Treatment at 4-7 (March, 2013) ....................................................................................................................42

## STATEMENT OF JURISDICTION

Plaintiff-Appellants Alaska Industrial Development and Export Authority ("AIDEA"), North Slope Borough ("NSB"), Arctic Slope Regional Corporation ("ASRC"), and Kaktovik Iñupiat Corporation ("KIC") (hereafter collectively referred to as "Plaintiffs") filed suit challenging the actions taken by the Department of the Interior ("DOI") to implement a moratorium halting any action arising under or relating to the oil and gas leasing program on the Arctic National Wildlife Refuge's Coastal Plain ("the Program"), and suspending all oil and gas leases issued by DOI under the Program. Appellants assert that the lease suspension and moratorium contravened the Tax Act, a federal statute mandating that DOI issues leases and administer this non-discretionary Program.[1] Plaintiff-Appellants challenged DOI's decision-making and agency actions as arbitrary, capricious, and otherwise not in accordance with law under the Administrative Procedure Act. 5 U.S.C. § 706. The District Court had subject matter jurisdiction under 28 U.S.C. § 1331.[2]

This Court has jurisdiction under 28 U.S.C. § 1291. The District Court issued a final order and Judgment on the parties' competing motions for summary judgment on August 7, 2023 (ECF Nos. 72 and 73, ER-29 through -104).

---

[1]   Pub. Law No. 115-97, § 20001 ("Tax Act").

[2]   *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

5

Subsequently, in accordance with Fed.R.Civ.P. 59(e) and 60, Plaintiffs filed a Motion to Alter or Amend the Court's Order re Motions for Summary Judgment on September 5, 2023 (ECF No. 76) and a Motion for Relief from Final Judgment on October 17, 2023 (ECF No. 84). The District Court issued a final order denying both post-judgment motions on February 22, 2024 (ECF No. 97, ER-3 through -21). Pursuant to Fed.R.App.P. 4(a)(4)(A), the parties' window to appeal began to run on that date with the order disposing of Plaintiffs' timely filed motion to alter or amend.[3] Plaintiffs filed their notice of appeal on April 15, 2024, 53 days after the District Court's final order, within the 60-days Fed.R.App.P. 4(a)(1)(B) provides for appeals involving federal agencies (ECF No. 98, ER-176 through -178).

---

[3]   Fed.R.Civ.P. 59(e) provides that a motion to alter or amend a judgment must be filed within 28-days of the judgment. That deadline fell on September 4, 2023, Labor Day. Because the Court was closed for the legal holiday, the deadline ran through the follow day, September 5, 2023. Fed.R.Civ.P. 6(a)(1)(C).

503357\285\1747246

## STATEMENT OF ISSUES

(1)    Did the District Court err in concluding DOI's identification of a "potential legal defect" regarding downstream, foreign greenhouse gas emissions in its Environmental Impact Statement ("EIS") for the Coastal Plain oil and gas program ("the Program") was reasonable grounds for DOI's change in position on the legality of the Program and its leases, specifically its adoption of the moratorium and its suspension of Appellant AIDEA's leases?

(2)    Does DOI's suspension of AIDEA's lease agreements and the continuing moratorium prohibiting the agency from taking actions related to the Program contravene and unduly delay the agency's statutory duty to establish, administer, and manage a competitive oil and gas leasing program on the Coastal Plain as is required by Section 20001 of Pub. L. No. 115-97?

(3)    Should the Court defer consideration of these lease suspension and moratorium issues, as Plaintiff-Appellants request in their accompanying Motion to Hold Appeal in Abeyance, due to (a) DOI's subsequent cancellation of the suspended leases, which is being challenged in a related fully-briefed action which will determine if the suspension issue is moot, and (b) the expected (but not certain) expiration of the moratorium by December, 2024? The Motion to Hold Appeal in Abeyance requests that the

Court hold this appeal in abeyance through February 28, 2025 to see if the lease cancellation is overturned and the leases are put back into suspended status, and to see if the moratorium expires in December, 2024.

## STATEMENT REGARDING ADDENDUM

An addendum reproducing relevant statutes, regulations, and other authorities is attached at the end of this brief.

## STATEMENT OF THE CASE

**A.** **Congress opens part of ANWR to oil and gas production and directs DOI to create an oil and gas program for the Coastal Plain.**

On December 22, 2017 Congress passed Pub. L. No. 115-97, the Tax Cuts and Jobs Act ("Tax Act"). Section 20001 requires the establishment of the oil and gas Program in the Coastal Plain of Arctic National Wildlife Refuge ("ANWR").

ANWR was established in 1980 by the Alaska National Interest Lands Conservation Act ("ANILCA") and spans approximately 19.3 million acres in northeast Alaska. Pub. L. No. 96-487, § 303(2). Of those lands constituting ANWR, ANILCA § 1002 set aside 1.56 million acres in the refuge's Coastal Plain for potential future oil and gas development. Section 1002 further directed DOI to complete a scientific study analyzing the affects that oil and gas exploration, development, and production would have on the region's wildlife, habitats, and people. DOI completed that review in the 1980s and recommended that Congress make the entire ANWR Coastal Plain available for oil and gas drilling. ER-164.

However, ANILCA § 1003 left the decision to open ANWR in the hands of Congress, prohibiting any leasing, development, or production of oil and gas within ANWR until such conduct is authorized by an act of Congress. About thirty years after DOI recommended doing so, Congress in the 2017 Tax Act lifted ANILCA's §1003 restriction and added to ANILCA a new statutory purpose for ANWR: "to provide for an oil and gas program on the Coastal Plain." § 20001(b)(2)(B). Congress directed DOI to "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." § 20001(b)(2)(A).

Congress in a series of non-discretionary "shall" commands directed that: (1) DOI conduct at least two lease sales for the Program, with the first occurring no later than December 22, 2021 and the second no later than December 22, 2024; (2) that each sale offer for lease at least 400,000 acres of Coastal Plain lands; (3) that those lands be the lands with the highest potential for hydrocarbon discovery; (4) that DOI "…shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section"; and (5) that DOI "…shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities…." for oil and gas. § 20001(c).

DOI during the Trump Administration established the Program in conformity with these directives. The agency issued a draft environmental impact statement in December 2018 and its final Environmental Impact Statement ("FEIS") in September, 2019. In accordance with National Environmental Policy Act ("NEPA") requirements, the FEIS extensively reviewed four alternatives for implementing the Program. DOI considered environmental and subsistence impacts for each alternative and wrote over 2,000 pages responding to 1.8 million public comments. ER-162. DOI noted that the FEIS was limited to evaluating what lands the agency will offer for lease and what terms and conditions that will apply to the leases and related oil and gas activities. ER-172. The FEIS does not authorize any "on-the-ground actions" such as exploration and development; those actions require site-specific NEPA analysis, under which DOI may place additional terms and conditions restricting such activities. ER-172.

In August 2020, DOI issued its final Record of Decision ("ROD") finalizing the Program's structure. ER-159. Following its adoption of the ROD, DOI initiated the first of the two required lease sales, publishing notice in the Federal Register on December 7, 2020 and inviting interested parties to submit bids for Coastal Plains leases through December 31, 2020. 85 Fed. Reg. 78865, ER-157. Appellant AIDEA submitted bids for multiple tracts offered for lease. The sale concluded on January 6, with DOI announcing that AIDEA was the high bidder on multiple

503357\285\1747246

tracts. A week later, on January 13, 2021, AIDEA and DOI finalized 10-year, renewable lease agreements covering 365,755 acres of the Coastal Plain. ER-120 through ER-149.

DOI under the Biden Administration then took several steps that forestall implementation of the Program. On his first day in office, President Biden issued an Executive Order directing the Secretary of the Interior to establish a moratorium halting the Program and to conduct a supplemental environmental review to address "alleged legal deficiencies."[4] In accordance with that order, on June 1, 2021, DOI Secretary Haaland issued Secretarial Order 3401 imposing a moratorium on the Program. ER-109 through -110. Secretary Haaland stated the ROD contained "multiple legal deficiencies" such as: 1) insufficient analysis of the Program under NEPA, including a failure to consider a reasonable range of alternatives; and 2) that the ROD misinterpreted § 20001 of the Tax Act. While DOI conducted its supplemental NEPA analysis of these alleged defects, the moratorium ordered that the agency "…shall not take any action to authorize any aspect of the Program, including, but not limited to, any leasing, exploration, development, production, or transportation, and shall not process any pending or future applications for such activities." ER-110.

---

[4]   Executive Order 13990, 86 Fed. Reg. 7039, ER-111 through -117.

The same day it established the moratorium, DOI sent AIDEA a notice of Suspension of Operations and Production, stating that effective immediately AIDEA's leases, and all operations or production arising from those leases, are suspended. ER-107 through -108. The notice reiterated the same asserted "defects" in the ROD and identified other "potential legal defects" such as the EIS's consideration of greenhouse gas emissions ("GHG").[5] ER-108. The notice, however, did not cancel the leases. Instead, it provided that DOI would issue a new decision either reaffirming, voiding, or continuing the leases with additional mitigation measures upon completion of a supplemental environmental review. ER-107. All leaseholders except Appellant AIDEA saw which way the winds were blowing and voluntarily surrendered their leases.[6]

Relying on the lease suspension and the moratorium, DOI declined to process applications submitted by Appellant AIDEA and Appellant KIC for preliminary survey work authorizations related to the Program. DOI further denied requests for pre-application meetings seeking to discuss preliminary, non-ground-disturbing, activities such as cultural, archeological, and seismic surveys. ER 105,

---

[5]    Just over a year later, in August 2022, DOI sent AIDEA an addendum to the suspension notice stating that the agency now identifies the 2020 ROD's exclusion of GHG emissions as an "additional specific legal defect." ER-107 through -108.

[6]    In the first lease sale DOI also awarded leases to two other entities, Knik Arm Services and Regenerate Alaska, Inc. These entities voluntarily terminated their leases after DOI imposed the moratorium and suspended the agreements.

12

ER-118 through 119, and ER-154.  DOI's refusal to consider applications for preliminary work extended not only to the DOI lands within ANWR leased by AIDEA, but also included a refusal to process applications KIC had earlier submitted seeking authorization for survey work over areas that included lands where KIC owned the surface.[7] ER-105, ER-155 through -156. Thus, the moratorium and lease suspension halted any actions aimed at further developing the oil and gas program that the Tax Act required DOI to implement.

**B.**     **Appellants Challenge the Lease Suspension and the Moratorium.**

Faced with the total cessation of work or development under AIDEA's leases or related to the Program as a whole, AIDEA, KIC, ASRC, and NSB filed suit as co-plaintiffs challenging the continuing moratorium and lease suspension in the U.S. District Court for the District of Alaska on November 4, 2021.[8] These Plaintiffs contended that the lease suspension and moratorium exceeded DOI's statutory authority and were contrary to law, i.e., the non-discretionary directives in the Tax Act requiring DOI to implement the Program. Plaintiffs challenged both DOI's actions (lease suspension and the moratorium) and inactions (refusal to process Program-related applications) under the Administrative Procedure Act, 5

---

[7]   The moratorium also discouraged business partners from working with KIC, which was an additional barrier.

[8]   The State of Alaska joined as an Intervenor-Plaintiff in the proceedings before the District Court. The State is not participating in this appeal.

503357\285\1747246

U.S.C. §706(1) and (2). The parties briefed the case on cross-motions for summary

judgment.[9]

The District Court issued its order on August 7, 2023, ruling in favor of DOI

("Summary Judgment Order").[10] The District Court recognized that the Tax Act

imposed non-discretionary duties on the agency, but concluded DOI had discretion

over the timing and pace in how it implemented those actions aside from the two

mandatory lease sales, which must occur no later than December 22, 2021 and

December 22, 2024. Summary Judgment Order, ER-40 through ER-42. Because

DOI had not failed to comply with an express deadline in the Tax Act, the District

Court held the moratorium and suspension neither conflicted with the statute nor

unreasonably delayed required agency action. Summary Judgment Order, ER-46,

ER-101. In reaching this decision, the court emphasized that DOI had not

cancelled AIDEA's leases or permanently ceased the Program, characterizing the

---

[9]  In addition to the Federal Defendants, two coalitions of environmental
organizations and native villages and tribes participated as Intervenor-Defendants:
the Gwichin' Steering Committee, et al and the Native Village of Venetie, et al.
These groups previously filed suit challenging the Final EIS and ROD for the
Coastal Plain Program. *Gwich'in Steering Comm. v. Bernhardt*, 3:20-cv-204 (D.
Alaska, filed Aug. 24, 2020); *Native Village of Venetie Tribal Gov't v. Bernhardt*,
3:20-cv-223 (D. Alaska filed Sept. 9, 2020). That litigation is currently stayed
pending completion of DOI's supplemental environmental review.

[10]  District Court ECF 72, published as *Alaska Indus. Dev. & Exp. Auth. v. Biden*,
685 F. Supp. 3d 813 (D. Alaska 2023) ("Summary Judgment Order"). ER-29
through ER-102.

moratorium as only a "temporary pause" rather than an indefinite delay. Summary Judgment Order, ER-46. Finally, the District Court held that DOI's newfound concerns regarding the legal sufficiency of its prior environmental review process justified issuing the moratorium and suspending AIDEA's leases to halt the Program while conducting the supplemental review. Summary Judgment Order ER-87 and -91.

**C.**   <u>**Post-judgement proceedings and subsequent DOI actions.**</u>

On September 5, 2023 Plaintiffs filed a motion to alter or amend the court's order seeking a revision that would uphold the court's ruling, but allow the parties limited relief to proceed with necessary, pre-development, non-ground-disturbing activities such as archeological and cultural surveys (ECF No. 76). However, the very next day, just thirty days after the Court's order, DOI permanently cancelled AIDEA's leases – the same leases whose earlier suspension is challenged in this appeal. ER-22 through ER-28. DOI's cancellation of the leases by administrative order was described as "final" and "not subject to appeal" and came prior to the agency completing its promised NEPA review.[11]  ER-22 through -28. Appellants' accompanying Motion to Hold Appeal in Abeyance further addresses this matter.

---

[11]   AIDEA has also filed a separate lawsuit challenging DOI's cancellation decision as unlawfully depriving AIDEA of due process and violating the Tax Act, *AIDEA v. U.S. Dep't of Int. et al*, 3:24-cv-00051-SLG. This matter is fully briefed on cross-motions for summary judgment and pending before the U.S. District Court for the District of Alaska.

The lease cancellation prompted justiciability concerns with regard to this case challenging the lease suspension and moratorium. In response to the cancellation of the previously suspended leases, Plaintiffs filed a motion under Fed.R.Civ.P. 60(e) requesting relief from judgment because DOI's subsequent actions rendered the litigation moot (ECF No. 84). By cancelling AIDEA's lease agreements DOI terminated every lease that had been issued in the first sale and, in Plaintiffs' view, removed the District Court's ability to grant the requested relief.

The District Court disagreed, denying both motions for post-judgment relief on February 22, 2024 (ECF No. 97, ER-3 through -21). The court concluded that the litigation was not entirely moot, because Plaintiff AIDEA could prevail in its new suit challenging lease cancellation, potentially leading to the reinstatement of its leases before the expiration of the moratorium. In other words, if the related case results in the lease cancellation being set aside, and the leases coming back to life in suspended status, the lease suspension and the moratorium could resume their relevance to AIDEA. ER-16. The Court also held that Plaintiff KIC could still obtain some relief despite the cancellation of AIDEA's leases, because an order lifting the moratorium would remove a legal barrier that has prevented DOI from considering KIC's application to conduct seismic surveys on its owned corporate lands. ER-17. There are other practical barriers resulting from the moratorium – it discourages business partners. However, the District Court determined that it was

the moratorium, and not the cancellation of AIDEA's leases, that was the legal impediment to KIC seeking permission from DOI for surveys concerning KIC's own land within ANWR. Er-17.

Meanwhile, DOI continued the supplemental NEPA review it had begun after suspending the leases and imposing the moratorium in June, 2021. DOI issued a Draft Supplemental Environmental Impact Statement ("SEIS") on September 6, 2023, the same day it cancelled AIDEA's leases.[12] DOI relied on the content of the Draft SEIS in justifying upgrading its lease suspension to lease cancelation, but the timing of these decisions meant that it cancelled AIDEA's leases before AIDEA had an opportunity to comment on either the Draft SEIS.[13] The comment period for the SEIS opened contemporaneously with DOI's cancellation decision. At the time Plaintiffs filed their notice of appeal, DOI's most recent status report anticipated publishing a final SEIS and new ROD for the Program in the second and third quarter of 2024.[14] Recognizing the effects that

---

[12]    ECF No. 126, Defendants' Status Report on Issuance of Draft Supplemental Environmental Impact Statement, Sep. 9, 2023, 3:20-cv-00224-SLG. (Please note, this and subsequent referenced status reports are filings in the separate, stayed litigation brought by Intervenor-Defendant-Appellees challenging the legality of the Program.)

[13]    ER-25 through -27. This procedural issue (lack of opportunity to comment, failure to provide due process before cancellation of leases) is part of the related lease cancellation case pending before the District Court.

[14]    DE 133, Defendants' Status Report on Issuance of Final Supplemental Environmental Impact Statement, Mar. 29, 2024, 3:20-cv-00224-SLG.

503357\285\1747246

completion of the SEIS process would have on this appeal, the parties agreed to extend the initial appellate briefing scheduled past the anticipated publication date of the SEIS. However, when DOI filed a new status report on June 28, 2024 indicating that both the SEIS and ROD would now be published in the third quarter this year,[15] the parties could not reach agreement on a further extension for the briefing schedule in this appeal.

Most recently, on September 30, 2024, DOI filed a Status Report in the District Court stating that the final SEIS and ROD will be published in the fourth quarter of 2024, "with sufficient time for compliance with deadlines in Section 20001 of the 2017 Tax Cuts and Jobs Act."[16] The deadline referred to in § 20001 of the Tax Act, is the requirement that DOI must hold a second lease sale by no later than December 22, 2024. Thus, through its most recent court filings DOI represents that the supplemental environmental review will be completed and the moratorium resolved within the next two months. In short, the lease suspension challenged in this appeal has for now been superseded by DOI's lease cancellation, which is contested in AIDEA's related case, and the moratorium challenged in this

---

[15]    DE 136, June 28, 2024 Status Report on Issuance of Final SEIS, 3:20-cv-00224-SLG.

[16]    DE 138, September 30, 2024 Status Report on Issuance of Final SEIS, 3:20-cv-00224-SLG.

appeal should expire in the next nine weeks, when DOI's holding of the second lease required by the Tax Act restarts the ANWR oil and gas program.

## SUMMARY OF ARGUMENT

As discussed in the accompanying Motion to Hold Appeal in Abeyance (and also discussed in Main Argument Point A below), this Court should hold this appeal in abeyance through February 28, 2025 to see if (1) the moratorium challenged in this appeal expires as expected by the end of December, 2024 and (2) if Appellant AIDEA succeeds in overturning the lease cancellation decision in its related case, which could put the leases back into effect in suspended status, making the lease suspension challenged in this appeal relevant again. These events will materially alter the scope of the appeal.

Briefing will be more informative and helpful to the Court after we know this information. Further, if the moratorium expires, it will no longer need to be briefed. If AIDEA prevails in the lease cancellation case and DOI puts the leases back into active rather than suspended status due to the expiration of the moratorium, then this entire appeal (including lease suspension) will be moot. Temporarily staying these appellate proceedings will allow the parties and the Court to most efficiently address the legal issues that remain relevant after these events, without imposing prejudice on any party.

503357\285\1747246

In the event that this Court denies Plaintiffs' motion to hold the appeal in abeyance, the appeal is justiciable, as the District Court ruled in denying the post-judgment motion to vacate the judgment as moot. ER-16 through -18. The Court may still be in a position to provide some prospective relief to Appellants while the parties await the developments discussed above (the expected expiration of the moratorium and the outcome of the lease cancellation case). More specifically, if Appellants establish error on the part of DOI in issuing the lease suspension and moratorium, which has halted all action in this statutorily-mandated oil and gas program for several years, the Court can direct that, if Appellant AIDEA prevails in the related lease cancellation case, then the leases go back into effect in active rather than suspended status. Further, this Court could direct that DOI (a) cease its refusal to consider Appellant KIC's earlier application for permission to conduct surveys within ANWR,[17] and (b) cease its refusal to consider Appellant AIDEA's and Appellant KIC's applications for permission to conduct surveys on the land DOI previously leased to AIDEA, if the lease cancelation is overturned in the related case. While this limited relief is mostly contingent on the outcome of the related lease cancellation case, Appellants submit this opening brief now because

---

[17]    KIC would still face significant obstacles attracting business partners.

Appellee DOI declined to consent to a briefing schedule extension and it is unknown whether the Court will stay this appeal.[18] [19]

The District Court erred in concluding that concerns over the Program's NEPA compliance warranted lease suspension due to the similarities between the downstream greenhouse gas ("GHG") analysis in this case and the analysis the Ninth Circuit considered in its holding in *Center for Biological Diversity v. Bernhardt*.[20] In *Bernhardt*, due to the agency's failure to consider downstream GHG emissions in the NEPA analysis concerning whether to issues oil and gas leases under a discretionary leasing statute, the Ninth Circuit invalidated the approval of an offshore drilling facility. But unlike the Outer Continental Shelf Lands Act ("OCSLA"), which was the discretionary leasing statute at issue in *Bernhardt*, the Tax Act established a non-discretionary leasing regime for the ANWR Coastal Plain requiring DOI to hold two lease sales, issue necessary rights-of-way, and otherwise administer a mandatory drilling program. Under Supreme

---

[18]    *See* Plaintiffs' Motion to Hold Appeal in Abeyance, pages 1-2 for an update on Appellee DOI's position on deferring proceedings in this appeal.

[19]    Appellants will likely need to seek leave from the Court to update this opening brief after the upcoming events in the fall of 2024, including a decision in the lease cancellation case and the December, 2024 lease sale, have occurred. One advantage of staying these proceedings is that, if a stay is granted, then only this opening brief will need to be updated, as the rest of the briefing will be deferred.

[20]    *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020); Summary Judgment Order, ER-86 through -87; Addendum to Suspension Notice ER-107 through -108.

Court precedent, NEPA does not apply to statutorily mandated, non-discretionary actions an agency cannot refuse to perform. *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 767-69 (2004). Because Congress in the Tax Act commanded DOI to hold the lease sale and issue the resulting leases, DOI could not refuse to take such actions even if it had concerns over downstream GHG effects. Thus, DOI erred in suspending AIDEA's leases due to the alleged lack of adequate downstream GHG analysis in the documents establishing the leasing program, and the District Court erred in affirming the suspension.

Notably, the suspension and moratorium were not directed at concerns with Program implementation details that the Tax Act left to DOI's discretion, and thus were not subject to NEPA analysis requirements. Justifying the suspension and moratorium on the basis of downstream greenhouse gas concerns went to the yes / no question of whether to issue leases and have a Program at all. Those questions the Tax Act definitively answered with a "yes," including requiring that DOI conduct lease sales and issues rights of way and easements. Tax Act § 20001(c).[21]

---

[21]   This point is even more clearly presented in the related lease cancellation case, which concerns in large part whether downstream greenhouse gas analysis could ever justify a decision by DOI to not issues, despite the Tax Act's command to conduct lease sales. If DOI was bound by statute to issue the leases, then it could not claim to have violated NEPA through issuing the leases. Cancellation of the leases is the undoing of their issuance. An advantage of granting the requested stay of appellate proceedings is allowing the lease cancellation case now pending (but fully-briefed) in the District Court to "catch up" with this appeal of lease

The District Court also erred in concluding that the moratorium and suspension did not contravene the Tax Act or unreasonably delay actions the agency was required to take in administering and managing the program. Inherent to the Tax Act's command that the agency shall establish and administer a competitive oil and gas program and conduct sales is the subsidiary directive that DOI must act to process the applications and approvals necessary to develop the leased lands. The moratorium has remained in place for over three years now, almost twice as long as the agency's original prediction.[22] Tax Act § 20001(b) borrows for the ANWR leasing program the statutory and regulatory structure of the leasing program in the nearby National Petroleum Reserve Alaska ("NPRA"). The NPRA structure requires DOI to administer the leasing program (not just part of the leasing program") in an "expeditious" manner. In finding that DOI had not engaged in unreasonable delay, the District Court placed too much emphasis on the lack of a specific statutory deadline to process Appellant AIDEA's and Appellant

---

suspension and moratorium issues, so that both cases with such closely related issues can be briefed together in the Court of Appeals.

[22]    86 Fed. Reg. 41989, ER-150 (Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program, Alaska). DOI originally expected to complete the draft SEIS by no later than May, 2022 and to complete the entirety of its supplemental review by March, 2023, an 18-month process.

503357\285\1747246

KIC's applications to conduct preliminary surveys, and did not fairly apply those other indications that Congress expected the agency to act promptly.

## **STANDARD OF REVIEW**

This Court reviews a district court's summary judgment ruling de novo. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 991 (9th Cir. 2014). Likewise, this Court also reviews de novo a district court's judicial review of agency actions, without deference to the district court's ruling. *Id*. Both the district court and court of appeals function as appellate courts in judicial review cases.

Pursuant to § 706 of the Administrative Procedure Act, Courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," taken "in excess of statutory jurisdiction, authority, or limitation, or statutory right," "made without observance of procedure required by law" or actions otherwise unsupported by evidence or the facts. 5 U.S.C. § 706(2). Agency action is arbitrary and capricious if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Whether an agency action is made in accordance with law is a

matter of statutory interpretation where this Court evaluates if the agency's action "conflict[s] with the language of a statute." *Nw. Env't Advocs. v. U.S. Env't Prot. Agency,* 537 F.3d 1006, 1014 (9th Cir. 2008).

## ARGUMENT

### A.     This Court should grant Plaintiffs' motion to hold the appeal in abeyance and temporarily stay these proceedings.

Over the next few weeks, and by no later than December 22, 2024, impending events will transpire materially altering the status of this appeal, both from a justiciability standpoint and a merits standpoint. These developments will clarify the scope of the issues before this Court and could potentially fully resolve this matter. In anticipation of these changes, which will arise either mid-briefing or immediately after briefing concludes, Plaintiffs have filed a motion requesting the Court hold these appellate proceedings in abeyance through February, 2025.[23] The Court should grant that request. If in February, 2025 the appeal has not become moot and Appellants wish to proceed, the Court should grant Appellants leave to re-file their opening brief so that they can account for the events that will be occurring between now and the end of 2024.

The Court has both discretion and authority to stay these appellate proceedings to allow the pending proceedings before the District Court and DOI to

---

[23]    Appellants' Motion to Hold Appellate Proceedings in Abeyance, filed Oct. 16, 2024.

503357\285\1747246

resolve because those actions will bear upon this case. *Landis v. North American Co.,* 299 U.S. 248, 254-55 (1936).[24] A short stay of the appeal will allow the parties to more effectively and efficiently brief the remaining issues before the Court. Plaintiffs urge the Court to review its accompanying motion for more in-depth discussion of the facts and the legal authorities that support holding the appeal in abeyance, but include a brief summation of the grounds justifying a temporary stay below. The Court should first resolve this request to stay appellate proceedings before considering the underlying merits of the appeal.

First, DOI represents that it will release its final SEIS and new ROD for the Coastal Plain Program within the next few weeks, early enough to give the agency sufficient time to comply with the statutory deadlines set forth in Tax Act § 20001, i.e., completing the Program's second lease sale by December 22, 2024.[25] DOI issued the moratorium and suspended AIDEA's leases largely to give DOI time to complete its supplemental review.[26] DOI's new ROD is intended to resolve the alleged deficiencies the agency previously identified, thus removing any

---

[24]   *See* Appellants' Motion to Hold Appellate Proceedings in Abeyance, pp 8-11.

[25]   ECF No. 138 September 30, 2024 Status Report on Issuance of Final SEIS, 3:20-cv-00224-SLG.

[26]   ER-109, "While that analysis is pending, I direct a temporary halt on all Department activities related to the Program." Notice of Lease Suspension, ER-152, "…the Department has concluded that it is necessary to suspend the above-referenced lease(s) and complete further environmental analysis under NEPA."

justification or purported need for continuing the moratorium after its release.

Further, because the moratorium halts <u>any</u> agency actions relating to the Program,

DOI must lift the moratorium before it can proceed in conducting the second lease

sale. ER-109. As a result, assuming that DOI meets its statutory deadline (and the

agency continues to represent that it will), the issues pertaining to the moratorium

will become moot by December 22, 2024 at the latest.

Alternatively, if DOI unexpectedly misses this upcoming deadline for the

second lease sale and the moratorium remains in place, this too would be a new

factual development materially affecting this appeal. The District Court upheld

DOI's actions stressing that the agency's moratorium and lease suspension orders

created only a "temporary pause…[that] does not violate any express deadlines in

any statute." Summary Judgment Order, ER-46. The District Court further

elaborated that "Agency Defendants have [] evidenced an intent to continue

implementing the Program…and there is no indication that they have deviated or

plan to deviate significantly from their stated plan." Summary Judgment Order,

ER-45 through -46. Failing to complete the second lease sale by the December 22nd

deadline would violate an express deadline in the Tax Act, completely up-ending

the District Court's analysis. Therefore, regardless of the outcome, the actions DOI

takes leading up the mid-December deadline for the second lease sale will

substantively affect this appeal.

Second, the related litigation challenging DOI's cancellation of AIDEA's leases is fully briefed and the parties have requested a decision by October 25, 2024 to provide clarity in how the lands leased to AIDEA should be treated in DOI's second lease sale. Appellant AIDEA expects that the District Court will endeavor to rule in advance of the second lease sale given the public interest in avoiding confusion in the second sale. In the meanwhile, there is little sense in asking this Court to decide the legal challenge to DOI's suspension order before the District Court rules on the validity of the subsequent cancellation decision. The District Court's impending ruling will either: 1) restore the leases, reviving the significance of AIDEA's arguments challenging the suspension order in this appeal; or 2) uphold the cancellation decision, in which case lease suspension will remain irrelevant unless AIDEA prevails in an appeal with this Court reversing the cancellation decision. Addressing the suspension order now, before determining if the leases will be reinstated, places the cart before the horse.

Staying the appeal until after the District Court's decision in the lease cancellation case will also provide another benefit in presenting a more developed record on issues only provisionally addressed in the lease suspension and moratorium suit. For example, a legal issue present in both this case and the lease cancellation litigation is DOI's assertion that the prior administration misinterpreted the Tax Act's statutory language authorizing development on "up to

28

2,000 surface acres." In these underlying proceedings, the District Court concluded that differing statutory interpretations provide grounds justifying the moratorium and suspending AIDEA's leases, but without ruling on which statutory interpretation is proper. Summary Judgment Order, ER-91 through -95, n. 259. But in the lease cancellation case, the District Court will need to address whether the prior administration in fact erred, thus providing a definitive ruling on the "correct" statutory interpretation. If the District Court concludes that DOI under the Trump administration properly interpreted the Tax Act, that decision will eliminate a justification for the continuing moratorium and suspension order.[27]

These developments will almost certainly occur prior to when this Court could issue its ruling. The briefing schedule currently concludes on December 6, 2024 and oral argument would not occur until 2025. As is, the parties must brief the Court addressing hypothetical future actions or the Court will need to decide the appeal based on briefing that addresses an outdated set of facts. Holding this appeal in abeyance promotes efficiency for the Court and parties.[28] A temporary stay through February, 2025 will eliminate these uncertainties and the confusion that accompanies briefing a set of facts that are known to be changing. And

---

[27]  *See* Appellants' Motion to Hold Appellate Proceedings in Abeyance, pp. 14-18.

[28]  *In re PG&E Co. Securities Litigation*, 100 F.4th 1076, 1086 (9th Cir. 2024); *See* Appellants' Motion to Hold Appellate Proceedings in Abeyance, pp. 9-12.

29

significantly, a stay will not prejudice any party. Plaintiffs do not ask the Court to set aside the District Court's ruling upholding the moratorium during the requested stay. The effect of Plaintiffs' request, then, is to continue the current status quo, which is favorable to the other parties in this appeal who prevailed in the proceedings before the District Court. As such, the Plaintiffs ask the Court to grant their accompanying motion to stay these proceedings through February 28, 2025 and allow the parties to reinitiate briefing, if necessary, at that time.

**B.    DOI and the District Court erred in concluding the EIS's downstream GHG emissions analysis justified the moratorium and lease suspension.**

The allegedly "deficient" treatment of downstream GHG emissions by DOI in the Program's 2020 NEPA analysis does not support DOI's June, 2021 decision to impose the moratorium or suspend AIDEA's leases.[29] Citing this Court's decision in *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) and the District Court's ruling in *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739 (D. Alaska 2021), DOI concluded that by omitting consideration of downstream GHG emissions and foreign oil consumption from the ROD and EIS for the Coastal Plain Program, the prior administration failed to comply with NEPA. ER-107 through -108. But Congress

---

[29]    Downstream GHG emissions refers to the emissions that will arise from the production of oil and gas due to the Program, either the direct consumption of that fuel or indirectly through market changes resulting from this production. *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 735 (9th Cir. 2020).

issued directives requiring DOI to conduct leases sales on the Coastal Plain, requiring the agency to offer for lease the lands with the highest potential to contain oil and gas reserves, and requiring DOI to issue any rights-of-way and easements necessary for development of the leases issued in those sales. Tax Act § 20001(c). These non-discretionary duties are not subject to NEPA, thus the alleged NEPA deficiencies due to downstream GHG emissions arising from these actions are immaterial.

NEPA does not apply to every agency action. In *Dep't of Transp. v. Public Citizen*, the U.S. Supreme Court addressed when agencies must conduct NEPA analyses. 541 U.S. 752, (2004). The Supreme Court concluded that to trigger NEPA review, the environmental consequences must have a "reasonably close causal relationship" between the environmental effects in question and the agency's decision making. *Public Citizen* 541 U.S. at 767. Such a causal connection does not exist when the agency has no authority or discretion to decline to take the agency action being considered. *Id.* at 770 ("We hold that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect."). The Supreme Court noted this approach is consistent with the "rule of reason" inherent to NEPA, where it serves no purpose to require environmental review if the agency cannot use that review to inform its

decision-making. *Id.* at 767-769 ("It would not, therefore, satisfy NEPA's 'rule of reason' to require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform.").

Following the Supreme Court's *Public Citizen* ruling, Congress amended NEPA through Pub. L. No. 118-5 § 321 incorporating into NEPA's text the distinction between "discretionary" and "non-discretionary" agency actions. NEPA's implementing statutes state "[a]n agency is not required to prepare an environmental document with respect to a proposed agency action if…the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action." 42 U.S.C. § 4336(a). Congress further clarified that "major federal action," the trigger for NEPA review, excludes "activities or decisions that are non-discretionary". 42 U.S.C. § 4336(e)(10); 40 C.F.R. § 1508.1(w)(2)(vii).

Because of the Tax Act's mandates in § 20001(b) and (c), DOI cannot prevent the establishment of a competitive oil and gas program, refuse to conduct the statutorily mandated lease sales and issue resulting oil and gas leases, choose to offer lands less likely to contain oil and gas reserves, or withhold approval of necessary rights-of-way and easements. Even if additional NEPA review indicates that these actions may have deleterious effects arising from increased downstream

GHG emissions, DOI's hands are tied. It must comply with Congress's statutorily

directed outcome. The District Court erred in overlooking this critical point. It

neither addressed *Public Citizen* nor considered the significance of the non-

discretionary components of the Tax Act. Instead, the District Court held:

> …conforming an agency's analysis to federal appellate decisions can
> be a 'good reason' to justify a change in position … Because the
> Ninth Circuit's holding [in *Center for Biological Diversity v
> Bernhardt*] governs the greenhouse gas analysis necessary for an oil
> and gas program to proceed in accordance with NEPA, it is reasonable
> for Agency Defendants to pause the Program to reconsider its
> underlying NEPA analysis…

Summary Judgment Order, ER-85 through -97. But the Court's determination that

DOI reasonably paused the Program to conform its analysis to the Ninth Circuit's

ruling in *Bernhardt* overlooks the pivotal first question in the analysis: does

*Bernhardt* apply to this case? It does not. The discretionary statutory scheme

analyzed in *Bernhardt* crucially distinguishes it from the Tax Act's use of non-

discretionary mandates that compel DOI to conduct lease sales and take the

ancillary actions necessary to develop the Program, altering the NEPA analysis.

    In *Bernhardt*, the Ninth Circuit evaluated challenges to the adequacy of the

NEPA review undertaken by DOI in approving a site-specific oil and gas project

proposed off the coast of Alaska on the outer continental shelf. The Ninth Circuit

concluded it was necessary for DOI to consider levels of greenhouse gas

consumption and emissions when considering a "no-action alternative" in its

503357\285\1747246

NEPA review for the oil and gas project. *Ctr. for Biological Diversity v. Bernhardt,* 982 F.3d at 737-740. The controlling statutory law in *Bernhardt* was the Outer Continental Shelf Lands Act ("OCSLA"). OCSLA conveys a permissive grant of authority to DOI, vesting the agency with authority to choose whether or not to approve new oil and gas projects and issue leases on the continental shelf. Therein lies the critical distinction. Under OCSLA, "[t]he Secretary is ***authorized*** to grant…any oil and gas lease on submerged lands of the outer Continental Shelf." 43 U.S.C. § 1337(a)(emphasis added). DOI "***may*** grant a lease, easement, or right-of-way…" 43 U.S.C. § 1337(p)(emphasis added). Thus, in *Bernhardt*, OCSLA vested DOI with discretionary authority allowing the agency to withhold approval of the oil and gas project. Because it could choose not to act, DOI was required under *Public Citizen* to conduct a full NEPA analysis regarding whether to issue the requested lease at all. The Ninth Circuit concluded such review must include consideration of downstream GHG emissions.

In contrast, the Tax Act's non-discretionary mandates removed any discretion from DOI on whether or not to implement a Coastal Plain Program or conduct the two mandatory lease sales. A side by side comparison of the statutory provisions highlights the difference in statutory construction:

| Tax Act § 20001 Oil and Gas Program | OCSLA – 43 U.S.C. § 1337 |
|---|---|
| " …the Secretary **shall** conduct not fewer than 2 lease sales area-wide under the oil and gas program." | "The Secretary **is authorized** to grant…any oil and gas lease on submerged lands of the outer Continental Shelf…" |
| "… The Secretary **shall** offer for lease under the oil and gas program under this section—(I) not fewer than 400,000 acres area-wide in each lease sale; and (II) those areas that have the highest potential for the discovery of hydrocarbons." | "The Secretary **is authorized** to grant…on a basis of competitive bidding leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf…upon such royalty, rental, and other terms and conditions as the Secretary may prescribe…" |
| "The Secretary **shall** issue any rights-of-way or easements across the Coastal Plain…necessary to carry out this section." | "The Secretary…**may** grant a lease, easement, or right-of-way on the outer Continental Shelf…" |

Under the Tax Act, DOI cannot refuse to conduct the two statutorily required lease sales and, thus, cannot avoid the resulting increase in downstream GHG emissions from those actions. No such restrictions constrained the agency's discretionary authority in *Bernhardt*.

The Tax Act's statutory structure blends a general command to establish and administer an oil and gas program with a series of specific non-discretionary actions DOI is required to take in implementing the program. DOI's reliance upon the District of Alaska's decision in *Sovereign Inupiat* as additional precedent establishing a need for downstream GHG review suffers the same flaw as *Bernhardt*.

*Sovereign Inupiat* concerned challenges to DOI's approval of the Willow Master Development Plan, a development plan submitted by ConocoPhillips seeking authorization for development of the leases DOI previously issued to it in the NPRA.[30] Like *Bernhardt*, the agency approval of the plan involved the discretionary exercise of permissive agency authority. No statute required DOI authorize the leases or approve the Master Plan. And though the *Sovereign Inupiat* court rejected the argument that a <u>contractual</u> agreement (the oil and gas lease) made approval of a Master Plan a mandatory non-discretionary agency action not subject to NEPA, this ruling does not alter the principal set forth in *Public Citizen* that a non-discretional <u>statutory</u> directive from Congress requiring particular agency action is not subject to NEPA analysis. It makes sense that an agency cannot avoid NEPA by

---

[30] The Development Plan sought broad approval for ConocoPhillips to undertake numerous projects related to the development of the lands it had leased, including the construction of five drill sites, processing facilities and operations centers, a gravel mine, a reservoir, and other infrastructure including roads, an airstrip, and boat ramps. *Sovereign Inupiat*, 555 F. Supp. 3d 739, 751 (D. Alaska 2021). These actions addressed site-specific, ground-disturbing activities, with particular environmental effects, distinct from the broader analysis in the Tax Act's EIS which addressed what lands should be offered for leasing and what terms and conditions should govern their use. Review of these specific actions necessarily involved the exercise of agency discretion and thus NEPA applied.

In the Final EIS, DOI represented that same NEPA process will apply on the Coastal Plain as the agency evaluates ground disturbing which "require further NEPA analysis based on the site-specific proposal." ER-172. Appellants have not sought permission for such ground-disturbing activities as were considered in the *Sovereign Inupiat* litigation.

36

handcuffing itself to the allegedly non-discretionary terms of a contract, when the agency had the discretion to negotiate the contract terms in the first place. But Congress can enact a statute that takes discretion away from an agency and directs the agency to take an action, in which case the agency need not conduct a NEPA analysis, because Congress pre-ordained the outcome of that analysis.

Rather than *Bernhardt* or *Sovereign Inupiat*, the Tax Act more closely parallels the statutory framework this Court analyzed in *Alaska Wilderness League v. Jewell*, 788 F.3d 1212 (9th Cir. 2015). In *Alaska Wilderness League*, plaintiffs opposing off-shore drilling sued DOI over its approval of oil spill response plans tied to off-shore leases. These response plans are governed by both OCSLA and the Clean Water Act. The statutory approval process for these projects involves a series of discretionary agency decisions subject to NEPA, but, like the Tax Act, there are also non-discretionary obligations DOI must undertake. For example, DOI "must 'promptly review' submitted [oil spill response] plans…and '***shall***…approve any plan that meets' the statutory requirements." *Alaska Wilderness League*, 788 F. 3d at 1216 (emphasis added, internal citations omitted).

Plaintiffs in *Alaska Wilderness League* claimed that approving oil spill response plans without an EIS violated NEPA. The Ninth Circuit rejected this argument, citing *Public Citizen* as precedent that NEPA does not apply to DOI's nondiscretionary review and approval of response plans:

37

…Plaintiffs' argument [is] that no authority prevents [DOI] from requiring Shell to make changes to the [response plans] in order to minimize adverse environmental effects. On the contrary, [DOI's] authority is just so constrained. The governing statute mandates that the agency "shall ... approve any plan that meets the requirements" of the statutory section. This language is similar to the statutory mandate at issue in *Public Citizen,* where the governing statute required that the [agency] "*shall* register a person to provide transportation ... as a motor carrier if [it] finds that the person is willing and able to comply with" that statute's requirements. …

The statute here similarly restricts [DOI's] discretion. [DOI] is required to approve an OSRP that meets the statute's requirements, which the agency reasonably interprets to be the checklist of six requirements…. Applying NEPA to this process, then, would merely require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform, which would clearly violate NEPA's rule of reason.

*Alaska Wilderness League*, 788 F.3d at 1225–26 (internal citations omitted). The

Tax Act operated in the same way, providing DOI with discretion to establish

various details regarding the Coastal Plain oil and gas program, but granting no

discretion as to ultimately enacting the Program: "the Secretary <u>shall</u> conduct not

fewer than 2 lease sales", "the Secretary <u>shall</u> offer for lease…not fewer than

400,000 acres area-wide in each lease sale", "the Secretary <u>shall</u> offer for

lease…those areas that have the highest potential for the discovery of

hydrocarbons", "the Secretary <u>shall</u> offer…the initial lease sale…not later than 4

years after the date of enactment of this Act", and "the Secretary <u>shall</u> issue any

rights-of-way or easements across the Coastal Plain…necessary to carry out this

section." Tax Act §20001(c) (emphasis added).

38

This Court should reach a similar determination as it did in *Alaska Wilderness League*, that these non-discretionary components of the Tax Act are not subject to NEPA review. By requiring DOI to conduct the lease sales, issue leases, and facilitate the program by granting necessary permitting approvals, Congress removed DOI's discretion to modify or restrict its implementation of the program due to GHG concerns. In mandating the creation of an active oil and gas program to develop ANWR's Coastal Plain, Congress knowingly accepted an inevitable outcome that such development will increase downstream GHG emissions.

Because the aspects of the program impacting downstream GHG emissions are non-discretionary in nature, they are not subject to NEPA. Implementing the moratorium and lease suspension order on the grounds that the agency failed to undertake additional environmental analysis it was not required to take was contrary to statute (the Tax Act) and arbitrary and capricious.

Critically, DOI did not limit the moratorium and lease suspension to those aspects of the Program such as environmental mitigation for which the agency has to engage in discretionary decision-making subject to NEPA. Instead, the agency suspended all leases and entirely halted the Program, to the point of even refusing to process AIDEA's applications and KIC's applications to conduct preliminary non-ground-disturbing *archeology* surveys. ER-105, ER-118, ER-154. In other

words, DOI did not confine the suspension and moratorium to those aspects of the Program over which it had discretion, which are the aspects subject to NEPA.

Because the analysis of downstream GHG emissions arises from non-discretionary actions DOI must take, the agency cannot justify the moratorium and lease suspension on a need for further NEPA review. Relatedly, these non-discretionary commands distinguish the Tax Act from the Court's analysis in *Bernhardt*, removing any justification of continuing the moratorium and suspension orders to conform the Program to the holdings in that case. The only other "legal defect" DOI identified in its orders implementing the moratorium and suspending AIDEA's leases is the alleged misinterpretation of the Tax Act's 2,000-surface-acre provision (§ 20001(c)(3)) and the resulting failure to consider a "reasonable range" of alternatives under NEPA. ER-109 and ER-152.  But this "error" will resolve itself with the completion of DOI's supplemental environmental review. DOI will release the new ROD and SEIS applying the current administration's interpretation of this statutory provision and analyze a range of alternatives consistent with that approach. And the agency represents this review will transpire in a matter of weeks, well in advance of this Court's ruling.[31]

---

[31]    DE 138 September 30, 2024 Status Report on Issuance of Final SEIS, 3:20-cv-00224-SLG.

The District Court affirmed that the statutory interpretation question over the 2,000-surface-acre provision justified lease suspension without deciding which interpretation of the statute is proper.[32] Because the SEIS will resolve any potential error in failing to consider a reasonable range of alternatives and because the District Court did not rule on how § 20001(c)(3) should be interpreted, by the time this appeal is fully briefed and before the Court for its decision there will not be any aspect of this "defect" left to address. At that point, the question of how to interpret the 2,000-surface-acre provision can no longer justify lease suspension and the moratorium. For these reasons, including the District Court's decision not to resolve the statutory interpretation aspect of the 2,000-surface-acre issue, Plaintiffs will not brief that statutory interpretation issue at this stage.

Thus, Plaintiffs request the Court reverse the District Court's decision and order DOI to lift the moratorium and proceed in processing applications for work under the Program.

## C.    <u>Tax Act § 20001(b) incorporates into the ANWR Program a statute requiring DOI to act "expeditious[ly]."</u>

This Court has adopted the "*TRAC* Factors" originally developed by the D.C. Circuit in order to evaluate claims that an agency has engaged in unreasonable delay, such that the reviewing court should require the agency to act

---

[32]    Summary Judgment Order, ER-91 at n. 259 ("The Court expresses no opinion in this order as to this legal issue.").

under the APA, 5 U.S.C. §§ 555(b), 706(1).[33] The APA requires agencies to decide matters "within a reasonable time," 5 U.S.C. § 555(b). The APA empowers courts to compel an agency to make a decision that the agency has unreasonably delayed making. 5 U.S.C. § 706(1). What constitutes a reasonable time varies based on the statutory context and the facts. The *TRAC* factors aid in that analysis.

The second *TRAC* factor provides that "(2) where Congress has provided a timetable ***or other indication of the speed with which it expects the agency to proceed*** in the enabling statute, that statutory scheme may supply content for this rule of reason" that governs unreasonable delay claims.[34] Factor Two is critical, and often essentially dispositive. Courts often tolerate agency delays lasting less than about four or five years, unless Factor Two calls for faster agency action.[35]

In applying *TRAC* Factor Two, the District Court erred by giving too much weight to the contrast it perceived between: (1) Tax Act provisions that directed DOI to hold lease sales by stated deadlines, and (2) Tax Act provisions that directed DOI to take various ancillary actions related to leases, including granting

---

[33]    *In re Natural Res. Def. Council, Inc*., 956 F.3d 1134, 1138-1139 (9th Cir. 2020) (citing *Telecommunications Research and Action Ctr. v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984) for the "*TRAC* factors") ("NRDC").

[34]    *NRDC*, 956 F.3d at 1138-1139 (emphasis added).

[35]    *See* Daniel T. Shedd (Congressional Research Service), Administrative Agencies and Claims of Unreasonable Delay: Analysis of Court Treatment at 4-7 (March, 2013) (available at https://sgp.fas.org/crs/misc/R43013.pdf ).

"necessary" easements and rights-of-way, but did not set specific deadlines.[36] The District Court analyzed AIDEA's and KIC's applications to conduct preliminary archeological and seismic survey using the rubric of the Tax Act's easement and right-of-way provision.[37] That provision requires DOI to grant "necessary" rights-of-way and easement, but does not impose a specific deadline for DOI to act.[38]

The District Court held that no statutory "timetable" exists to decide these applications for permissions, and thus Factor Two did not help Appellants: "Second, Congress has not provided any timetable for implementation of the Program beyond the requirements to conduct two lease sales with set periods of time, neither deadline of which Agency Defendants have violated."[39] The District Court also stated earlier in its opinion that "the agency is only required to complete the post-lease-sale components of the Program within a reasonable period of time."[40] This is true enough, but overlooks the possibility that Congress has provided some "other indication of … speed" besides a "timetable" that would

---

[36]   Summary Judgment Order, ER-47, 48, 99, and 100; Tax Act § 20001(b), (c).

[37]   Summary Judgment Order at ER-47, 48, 99, and 100. For DOI's processing of applications by AIDEA and its subcontractors, see ER-118 through -119; *see* Exhibit 4 of Plaintiffs' Motion to Hold in Abeyance.  For DOI's processing of KIC's applications, *see* ER-155 through -156 and Exhibits 5, 6, and 7 to Plaintiffs' Motion to Hold in Abeyance.

[38]   Tax Act § 20001(c)(2).

[39]   Summary Judgment Order, ER-101.

[40]   Summary Judgment Order, ER-47 through -48.

503357\285\1747246

inform the determination of what constitutes a reasonable period of time.[41] The

District Court held that "none of the factors weigh heavily in favor of Plaintiffs"

and that "Agency Defendants' delay in implementing the Program is reasonable

and that to date Agency Defendants have not unlawfully withheld any action."[42]

However, in focusing so heavily on the lack of a specific statutory

"timetable," the District Court overlooked the full breadth of Factor Two, which

asks whether the statute includes a "timetable ___*or other indication of the speed with*___

___*which it expects the agency to proceed*___ …."[43] Tax Act § 20001(b) directs that DOI

"shall manage the oil and gas program on the Coastal Plain in a manner similar to

the administration of lease sales under the Naval Petroleum Reserves Production

Act of 1976 (42 U.S.C. 6501 et seq.)…." That borrowed statute in turn requires

that DOI "conduct" the NPRA oil and gas program "expeditious[ly]." 42 U.S.C. §

6506a(a) ("DOI shall conduct an expeditious program of competitive oil and gas

leasing in the Reserve in accordance with this Act."). The duty to act

"expeditious[ly]" applies to all aspects of the NPRA leasing program, not just the

lease auction itself, or the bare issuance of leases.[44] Through the borrowing clause

---

[41]  *NRDC*, 956 F.3d at 1138.

[42]  Summary Judgment Order, ER-68 through -69.

[43]  *NRDC*, 956 F.3d at 1138 (emphasis added).

[44]  This can be seen in the structure of 42 U.S.C. § 6506a, which is entitled
"Competitive leasing of oil and gas". Within that title falls § 6506a(a), which is
DOI's duty to act "expeditious[ly]", § 6506a(b), which is DOI's duty to engage in

in Tax Act § 20001(b), DOI's duty to act "expeditious[ly]" in all aspects of program administration extends to the ANWR Coastal Plain program, not just issuing leases. This duty includes expeditiously processing the applications from AIDEA and KIC to conduct preliminary surveys.

The District Court was fully aware of both the borrowing provision and the expedition requirement in the NPRA statute. Elsewhere in its opinion, the District Court: (1) recognized that DOI was under a duty to act "expeditious[ly]" in implementing the **NPRA** oil and gas program;[45] and (2) recognized that Tax Act § 20001(b) borrowed for the ANWR program the various NPRA statutory and regulatory provisions, holding that DOI's suspension of leases was supported by borrowing for ANWR on such NPRA rule, the lease suspension rule.[46] Nevertheless, the District Court specifically held that the "Tax Act … does **not** expressly call for 'expeditious' development but does specifically impose two

---

the "Mitigation of adverse effects" of oil and gas development, § 6506a(c), which is "Land use planning…", and § 6506a(d), which is the conducting of the "First lease sale," and various other provisions. The point is that DOI's duty in § 6506a(a) to "conduct an expeditious program of competitive leasing of oil and gas in the Reserve in accordance with this Act" refers to all aspects of administration of the oil and gas leasing program, not just narrowly to the time period in which the lease auction is held and leases are executed and delivered to the winning bidders.

[45]    Summary Judgment Order, ER-52.

[46]    *Id*. at ER-32, -49, and -50. The unreasonable delay issue goes to whether the suspension and moratorium, if properly begun, have had an unreasonable duration.

45

deadlines for holding lease sales."[47] In short, in evaluating the delays, the District Court failed to apply the "expeditious" action standard it should have applied.[48]

The duty to act expeditiously imposed through the Tax Act's borrowing provision is express, but a duty to act expeditiously would in any event be implied from the structure of the Tax Act. A "statute which confers powers or duties in general terms includes by implication all powers and duties incidental and necessary to make the legislation effective."[49] The Tax Act directs DOI to issue "necessary" easements and rights-of-way, and to otherwise "manage" the program.[50] These steps are ancillary to the overarching duty to issue leases by the stated statutory deadlines, in order to achieve a revenue-producing oil and gas program. DOI's duty to act promptly in considering a lessee's follow-up applications to conduct activities pursuant to the leases is necessarily implied from the express duty to hold lease sales by specific dates. Unless the lessee can secure permissions to conduct preliminary surveys without lengthy multi-year delays, the paperwork act of issuing leases by a deadline accomplishes nothing.[51] As this

---

[47]  *Id*. at ER-52 (emphasis added).

[48]  *Id.* at ER-52 and -100.

[49]  2B Sutherland Statutory Construction § 55:4 (7th ed.); *see also, id*. 55:2.

[50]  Tax Act § 20001(b)(3) & (c)(2).

[51]  *Cf. Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("The Second Amendment … does not explicitly protect ammunition. Nevertheless, without bullets, the right to bear arms would be meaningless. …

46

Court noted in *Independence Mining Co. v. Babbitt*, a duty to act "expeditiously" may be "implie[d]" from "the circumstances."[52]

The District Court also read too much into *General Motors v. United States*, a Supreme Court case not cited by the parties in their briefs.[53] To be sure, the Supreme Court commented in that case that there was significance in the Clean Air Act ("CAA") having an express deadline for one type of agency action but not another.[54] However, the Supreme Court did not hold that the absence of an express statutory deadline means there can be no other basis in a statutory regime for concluding Congress wanted the agency to act expeditiously. The case does not discuss anything similar to the "expeditious" action requirement of the NPRA statute that the Tax Act's borrowing provision applies to the ANWR program. The case is also distinguishable because there was an express remedy for delay in the statute, and the Supreme Court therefore declined to imply an additional remedy.[55]

---

Thus the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them."). Second Amendment law has since evolved, *Warren v. U.S. Parole Commission*, 2023 WL 5348825. *1 (9th Cir. Aug. 21, 2023), but the statutory construction principle for which the case is cited remains.

[52]    *Independence Mining Co. v. Babbitt,* 105 F.3d 502, 507 (9th Cir. 1997).

[53]    *Gen. Motors v. United States*, 496 U.S. 530 (1990); see Summary Judgment Order, ER-47 and n. 78 (citing this case).

[54]    *Id*. at 538 (quoted in Summary Judgment Order at 19).

[55]    In *Gen. Motors*, the Clean Air Act ("CAA") required the Environmental Protection Agency ("EPA") to approve or reject a State's original application for

47

Appellants acknowledge that Factor Two is only of the six *TRAC* factors.
However, in denying relief the District Court repeatedly emphasized what it called
a "critical" distinction – the contrast between the presence in the Tax Act of two
statutory deadline for issuing leases and the absence from the Tax Act of statutory
deadline for the post-leasing implementation activities that DOI had halted.[56] Thus,

---

approval of "State Implementation Plan" within four months. *Id*., 496 U.S. at 536
(citing CAA § 110(a)(2), 43 U.S.C. § 7419(a) (1982)). However, the CAA
addressed in a different way the delays that might occur in EPA's review of State
applications to revise a previously-approved SIP – this was the type of delay at
issue in the case. The CAA empowered each State's Governor to remedy EPA's
delays in processing an application to revise its SIP by issuing an order suspending
the State's obligation to comply with those aspects of the original approved SIP
that the State sought to revise. *Id*. 496 U.S. at 538 (citing CAA § 110(g)). Faced
with this express statutory language providing different express remedies for
different types of EPA delay, the Supreme Court declined to impose a more
aggressive remedy that would have stripped EPA of the power to enforce any
aspect of the originally-approved SIP if EPA delayed deciding a State's application
to revise a SIP. *Id.* at 539-42. Appellants are not suggesting that DOI loses the
power to act by failing to act expeditiously in implementing the ANWR program,
just that a court should apply 5 U.S.C. § 706(1) to spur agency action.

[56]     Summary Judgment Order at ER-46, -47, -49, -99, and -100. At pages ER-46
and -47, the opinion stresses how "critical" the lack of an express deadline is to its
analysis:

> The Tax Act mandated only that DOI hold one lease sale within four years
> of its enactment and another within seven years of its enactment. The first
> lease sale was held nearly one year prior to the statutory deadline; the
> second lease sale must occur before December 22, 2024 – after the
> Supplemental EIS is due to be completed. There are no other deadlines in
> the Tax Act, such as deadlines to issue rights-of-way or easements or to
> authorize surface development.

> These **critical** points guide the Court's analysis …. (Emphasis added).

48

the District Court's error as to Factor Two was consequential to its analysis. As noted above, under the caselaw, Factor Two is the key to the plaintiff getting relief when the agency delay is on order of three or four years or less. As of the District Court's August, 2023 ruling, that delay totaled 2.5 years (from February, 2021).

There is no express finding by the District Court that any of the *TRAC* factors so strongly favor the defense as to justify the delay even if the agency had to act expeditiously.[57] Factor One is a restatement that delay must be evaluated based on a "rule of reason," which is a summary of all six factors. The other factors collectively do not point strongly in Appellee-Defendants' favor, which is why Factor Two is so important.[58] Factor Three asks whether the regulatory subject is economic in nature, or health and safety in nature, and here it is primarily economic. Factor Four asks if the agency's resources are strained by other competing priorities. This factor seems neutral – there is no discussion of some other proceeding involving some other project straining agency resources. Factor Five considers prejudice to the plaintiff from delay, which here is substantial, as AIDEA and the other Appellants have now been blocked for almost four years from developing the leases that AIDEA won in January, 2021. Factor Six is a reminder unreasonable delay can occur through "lassitude," without misconduct.

---

[57]    Summary Judgment Order, ECF-99 and -100 (applying the *TRAC* factors).

[58]    *See NRDC*, 956 F.3d 1134 at 1138-1139 (listing factors).

49

We do not know how the District Court would have ruled had it applied *TRAC* Factor Two correctly by evaluating agency delays under the "expeditious" standard that Tax Act § 20001(b) borrows for ANWR from the NPRA statute. As a result, this Court should reverse the District Court's dismissal of the 5 U.S.C. § 706(1) claim and remand to the District Court for further consideration in light of the expeditious action standard.[59] Moreover, the issue of whether DOI is under a duty to act expeditiously in all aspects of its implementation of the ANWR oil and gas program is likely to recur. There will inevitably be more delays after the second lease sale is held in December, 2024, the current moratorium ends, and the Program resumes. The Program would benefit from appellate resolution of this issue, and confirmation that DOI must proceed at an expeditious pace.

## **<u>CONCLUSION</u>**

Rather than turning to the merits of this appeal on a shifting set of facts, the Court should grant Plaintiffs' separate motion to hold this appeal in abeyance through February 28, 2025. DOI represents it will meet the Tax Act's deadline for the second lease sale in December and complete its supplemental environmental review addressing the alleged legal defects in the 2020 ROD within the next few

---

[59]    By the time this Court rules, the facts to which the District Court applies the *Trac* factors will likely have changed even further from the facts as they stood in August, 2023, when the District Court ruled. The District Court is best positioned to consider those changes, including those changes occurring in the coming weeks.

503357\285\1747246

weeks. The Parties have also asked the District Court to rule on the related lease cancellation case in advance of that second lease sale to help guide the format of the sale; that decision too is expected to within the next few weeks. A temporary stay will allow the facts to resolve before briefing any remaining issues.

If the Court denies Plaintiffs' motion to hold the appeal in abeyance and instead proceeds to addressing the merits of this appeal, it should rule that the District Court erred in its analysis of downstream greenhouse gas emissions, failing to address that the non-discretionary nature of the Tax Act's directives required DOI to conduct lease sales and establish an oil and gas program. These mandates compel the agency to take these actions regardless of the effects that will arise on downstream greenhouse gasses. Similarly, the Court erred in its "unreasonable delay" analysis of the impacts from the moratorium. In overlooking the incorporation of a command to administer the program "expeditious[ly]" the Court's analysis of the *TRAC* factors and impacts of the delay was incomplete.

For these reasons, Plaintiffs respectfully request this Court reverse the District Court's findings and issue an order directing DOI to lift the moratorium and suspension orders and begin processing the applications submitted to the agency for work on the Coastal Plain.

503357\285\1747246

DATED this 16th day of October, 2024.

Respectfully submitted,

/s/ *James H. Lister*
James Lister, ABA #1611111
Brian V. Gerd, ABA #1810097
David Karl Gross, ABA #9611065
Zoe A. Eisberg, ABA #1911094
Birch Horton Bittner & Cherot
1150 Connecticut Ave, N.W. Suite 350
Washington, DC 20036
jlister@bhb.com
bgerd@bhb.com
dgross@bhb.com
zeisberg@bhb.com
Telephone 202.862-8368
Facsimile 202.659.1027

Attorneys for Plaintiffs-Appellants Alaska
Industrial Development and Export
Authority, North Slope Borough, Arctic
Slope Regional Corporation, and Kaktovik
Iñupiat Corporation

503357\285\1747246

## <u>CERTIFICATE OF COMPLIANCE</u>

9th Circuit Case Number 24-2533

I am the attorney.

This brief contains 11,621 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.


Dated: 16th October 2024

/s/ *James H. Lister*
Attorney for Plaintiff-Appellants

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2024, I electronically filed the foregoing with the Clerk of the Court for the by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *James H. Lister*
Attorney for Plaintiff-Appellants