No. 24-2533

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT
AUTHORITY, et. al.,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, et al.,

*Defendants-Appellees*,

and

NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, et al.,

*Intervenor-Defendants-Appellees*.

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF ALASKA

No. 3:21-cv-00245-SLG (Honorable Sharon L. Gleason)

───────────────

## APPELLANTS' EXCERPTS OF RECORD
## Volume 1 of 1

James H. Lister
David Karl Gross
Brian V. Gerd
Zoe A. Eisberg
Birch Horton Bittner & Cherot
1150 Connecticut Avenue, NW, Suite 350
Washington, DC  20036-4142
Phone: (202) 659-5800

*Attorneys for Plaintiffs-Appellants*

# INDEX

## APPELLANT'S EXCERPTS OF RECORD

### No. 24-2533

| ECF/AR No. | Date | Description | Pages of ER |
|---|---|---|---|
| ECF 97 | 02/22/24 | Final Order on Plaintiffs' Motions for Post-Judgment Relief | 3 |
| ECF 79 | 09/06/23 | Final Decision | 22 |
| ECF 72 | 08/07/23 | Order re Motions for Summary Judgment | 29 |
| ECF 73 | 08/07/23 | Judgment | 103 |
| ECF 56-5 AR 3718 | 10/03/22 | DOI Letter Delaying Processing of KIC's Application for Seismic Permit | 105 |
| ECF 53-3 AR 3404-3305 | 08/19/22 | Addendum to Suspension of Operations and Production | 107 |
| ECF 48-12 AR 3362-3363 | 06/03/22 | Secretarial Order 3401- Establishing a Moratorium on the Coastal Plain Program | 109 |
| ECF 48-12 AR 3349-3355 | 01/25/22 | Executive Order 13990 | 111 |
| AR 3395-3396 | 08/07/21 | BLM Denial of Cultural Survey Permit Application | 118 |
| ECF 48-11 AR 3317-3346 | 01/13/21 | DOI's Lease Issuance Decision on AIDEA's Coastal Plain Oil and Gas Leases | 120 |
| ECF 48-12 AR 3368-3369 | 08/08/21 | Notice of Intent to Prepare Supplemental EIS | 150 |
| ECF 48-12 AR 3364-3365 | 06/01/21 | Notice of Suspension of Operations and Production | 152 |
| ECF 48-12 AR 3399 | 12/03/21 | Denial of Pre-Application Meeting Request | 154 |
| ECF 56-3 AR 3507-3508 | 09/07/20 | KIC Application to Conduct Seismic Surveys on its Holdings | 155 |
| ECF 48-111 AR 3227 | 12/07/20 | Federal Register Notice of First Coastal Plain Lease Sale | 157 |
| ECF 48-10 AR 3144-3156 | August 2020 | DOI Coastal Plain Oil and Gas Leasing Program – Record of Decision | 159 |
| ECF 48-4 AR0017-0020 | September 2019 | Coastal Plain Program - Environmental Impact Statement – Executive Summary | 172 |
| ECF 98 | 04/15/24 | Plaintiffs' Notice of Appeal | 176 |
| Docket Report | 10/16/24 | Docket Report of District Court Proceedings | 182 |

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, *et al.*, | |
| Plaintiffs, | |
| and | Case No. 3:21-cv-00245-SLG |
| STATE OF ALASKA, | |
| Intervenor-Plaintiff, | |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, | |
| Defendants, | |
| and | |
| NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, *et al.*, | |
| Intervenor-Defendants. | |

## ORDER RE MOTION TO ALTER OR AMEND SUMMARY JUDGMENT ORDER AND JUDGMENT AND MOTION FOR RELIEF FROM FINAL JUDGMENT

Before the Court at Docket 76 is Plaintiffs' and Intervenor-Plaintiff's[1] Motion to Alter or Amend Summary Judgment Order and Judgment. Defendants[2]

---

[1] Plaintiffs consist of Alaska Industrial Development and Export Authority ("AIDEA"), North Slope Borough, Arctic Slope Regional Corporation, and Kaktovik Iñupiat Corporation. Intervenor-Plaintiff is the State of Alaska ("State").

[2] Defendants consist of the President, U.S. Department of the Interior ("DOI" or "Interior"), DOI

responded in opposition at Docket 79, and Intervenor-Defendants[3] responded in opposition at Docket 80.  Plaintiffs and Intervenor-Plaintiff filed a reply at Docket 83.  Also before the Court at Docket 84 is Plaintiffs' and Intervenor-Plaintiff's Motion for Relief from Final Judgment.  Defendants responded in opposition at Docket 89, and Intervenor-Defendants responded in opposition at Docket 90.  Plaintiffs and Intervenor-Plaintiff filed a reply at Docket 93.  Plaintiffs and Intervenor-Plaintiff are hereinafter collectively referred to as "Plaintiffs"; Defendants and Intervenor-Defendants are hereinafter collectively referred to as "Defendants."  Oral argument was not requested on either motion and was not necessary to the Court's determination.

## BACKGROUND

The facts of this case are set forth in the Court's order at Docket 72; the Court assumes familiarity here and includes only the relevant facts below.  In December 2017, Congress authorized an oil and gas leasing program ("Program")

---

Secretary Deb Haaland, DOI Principal Deputy Assistant Secretary of Land and Minerals Management Laura Daniel-Davis, Bureau of Land Management ("BLM"), BLM Director Tracy Stone-Manning, and BLM Alaska State Director Steven Cohn (collectively, "Federal Defendants").  The original complaint named Thomas Heinlein, the then BLM Alaska State Director, as a defendant.  Pursuant to Fed. R. Civ. P. 25(d), the current BLM Alaska State Director, Steven Cohn, is automatically substituted for Thomas Heinlein.

[3] Intervenor-Defendants consist of two groups: the Native Village of Venetie Tribal Government, Venetie Village Council, and Arctic Village Council ("Venetie Movants"); and the Gwich'in Steering Committee, Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, and Wilderness Watch ("Gwich'in Movants") (collectively, "Intervenor-Defendants").  *See* Docket 40.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 2 of 19

on the Coastal Plain of the Arctic National Wildlife Refuge ("Coastal Plain" or "ANWR") through Section 20001 of the Tax Cuts and Jobs Act of 2017 ("Tax Act").[4] Section 20001(c)(1) requires the Secretary of the U.S. Department of the Interior ("DOI" or "Interior") to conduct at least two area-wide lease sales under this program of at least 400,000 acres each; the Secretary "shall offer" the first lease sale not later than December 22, 2021, and the second sale not later than December 22, 2024.[5] Pursuant to the National Environmental Policy Act ("NEPA"), the Bureau of Land Management ("BLM") reviewed the Program and published an Environmental Impact Statement ("EIS") in September 2019; the Record of Decision ("ROD") was published in August 2020.[6] The first lease sale then took place on January 6, 2021, and Alaska Industrial Development and Export Authority ("AIDEA"), one of the Plaintiffs in this action and one of three bidders, secured leases for seven tracts of land.[7]

However, when President Biden took office two weeks later, he issued Executive Order ("EO") 13990, which directed DOI to conduct a supplemental

---

[4] Pub. L. No. 115-97, 131 Stat. 2054 (2017) [hereinafter Tax Act].

[5] *See* Tax Act § 20001(c)(1)(B)(ii)(I), (II).

[6] Administrative Record ("AR") 1-3135, 3138-3225. Federal Defendants filed the Administrative Record at Docket 48, Docket 53, and Docket 56.

[7] Two other bidders, Knik Arm Services, LLC, and Regenerate Alaska, Inc., each secured one tract of land. AR 3314-18, 3347, 3689, 3695. However, these two lessees eventually entered into agreements with BLM in which BLM cancelled and rescinded their leases and refunded their bid and initial rental payments. AR 3782-92.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 3 of 19

environmental review of the Program and, during the pendency of such review, temporarily halt all activities related to the Coastal Plain oil and gas leases (the "Moratorium").[8]  Following the President's directive, on June 1, 2021, the Interior Secretary issued Secretarial Order 3401 ("Secretarial Order"), which instructed DOI and BLM officials to conduct the supplemental environmental review and instituted a "temporary halt on all Department activities related to the Program in the Arctic Refuge" while that supplemental review was being conducted.[9]  The temporary halt extended to "any action[s] to authorize any aspect of the Program, including, but not limited to, any leasing, exploration, development, production, or transportation," and the "process[ing of] any pending or future applications for such activities."[10]  Also on June 1, 2021, DOI issued a Suspension of Operations and Production Letter ("SOP Letter") to each of the lessees, notifying them it was suspending the leases and associated operations pending the supplemental NEPA review.[11]

While BLM conducted its supplemental NEPA review, AIDEA, through its contractors, sought authorizations from DOI to begin the initial stages of oil and gas exploration pursuant to its leases, such as conducting archeological

---

[8] AR 3349-55.

[9] AR 3362.

[10] AR 3363.

[11] AR 3364-65, 3714-17.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 4 of 19

investigations and seismic exploration.[12]    Citing the Moratorium, Federal Defendants refused to authorize AIDEA or its contractors to proceed with any activities relating to the leases.[13]  AIDEA then brought this suit in November 2021, challenging both the President's issuance of EO 13990 and DOI's implementation of the Moratorium.[14]  The other Plaintiffs in this action—North Slope Borough, Arctic Slope Regional Corporation ("ASRC"), and Kaktovik Iñupiat Corporation ("KIC")—and Intervenor-Plaintiff State of Alaska ("State") all asserted that the Moratorium caused loss of revenue and employment opportunities that would have come from development of the Coastal Plain oil and gas leases.[15]

In August 2023, the Court issued an order and final judgment dismissing all of Plaintiffs' claims with prejudice.[16]  The Court held that (1) "the President acted in accordance with his powers by ordering Agency Defendants to implement a

---

[12] AR 3370-98.

[13] AR 3399-3400.

[14] Docket 1.

[15] *See* Docket 60-4 at ¶¶ 11, 14, 17 (Decl. Harry Brower Jr.) (describing loss of revenue and employment opportunities due to Moratorium); Docket 60-3 at ¶ 10 (Decl. Rex A. Rock, Sr.) ("The moratorium has directly resulted in the loss of employment opportunities for ASRC shareholders.  Second, the moratorium has directly denied ASRC the opportunity to increase its revenues."); Docket 60-2 at ¶¶ 6, 11 (Decl. Charles Lampe) (explaining that KIC was a subcontractor for SAExploration Inc., one of AIDEA's contractors for its Coastal Plain oil and gas leases, and stating that the Moratorium caused loss of revenue and employment opportunities); Docket 59-1 at ¶¶ 3-5 (Decl. Vasilios Gialopsos) (describing loss of rental and royalty revenue and employment opportunities due to Moratorium).

[16] *Alaska Indus. Dev. & Exp. Auth. v. Biden*, __ F. Supp. 3d ___, Case No. 3:21-CV-00245-SLG, 2023 WL 5021555, at *29 (D. Alaska Aug. 7, 2023) [hereinafter *AIDEA I*]; Docket 73.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 5 of 19

temporary moratorium while DOI undertook to correct 'alleged legal deficiencies' in its environmental analysis"; and (2) the Moratorium did not violate the Administrative Procedure Act ("APA").[17]   In its ruling, the Court noted that the Moratorium only temporarily prevented AIDEA from developing its leases, and that its leases had not been "cancelled, rescinded, nullified, or otherwise undone."[18]

On September 5, 2023, Plaintiffs filed their Motion to Alter or Amend Summary Judgment Order and Judgment, requesting that the Court "invalidate the . . . moratorium to the extent it blocks Plaintiffs from conducting preliminary steps such as archeological surveys that do not impact the environment," and that it "direct the Federal Defendants to carry out actions necessary to implement the oil and gas leases held by Plaintiff AIDEA at a pace proportional to the urgency expressed by Congress in directing that the Federal Defendants issue oil and gas leases by December[] 2021."[19]   One day later, on September 6, 2023, DOI sent AIDEA a letter stating that it was cancelling AIDEA's Coastal Plain leases because DOI had "determined that the leases were improperly issued due to pre-leasing legal defects."[20]   On the same day, BLM released its Draft Supplemental EIS

---

[17] *AIDEA I*, 2023 WL 5021555, at *16.

[18] *Id.* at *25, 27 (noting that "the issues of whether Agency Defendants have the authority to cancel any leases and under what circumstances are not before this Court").

[19] Docket 76 at 7, 11.

[20] Docket 79-1 at 1.  DOI added that AIDEA was "entitled to a refund of lease payments [comprised of lease sale bonus bids and first year rentals] totaling $12,801,425," but that it was "not entitled to interest on that amount."  Docket 79-1 at 7.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 6 of 19

("SEIS") for the Coastal Plain oil and gas leasing program,[21] and Federal Defendants stated in a related case that they anticipate the Final SEIS to be issued in the first quarter of 2024, with the ROD issued in the second quarter of 2024.[22]

Plaintiffs then asserted that the lease cancellation made moot their previous motion to amend the summary judgment order, and they filed a Motion for Relief from Final Judgment, asserting that the lease cancellation also made moot all of their claims in this action.[23]  "In the absence of any leasehold interest," Plaintiffs maintain that they "lack the ability to pursue development on the Coastal Plain" and that their "claims in this case, and any potential claims on appeal, have been rendered moot."[24]  Plaintiffs seek vacatur of the Court's judgment dismissing Plaintiffs' claims.[25]  In response, Defendants assert that the Court should deny the motion because the case is not moot.[26]

In addition, Plaintiffs filed another suit in October 2023 in the United States

---

[21] The Draft SEIS and related documents can be found at https://eplanning.blm.gov/eplanning-ui/project/2015144/570.  *See also* Notice of Availability of the Draft Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement, 88 Fed. Reg. 62104-01 (Sept. 8, 2023).

[22] *See* Defendants' Status Report on Issuance of Draft Supplemental Environmental Impact Statement at 2, *Gwich'in Steering Comm. v. Haaland*, Case No. 3:20-cv-00204-SLG (D. Alaska Sept. 6, 2023), ECF No. 98.

[23] Docket 83 at 3 ("Federal Defendants are correct that lease cancellation does overtake the present Motion."); Docket 84 at 2.

[24] Docket 84 at 3.

[25] Docket 84 at 3-4.

[26] Docket 89 at 2; Docket 90 at 3.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 7 of 19

District Court for the District of Columbia regarding the lease cancellation, wherein they requested "[a] declaratory judgment invalidating DOI's cancellation of AIDEA's leases" and "[a]n order directing, on a preliminary and final basis, that Defendants proceed with leasing, exploration, and development of the ANWR Coastal Plain as prescribed in the Tax Act, § 20001."[27] For the reasons discussed below, the Court finds that this case is not moot, and it denies Plaintiffs' motions.

<div align="center">

**LEGAL STANDARD**

</div>

The Court first addresses Plaintiffs' Motion for Relief from Final Judgment and then addresses Plaintiffs' Motion to Alter or Amend Summary Judgment Order and Judgment.

## I. Federal Rule of Civil Procedure 60(b)

Plaintiffs seek relief from judgment pursuant to Rule 60(b)(5) or, alternatively, 60(b)(6).[28] Rule 60(b)(5) authorizes relief from a judgment when "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Rule 60(b)(6) authorizes relief from a final judgment or order for "any other reason that justifies relief." The moving party "bears the burden of proving the existence of a justification for Rule 60(b) relief."[29]

---

[27] Amended Complaint at 31, *Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior*, Case No. 1:23-cv-03126-JMC (D.D.C. Jan. 16, 2024), ECF No. 11.

[28] Docket 84 at 3-4.

[29] *Cassidy v. Tenorio*, 856 F.2d 1412, 1415 (9th Cir. 1988) (citations omitted); *see also Atchison,*

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 8 of 19

Case 3:21-cv-00245-SLG   Document 97   Filed 02/22/24   Page 8 of 19   ER-010

## II.     Federal Rule of Civil Procedure 59(e)

Pursuant to Rule 59(e), a party may move to alter or amend a judgment no later than 28 days after the entry of the judgment. "[T]he district court enjoys considerable discretion in granting or denying the motion," but "amending a judgment after its entry remains 'an extraordinary remedy which should be used sparingly.'"[30]  "In general, there are four basic grounds upon which a Rule 59(e) motion may be granted," though a court "is not limited merely to these four situations":

> (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law.[31]

"A Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation."[32]

---

*Toreka & Santa Fe Ry. Co. v. Barrett*, 246 F.2d 846, 849 (9th Cir. 1957) ("[T]here still exists a definite burden on the moving party to prove the existence of the fraud, or other misconduct, or other cause for relief.").

[30] *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (quoting *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir.1999) (en banc) (per curiam)).

[31] *Id.* (citations omitted).

[32] *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (citation omitted).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 9 of 19

## DISCUSSION

### I. Motion for Relief from Final Judgment

In their Rule 60(b) motion, Plaintiffs contend that their seven claims—"five of which challenged the Coastal Plain Moratorium generally (Counts I, II, IV, VI, and VII) and two of which challenged actions taken by DOI/BLM specific to AIDEA's leases (Counts III and V)"—have been rendered moot by the lease cancellation.[33] Plaintiffs assert that, but for the lease cancellation, they "would have appealed from the Court's final order."[34] However, Plaintiffs maintain that

> [e]ven if the Ninth Circuit were to reverse the summary judgment decision, the reinstatement of AIDEA's leases would not be the result, nor would AIDEA or its contractors be permitted to begin archaeological or seismic activities on the leased lands, or further oil and gas development activities, as it no longer holds any leasehold interest to such lands.[35]

Plaintiffs further contend that the relief they sought in this case—lifting the Moratorium—would not "allow Plaintiffs to engage in ground-disturbing lease implementation activities," because "AIDEA and its contractors have no right to develop the Coastal Plain without leases."[36] Citing *United States v. Munsingwear, Inc.*, Plaintiffs assert that the mootness of their claims requires vacatur under Rule

---

[33] Docket 84 at 4; *see also* Docket 34 at ¶¶ 119-55 (2d Am. Compl.).

[34] Docket 84 at 3.

[35] Docket 84 at 4-5.

[36] Docket 84 at 5.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 10 of 19

60(b)(5), which allows for relief when applying the judgment prospectively "is no longer equitable."[37]  In *Munsingwear*, the United States asserted that Munsingwear had violated a price fixing regulation for a certain commodity.[38]  However, the commodity became decontrolled while the case was on appeal, rendering the case moot.[39]  The Supreme Court held that "[t]he established practice of the Court in dealing with a civil case from a court in the federal system which has become moot . . . is to reverse or vacate the judgment below and remand with a direction to dismiss."[40]  Plaintiffs also assert that vacatur is warranted pursuant to Rule 60(b)(6), which authorizes relief for "any other reason that justifies relief," because the lease cancellation "was an abrupt final decision by the agency" which "occurred without providing AIDEA or the other Plaintiffs with an opportunity to defend against the cancellation."[41]

Defendants disagree that the case is moot.  Defendants stress that the challenged Executive Branch actions in this case—that is, the Moratorium on all permitting of any oil and gas activities on the Coastal Plain—remain in effect.[42]

---

[37] *See* Docket 84 at 7-9 (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)); Docket 93 at 2-5.

[38] *Munsingwear*, 340 U.S. at 37.

[39] *Id.*

[40] *Id.* at 39.

[41] *See* Docket 84 at 9-13.

[42] Docket 90 at 3.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 11 of 19

Defendants contend that "only by singularly focusing on AIDEA's leases" do Plaintiffs claim that the case is moot, but that Plaintiffs other than AIDEA have "their own interests in the broader Program" that were not mooted by cancellation of AIDEA's leases.[43]  Defendants point out that KIC, ASRC, and the North Slope Borough have economic and employment interests in the "implementation of the overall Program," which is currently on hold due to the Moratorium.[44]  And Defendants assert that because AIDEA is seeking the same form of relief in its suit in the District of Columbia—an order requiring development of the Coastal Plain, which is, in effect, the same relief as lifting the Moratorium sought here—AIDEA's actions belie its claims that the case is moot.[45]  Thus, because this case challenged the Moratorium, Defendants argue, Plaintiffs "have not shown that Defendants' *lease cancellation* decision makes it 'impossible for a court to grant any effectual relief whatever.'"[46]  Lastly, Defendants assert that "Rule 60(b) offers nothing to save [Plaintiffs'] Motion" because the lease cancellation is not an extraordinary circumstance.[47]  Defendants contend that Plaintiffs were on notice that the

---

[43] Docket 89 at 4-5.

[44] Docket 89 at 4-5.  *See also* Plaintiffs' declarations *supra* note 15.

[45] Docket 89 at 7-8.

[46] Docket 89 at 3-4 (emphasis in original) (quoting *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012)).  *See also* Docket 90 at 5 (noting that both EO 13990 and the Secretarial Order enforcing the Moratorium, "both of which were focal points of this litigation," are still in place and still prohibit "any oil and gas activities on the Coastal Plain until the agency adopts a revised oil and gas program").

[47] Docket 89 at 6; *see also* Docket 90 at 11.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 12 of 19

supplemental NEPA review would "determine whether the leases should be affirmed, voided, or subject to additional mitigation measures," and Plaintiffs do not show that they were entitled to defend against the cancellation.[48]

"The mootness doctrine 'requires that an actual, ongoing controversy exist at all stages of federal court proceedings.'"[49] "[T]he central question . . . is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief."[50] "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."[51]

The Court finds that this case is not moot, because it would be possible for a court to grant some effectual relief to Plaintiffs in this case. Indeed, it appears that Plaintiffs are seeking from the D.C. district court much the same relief that this Court previously denied them—that is, an order directing the federal government to proceed not only with leasing at ANWR, but also directing the federal government to proceed with "exploration" and "development" at ANWR, which is

---

[48] Docket 89 at 6.

[49] *Leigh v. Salazar*, 677 F.3d 892, 896 (9th Cir. 2012) (quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011)); *see also Arizonans for Off. English v. Arizona*, 520 U.S. 43, 67 (1997) ("[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975))).

[50] *Timbisha Shoshone Tribe v. U.S. Dep't of Interior*, 824 F.3d 807, 812 (9th Cir. 2016) (citation omitted).

[51] *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1208 (9th Cir. 2021) (quoting *Knox*, 567 U.S. at 307).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 13 of 19

effectively seeking an order that would lift the Moratorium.[52]  Stated differently, if a court were to grant Plaintiffs the remedy of lifting the Moratorium, activities needed to proceed with exploration and development could continue or commence; this relief is effectual for Intervenor-Plaintiff State of Alaska because it would both increase economic activity and employment in the State and reduce the delay in the State's collection of lease rental payments and royalty revenue.[53]  And, if Plaintiffs were to prevail in the D.C. district court on their claim that the lease cancellation is invalid—or new leases are issued when the statutorily mandated second lease sale is held later this year—then Plaintiffs' interest in the legality of the Moratorium, which this Court has now resolved, is once again directly relevant. And unlike in *Munsingwear*, where the commodity was decontrolled such that the challenged regulation no longer had any applicability to that commodity, which then made that case moot, the Moratorium here has not been invalidated or rescinded by the agency with respect to development activities at ANWR.[54]

---

[52] *Compare* Amended Complaint at 31, *Alaska Indus. Dev. & Exp. Auth.*, Case No. 1:23-cv-03126-JMC, ECF No. 11 (seeking "[a]n order directing, on a preliminary and final basis, that Defendants proceed with leasing, exploration, and development of the ANWR Coastal Plain as prescribed in the Tax Act, § 20001"), *with* Docket 34 at 41 (2d Am. Compl.) (seeking "[a]n order compelling Defendants to proceed with leasing and development as prescribed by Congress in ANILCA and the 2017 Tax Act").

[53] *See* Docket 59-1 at ¶¶ 2-4; Docket 22 at ¶ 32 (State's Compl. in Intervention) ("Under the Tax Act and other applicable law, the State earns revenues from sales, bonuses, royalties, and rentals associated with Coastal Plain oil and gas leasing.").

[54] *See Munsingwear*, 340 U.S. at 37.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 14 of 19

Further, while KIC, as one of AIDEA's subcontractors, had an interest intertwined with AIDEA being able to develop its leases,[55] KIC has also advanced an interest separate from AIDEA. KIC has asserted that "[b]eyond the harm to KIC as a result of BLM's suspension of AIDEA's leases, the moratorium prevents KIC from performing its own Coastal Plain seismic operations," which then "precludes KIC from obtaining valuable data regarding potential oil and gas reserves on its own lands."[56] If the Moratorium were lifted, then KIC would no longer be legally precluded from performing seismic operations for its own purposes. This constitutes some relief that a court could grant.

Finally, the Court is not persuaded by Plaintiffs' argument that vacatur of the Court's prior order and judgment is appropriate pursuant to Rule 60(b)(6) due to the lease cancellation, which Plaintiffs characterize as an "extraordinary circumstance."[57] Rather, Plaintiffs were on notice that "the additional NEPA analysis [was] to determine whether the leases should be affirmed, voided, or subject to additional mitigation measures."[58] Thus, that AIDEA's leases would later

---

[55] *See* Docket 93 at 11 & n.32.

[56] Docket 60-2 at ¶ 13 (Decl. Charles Lampe) (explaining that, "[a]s a result of the moratorium, the BLM and FWS sent a letter to KIC in August 2021 indicating that they had halted processing KIC's application to conduct seismic operations on the Coastal Plain and the accompanying [Incidental Harassment Authorization] application").

[57] *See* Docket 84 at 9-13; *Fed. Trade Comm'n v. Hewitt*, 68 F.4th 461, 468 (9th Cir. 2023) ("Relief under Rule 60(b)(6)—which is ordinarily addressed to the wide discretion of the district court—is available only in extraordinary circumstances." (internal quotation marks omitted)).

[58] AR 3405.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 15 of 19

be cancelled should not have been totally unexpected. Moreover, while Plaintiffs claim that they "would have appealed from the Court's final order" but for the lease cancellation, the Court notes that there was no obstacle to Plaintiffs appealing from that judgment to the Ninth Circuit.[59] Accordingly, no relief is justified pursuant to Rule 60(b)(6).

In light of the foregoing, the Court finds that this case is not moot because it is not "impossible for a court to grant any effectual relief whatever to the prevailing party," such that vacatur of the Court's judgment is not warranted.[60]

## II. Motion to Alter or Amend Summary Judgment Order and Judgment

In their Rule 59(e) motion filed prior to the lease cancellation, Plaintiffs request that the Court amend its prior order at Docket 72 and judgment at Docket 73 so as to allow for lease implementation actions that do not impact the environment, such as archeological and other surveys.[61] In addition, Plaintiffs ask the Court to amend its order to "recognize that the various follow-up matters ancillary to the issuance of the leases by the December[] 2021 statutory deadline must be addressed by the Federal Defendants with an urgency and timeliness proportional to the statutory deadline for the issuance of the leases."[62] However,

---

[59] *See* Docket 84 at 3.

[60] *See Native Vill. of Nuiqsut*, 9 F.4th at 1208 (quoting *Knox*, 567 U.S. at 307).

[61] Docket 76 at 2.

[62] Docket 76 at 11 (citing Tax Act § 20001(c)(2) ("The Secretary shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 16 of 19

once the lease cancellation occurred, Federal Defendants noted in their response that Plaintiffs "could not undertake lease implementation actions regardless of whether they prevail on their Motion, because the Department of the Interior cancelled the corresponding leases in a Decision dated September 6, 2023."[63] In their reply, Plaintiffs acknowledge that the lease cancellation "overt[ook] the present Motion" in that regard and that they would instead be filing the above Rule 60(b) motion.[64] Plaintiffs also request that, should the Court find the case not moot, the Court grant the motion to amend the judgment.[65]

Plaintiffs' first request seeking amendment to the Court's order pertaining to archeological surveys and other lease implementation actions is now moot given that AIDEA's leases have been cancelled. However, Plaintiffs' second request regarding timelines for "follow-up matters ancillary to the issuance of the leases" from the December 2021 sale is not moot, because this request directly implicates the validity of the Moratorium, which this Court has resolved.[66] While Plaintiffs make this second request pursuant to Rule 59(e), they fail to identify under which of the four basic grounds they seek relief, and the Court finds that Plaintiffs have

---

transportation necessary to carry out this section.")).

[63] Docket 79 at 4 n.2.

[64] Docket 83 at 3.

[65] Docket 83 at 10.

[66] *See* Docket 76 at 11 (citing Tax Act § 20001(c)(2)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 17 of 19

not shown that any of the four bases apply.[67]  Although Plaintiffs may disagree with the Court's discussion of case law, Plaintiffs have not shown that there was a manifest error of law or fact.[68]  They have not presented newly discovered or previously unavailable evidence.  Nor do they claim that a manifest injustice has occurred or that there has been any intervening change in controlling law.[69]  Accordingly, the Court finds that there is no basis to alter its judgment regarding timelines for follow-up matters ancillary to the December 2021 lease sale.  Given the "considerable discretion" the Court has in granting or denying a Rule 59(e) motion, the Court denies this motion.[70]

---

[67] *See Allstate Ins. Co.*, 634 F.3d at 1111 (citations omitted) (holding that, while not limited to these four grounds, a Rule 59(e) motion may be granted "(1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law").

[68] *See* Docket 83 at 7-8.

[69] *See Allstate Ins. Co.*, 634 F.3d at 1111 (citations omitted).

[70] *Id.* (citation omitted).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for Relief from Final Judgment
Page 18 of 19

## CONCLUSION

In light of the foregoing, IT IS ORDERED that Plaintiffs' and Intervenor-Plaintiff's Motion to Alter or Amend Summary Judgment Order and Judgment at Docket 76 and Plaintiffs' and Intervenor-Plaintiff's Motion for Relief from Final Judgment at Docket 84 are each DENIED.

DATED this 22nd day of February, 2024, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motion to Alter or Amend Summary Judgment Order and Judgment and Motion for
Relief from Final Judgment
Page 19 of 19



THE DEPUTY SECRETARY OF THE INTERIOR
WASHINGTON

**SEP 06 2023**

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

DECISION

| | | |
|---|---|---|
| Alaska Industrial Development | : | Oil and Gas Leases |
| and Export Authority | : | AA095889 |
| 813 West Northern Lights Blvd. | : | AA095890 |
| Anchorage, Alaska  99503 | : | AA095893 |
| | : | AA095897 |
| | : | AA095898 |
| | : | AA095900 |
| | : | AA095901 |

<u>Lease Cancellation</u>

After careful review of all available information related to the seven oil and gas leases identified in the caption above, the Department of the Interior (Department) has determined that the leases were improperly issued due to pre-leasing legal defects. The record before the Department has confirmed the seriousness of those legal defects in the environmental review supporting the leases, and, in light of the minimal disruptive consequences of cancellation, the Department has determined that cancellation is appropriate. The reasons for that determination are set forth below.

**I.      Background**

    A.  First Lease Sale

Section 20001 of the Tax Cuts and Jobs Act of 2017, Public Law 115-97 (Tax Act) directed the Secretary of the Interior (Secretary), acting through the Bureau of Land Management (BLM), to (1) "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain"; (2) issue "any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out [the Program]"; and (3) conduct two oil and gas lease sales by December 2021 and December 2024, respectively, of not less than 400,000 acres each.

In September 2019, BLM issued the "Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement" (Coastal Plain EIS) under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4231-4370h. In August 2020, the Secretary signed a record of decision (2020 ROD) approving a leasing program, determining where and under what terms and conditions leasing would occur. Shortly after issuance of the 2020 ROD, 4 lawsuits were filed by 16 environmental groups, 3 Alaska Native tribes and an Alaska Native organization, and 15 States. On January 5,

2021, without discussing whether plaintiffs were likely to succeed on any of their claims, the U.S. District Court for the District of Alaska denied three motions for preliminary injunction seeking to prevent issuance of leases.[1]

During the first required lease sale held on January 6, 2021, BLM received 13 total bids on 11 tracts covering 552,802 acres of the 1,089,053 acres offered. On January 13, 2021, the Department issued seven leases to the Alaska Industrial Development and Export Authority (AIDEA). On January 15, 2021, the Department issued one lease each to Regenerate Alaska, Inc. and to Knik Arm Services, LLC. AIDEA abandoned its qualifying high bids on the two remaining lease tracts. The BLM relied on the Coastal Plain EIS for its NEPA compliance for the lease sale and conducted the lease sale and issued leases in accordance with the 2020 ROD.[2]

    B.  Secretary's Order 3401 and Lease Suspensions

On June 1, 2021, the Secretary issued Secretary's Order 3401, which identified "multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under [NEPA], including failure to adequately analyze a reasonable range of alternatives in the [EIS]; and (2) failure in the August 17, 2020, [ROD] to properly interpret [the Tax Act]." Secretary's Order 3401 directed the initiation of a "process to conduct a comprehensive environmental analysis, complete necessary consultation, and correct the identified legal deficiencies" and "as appropriate and consistent with applicable law, take appropriate action with respect to existing leases in light of the direction provided herein."

Also on June 1, 2021, the Department suspended the nine leases, with each suspension decision stating:

> The BLM will undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures. The BLM will publish a notice of intent to begin this process to undertake additional analysis, complete necessary consultation, and correct defects in the EIS and ROD. When complete, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases.

On August 4, 2021, BLM issued a *Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program*, 86 Fed. Reg. 41989, which initiated the scoping process to begin the comprehensive analysis of potential environmental impacts, including addressing deficiencies identified in Secretary's Order 3401. On November 4, 2021, AIDEA filed a lawsuit in U.S. District Court for the District of Alaska (*Alaska Industrial*

---

[1] The four cases challenging the 2019 Coastal Plain EIS and 2020 ROD have been stayed prior to any briefing on the merits pending completion of the additional environmental analysis, with a court order of September 13, 2021, directing status reports at key milestones in the new environmental review. The next such status report is required at the issuance of the Draft Supplemental Environmental Impact Statement or no later than September 29, 2023.

[2] While the Department did not promulgate implementing regulations for the Tax Act, the Department generally looks to the NPRPA or its implementing regulations for guidance consistent with the Tax Act's direction that "the Secretary shall manage the oil and gas program in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. § 6501 et seq.) [NPRPA] (including regulations)."

2

*Development and Export Authority v. Biden*; 3:21-cv-00245-SLG), challenging, among other things, the Department's issuance of Secretary's Order 3401 and the lease suspensions.[3]

Based on an agreement initiated at the request of the lessee to rescind its lease and refund its payments, on April 28, 2022, BLM rescinded and cancelled the lease held by Regenerate Alaska, Inc. and started the process to refund the full bonus bid and first year's rental. A similar request to rescind its lease and refund its payments, was made by Knik Arm Services LLC. On August 16, 2022, BLM rescinded and cancelled the lease and started the process to refund the cash bond, full bonus bid, and first year's rental.

On August 19, 2022, the Department issued to AIDEA, the only remaining leaseholder under the Program, an "Addendum to Suspension of Operations and Production" ("Addendum"), identifying an additional legal defect related to the analysis of foreign greenhouse gas emissions:

> In the Suspension of Operations and Production, dated June 1, 2021, the Department identified two legal defects and also several areas involving a potential legal defect, specifically including the treatment of foreign greenhouse gas (GHG) emissions in the Environmental Impact Statement (EIS). … The Department has concluded that this legal defect provides an additional basis to continue to suspend the above-referenced leases and complete further environmental analysis under NEPA.

The Addendum repeated that "[t]he BLM is conducting this additional NEPA analysis to determine whether the leases should be affirmed, voided, or subject to additional mitigation measures." The Addendum also indicated that the decision on the existing leases might happen prior to the completion of the additional environmental analysis: "Once sufficient information is developed, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases."

## II.     Exercise of Secretary's Lease Cancellation Authority Due to Pre-Leasing Legal Defects

The Secretary has inherent authority, under her general managerial power over public lands, to cancel or suspend oil and gas leases issued in violation of a statute or regulation. *Boesche v. Udall*, 373 U.S. 472 (1963). This authority exists whether the statute or regulation violated is substantive (e.g., a law prohibiting leasing) or procedural (e.g., the National Environmental Policy Act).[4]

---

[3] On August 7, 2023, the court issued a decision rejecting all the claims raised by AIDEA and dismissing the lawsuit. Order Re Motions for Summary Judgment, Slip Op. at 74.

[4] The BLM has occasionally sought to address procedural errors by completing an additional process *post hoc* (e.g., additional NEPA analysis to address a NEPA error), and then determining whether the leases should be cancelled. *See Clayton W. Williams Jr.*, 103 IBLA 192, 203 (1988); *N. Cheyenne Tribe v. Lujan*, 804 F. Supp. 1281, 1285 (D. Mont. 1991); *see also Douglas Timber Operators v. Salazar*, 774 F. Supp. 2d 245 (D.D.C. 2011); *S. Utah Wilderness All.* (*SUWA*), 194 IBLA 333, 334, 337 and note 28 (2019) (collecting cases); *Bd. of Cnty. Comm'rs of Pitkin Cnty.*, 186 IBLA 288, 293-295 (2015), *reconsideration denied*, 187 IBLA 328 (2016). Nothing obligates BLM to take such an approach, and, for the reasons set forth below, further process is inappropriate in this case given the gravity of the errors and the minimal consequences of cancellation.

3

After reviewing the Coastal Plain Oil and Gas Program pursuant to Section 4 of Executive Order 13990, entitled "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis," January 20, 2021, Secretary's Order 3401 identified two specific legal deficiencies in the record supporting the leases: (1) insufficient analysis under NEPA, including failure to adequately analyze a reasonable range of alternatives in the EIS and (2) failure in the August 17, 2020, ROD to properly interpret the Tax Act.

With respect to the first and second identified defects, the Coastal Plain EIS failed to analyze a reasonable range of alternatives because it did not analyze any alternative—besides the no action alternative—that involved fewer than 2,000 acres of surface development. NEPA requires consideration of a reasonable range of alternatives, 40 C.F.R. § 1502.14, as the "heart" of the environmental impact statement. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1207 (9th Circ. 2004). Here, BLM omitted consideration of an alternative that involved fewer than 2,000 acres to be covered by "production and support facilities" on the grounds that such an alternative would conflict with the direction in the Tax Act. *See* Coastal Plain Oil and Gas Leasing Program Final Environmental Impact Statement (2019) at 2-44; Coastal Plain Oil and Gas Leasing Program Record of Decision (2020) at 10.

This was in error. The Tax Act provides, in relevant part:

> (3) SURFACE DEVELOPMENT.—In administering [the program], the Secretary shall authorize *up to* 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

Pub. L. 115-97, § 20001(c)(3) (2017) (emphasis added).

The phrase "up to" plainly indicates that BLM may authorize less than 2,000 acres for production and support facilities, and BLM's conclusion otherwise was incorrect as a matter of law, as well as unreasonable. *See Terumo Ams. Holding, Inc. v. Tureski*, 2015 U.S. Dist. LEXIS 97592, *12 (D. Mass. July 27, 2015) (collecting cases and concluding that "[t]he ordinary meaning of "up to" is one of limitation, implying a maximum cap or limit"); *see also AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1285 (Fed. Cir. 2003); *Ass'n for Cmty. Affiliated Plans v. US Treasury*, 392 F. Supp. 3d 22, 45 (D.C. Dist. 2019). *Accord* 163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017) (Sen. Murkowski, floor statement on the Tax Act legislation) ("[T]he environment and local wildlife will always be a concern, always be a priority . . . . That is why surface development will cover *up to*, but no more, than 2,000 Federal acres.") (emphasis added).

The BLM's mistaken interpretation of the Tax Act's 2,000-acre provision constrained analysis of the reasonably foreseeable development scenario and IS—every action alternative evaluated in the 2019 EIS involved exactly 2,000 acres of surface development. By omitting any alternative that evaluated fewer than 2,000 acres of surface development, the EIS failed to adequately inform the decisionmaker and to provide a meaningful basis for comparison of alternatives.[5]

---

[5] While the NEPA process is still ongoing, the Draft Supplemental Environmental Impact Statement, incorporating feedback from the Cooperating Agencies, has resulted in a substantially revised and expanded range of alternatives, including considering varying levels of surface development and the development of a new action alternative that is

4

The BLM's omission in this case was noteworthy because the statutory purposes of the Arctic National Wildlife Refuge include not merely provision of "an oil and gas program," but also the existing purposes impacted by surface development, including conservation of "fish and wildlife populations and habitats on their natural diversity," "the opportunity for continued subsistence uses by local residents," and "water quality." Alaska National Interest Lands Conservation Act (ANILCA), P.L. 96-487 (1980) § 303(2)(B),[6] *see Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 804 (D. Alaska Aug. 18, 2021) (finding the errors identified by the court to be serious, including "fail[ing] to adequately analyze a reasonable range of alternatives for the Willow Project—a process that is 'the heart of the environmental impact statement.'"); *Ctr. for Biological Diversity v. DOI,* 623 F.3d 633, 642 (9th Cir. 2010) ("'The existence of reasonable but unexamined alternatives renders an EIS inadequate,'" quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998)).

In addition to these specific defects, the Department's June 1, 2021 Suspension Order also identified "several areas for which additional analysis may either address a potential legal defect or, at a minimum, serve NEPA's purpose to meaningfully inform the decisionmaker as to the environmental consequences of federal action." Those areas included, but were not limited to, the EIS's treatment of foreign greenhouse gas (GHG) emissions and compliance with the subsistence analysis required by section 810 of the ANILCA. The Department also noted it was "carefully evaluating its approach to this issue and may later identify this issue as an additional specific legal error depending on the resolution of pending court cases involving similar issues."

On August 19, 2022, in its Addendum to the suspension decision, the Department identified an additional legal error in the record supporting the AIDEA leases. Specifically, the Department noted that, in *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739 (D. Alaska Aug. 18, 2021), the District Court for the District of Alaska had invalidated approval of an oil and gas project that, like the NEPA analysis for the leases here, "did not give a quantitative estimate of the downstream GHG emissions that would result from changes in consumption of oil abroad due to the foreseeable production of Coastal Plain oil . . . [or] sufficiently explain why it could not do so and provide a more thorough discussion of how changes in foreign oil consumption might change the GHG emissions analysis." *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) (holding that the Bureau of Ocean Energy Management's (BOEM) approval of the "Liberty" offshore drilling and production facility failed to comply with NEPA because it did not adequately estimate emissions resulting from increased foreign consumption of oil or sufficiently explain why it could not); *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113

---

significantly different from the action alternatives previously considered. For example, BLM has developed a scalable hypothetical development model which applies proportional adjustments across the range of alternatives to guide the hypothetical number of acres that may be developed. Additionally, BLM has developed revised stipulations and required operating procedures that provide significant new restrictions on where surface development can occur. These changes have impacted the availability for surface development of a large portion of the Program area, including a majority of the area currently under lease. These new stipulations and required operating procedures are included in the analysis of a new alternative, Alternative D, significantly expanding the range of alternatives from that previously considered.

[6] Section 1.1 of the Coastal Plain Oil and Gas Leasing Program Final EIS (September 2019) acknowledges that "[t]he oil and gas leasing program must consider the Arctic Refuge purposes set out in Section 303(2)(B) of ANILCA, as amended by Section 20001 of PL 115-97."

(D.D.C. 2022), *vacated on other grounds* 2023 U.S. App. LEXIS 10554 (D.C. Cir. 2023) (citing *Ctr. for Biological Diversity* and *Sovereign Inupiat* and holding that BOEM's decision to hold an offshore oil and gas lease sale was arbitrary and capricious because it failed to provide a quantitative estimate of downstream GHG emissions resulting from reduced foreign consumption or adequately explain why it could not). *See also Alaska Industrial Development and Export Authority v. Biden*; Order Re Motions for Summary Judgment, Slip Op. at 58-59 (citing *Ctr. for Biological Diversity* and finding that the Coastal Plain EIS failed to consider GHG emissions resulting from foreign oil consumption, in violation of NEPA).

A recent Court of Appeals decision highlighted the importance of quantifying downstream emissions in a NEPA document for a sizable fossil fuel authorization. *350 Montana v. Haaland*, 50 F.4th 1254, 1268 (9th Cir. 2022) ("The omission of combustion-related emissions also contradicts a key premise of the [agency's environmental assessment and finding of no significant impact]—that climate change is a global problem."). The EIS for the leasing decisions at issue here used the same model (MarketSim) as did BOEM and BLM in the cases cited above, which excluded consideration of the impacts of foreign consumption on downstream GHG emissions. Because the emissions from the leasing decisions at issue—like the discrete projects at issue in *Sovereign Inupiat for a Living Arctic* and *350 Montana*—readily lend themselves to quantification of reasonably foreseeable downstream GHG emissions in order to "inform[] the public and ensur[e] agency consideration of the environmental impacts of its actions," the omission of that quantification was serious and tainted the leasing decisions before they were finalized. *350 Montana v. Haaland*, 50 F.4th at 1265. Furthermore, in the Ninth Circuit, vacatur is "the presumptive remedy for agency action that violates the NEPA as reviewed through the [Administrative Procedure Act]." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt*., 36 F.4th 850, 882 (9th Cir. 2022) (citation omitted), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr*., No. 22-703, 2023 WL 3801206 (U.S. June 5, 2023).

For the foregoing reasons, the Department has determined that the legal deficiencies undergirding the original lease sale were sufficiently serious and fundamental to the decision-making process to justify addressing the underlying issues in a completely new analysis rather than trying to rectify past errors through remedial NEPA analysis. While the original suspension order indicated that the Department might complete the NEPA process before deciding whether to cancel the leases, we also noted in the addendum to the original lease suspension that "[o]nce sufficient information is developed, BLM will issue a new decision concerning this suspension of operations." As set forth above, that information has been revealed at the draft Supplemental Environmental Impact Statement stage. In addition, there are practical considerations that support cancelling the invalidly-issued leases now. Specifically, cancelling these leases before consummation of the NEPA process to support a 2024 sale as required by the Tax Act will enable the Department to consider whether some or all of the areas at issue in these leases may be offered in the second lease sale contemplated by the Tax Act. As a general matter, moreover, the Department recognizes the value of finality for all interested parties vis-à-vis the subject leases. Accordingly, there is no reason for further delay in his matter.

The Department has also considered the disruptive consequences of cancellation and finds those consequences to be minimal. Less than 140 days after the AIDEA leases were issued, the Department identified serious pre-leasing legal defects and suspended the leases. Since that time,

the lease terms have been tolled and lease rentals suspended. No approved permits or authorizations for exploration or other activity on the leases were affected by the lease suspension and no ongoing activity will be disrupted.[7] Because AIDEA will receive a full refund of the bonus bid and first year's rentals consistent with this decision to cancel the leases, the consequences from cancellation are minimal.

### III.   Conclusion

In consideration of the foregoing, and in accordance with the Secretary's inherent authority under her general managerial power over public lands, the seven leases identified in the caption above are cancelled as being invalidly issued. I reach this decision based on the seriousness of the pre-leasing legal errors given the special legal and factual circumstances of the original leasing decisions, and on the minimal disruptive consequences from cancellation.

Lease payments not previously refunded, comprising lease sale bonus bids and first year rentals totaling $12,801,425 were made in January 2021 for the seven leases. Our cancellation of the seven leases entitles AIDEA to a refund of that amount.

You are not entitled to interest on that amount because the United States cannot pay interest without statutory authorization and there is no applicable authority allowing payment of interest for refunds of lease bonus bid and rental payments.

### IV.   Final Agency Action

It is my decision to hereby cancel all seven of AIDEA's leases. You are entitled to a refund of lease payments totaling $12,801,425. You are not entitled to interest on that amount.

My decision constitutes the final decision of the Department and, in accordance with the regulations at 43 C.F.R. § 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 C.F.R. Part 4.

Sincerely,

Tommy P. Beaudreau

---

[7] By way of contrast, this is not a case where the lessee had acquired and held the leases for several years, paying annual rent without notice of pre-leasing legal defects or limitations on development. Nor is it a case where a lessee has spent considerable time and money in exploration activities and invested large amounts in the engineering and preparation of a development plan. In fact, AIDEA has no outstanding reclamation obligations to BLM related to these leases because there has been no development or surface disturbance on the leases.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, *et al.*, | |
| Plaintiffs, | |
| and | Case No. 3:21-cv-00245-SLG |
| STATE OF ALASKA, | |
| Intervenor-Plaintiff, | |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,[1] | |
| Defendants, | |
| and | |
| NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, *et al.*, | |
| Intervenor-Defendants. | |

## ORDER RE MOTIONS FOR SUMMARY JUDGMENT

Before the Court at Docket 60 is the motion for summary judgment filed by

Plaintiffs Alaska Industrial Development and Export Authority ("AIDEA"), North

Slope Borough, Arctic Slope Regional Corporation, and Kaktovik Iñupiat

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the current Alaska State Director for the Bureau of Land Management, Steven Cohn, is automatically substituted in this matter for his predecessor, Defendant Thomas Heinlein.

Corporation; at Docket 59 is Intervenor-Plaintiff State of Alaska's (the "State") motion for summary judgment.[2]  Plaintiffs and the State challenge President Joe Biden's Executive Order 13990 ("EO 13990") and actions the U.S. Department of the Interior ("DOI" or "Interior") and the Bureau of Land Management ("BLM") took to implement that order's directive to place a temporary moratorium (the "Moratorium") on the federal government's implementation of an oil and gas leasing program (the "Program") on the Coastal Plain of the Arctic National Wildlife Refuge ("ANWR" or the "Refuge").

The President, DOI, Interior Secretary Deb Haaland, Interior Principal Deputy Assistant Secretary of Land and Minerals Management Laura Daniel-Davis, BLM, BLM Director Tracy Stone-Manning, and BLM Alaska State Director Cohn (collectively, "Federal Defendants")[3] responded in opposition at Docket 63 to Plaintiffs' and the State's motions and request entry of judgment in their favor. Intervenor-Defendants Gwich'in Steering Committee, *et al.*, and the Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council (collectively, "Intervenor-Defendants") responded in opposition to Plaintiffs' and the State's motions at Docket 64 and Docket 65, respectively.[4]  Federal

---

[2] Throughout this order, the citations to the parties' filings refer to the page numbers from the docket rather than the page numbers of the parties' briefs.

[3] When appropriate throughout this order, the Court refers to all Federal Defendants except for the President as "Agency Defendants."

[4] The Gwich'in Steering Committee submitted its opposition at Docket 64 on behalf of itself and the Alaska Wilderness League; the Alaska Wildlife Alliance; the Canadian Parks & Wilderness Society – Yukon; Defenders of Wildlife; Environment America, Inc.; Friends of Alaska National

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 2 of 74

Defendants and Intervenor-Defendants are hereinafter collectively referred to as "Defendants." Plaintiffs replied to the oppositions at Docket 67, and the State replied at Docket 66.

The Court heard oral argument on June 20, 2023. For the reasons set forth below, the Court denies Plaintiffs' and the State's motions and enters judgment in favor of Defendants.

## BACKGROUND

This case is one of several actions involving Agency Defendants' implementation of the Program on ANWR's Coastal Plain. The Court described the Coastal Plain and its cultural, ecological, and economic significance in a January 2021 order issued in *Gwich'in Steering Committee v. Bernhardt*.[5] The Court assumes familiarity here.

As relevant here, in December 2017, Congress authorized an oil and gas leasing program on the Coastal Plain through Section 20001 of the Tax Cuts and Jobs Act of 2017 (the "Tax Act").[6] Section 20001(b)(1) amends the Alaska National Interest Lands Conservation Act ("ANILCA")[7] by lifting the restriction on

---

Wildlife Refuges; the National Wildlife Federation; the National Wildlife Refuge Association; the Northern Alaska Environmental Center; the Sierra Club; The Wilderness Society; and Wilderness Watch. The remaining Intervenor-Defendants filed their joint opposition at Docket 65.

[5] Case No. 3:20-cv-00204-SLG, 2021 WL 46703, at *1–3 (D. Alaska Jan. 5, 2021).

[6] Pub. L. No. 115-97, 131 Stat. 2054 (2017) [hereinafter Tax Act].

[7] Pub. L. No. 96-487, 94 Stat. 2371 (1980) (codified in relevant part at 16 U.S.C. §§ 3101–3233) [hereinafter ANILCA].

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 3 of 74

oil and gas development on the Coastal Plain that had been included in ANILCA since it was enacted in 1980; it does so by adding an additional purpose for the Refuge: "to provide for an oil and gas program on the Coastal Plain." Section 20001(b)(2)(A) directs the Interior Secretary to "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." Section 20001(c)(1) requires the Interior Secretary to conduct at least two area-wide lease sales under this program of at least 400,000 acres each; the Interior Secretary "shall offer" the first lease sale not later than December 22, 2021, and the second not later than December 22, 2024. Section 20001(c)(2) directs the Interior Secretary to "issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." Section 20001(c)(3) provides that the Interior Secretary "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section." The Tax Act further instructs the Interior Secretary, "[e]xcept as otherwise provided in this section," to administer this oil and gas program "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 . . . (including regulations)."[8]

---

[8] Tax Act § 20001(b)(3). The regulations governing oil and gas leases under the Naval Petroleum Reserves Production Act of 1976 (the "NPRPA"), 42 U.S.C. § 6501 *et seq.*, are set

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 4 of 74

After Congress passed the Tax Act, BLM initiated the Program's review process pursuant to the National Environmental Policy Act ("NEPA"). In September 2019, BLM released an Environmental Impact Statement (the "EIS") analyzing the environmental impacts of a leasing program on the Coastal Plain.[9] The EIS evaluated three action alternatives and one no-action alternative.[10] BLM identified the alternative that "offers the opportunity to lease the entire program area" and "the fewest acres with no surface occupancy (NSO) stipulations" as its preferred alternative.[11] BLM did not analyze alternatives that allowed fewer than 2,000 acres of surface facilities, reasoning that doing so "would be inconsistent with [the Tax Act] as Congress explicitly established the protective facility acreage limit."[12]

In August 2020, then-Interior Secretary David Bernhardt published a Record of Decision (the "ROD") establishing the Program.[13] The ROD adopted the preferred alternative identified in the EIS with some modifications.[14] Then, on December 7, 2020, BLM published a Notice of 2021 Coastal Plain Alaska Oil and

---

forth at 43 C.F.R. Part 3130.

[9] Administrative Record ("AR") 1–3135. Federal Defendants filed the Administrative Record at Docket 48, Docket 53, and Docket 56.

[10] AR 19–20.

[11] AR 19.

[12] AR 76.

[13] AR 3138–3225.

[14] AR 3145.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 5 of 74

Gas Lease Sale and Notice of Availability of the Detailed Statement of Sale.[15]  The lease sale took place on January 6, 2021.[16]  Three bidders participated: AIDEA; Knik Arm Services, LLC; and Regenerate Alaska, Inc.[17]  AIDEA secured leases for seven tracts of land, while Knik Arm Services, LLC, and Regenerate Alaska, Inc., each secured a lease for one tract of land.[18]

When President Biden took office two weeks later, he issued EO 13990, which directed DOI to conduct a supplemental environmental review of the Program and, during the pendency of such review, temporarily halt all activities related to the Coastal Plain oil and gas leases.[19]  Section 4(a) of EO 13990 provides:

> In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.[20]

---

[15] 85 Fed. Reg. 78865–66.

[16] AR 3314–16.

[17] AR 3314–16.

[18] AR 3317–18, 3347, 3689, 3695.

[19] AR 3349–55.

[20] AR 3351.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 6 of 74

Following the President's directive, on June 1, 2021, Interior Secretary Haaland issued Secretarial Order 3401 (the "Secretarial Order"), which instructed DOI and BLM officials to conduct the supplemental environmental review and instituted a "temporary halt on all Department activities related to the Program in the Arctic Refuge" while that supplemental review was being conducted.[21] The temporary halt extended to "any action[s] to authorize any aspect of the Program, including, but not limited to, any leasing, exploration, development, production, or transportation," and the "process[ing of] any pending or future applications for such activities."[22] The Secretarial Order expanded upon the justifications for the temporary moratorium articulated in EO 13990:

> My review of the Coastal Plain Oil and Gas Leasing Program (Program) as directed by EO 13990 has identified multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under the National Environmental Policy Act (NEPA), including failure to adequately analyze a reasonable range of alternatives in the environmental impact statement (EIS); and (2) failure in the August 17, 2020, Record of Decision (ROD) to properly interpret Section 20001 of Public Law 115-97 (Tax Act).[23]

Also on June 1, 2021, DOI issued a Suspension of Operations and Production Letter (the "SOP Letter") to each of the lessees, notifying them it was suspending the leases and associated operations pending the supplemental

---

[21] AR 3362.

[22] AR 3363.

[23] AR 3362.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 7 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 7 of 74          ER-035

NEPA review.[24]   The SOP Letter expanded upon the reasons offered for the temporary moratorium in the Secretarial Order, and a subsequent amendment offered further explanation.[25]

Agency Defendants plan to release a Draft Supplemental EIS for the Program in the third quarter of 2023.[26]   In the meantime, AIDEA, through its contractors, sought authorizations from DOI to begin the initial stages of oil and gas exploration pursuant to its leases, such as conducting archeological investigations and seismic exploration.[27]   Citing the Moratorium, Federal Defendants refused to authorize AIDEA or its contractors to proceed with any activities relating to the leases.[28]   AIDEA then brought this action on November 4, 2021, challenging both the President's issuance of EO 13990 and DOI's implementation of the Moratorium.[29]   The other two lessees have entered into

---

[24] AR 3364–65, 3714–17.

[25] AR 3364–65, 3404–05, 3714–17.

[26] Agency Defendants initially represented to the Court that they planned to release the Draft Supplemental EIS in the second quarter of 2023.  Docket 63 at 16.  However, in a related case, *Gwich'in Steering Committee v. Haaland*, Agency Defendants filed a more recent status report updating that timeframe to the third quarter of 2023.  Defs.' Status Report on Issuance of Draft Suppl. Environmental Impact Statement at 2, *Gwich'in Steering Comm. v. Haaland*, Case No. 3:20-cv-00204-SLG, (D. Alaska Apr. 28, 2023), ECF No. 95.

[27] AR 3370–98.

[28] AR 3399–3400.

[29] Docket 1.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 8 of 74

agreements with BLM in which BLM cancelled and rescinded their leases and refunded their bid and initial rental payments.[30]

In their complaint, Plaintiffs allege that the Moratorium violates the Administrative Procedure Act (the "APA"), 5 U.S.C. § 551 *et seq.*, because it was put in place without an opportunity for the public to comment on it, is contrary to law, unlawfully withholds or unreasonably delays agency action, and is arbitrary and capricious.[31] They also allege that EO 13990 is an *ultra vires* act that exceeds the President's authority.[32] Plaintiffs seek declaratory relief, a permanent injunction vacating Section 4(a) of EO 13990 and the Moratorium, and an order compelling Agency Defendants to implement the leasing and development program.[33]

For the purposes of this order, the Court considers the "Moratorium" to encapsulate Agency Defendants' efforts to implement the directive in EO 13990 by temporarily suspending implementation of the Program and the leases issued pursuant thereto. The Moratorium therefore includes issuance of Secretarial Order 3401, the SOP Letter, the responses to AIDEA and its contractors' attempts to conduct oil-and-gas-related activities on the lands leased pursuant to the Program,

---

[30] AR 3782–92.

[31] Docket 7 at 27–32, ¶¶ 115–48.

[32] Docket 7 at 32–33, ¶¶ 149–51.

[33] Docket 7 at 33–34.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 9 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 9 of 74          ER-037

and the withholding of any further actions to implement the Program pending the ongoing NEPA review.[34]  The Court considers Agency Defendants' supplemental environmental review aimed at correcting alleged legal deficiencies to be the Moratorium's primary justification, but this review remains ongoing and did not itself serve as the formal vehicle suspending the Program's implementation.[35]

## JURISDICTION

There is no dispute that the Court has subject matter jurisdiction over Plaintiffs' and the State's claims regarding Agency Defendants' actions taken to implement the Moratorium pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[36]

The parties dispute whether Plaintiffs and the State have standing to assert an *ultra vires* claim against the President with respect to his issuance of EO 13990.[37]  To establish standing, a  litigant must demonstrate that (1) it suffered an "injury in fact," (2) the injury is "fairly traceable" to the challenged conduct, and (3)

---

[34] AR 3362–65, 3395–96, 3399–3400, 3404–05, 3702–03, 3713–19.

[35] *See* Docket 66 at 15–16 (maintaining that Defendants conflate BLM's supplemental NEPA analysis with the Moratorium itself, noting that Agency Defendants could have conducted the supplemental review without imposing the Moratorium).

[36] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[37] *Compare* Docket 60 at 18–19 (alleging that Plaintiffs have standing), *with* Docket 63 at 21–26 (alleging Plaintiffs do not have standing and therefore the Court lacks subject matter jurisdiction over the claim against the President).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 10 of 74

it is likely that a favorable decision will redress the injury.[38]  To establish an injury in fact, a plaintiff must identify "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical."[39]  Plaintiffs and the State's asserted injuries pass this hurdle.  AIDEA Plaintiffs complain that they have been unable to proceed with the activities critical to developing AIDEA's leases, such as archeological and seismic work, meaning that they cannot reap the revenue, employment opportunities, and information gathering that would result from commencing work on the leases.[40]  The State similarly points to the revenue it has lost in the form of lease payments and taxes due to the Moratorium.[41]

To demonstrate a "fairly traceable" connection between an injury and an action, a plaintiff need only show "no more than de facto causality."[42]  Plaintiffs and the State's alleged injuries are fairly traceable to EO 13990 because that Executive Order directed DOI to suspend the leases and all related activities.[43]  DOI expressly acted at the President's direction when issuing Secretarial Order 3401

---

[38] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations omitted).

[39] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016) (citation omitted).

[40] Docket 60 at 18–19.

[41] Docket 59 at 16–17.

[42] *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (citation omitted).

[43] *See* AR 3351 ("[T]he Secretary of the Interior shall . . . place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program . . . .").

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 11 of 74

and implementing the other components of the Moratorium.[44]  It is fair to say that without the President's issuance of EO 13990, there likely would not have been a Moratorium, or at least not *this* moratorium implemented at the time and manner in which DOI implemented it.

To evaluate redressability, a court considers the relationship between "the judicial relief requested" and the suffered injury.[45]  The Court has the authority to vacate a President's *ultra vires* action and order Agency Defendants to implement the Program in accordance with the law,[46] which is precisely what Plaintiffs and the State are seeking and what would redress their injuries.[47]

Federal Defendants' arguments to the contrary are unavailing.  They point to two cases in which a district court rejected challenges to an executive order that allegedly "delayed or derailed the promulgation of desired rules."[48]  Each case challenged the same executive order that directed agencies to repeal two regulations for every new regulation issued, offset costs from new regulations by eliminating costs from existing regulations, and comply with an "annual cap" on the

---

[44] *See* AR 3362 ("This Order is taken in furtherance of Section 4(a) of Executive Order (EO) 13990 . . . .").

[45] *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (citation omitted).

[46] *See Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998).

[47] Docket 7 at 33–34; Docket 22 at 12–13.

[48] Docket 63 at 24 (first citing *California v. Trump*, 613 F. Supp. 3d 231 (D.D.C. 2020); and then citing *Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 152 (D.D.C. 2019)); *California*, 613 F. Supp. 3d at 236.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 12 of 74

total incremental costs allowed from all federal regulations issued in a given year.[49]

Each court found that the plaintiffs lacked standing because they could not show that the challenged executive order caused any material delay to the particular rules about which the plaintiffs complained and the agency defendants presented evidence showing that the delay or rescission of the rules was not connected to the executive order.[50]

Here, there is no genuine dispute that EO 13990 is causally connected to the Moratorium. The Executive Order not only expressly orders the Moratorium,[51] but the Secretarial Order and SOP Letter also expressly state the agency action was taken in furtherance of the Executive Order.[52] Thus, vacatur of EO 13990 would redress Plaintiffs' claimed injuries.

Given the above, the Court finds that Plaintiffs and the State meet the requirements for standing to challenge EO 13990. As a result, the Court has subject matter jurisdiction over the *ultra vires* claim pursuant to 28 U.S.C. § 1331, which vests the Court with jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."

---

[49] *See California*, 613 F. Supp. 3d at 236–37 (describing the nature of the claims at issue in both that case and *Public Citizen*).

[50] *Id.* at 244.

[51] AR 3351.

[52] AR 3362, 3364.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 13 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 13 of 74   ER-041

## LEGAL STANDARD

Plaintiffs maintain that EO 13990 exceeds the President's statutory and constitutional authority.[53]  While a President's actions are not reviewable under the APA,[54] a court may review an executive order to determine whether it is constitutional and whether the President acted within his statutory authority.[55]

Plaintiffs and the State also seek review of Agency Defendants' implementation of the Moratorium pursuant to the APA.[56]  Section 706 of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law[,] . . . [or] in excess of statutory jurisdiction, authority, or limitations."[57]

---

[53] Docket 60 at 19–20.

[54] *See Dalton v. Specter*, 511 U.S. 462, 470 (1994) ("The actions of the President, in turn, are not reviewable under the APA because . . . the President is not an 'agency.'" (citation omitted)).

[55] *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself."); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (holding President lacked authority to issue executive order directing agencies to withhold funds appropriated by Congress to punish localities that adopted "sanctuary" policies).

[56] Plaintiffs and the State filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, which is an appropriate mechanism to seek review of an agency action.  Docket 59 at 2; Docket 60 at 7, 17–18; *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).  *But see* Alaska L. Civ. R. 16.3 (providing procedures for briefing administrative agency appeals).  Defendants also request judgment in their favor, effectively making their opposition filings cross-motions for summary judgment pursuant to Rules 56 and 7(b).  Docket 63 at 8 n.1; Docket 64 at 13–14; Docket 65 at 9.

[57] 5 U.S.C. § 706.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 14 of 74

## DISCUSSION

Plaintiffs' and the State's challenges to both EO 13990 and Agency Defendants' implementation of the Moratorium allege the lack of statutory authority. Therefore, the Court begins by considering whether any statutory authority exists for the Moratorium. If there is authority for Agency Defendants to implement the Moratorium, then it would stand to reason that the President acted consistent with his presidential powers when issuing EO 13990 since he directed Agency Defendants to act consistent with their authority.[58] After considering the legal authority underpinning the Executive Order and the Moratorium, the Court considers Plaintiffs' and the States' APA claims against Agency Defendants.

I. **The Tax Act provides authority for both EO 13990 and Agency Defendants' implementation of the Moratorium, authority which no other source of law undermines.**

Plaintiffs and the State maintain that Congress, not the executive branch, has the power to manage federal lands and that the Executive Order and Moratorium violate the mandate of the Tax Act and the amendment to ANILCA to provide for an oil and gas leasing program on the Coastal Plain.[59] Plaintiffs also allege that the Moratorium constitutes "an unlawful withdrawal" of public lands

---

[58] AR 3351.

[59] Docket 60 at 20, 24 (first citing U.S. Const. art IV, § 3 cl. 2; and then citing Tax Act § 20001). The State also alleges that "DOI cannot cancel the Coastal Plain leases because to do so would violate the Tax Act." Docket 59 at 25.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 15 of 74

because it did not comply with the Federal Land Policy and Management Act of 1976's ("FLPMA") withdrawal requirements.[60]

Federal Defendants respond that the Moratorium does not violate any federal statute and that the President has broad constitutional latitude to formulate policy and implement statutory mandates within the confines of federal law, which they claim the President did here by including within the Executive Order a "savings" clause cabining the Interior Secretary's authority to those actions that are "appropriate and consistent with applicable law."[61]   Intervenor-Defendants similarly maintain that DOI's efforts to suspend temporarily the Program leases are "consistent with [DOI's] authority to fix legal problems and manage lands, and no statute imposes other directives or processes with which Interior failed to comply."[62]

## A.    The Moratorium's Temporary Duration and Limited Scope

As an initial matter underlying the Moratorium's legality, the Court highlights what are perhaps the Moratorium's most critical elements: its temporary duration and limited scope.   Plaintiffs and the State characterize the Moratorium as

---

[60] Docket 60 at 30–31.

[61] Docket 63 at 21–22.

[62] Docket 64 at 13 (citation omitted); *see also* Docket 65 at 8 ("It is well within the Secretary's discretion to order such a [NEPA] supplementation as well as to protect the public resources at issue by issuing a temporary suspension of leases to maintain the status quo ante while the supplemental EIS process is undertaken." (citation omitted)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 16 of 74

"indefinitely" suspending the ROD prepared in conjunction with the Program.[63]
This characterization is inaccurate.  EO 13990 expressly directs only a "*temporary*
moratorium,*"* and Secretary Order 3401 orders a "*temporary* halt on all
Department activities related to the Program."[64]  The SOP Letter also connotes
temporality: "*While this SOP is in place*, no lease operations may transpire on the
leases, the terms of the leases are *tolled*, and lease rentals are *suspended*."[65]
These documents do not suspend the ROD, EIS, or any other component of the
Program's NEPA review or other prerequisites.  And they contain no statement or
suggestion that the Program, including the ROD, is terminated or that AIDEA's
leases are cancelled.[66]  Agency Defendants have instead evidenced an intent to
continue implementing the Program.[67]  The supplemental NEPA review is the
current stage of that implementation.[68]  Agency Defendants intend to release their
Draft Supplemental EIS later this year, and they have outlined the steps that will

---

[63] *See* Docket 59 at 3 ("In effect, DOI and BLM accomplished the President's desired moratorium by suspending and disregarding the ROD indefinitely."); Docket 60 at 39–40 ("By indefinitely suspending all Coastal Plain leases and indefinitely refusing to process any right-of-way applications, . . . Agency Defendants are unlawfully and unreasonably delaying the completion of these discrete, required actions." (footnote omitted)).

[64] AR 3351 (emphasis added); AR 3362 (emphasis added).

[65] AR 3365 (emphasis added).

[66] The SOP Letter notes that DOI eventually *may* determine to "void[]" the leases, but that is not the case now and the validity of such an action is not before the Court.  AR 3365.

[67] *See* AR 3369 (establishing timeframe for issuance of a "record of decision selecting a program alternative").

[68] AR 3368–69; Docket 63 at 16.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 17 of 74

follow thereafter as they continue to implement the Program.[69]  As such, the Moratorium has a finite, even if inexact, endpoint, and it is limited to a suspension of lease operations.  Agency Defendants established these fundamental elements at the outset of the process reinitiating the supplemental environmental review, and there is no indication that they have deviated or plan to deviate significantly from their stated plan.[70]

Contrary to Plaintiffs' and the State's assertions,[71] a temporary pause in implementing a program is not a decision to indefinitely cease its implementation. An agency may terminate a moratorium and authorize activities it previously paused.[72]  Additionally, the temporary pause implemented here does not violate any express deadlines in any statute.  The Tax Act mandated only that DOI hold one lease sale within four years of its enactment and another within seven years of its enactment.[73]  The first lease sale was held nearly one year prior to the statutory deadline; the second lease sale must occur before December 22, 2024—

---

[69] *Supra* note 29; *see also* AR 3369 (predicting release of new ROD within approximately nine months following release of Draft Supplemental EIS).

[70] *See* AR 3369 (establishing timeframe and purpose of the supplemental EIS process).

[71] *See* Docket 59 at 3 (characterizing Moratorium as "suspending and disregarding the ROD indefinitely"); Docket 60 at 29 (characterizing Moratorium as "indefinite" suspension of leases and "indefinitely freezing all federal actions necessary to effectuate any development, production, or transportation of oil and gas").

[72] *Cf. Citizens for Clean Energy v. U.S. Dep't of the Interior*, 621 F. Supp. 3d 1165, 1169 (D. Mont. 2022) (describing BLM's termination of its previously issued coal leasing moratorium).

[73] Tax Act § 20001(c)(1)(B)(ii).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 18 of 74

after the Supplemental EIS is due to be completed.[74]  There are no other deadlines in the Tax Act, such as deadlines to issue rights-of-way or easements or to authorize surface development.[75]

These critical points guide the Court's analysis; yet throughout their briefing, Plaintiffs and the State appear to conflate the statutory mandate to conduct two lease sales by dates certain with a requirement to perform certain post-sale actions without any pause or moratorium.[76]  But the Tax Act contains only the two deadlines by which Interior must hold the lease sales; no other specific deadlines are set out in the Tax Act for the Program.[77]  When Congress imposes an explicit deadline for one agency action in a statute but not for another action, "it seems likely that Congress acted intentionally in omitting the . . . deadline [for a different agency action]."[78]  In the absence of other statutorily mandated timeframes, the

---

[74] *Id.* § 20001(c)(1)(B)(ii).

[75] *See generally id.* § 20001.

[76] *See, e.g.*, Docket 60 at 25 ("[T]he issuance of leases, rights-of-way, and easements necessary to explore for, develop, produce, or transport oil and gas in the Coastal Plain is not a matter of discretion for the Agency Defendants.  Rather, Agency Defendants are bound by statute to issue all such leases, rights-of-way, and easements."); Docket 60 at 28 ("[T]he Tax Act mandates a lease sale by December 2021, followed by the issuance of any rights-of-way or easements . . . .  Agency Defendants have attempted to nullify this congressional deadline by issuing leases before December 2021 only to indefinitely suspend them well beyond that date." (citation omitted)); Docket 66 at 6 ("The Secretary also is not issuing rights-of-way or easements necessary to carry out the Program, a fact that the Federal Defendants do not dispute. . . .  As such, the ROD has been effectively suspended and rescinded." (citation omitted)).

[77] Tax Act § 20001(c).

[78] *See Gen. Motors Corp. v. United States*, 496 U.S. 530, 538 (1990) (holding that statutory requirement that EPA act on a state plan within four months applied only to original state plan, not to revised state plan).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 19 of 74

agency is only required to complete the post-lease-sale components of the Program within a reasonable period of time.[79]

## B.    The Tax Act

The Court next considers whether the Moratorium and EO 13990 are within the executive branch's authority.  Plaintiffs and the State are correct that the executive branch can act only in accordance with its own constitutional powers or the expressed or implied will of Congress.[80]  In many cases, federal statutes are the appropriate starting point to determine whether the executive branch possesses the authority to act.[81]

Here, the parties focus much of their briefing on the Tax Act.  Although Article IV of the Constitution gives Congress the authority to regulate public lands, Congress, through the Tax Act, expressly delegated the authority to "establish and administer" the Program on the Coastal Plain to the Interior Secretary.[82]  This broad grant of authority accords to DOI, under the supervision of the President as

---

[79] *See* 5 U.S.C. § 706(1) (directing a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed"); *cf. Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (holding that the General Mining Act of 1872 "provided no express timetable or deadline for the issuance of the patents" and, "[a]t most, . . . implie[d] that the issuance must be completed within a reasonable time, or . . . 'expeditiously' under the circumstances").

[80] *City & Cnty. of San Francisco*, 897 F.3d at 1233 (citing *Youngstown*, 343 U.S. at 585, 637–38 (Jackson, J., concurring)).

[81] *See, e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018) (reviewing the Immigration and Nationality Act's plain language to determine whether the President has discretion to place entry restrictions on the nationals of eight foreign countries).

[82] Tax Act § 20001(b)(2)(A).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 20 of 74

chief executive,[83] the authority to implement and operate the Program, provided it does so in accordance with all applicable federal laws.  By using broad language directing the Interior Secretary to administer the Program with no timetable apart from the two deadlines for the mandated lease sales,[84] Congress left the timetable for the vast majority of the Program's implementation to DOI's discretion.[85]  This includes the discretion to temporarily pause the Program while ensuring NEPA compliance.

As Plaintiffs point out, the decision of whether to "establish and administer" the Program is not subject to DOI's or the President's discretion.[86]  But this does not mean, as Plaintiffs maintain, that Congress explicitly or implicitly intended to limit the President's authority to direct DOI to pause the Program while conducting a supplemental environmental review.  To the contrary, Congress authorized DOI to suspend leases by virtue of the Tax Act's reference to the NPRPA, which expressly allows the Interior Secretary to "direct or assent to the suspension of

---

[83] *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2211 (2020) ("In our constitutional system, the executive power belongs to the President, and that power generally includes the ability to supervise and remove the agents who wield executive power in his stead. . . . The Constitution requires that such officials remain dependent on the President . . . .").

[84] The Tax Act's provisions governing the Program take up just over one page of space in the 186-page statute.  *See generally* Tax Act § 20001.

[85] *Cf. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019) (observing that the Census Act leaves much of its implementation to the Secretary of Commerce's discretion given its broad language).

[86] Docket 60 at 10, 24–25.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 21 of 74

operations and production on any lease or unit."[87]  The actions taken to implement the Moratorium are precisely within this grant of authority: DOI temporarily suspended the leases issued from the 2021 sale.[88]  There simply is no language within the Tax Act that limits the President's authority to order—or DOI's authority to implement—a temporary suspension of the Program leases while the agency undertakes supplemental environmental review.  The cases the State cites for the proposition that "[t]he ROD could have remained in effect while BLM prepared supplemental NEPA analysis"[89] do not suggest that Agency Defendants lack authority to suspend the Program's implementation while supplementing its NEPA analysis.  Those cases instead suggest only that an agency need not always—but still may have authority to—vacate or suspend an underlying action while engaging in supplemental NEPA analysis.[90]

---

[87] 42 U.S.C. § 6506a(k)(2); *see also United States v. Merrell*, 37 F.4th 571, 576 (9th Cir. 2022) ("Congress is . . . presumed to know existing law pertinent to any new legislation it enacts . . . ." (quoting *United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir. 1991))).

[88] *See* AR 3365 ("[T]he Department has concluded it is necessary to suspend the . . . lease(s) . . . . While this [suspension of operations and production] is in place, no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended.").

[89] Docket 66 at 16 (first citing *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1031 (10th Cir. 2023); and then citing *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regul., & Enf't*, 871 F. Supp. 2d 1312, 1339 (S.D. Ala. 2012)).

[90] *See Diné*, 59 F.4th at 1032 (concluding that the NEPA regulations' "silence" on whether an agency must vacate or suspend an action while supplementing a NEPA review "lends support to BLM's argument that vacatur during supplemental analysis is not mandatory"); *Defs. of Wildlife*, 871 F. Supp. 2d at 1334, 1339 (finding that BOEM did not violate NEPA by issuing leases during pendency of supplemental environmental review).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 22 of 74

Plaintiffs nonetheless argue that the NPRPA's suspension provision "pertains to specific leases based on site-specific considerations. It does not provide the Secretary blanket authority to issue a categorical suspension of operations across all leases . . . ."[91] Plaintiffs also allege that the Tax Act's "mandate for oil and gas development" supersedes the NPRPA's suspension provision due to the inclusion in the Tax Act's mandate of the phrase "except as otherwise provided in this section."[92]

Both arguments are unavailing. The NPRPA uses broad language allowing the Interior Secretary to suspend operations "on *any* lease or unit."[93] There is no language within the Tax Act or the NPRPA's suspension provision requiring "site-specific considerations," but even if there were, Agency Defendants may be making "site-specific considerations" as part of the Supplemental EIS process.[94] As for the Tax Act's mandate for oil and gas development, there is nothing in that

---

[91] Docket 60 at 28 n.8.

[92] Docket 60 at 28 n.8.

[93] 42 U.S.C. § 6506a(k)(2) (emphasis added).

[94] BLM's notice of intent to prepare the Supplemental EIS states that BLM plans to consider whether to "[d]esignate certain areas of the Coastal Plain as open or closed to leasing . . . [and] prohibit surface infrastructure in sensitive areas." AR 3368. BLM's Supplemental EIS also will "evaluate impacts to various surface resources including, but not limited to, caribou, polar bears, birds, vegetation, and surface waters including wetlands." AR 3368–69. By evaluating whether "certain" areas should be open or closed to leasing, considering whether to prohibit impacts to "sensitive" areas, and evaluating impacts to protected species and resources that inherently vary across the Coastal Plain, Agency Defendants may be making "site-specific considerations" as they conduct the supplemental NEPA review that will guide the manner in which they implement the Program and, if and when appropriate, allow operations to proceed on the issued leases.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 23 of 74

mandate to suggest that Agency Defendants cannot temporarily pause implementation of the Program to ensure it complies with the law and, upon making that determination, resume the Program's implementation. Notably, Congress included the suspension provision within the NPRPA notwithstanding the NPRPA's mandate to DOI to "conduct an *expeditious* program of competitive leasing of oil and gas."[95] If DOI can suspend lease operations and production notwithstanding the NPRPA's mandate for "expeditious" development, clearly it can do so when implementing the Tax Act, which does *not* expressly call for "expeditious" development but does specifically impose two deadlines for holding lease sales.

Plaintiffs' contention that this interpretation results in "unfettered" discretion or authority for DOI to "indefinitely suspend" the Program again conflates a temporary pause with a permanent pause.[96] DOI's discretion is constrained by the Tax Act's mandate to implement the Program and conduct the two lease sales within the required timeframe and the APA's requirement to act within a reasonable time.[97] As intimated above, Congress could have included additional deadlines requiring Agency Defendants to issue any subsequent approvals by a date certain, but it chose not to do so.[98] Rather, the Tax Act accords to DOI the discretion to

---

[95] 42 U.S.C. § 6506a(a) (emphasis added).

[96] Docket 67 at 16–17.

[97] *See supra* note 86.

[98] *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 24 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 24 of 74        ER-052

implement the Program in a manner consistent with the Tax Act and consistent with ANILCA's purposes, which include environmental conservation along with the newly added purpose of the oil and gas program, and also consistent with other applicable federal laws, including NEPA.[99]

Plaintiffs also read the Tax Act to foreclose application of the NPRPA's suspension authority to "post-sale" activities such as easement or right-of-way applications.[100]  Although these activities take place after the issuance of a lease, they are an essential component of the "administration of lease sales."[101] Moreover, the Tax Act itself accords DOI discretion in issuing easements or rights-of-way, as DOI is directed to issue those easements and rights-of-way that it determines are "necessary to carry out" the Program.[102]  This includes the discretion, subject to the APA's requirements governing agency action, to decline to issue easements or rights-of-way at a time when they are *not* necessary to the Program's implementation.

---

exclusion." (alteration in original) (citations omitted)).

[99] *See* ANILCA § 303(2)(B) (listing ANWR's purposes); 163 Cong. Rec. S7539–40 (daily ed. Nov. 30, 2017) (Murkowski Floor Statement).

[100] Docket 67 at 16.

[101] Tax Act § 20001(b)(3).

[102] *Id.* § 20001(c)(2); *cf. City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 803 (9th Cir. 2019) (noting the "broad regulatory authority" Congress vests in agencies through the use of statutory language such as "appropriate and necessary" (quoting 42 U.S.C. § 7412(n)(1)(A))).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 25 of 74

Next, Plaintiffs rely on a series of cases that they allege provide support for the proposition that the Tax Act does not confer authority to Agency Defendants to institute the Moratorium.[103]  These cases, which touch on the "major questions doctrine",[104] are inapplicable.  This is not a case involving an agency's assertion of "sweeping authority,"[105] such as a statutory interpretation that would allow an agency to "substantially restructure the American energy market"[106] or "cancel[] roughly $430 billion of federal student loan balances, completely erasing the debts of 20 million borrowers."[107]  The Moratorium affects only a total of nine oil and gas leases held by three lessees over a discrete portion of land in northern Alaska, and it is both temporary and limited in nature.  And while some out-of-circuit courts have held that "a decision to reconsider a rule does not simultaneously convey authority to indefinitely delay the existing rule pending that reconsideration,"[108] Agency Defendants are not indefinitely delaying a rule because the Moratorium is

---

[103] Docket 60 at 29 (first citing Tax Act § 20001(b)(2)(A); then citing *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022); and then citing *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 111 (2d Cir. 2018)); Docket 67 at 11–12 (first citing *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1649 (2022); then citing *West Virginia*, 142 S. Ct. at 2607–08; then citing *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2486 (2021); then citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); and then citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125-26 (2000)).

[104] *See, e.g.*, *West Virginia*, 142 S. Ct. at 2610 ("Under our precedents, this is a major questions case.").

[105] *Ala. Ass'n of Realtors*, 141 S. Ct. at 2486.

[106] *West Virginia*, 142 S. Ct. at 2610.

[107] *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023).

[108] *Nat. Res. Def. Council*, 894 F.3d at 111–12 (citing *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 26 of 74

not of indefinite duration, and the actions being delayed—approving requests to begin conducting oil and gas activities or issuing easements or rights-of-way—are adjudicatory actions, not rules.[109]

### C. Other Authorities

The Court next considers whether ANILCA, FLPMA, or any other federal statute or caselaw precludes Agency Defendants from implementing the Moratorium or strips the President of authority to order the same.

### 1. ANILCA

Plaintiffs maintain that the Moratorium violates ANILCA because of ANILCA's newly added purpose "to provide for an oil and gas program on the Coastal Plain."[110] But as discussed above, a temporary moratorium is not evidence that Agency Defendants have abandoned or plan to stop implementing the Program. And the Tax Act otherwise left ANILCA untouched, including its purposes related to environmental conservation and protection.[111] The Moratorium is intended to allow Agency Defendants to conduct what they describe as a proper review of the Program's environmental impacts, thereby satisfying ANILCA's other purposes without undermining its newly added purpose to conduct an oil and gas program. Since the Moratorium furthers ANILCA's purposes and

---

[109] *See* discussion *infra* Section II.A.

[110] Docket 60 at 24 (citing Tax Act § 20001(b)(2)).

[111] ANILCA § 303(2)(B).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 27 of 74

ANILCA contains no provisions limiting Agency Defendants' authority to institute a temporary moratorium on the oil and gas program, the Moratorium does not violate ANILCA.

### 2. FLPMA

Plaintiffs assert that the Moratorium constitutes a "withdrawal" as defined by FLPMA because it precludes oil and gas activities on the Coastal Plain and transfers jurisdiction over the Coastal Plain from BLM to the Interior Secretary.[112] FLPMA defines "withdrawal" as

> withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular purpose or program; or transferring jurisdiction over an area of Federal land, other than "property" governed by the Federal Property and Administrative Services Act, as amended (40 U.S.C. 472) from one department, bureau or agency to another department, bureau or agency.[113]

When withdrawing public lands pursuant to FLPMA, an agency must follow certain procedures, including public notice requirements, and comply with size and temporal limits.[114] "Removing otherwise eligible and available federal land from oil and gas leasing can constitute a 'withdrawal' . . . ."[115] However, "[t]o withdraw . . .

---

[112] Docket 60 at 30.

[113] 43 U.S.C. § 1702(j).

[114] *Yount v. Salazar*, Case No. CV11-8171 PCT-DGC, 2014 WL 4904423, at *18 (D. Ariz. Sept. 30, 2014), *aff'd sub nom. Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845 (9th Cir. 2017).

[115] *W. Energy All. v. Biden*, Case No. 21-CV-13-SWS, 2022 WL 18587039, at *11 (D. Wyo. Sept. 2, 2022).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 28 of 74

means to withhold the parcel of land from sale entirely" rather than an action such as "cancel[ling] a specific sale to a specific buyer."[116]

The Moratorium does not run afoul of FLPMA.  Agency Defendants are not "withholding" the leased land from "settlement, sale, location, or entry" because they have not acted to indefinitely prevent oil and gas activity on the leased land.[117] The Moratorium does not withhold AIDEA's leased land from oil and gas leasing entirely; nor does it reserve any of the leased land for a particular public purpose or program.

At least one district court has found that a temporary action that delays an oil and gas leasing program to allow for a supplemental NEPA review does not constitute a withdrawal subject to FLPMA.[118]  Plaintiffs, meanwhile, have failed to identify any authority indicating that a temporary restriction on the use of leased lands while an agency supplements its NEPA review constitutes a "withdrawal" within the meaning of the FLPMA.  Their citation to *Mountain States Legal Foundation v. Hodel* is unavailing.[119]  The "withdrawal" at issue in that case was

---

[116] *Silver State Land, LLC v. Schneider*, 843 F.3d 982, 991 (D.C. Cir. 2016).

[117] 43 U.S.C. § 1702(j).

[118] *See W. Energy All.*, 2022 WL 18587039, at *4, *12 (finding no withdrawal under or violation of FLPMA when BLM delayed a statutorily mandated lease sale to allow additional consideration of Environmental Assessments in light of federal caselaw (first citing *Columbia Riverkeeper v. U.S. Army Corps of Engrs.*, Case No. 19-6071 RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020), and then citing *WildEarth Guardians v. Bernhardt*, Case No. 16-1724 (RC), 2020 WL 6701317 (D.D.C. Nov. 13, 2020)).

[119] Docket 67 at 18–19 (citing *Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 29 of 74

BLM's suspension of mineral leasing in one national forest and its failure to act on lease applications in another national forest that had been pending for up to 12 years.[120]  BLM took these actions at the request of the U.S. Forest Service, which asked BLM to delay further processing of any leases pending completion of a final EIS or until a Forest Plan was completed.[121]  In setting aside the suspension, the U.S. District Court for the District of Wyoming interpreted FLPMA to find that BLM's suspension and unreasonable delay of mineral leasing constituted a withdrawal pursuant to FLPMA.[122]

The Ninth Circuit has expressly rejected the District of Wyoming's FLPMA analysis.[123]  In *Bob Marshall Alliance v. Hodel*, BLM issued 19 oil and gas leases on the 42,000-acre Deep Creek Further Planning Area in the Lewis and Clark National Forest.[124]  BLM did not prepare an EIS prior to issuing the leases; instead, it prepared an Environmental Assessment that "concluded that such leasing would have no significant effect on the quality of the human environment."[125]  The district court enjoined the lease issuances, finding that the federal defendants violated NEPA and the Endangered Species Act by failing to prepare an EIS and address

---

[120] *Mountain States*, 668 F. Supp. at 1469.

[121] *Id.*

[122] *Id.* at 1474.

[123] *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1230 (9th Cir. 1988).

[124] *Id.* at 1224–26.

[125] *Id.* at 1226.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 30 of 74

the effects of the leasing on protected species.[126]  The Ninth Circuit affirmed the district court's ruling as to any leases that allowed surface disturbance without further government approval.[127]  As an ancillary issue to the issues on appeal, the Ninth Circuit addressed whether denying or deferring action on the lease applications would have violated FLPMA.[128]  The Ninth Circuit rejected as unpersuasive the determination in *Mountain States* that deferring action on oil and gas leases can constitute an unlawful administrative withdrawal.  Instead, the Ninth Circuit observed that a refusal to issue mineral leases is "far from removing [the land at issue] from the operation of the mineral leasing law" and is "a legitimate exercise of the discretion granted to the Interior Secretary under [the Mineral Leasing Act]."[129]

Plaintiffs maintain that *Bob Marshall* is distinguishable from the instant case because "it involved BLM's discretionary decision not to issue a specific lease."[130]  But the Moratorium involves Agency Defendants' discretionary decision pursuant to the Tax Act, and, by incorporation, the NPRPA, to temporarily pause lease

---

[126] *Id.* at 1226–27.

[127] *Id.* at 1227.

[128] *Id.* at 1229–30.  Through its NEPA review, the Forest Service had considered a "no action" alternative in which it would have denied or deferred action on the Deep Creek lease applications, but one defendant asserted that choosing this alternative "would have constituted an illegal administrative 'withdrawal' of Deep Creek from mineral leasing" pursuant to FLPMA. *Id.* at 1229.  It is in that context that the Ninth Circuit addressed the FLPMA.

[129] *Id.* at 1230.

[130] Docket 67 at 19.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 31 of 74

operations pertaining to a confined portion of land.  Because the Moratorium does not remove the leased land on the Coastal Plain from oil and gas development, it cannot be considered a FLPMA "withdrawal" as the Ninth Circuit has interpreted that term.

Nor has DOI transferred jurisdiction over the Coastal Plain from BLM to the Interior Secretary.  Plaintiffs are correct that a "withdrawal" can include "transferring jurisdiction over an area of Federal land . . . from one department, bureau or agency to another department, bureau or agency."[131]  Secretarial Order 3401 directs BLM to act; it does not transfer jurisdiction over the Coastal Plain or any other portion of ANWR to the secretarial level at DOI.[132]  Indeed, DOI expressly "redelegate[d]" the Interior Secretary's authority to implement the Tax Act to BLM, demonstrating that DOI intended for BLM to maintain its jurisdiction over the Program and land leased pursuant thereto.[133]  As such, because Agency Defendants did not withdraw public lands or transfer jurisdiction over public lands between any agencies, there was no requirement for them to follow FLPMA's land withdrawal procedures.[134]

---

[131] 43 U.S.C. § 1702(j).

[132] *See* AR 3363 ("The Assistant Secretary for Land and Minerals Management and the Director of the BLM shall, as appropriate and consistent with applicable law, take appropriate action with respect to existing leases in light of the direction provided herein.").

[133] AR 3363.

[134] *See* 43 U.S.C. § 1714 (establishing procedures to be followed when the Interior Secretary "make[s], modif[ies], extend[s], or revoke[s] withdrawals").

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 32 of 74

### 3. Caselaw

Plaintiffs' citation to *Louisiana v. Biden*,[135] an out-of-circuit district court decision, is neither controlling nor persuasive. The operative statutes at issue there were not the Tax Act, ANILCA, or FLPMA, but the Outer Continental Shelf Lands Act ("OCSLA") and the Mineral Leasing Act ("MLA").[136] That decision rested on the fact that, when suspending further leasing on the Outer Continental Shelf, the agency had not followed the process set forth in OCSLA for making changes to a previously adopted five-year leasing plan.[137] But the Tax Act contains no such delineated process for the executive branch to follow while administering the Program. Rather, the Tax Act contains a one-sentence directive to DOI to implement the Program.[138] And it instructs DOI to do so in a manner similar to the manner in which it implements the NPRPA oil and gas leasing program, which expressly authorizes DOI to suspend lease operations.[139] Neither the Tax Act nor the NPRPA contain any provisions comparable to OCSLA's provisions that

---

[135] 622 F. Supp. 3d 267 (W.D. La. 2022).

[136] *Id.* at 275.

[137] 43 U.S.C. § 1344(e); *Louisiana*, 622 F. Supp. 3d at 288–89. Notably, the *Louisiana* court omits discussion of the President's authority to withdraw unleased lands pursuant to OCSLA, which could be construed as authority for a nationwide leasing moratorium. *See id.* at 288–90 (evaluating *ultra vires* claim concerning the President's authority to pause leasing nationwide without analysis of 43 U.S.C. § 1341(a), which provides that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf").

[138] Tax Act § 20001(b)(2)(A).

[139] *Id.* § 20001(b)(3); *see also* 42 U.S.C. § 6506a(k)(2) ("The Secretary may direct or assent to the suspension of operations and production on any lease or unit.").

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 33 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 33 of 74   ER-061

establish steps DOI must take in order to effectuate a "revision and reapproval" of OCSLA's statutorily mandated program.[140]   Nor have Plaintiffs alleged any violation of NPRPA-like procedures applicable to the Program.   And even if the "expeditious" portion of the NPRPA's mandate applies to the Tax Act, Congress allowed for the possibility of a lease suspension in the implementation of what it explicitly directed to be an "expeditious" program in the NPRPA.[141]

With respect to Agency Defendants' authority to temporarily pause leasing activities pursuant to the Tax Act, the Court finds *Western Energy Alliance v. Biden*[142] to be more persuasive than *Louisiana*.   In *Western Energy Alliance*, the U.S. District Court for the District of Wyoming upheld BLM's decision to postpone lease sales required pursuant to the MLA to ensure that the Environmental Assessments prepared in conjunction with those sales satisfied then-recent federal court decisions governing the proper analysis of greenhouse gas emissions in the NEPA review process.[143]   The MLA contains a clear mandate for BLM to

---

[140] *See generally* Tax Act § 20001; 43 U.S.C. § 1344(e).

[141] The State acknowledges Intervenor-Defendants' argument that "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions," yet the State maintains that no such authority exists "when Congress has provided a mechanism capable of rectifying mistaken actions."   Docket 66 at 8 (quoting *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014)); Docket 64 at 24 (citing *Ivy Sports*, 767 F.3d at 86). Unlike other statutes, the Tax Act's brief provisions governing the Program do not provide a mechanism for correcting legal errors in the Program's implementation, so *Ivy Sports* suggests that Agency Defendants do have inherent authority to revisit the Program's implementation. This inherent authority, coupled with the NPRPA's explicit grant of authority to suspend lease operations, is an adequate statutory backdrop against which Agency Defendants can temporarily pause the Program.

[142] 2022 WL 18587039.

[143] *Id.* at *8–10 (first citing *Rocky Mountain Wild v. Bernhardt*, Case No. 2:19-cv-00929-DBB-

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 34 of 74

Case 3:21-cv-00245-SLG    Document 72    Filed 08/07/23    Page 34 of 74          ER-062

hold lease sales on at least a quarterly basis with respect to certain lands deemed available for leasing.[144]  BLM postponed lease sales scheduled for the first quarter of 2021 shortly after the President issued an executive order directing a nationwide oil and gas leasing moratorium pending additional NEPA review.[145]  *Western Energy Alliance* involved the same executive order at issue in *Louisiana*, but the District of Wyoming determined that the lands at issue were not "available" within the meaning of the MLA since BLM had determined that their underlying Environmental Assessments "needed additional review and possible reworking due to recent caselaw."[146]  Here, BLM made a similar determination concerning the EIS and ROD underlying the Program while implementing a statute with a significantly less rigid imperative.  The Tax Act specifies only the dates by which two lease sales must take place, whereas the MLA requires quarterly lease sales. If BLM has the authority to postpone a statutorily mandated quarterly lease sale in order to conduct additional environmental review, it has the authority to postpone activities on leases when no statutory source commands it to take any actions beyond the lease sales within a set timeframe.

---

CMR, 2020 WL 7264914 (D. Utah Dec. 10, 2020); then citing *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237 (D.D.C. 2020); and then citing *Columbia Riverkeeper*, 2020 WL 6874871).

[144] 30 U.S.C. § 226(b)(1)(A).

[145] *W. Energy All.*, 2022 WL 18587039, at *3 (citing Exec. Order No. 14008, 86 Fed. Reg. 7619, 7624–25 (Feb. 1, 2021)).

[146] *Id.* at *9; *Louisiana*, 622 F. Supp. 3d at 288–90.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 35 of 74

Intervenor-Defendants' citation to *Boesche v. Udall*[147] provides further support for the Moratorium.[148] There, the Supreme Court interpreted the MLA to grant the Interior Secretary "the power to correct administrative errors . . . by cancellation of leases in proceedings timely instituted by competing applicants for the same land."[149] In *Boesche*, the Supreme Court recognized DOI's "general powers of management over the public lands" and the limited nature of a leasehold interest in such lands: A leasehold interest in public lands "does not give the lessee anything approaching the full ownership of a fee patentee," and so the Interior Secretary "should have the power, in a proper case, to correct his own errors."[150]

*Boesche* involved a different statute and, as the State points out,[151] a different type of agency error. The Supreme Court also cautioned that its holding was limited and "do[es] not open the door to administrative abuses."[152] But there is no indication in the Tax Act that similar authority to correct administrative errors does not exist here. If DOI can cancel a lease to correct its own errors, it can temporarily suspend a lease for the same purpose.[153] *Boesche* also undermines

---

[147] 373 U.S. 472 (1963).

[148] Docket 65 at 17 n.44, 20 n.55.

[149] *Boesche*, 373 U.S. at 485.

[150] *Id.* at 476, 478.

[151] Docket 66 at 11–14.

[152] *Boesche*, 373 U.S. at 485.

[153] In another attempt to distinguish *Boesche*, the State asserts that a violation of a procedural statute such as NEPA is not the type of substantive error that would authorize DOI to cancel a lease. Docket 66 at 12–13. The State alleges that "courts often do not vacate agency decisions

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 36 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 36 of 74        ER-064

the State's assertion that the Moratorium's purpose—which the State contends is "to consider cancelling already-issued leases"—is "invalid."[154]

Contrary to another of the State's assertions,[155] the Tax Act does not restrict DOI's broad authority to manage public lands; it simply directs DOI to implement a leasing program, just as the MLA and other federal statutes do. Likewise, ANILCA's purposes, which include environmental conservation,[156] do not restrict DOI's general managerial powers over the Coastal Plain with respect to the imposition of a temporary oil and gas moratorium, especially since DOI completed the first lease sale and currently is supplementing its environmental review and hence is "provid[ing] for an oil and gas program on the Coastal Plain."[157]

*Century Exploration New Orleans, LLC v. United States* also supports the proposition that an agency has authority to pause oil and gas activities after a

---

and, particularly, do not void oil and gas leases because of deficiencies in NEPA analyses." Docket 66 at 12 (citations omitted). But DOI has not cancelled AIDEA's leases. In any event, in the Ninth Circuit, vacatur is "the presumptive remedy for agency action that violates the NEPA as reviewed through the APA." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (citation omitted), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr.*, No. 22-703, 2023 WL 3801206 (U.S. June 5, 2023).

[154] Docket 59 at 20, 23–26; Docket 66 at 9–14; *see also* discussion *infra* Section II.B.3.b (discussing validity of the Moratorium's purpose). Additionally, it cannot be said that the purpose of the Moratorium is to void AIDEA's leases or even, as the State asserts, "to consider whether to reaffirm or void the leases." Docket 59 at 24. This might be a purpose of the supplemental NEPA analysis, but it is not the purpose of the Moratorium itself. *See* AR 3365 ("The BLM will undertake *this additional NEPA analysis* to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures." (emphasis added)).

[155] Docket 66 at 13–14.

[156] ANILCA § 303(2)(B).

[157] Tax Act § 20001(b)(2)(B)(iii).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 37 of 74

lease's issuance.[158]    That case involved an oil and gas lessee's challenge to Interior's implementation of two moratoria on deepwater drilling operations in the Gulf of Mexico following the Deepwater Horizon disaster while new and increased substantive requirements were developed for drilling operations.[159]   The Court of Federal Claims held that neither of the moratoria breached the plaintiffs' lease.[160] Rather, the court concluded that the two moratoria, which together resulted in an approximately six-month pause in drilling operations and permitting for such activities, were "well within the government's authority under both the terms of the lease and applicable law."[161]    Similarly, the court observed that the moratoria's "short delay would not have effected a total breach of the lease, particularly in light of the absence of any express deadlines for the review and approval of" applications for drilling permits.[162]

Certainly, the circumstances leading to the Moratorium in the instant case are completely different from the Deepwater Horizon disaster.   Yet the legal framework and analysis outlined in *Century Exploration* are analogous.   Neither AIDEA's leases nor any federal statute or regulation prohibit the Moratorium or provide an express deadline by which Agency Defendants must allow oil and gas

---

[158] 110 Fed. Cl. 148, 168 (2013), *aff'd*, 745 F.3d 1168 (Fed. Cir. 2014).

[159] *Id.* at 157–59.

[160] *Id.* at 168.

[161] *Id.* at 167–68.

[162] *Id.* at 168.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 38 of 74

activities on the Coastal Plain to proceed after a lease sale is conducted.  And as discussed below, the leases themselves expressly accord to Agency Defendants the right to alter the "timing of operations" conducted pursuant to the leases.  Thus, as in *Century Exploration*, a temporary moratorium on post-sale oil and gas activities on the Coastal Plain is "well within the government's authority."[163]

### 4.    The Lease Provisions

Although not discussed in detail in the parties' briefing,[164] the leases themselves provide support for the Moratorium.  The leases contain a general disclaimer subjecting lessees to "reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision[s] of this lease."[165]  This language covers the instant situation since Secretarial Order 3401 and the SOP Letter are not inconsistent with the lease provisions and provide no additional obligations or burdens on the lessees beyond those associated with delay, which in this context are not "unduly burdensome."  Similarly, Section 6 of the lease—which pertains to "minimiz[ing] adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users"—allows the lessor to

---

[163] *Id.* at 168.

[164] Plaintiffs discuss the lease provisions in one short paragraph of their motion.  Docket 60 at 29.  The State's motion contains one sentence asserting that, upon a lease's cancellation, the lessee and third-party beneficiaries may be able to assert claims for breach of contract.  Docket 59 at 26.

[165] *E.g.*, AR 3320.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 39 of 74

subject the lessee to "reasonable measures deemed necessary . . . to accomplish the intent of this section."[166]  These measures include the "timing of operations," thereby expressly reserving to Agency Defendants the right to alter the timing of operations conducted pursuant to the leases in an effort to minimize adverse environmental impact, an endeavor with which the supplemental NEPA review may assist.[167]  Though not a statutory provision, the lease has the force of law as a contract between the United States and AIDEA, so these provisions provide further support for the legality of  the Moratorium.[168]

In short, Plaintiffs have not identified any provision or source of federal law that precludes a temporary moratorium for the purpose of ensuring that the Program comports with the law.  When viewed in conjunction with the broad discretion that the Tax Act accords DOI, it is clear that the President acted in accordance with his powers by ordering Agency Defendants to implement a temporary moratorium while DOI undertook to correct "alleged legal deficiencies" in its environmental analysis.[169]  Consequently, Agency Defendants themselves

---

[166] *E.g.*, AR 3321.

[167] *E.g.*, AR 3321.

[168] *See Peabody Coal Co. v. Navajo Nation*, 373 F.3d 945, 951 (9th Cir. 2004) (recognizing that oil and gas leases "represent a very specialized subset of contracts" governed by an "extensive federal regulatory scheme" (citation omitted)).

[169] AR 3351, 3362.  Because the Court finds that EO 13990 orders DOI to take actions that are authorized by statute, the Court need not consider whether the Executive Order's savings clause salvages what Plaintiffs assert is an otherwise *ultra vires* order.  Docket 60 at 21–22.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 40 of 74

also acted in accordance with their powers by implementing the temporary moratorium.

## II. The Moratorium does not violate the APA.

Plaintiffs and the State allege three categories of APA violations, namely that Agency Defendants (1) failed to follow the APA's notice-and-comment requirements, (2) arbitrarily and capriciously reversed their position regarding the Program's NEPA compliance without adequate factual or legal support or a lawful purpose, and (3) unlawfully and unreasonably withheld or delayed action to implement the Program.[170] The parties do not dispute that the APA governs these claims against Agency Defendants.[171] Defendants respond that the Moratorium is not a substantive rule that must follow the APA's notice-and-comment procedures, that Agency Defendants have not unlawfully reversed their position regarding the legality of the NEPA analysis underlying the Program's implementation, and that Plaintiffs cannot bring a viable failure-to-act claim.[172] The Court addresses these arguments in turn.

---

[170] Docket 59 at 19–34; Docket 60 at 32–40; Docket 66 at 5–14; Docket 67 at 19–25; *see also* discussion of the State's additional arguments *infra* Section II.B.3.

[171] Docket 59 at 18–59; Docket 60 at 22–24; Docket 63 at 29; Docket 64 at 21–22; Docket 65 at 14–15.

[172] Docket 63 at 26–29, 34–42; Docket 64 at 31–39; Docket 65 at 21–28.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 41 of 74

## A.    Notice-and-Comment Procedures

Plaintiffs contend that Agency Defendants' implementation of the Moratorium "constitutes a substantive rule subject to notice and comment given that it leaves agency staff with no discretion to process or approve applications to perform oil and gas activities on the Coastal Plain."[173]  Plaintiffs point to several aspects of the Moratorium that they claim make it a substantive rule: its categorical application to all Coastal Plain leases and activities, the suspension of all leases on the same day Secretarial Order 3401 was issued, the virtually identical SOP Letters issued to each of the lessees, and BLM's informing of each contractor that it would not process their applications for work on the leases until the supplemental NEPA review was complete.[174]

Federal Defendants counter that DOI's implementation of the Moratorium is not a substantive rule subject to the APA's notice-and-comment requirements but rather an adjudication.[175]  And even if Secretarial Order 3401 is considered a rule, Federal Defendants allege it is at most an interpretative rule or clarification of agency practice rather than a substantive or legislative rule requiring notice and comment.[176]  Federal Defendants add that "neither the Program ROD nor its oil

---

[173] Docket 60 at 33; *see also* Docket 59 at 22 ("[T]he agencies did not engage in required notice and comment processes . . . .").

[174] Docket 60 at 34–35.

[175] Docket 63 at 34–37 (quoting *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994)).

[176] Docket 63 at 37–39.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 42 of 74

and gas leases were established through rule making, so it makes little sense to suggest that similar (or lesser) action such as modifying the ROD or suspending the leases would require a rule making."[177]

The APA contemplates two primary forms of agency action: rulemaking and adjudication.[178]  Rulemaking is the "agency process for formulating, amending, or repealing a rule."[179]  The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."[180]  Adjudication "is virtually any agency action that is not rulemaking."[181]  As the Ninth Circuit explained,

> Two principal characteristics distinguish rulemaking from adjudication. First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals. Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute). Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied.[182]

---

[177] Docket 63 at 36.

[178] 5 U.S.C. § 551(4)–(7).  Defendants also suggest that the leases fall under the APA's definition of "licensing," which in their view is further indication that their suspension should not be considered a form of rulemaking.  Docket 63 at 36 n.10 (quoting 5 U.S.C. § 551(8), (9)).

[179] 5 U.S.C. § 551(5).

[180] *Id.* § 551(4).

[181] *Yesler*, 37 F.3d at 448 (citing 5 U.S.C. § 551(6)–(7)).

[182] *Id.* (citations omitted).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 43 of 74

An agency has the discretion to "announce new principles during adjudication" instead of rulemaking.[183]  Two exceptions limit this discretion: "First, agencies may not impose undue hardship by suddenly changing direction, to the detriment of those who have relied on past policy. . . . The second limiting doctrine is that agencies may not use adjudication to circumvent the Administrative Procedure Act's rulemaking procedures."[184]  These procedures include a requirement for an agency to issue a notice of proposed rulemaking in the Federal Register before it proposes a rule and allow public comment on the proposed rule.[185]

Applying these principles, the Court finds that the Moratorium is not a rule subject to the APA's notice-and-comment procedures.  Although the Moratorium reverses Agency Defendants' prior determination—expressed through the NEPA review and their carrying out of the lease sale—that the Program comported with applicable federal laws, the Moratorium does not operate prospectively to affect the rights of unspecified individuals in the future.  Rather, it directly and immediately affected the rights of the identified lessees on the Coastal Plain.[186]

---

[183] *Cities of Anaheim, Riverside, Banning, Colton & Azusa v. FERC*, 723 F.2d 656, 659 (9th Cir. 1984) (citations omitted); *see also Reyes v. Garland*, 11 F.4th 985, 991 (9th Cir. 2021) ("An agency may also exercise its congressionally delegated legislative authority through adjudicatory proceedings, where 'new administrative policy [is] announced and implemented through adjudication.'" (alteration in original) (quoting *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1328 (9th Cir. 1982))).

[184] *Anaheim*, 723 F.2d at 659 (citations omitted).

[185] 5 U.S.C. § 553(b)–(d).

[186] *Cf. Reyes*, 11 F.4th at 991 ("But while rules promulgated through . . . formal rulemaking

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 44 of 74

Further, neither of the two exceptions that limit an agency's authority to use adjudication apply here. First, the Moratorium does not result in undue hardship to the detriment of those who have relied on a previous agency action. Prior to the Moratorium, the only agency action directly impacting Plaintiffs had been the issuance of the leases; no work on the leases had begun when the Moratorium began.[187] The impact of the Moratorium's suspension of AIDEA's leases was not "excessive or unwarranted" given that the Moratorium is temporary in nature and that AIDEA had—but declined—the opportunity to cancel its leases and receive refunds of its lease payments.[188]

Second, Agency Defendants did not use adjudication to circumvent the APA's rulemaking procedures. A circumvention of the APA's rulemaking procedures occurs when, for example, an agency uses adjudication "to amend a recently amended rule" or "to bypass a pending rulemaking proceeding."[189] Agency Defendants did not circumvent any rulemaking procedure. They chose adjudication as the Moratorium's vehicle to temporarily pause implementation of

---

generally apply prospectively . . . , adjudicatory rules may have a permissible retroactive effect, even without authorization from Congress, in some circumstances." (citation omitted)).

[187] *See* Docket 7 at 20–21, ¶¶ 76–83 (describing AIDEA's efforts to secure its leases, which were effective beginning January 1, 2021, shortly before issuance of EO 13990 on January 20, 2021).

[188] The other two lessees chose to cancel their leases and receive refunds of their lease payments. AR 3785, ¶ 13; AR 3790, ¶ 13.

[189] *Union Flights, Inc. v. Adm'r, FAA*, 957 F.2d 685, 689 (9th Cir. 1992) (citations omitted).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 45 of 74

the Program; they did not amend an existing rule or bypass a pending rulemaking proceeding in so choosing.

In short, Secretarial Order 3401 is not broad or general in scope with the intent to be applied by Agency Defendants to unspecified future leasing. Rather, it is specific and limited to just one EIS for one leasing program. Likewise, BLM's actions to implement Secretarial Order 3401—which, as Plaintiffs put it, "prohibit[] all access for oil and gas activities during the moratorium"[190]—fall squarely within the realm of adjudication rather than rulemaking. These actions took the form of "individual order[s]" issued to the lessees informing each of them of the suspension of their leases[191] and specific responses to AIDEA's contractors' requests to proceed with activities on the leased lands.[192] The Court finds that Agency Defendants operated within their discretionary authority to use adjudication as the means to exercise their statutory authority to address the identified legal deficiencies specific to the Program, which involves a finite, limited number of parties.[193]

---

[190] Docket 7 at 28, ¶ 123. These actions include BLM's issuance of the SOP Letter; refusal to process AIDEA's contractors' applications for rights-of-way, easements, or permits; and alleged "reopening" of the lease sale. Docket 7 at 30, ¶ 133.

[191] *See SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947) (noting agencies may act "by general rule or by individual order"); AR 3364–65, 3714–17.

[192] AR 3395–96, 3399–3400.

[193] *See Montgomery Ward*, 691 F.2d at 1328 ("It is well settled that the decision whether to proceed by adjudication or rule-making 'lies in the first instance within the agency's discretion.'" (alteration omitted) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974))). To the extent Secretarial Order 3401 or the SOP Letter interprets statutes such as the Tax Act or redelegates authority within DOI, they could be considered interpretative rules or rules of

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 46 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 46 of 74   ER-074

Plaintiffs maintain that the Moratorium is a substantive rule because Secretarial Order 3401 constrains DOI staff's discretion to authorize oil and gas activities on the Coastal Plain and is "binding."[194]  Plaintiffs cite several cases, including one Ninth Circuit case, *Mada-Luna v. Fitzpatrick*, that they maintain support their position.[195]  Agency Defendants respond that *Mada-Luna* is inapposite because it concerned a "general policy constraining implementing official discretion in a multitude of future, distinct cases."[196]

In *Mada-Luna*, the Ninth Circuit held that an internal Immigration and Naturalization Service ("INS") directive issued to agency officials as an operating instruction did not violate the notice-and-comment requirements of the APA.[197]  The instruction listed factors that INS district directors should consider in determining whether to defer immigration action with respect to undocumented persons.[198]  The court held that the instruction was rulemaking but fell within the "general statements of policy" exception to the notice-and-comment requirements

---

agency organization, procedure, or practice.  Neither of these types of rulemaking requires adherence to notice-and-comment procedures.  5 U.S.C. § 553(b)(3)(A).

[194] Docket 60 at 32–35.

[195] Docket 60 at 33 (first citing *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987); then citing *Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 702 (4th Cir. 2019); and then citing *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000)).

[196] Docket 63 at 38.

[197] *Mada-Luna*, 813 F.2d at 1009; *see also* 5 U.S.C. § 553(b)(3)(A) (exempting "general statements of policy" from notice-and-comment requirements).

[198] *Mada-Luna*, 813 F.2d at 1008 n.1.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 47 of 74

because it did not establish a "binding norm" that prohibited agency officials from considering individual facts in individual cases.[199]  *Mada-Luna* is inapposite because Secretarial Order 3401 is not a general statement of policy applicable to all future agency actions on a particular topic; it is instead an agency adjudication limited to one EIS—the Program's EIS.

The other two cases Plaintiffs cite, *Casa De Maryland* and *Appalachian Power Company*, are inapposite for a similar reason: Like *Mada-Luna*, the former differentiated legislative rules subject to notice and comment from general statements of policy,[200] whereas the latter differentiated agency guidance from a legislative rule to be prospectively enforced against unidentified future persons or entities.[201]  Neither case supports the proposition that the agency action in this case—directed solely at the identified lessees on the Coastal Plain—is a substantive rule subject to notice and comment.

Because the Moratorium constitutes an adjudication, and the APA's notice-and-comment procedures do not apply to agency adjudications, Agency

---

[199] *Id.* at 1016–17.

[200] *See Casa De Md.*, 924 F.3d at 701–02 ("Plaintiffs argue that DACA's rescission required notice and comment under the APA because the Rescission Memo is a legislative rule that mandates how Department officials must act and substantively affects DACA recipients. The government rejects this premise, countering that the Memo is a general statement of policy.").

[201] *See Appalachian Power Co.*, 208 F.3d at 1021 ("If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document . . . as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, . . . then the agency's document is . . . 'binding.'" (citation omitted)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 48 of 74

Defendants did not violate the APA's notice-and-comment procedures by implementing the Moratorium.[202]

## B. Reversal of Position

Plaintiffs and the State next allege that Agency Defendants "failed to provide a reasoned explanation" for reversing their prior position, expressed in separate litigation before this Court, that the Program had "satisfied all legal requirements."[203]  Federal Defendants respond that "[n]o reversal [of position] has yet occurred" because the ROD remains in place pending the Supplemental EIS process currently underway.[204]  In the alternative, Federal Defendants assert that they provided a reasoned explanation for supplementing the Program's environmental analysis,[205] an argument Intervenor-Defendants echo.[206]

---

[202] As a result, the Court need not consider the degree to which Secretarial Order 3401 constrains the discretion of DOI staff.

[203] Docket 60 at 36; *see also* Docket 59 at 30–31 (alleging that Agency Defendants contradicted their prior findings "without acknowledgment or explanation of the contradiction").  That separate litigation is *Gwich'in Steering Comm. v. Haaland*, Case No. 3:20-cv-00204-SLG (D. Alaska filed Aug. 24, 2020), and *Native Vill. of Venetie Tribal Gov't v. Haaland*, Case No. 3:20-cv-00223-SLG (D. Alaska filed Sept. 9, 2020).  The Court stayed those cases pending the supplemental NEPA review currently in progress.  Text Order, *Gwich'in Steering Comm.*, Case No. 3:20-cv-00204-SLG (D. Alaska Feb. 12, 2021), ECF No. 75; Order Re Defs.' & Pls.' Unopposed Mot. to Stay Proceedings, *Native Vill. of Venetie*, Case No. 3:20-cv-00223-SLG (D. Alaska Sept. 13, 2021), ECF No. 77.

[204] Docket 63 at 39–40.

[205] Docket 63 at 40–41.

[206] Docket 64 at 31–36; Docket 65 at 25–28.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 49 of 74

### 1. Whether Agency Defendants Changed Positions

The requirement that an agency explain when it changes its position applies somewhat broadly to a "subsequent agency action undoing or revising" a prior agency action.[207] This requirement applies to a change in "agency policy," although no precedent specifies what, precisely, constitutes an "agency policy" in this context.[208] A survey of the caselaw suggests that this requirement applies to any agency practice, interpretation, or position, whether announced through formal means, such as a rescission of a federal regulation published in the Federal Register, or less formal means, such as a change in an interpretation of a statute that arises through an enforcement action or issuance of a ROD.

In *FCC v. Fox Television Stations, Inc.*, the specific change at issue was the Federal Communications Commission's (the "FCC") new interpretation of a federal prohibition on the use of expletives in certain broadcasts.[209] The FCC's changed position surfaced in orders issued to broadcasters whose broadcasts featured allegedly indecent language that violated the newly revised federal prohibition.[210] The Supreme Court held that the FCC's reversal was not arbitrary or capricious because the FCC "forthrightly acknowledged that its recent actions have broken

---

[207] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[208] *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (discussing *Fox* and its precursor cases).

[209] 556 U.S. at 505–10.

[210] *Id.* at 509–13.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 50 of 74

new ground" and it had provided "rational" reasons for the new policy rooted in a "context-based approach" intended to reduce the widespread use of offensive language.[211]  Other courts have applied the reasoned explanation requirement to myriad settings, including a new statutory interpretation contained in a formal federal rule that was inconsistent with an agency's prior practice,[212] a decision that a species warranted listing as an endangered or threatened species that contradicted a prior listing decision,[213] a finding in a ROD concerning the cost-benefit analysis of a regulation that contradicted the cost-benefit analysis in a prior ROD,[214] and an agency's agreement to transfer land to a Native corporation to build a road after concluding in an earlier ROD that the road's construction would not be in the public interest.[215]

　　With this caselaw in mind, the Court considers the two specific reversals Plaintiffs allege: (1) the alleged reversal of the ROD and (2) the alleged reversal of Agency Defendants' position regarding the legality of the Program, namely its NEPA review.  Beginning with the first alleged reversal, the Court finds that Agency Defendants have not yet "undone" or "revised" the ROD because, to date, they

---

[211] *Id.* at 517–19.

[212] *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005).

[213] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1060–62 (9th Cir. 2018).

[214] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966–68 (9th Cir. 2015) (en banc).

[215] *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1133, 1139 (D. Alaska 2019).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 51 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 51 of 74        ER-079

have not issued a revised ROD or other document that purports to rescind or replace the August 2020 ROD.

As for the second alleged reversal, there is no genuine dispute that Agency Defendants changed their position regarding the legality of the Program's implementation. Agency Defendants promulgated the existing EIS and ROD during the previous presidential administration, defended their legality in litigation before this Court, and relied on the ROD to conduct the Program's first lease sale.[216] Then, following the new administration's issuance of EO 13990, Secretarial Order 3401 identified alleged legal deficiencies in the Program's implementation, such as a failure to adequately analyze a reasonable range of alternatives in the EIS and a failure to properly interpret the Tax Act.[217] The SOP Letter expanded upon these deficiencies and identified other potential deficiencies or concerns warranting additional analysis, such as "compliance with Section 810 of [ANILCA]"[218] and the Ninth Circuit's December 2020 decision in *Center for Biological Diversity v. Bernhardt*.[219]

---

[216] *See generally* AR 1–3226 (EIS, ROD, and associated notices of availability); AR 3227–3316 (lease sale materials); Fed. Defs.' Combined Mem. in Opp'n to Pls.' Mots. for Prelim. Inj., *Gwich'in Steering Comm.*, Case No. 3:20-cv-00204-SLG (D. Alaska Dec. 23, 2020), ECF No. 59.

[217] AR 3362.

[218] AR 3364–65.

[219] 982 F.3d 723 (9th Cir. 2020).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 52 of 74

The issue is not whether there was a positional change, as there indisputably was, but instead whether the positional change rises to the level of a change that warrants a reasoned explanation. Agency Defendants expressed their initial position regarding the legality of the Program's NEPA review in an EIS and ROD and in litigation defending those documents. Agency Defendants effectuated their positional change through a Secretarial Order, the SOP Letter, and, to some extent, subsequent adjudicatory decisions—e.g., the refusal to process AIDEA's contractors' applications to begin archeological and seismic investigations—but have not done so in a formal instrument such as a ROD. The Court agrees with Plaintiffs and the State that Agency Defendants have changed their position such that the reasoned explanation requirement applies. Defendants have identified no caselaw requiring that the reversal be expressed in "a rule or a formal agency position of general applicability."[220]  Here, Agency Defendants paused implementation of a program that they had been in the process of implementing because they changed their view on the program's legality. Such a reversal constitutes a change in agency policy. As a result, the Court moves to the next step of the analysis, which is to determine if Agency Defendants acknowledged and adequately explained their new position.

---

[220] Docket 63 at 39.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 53 of 74

### 2. Whether Agency Defendants Provided a Reasoned Explanation for the Policy Change

Courts do not provide "heightened review" to an agency action that changes a prior policy.[221]  Rather, under *Fox*, a court's review focuses on whether (1) the agency "display[s] awareness that it *is* changing position," (2) "the new policy is permissible under the statute," (3) "there are good reasons for" the new policy, and (4) "the agency *believes* [the new policy] to be better."[222]

Here, the Court finds that each of the *Fox* requirements is met.  Agency Defendants acknowledged their change in position from implementing to pausing the Program by stating in Secretarial Order 3401 and the SOP Letter that they were aware of the Program's implementation through the EIS, ROD, and lease sale and were suspending it due to the identification of legal deficiencies in the Program's NEPA review, interpretation of the Tax Act, and compliance with ANILCA.[223]  Although Agency Defendants did not expressly state in Secretarial Order 3401 and the SOP Letter that they had previously not identified any legal deficiencies in the Program and had defended that position in litigation, they acknowledged a departure from their previous position by describing the prior

---

[221] *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020) (citing *Fox*, 556 U.S. at 514).

[222] *Fox*, 556 U.S. at 515 (citation omitted) (emphasis in original).

[223] *See* AR 3362 (quoting EO 13990, which references the ROD); AR 3364–65 (acknowledging alleged deficiencies or potential deficiencies with the Program's greenhouse gas analysis, compliance with section 810 of ANILCA, and interpretation of the Tax Act, which were part of the "NEPA documents underlying the competitive lease sale").

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 54 of 74

NEPA review and explaining the basis for their current position that the prior NEPA review was legally deficient.[224]  The caselaw does not require Agency Defendants to be more explicit, as they simply must "display awareness that [they are] changing position,"[225] which they have done.

As for the remaining factors, Agency Defendants cited multiple statutes in Secretarial Order 3401 and the SOP Letter that they maintain support their decision to implement the Moratorium: the Tax Act, NEPA, and possibly also ANILCA.[226]  As discussed above, the Moratorium "is permissible under the[se] statute[s]."[227]  Further, the Court may presume that Agency Defendants believe that their new position is "better" since they identified legal deficiencies in the Program's implementation that they determined warranted a temporary pause.[228]

Agency Defendants also satisfied the requirement to provide "good reasons" to justify their positional change.  It is not a coincidence that Agency Defendants identified legal errors in the Program promptly after a change in presidential administrations.  A political motivation for a policy change may not necessarily by

---

[224] This is not a case where Agency Defendants failed entirely to discuss the substance of how their new policy diverges from the prior policy.  *See Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061 (9th Cir. 2021) (vacating agency's decision that Pacific walrus no longer qualified as threatened species where decision referred to contradictory prior finding only in a discussion of the decision's procedural history).

[225] *Fox*, 556 U.S. at 515 (emphasis omitted).

[226] AR 3362, 3364–65.

[227] *Fox*, 556 U.S. at 515; *see also* discussion *supra* Section I.

[228] *Vill. of Kake*, 795 F.3d at 967 ("[W]e assume the Department 'believes' the new policy is better because it decided to adopt it." (quoting *Fox*, 556 U.S. at 515)).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 55 of 74

itself be a "good reason" for a positional change.[229]  And yet, as the Supreme Court explained, "[a]n initial agency interpretation is not instantly carved in stone.  On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, *or a change in administrations*."[230]  And "a court may not reject an agency's stated reasons . . . simply because the agency might also have had other unstated reasons."[231]  Instead, a court should evaluate only the reasons the agency provided when explaining its new policy.[232]

An agency's reasons for a change can be sufficient even if they simply take the form of a "brief" explanation that the agency's "interpretation is 'more consistent' with statutory language" than an earlier interpretation.[233]  This is precisely what Agency Defendants have done here.  Agency Defendants identified violations of NEPA, and numerous federal courts over the past half-century have

---

[229] *See Coteau Props. Co. v. U.S. Dep't of the Interior*, 53 F.3d 1466, 1478 (8th Cir. 1995) (rejecting withdrawal of agency decision following change in administration when agency made "no pretense of applying . . . the deferential standard of review mandated by [its] own regulations"); *Amalgamated Transit Union, Int'l v. U.S. Dep't of Lab.*, Case No. 2:20-cv-00953-KJM-DB, 2022 WL 17978627, at *24 (E.D. Cal. Dec. 28, 2022) (invalidating agency decisions "motivated by a desire to reach a specific outcome, and . . . not informed by expertise, evidence or careful analysis").

[230] *Brand X Internet Servs.*, 545 U.S. at 981 (emphasis added) (citations and internal quotation marks omitted).

[231] *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019) (citation omitted).

[232] *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (observing the "foundational principle of administrative law" that a court's review is limited to "the grounds that the agency invoked when it took the action." (citation omitted)).

[233] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007) (citations omitted).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 56 of 74

found NEPA violations to be significant enough to warrant the suspension of important federal projects.[234]  Agency Defendants also identified a purported misinterpretation of the Tax Act—the primary substantive law authorizing the Program—concerning the number of surface acres that the Interior Secretary must authorize to be covered by oil and gas production and support facilities.[235]  Further, Agency Defendants noted, albeit without providing additional explanation, that they identified a possible error concerning the other substantive law governing the Program, ANILCA.[236]  For these reasons, Plaintiffs' contention that the Interior Secretary "does not explain how she reached [her] determination" and "makes no attempt to reconcile the Moratorium with Interior's prior position that the environmental review complied 'with all appliable [sic] laws'" is unfounded.[237]

Additionally, the Ninth Circuit has held that conforming an agency's analysis to federal appellate decisions can be a "good reason" to justify a change in position.[238]  In *Center for Biological Diversity v. Bernhardt*, the Ninth Circuit held

---

[234] *See, e.g.*, *Citizens for Responsible Area Growth v. Adams*, 477 F. Supp. 994, 1006 (D.N.H. 1979); *Nat'l Audubon Soc'y v. Hodel*, 606 F. Supp. 825, 846 (D. Alaska 1984); *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407–08 (9th Cir. 1985).

[235] AR 3365 (citing Tax Act § 20001(c)(3)).

[236] *See* AR 3364 ("[T]he Department has identified several areas for which additional analysis may either address a potential legal defect or, at a minimum, serve NEPA's purpose to meaningfully inform the decisionmaker as to the environmental consequences of federal action. These include . . . compliance with section 810 of [ANILCA].").

[237] Docket 60 at 36.

[238] *See Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 682 (9th Cir. 2016) (approving National Marine Fisheries Service's explanation for adopting a new approach to climate analysis during the Endangered Species Act review process based in part on conformance to federal appellate

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 57 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 57 of 74          ER-085

that a NEPA analysis of a planned offshore oil drilling and production facility was deficient because it failed to include greenhouse gas emissions estimates resulting from foreign oil consumption in its analysis of the no-action alternative.[239]  Here, the EIS prepared in conjunction with the Program similarly fails to consider greenhouse gas emissions estimates resulting from foreign oil consumption.[240] Although BLM's EIS for the Program attempts to explain why it did not consider the Program's impact on foreign oil consumption and greenhouse gas emissions, the Ninth Circuit rejected those same arguments in *Center for Biological Diversity*.[241]

The Ninth Circuit issued its *Center for Biological Diversity* decision after Agency Defendants completed the EIS, issued the ROD, and provided the public with notice of the lease sale.[242]  Although the lease sale took place shortly after

---

decisions interpreting the Act's "best data available" standard).

[239] 982 F.3d at 736.

[240] *See* AR 84 ("Note that BOEM did not model alternative future carbon policies and foreign energy consumption . . . ."); AR 1019 ("[T]here are currently no reliable methodologies for forecasting foreign energy cross-price elasticities and oil/gas price shock substitution responses to arrive at a global [greenhouse gas] emissions impact from associated domestic changes."); AR 1690 (explaining, in response to a comment, BLM's position that the D.C. Circuit Court of Appeals "has held that agencies are not required to model how their actions will affect global energy markets and how those market changes will, in turn, affect foreign greenhouse gas emissions" (citation omitted)).

[241] *Ctr. for Biological Diversity*, 982 F.3d at 737–740; *see also Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 762–67 (D. Alaska 2021) (vacating BLM's approval of proposed oil and gas development project in part because BLM's greenhouse gas emissions analysis suffered from the same flaws the Ninth Circuit identified in *Center for Biological Diversity*).

[242] *See generally* AR 1–3135 (EIS); AR 3138–3225 (ROD); AR 3227–28 (notice of lease sale).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 58 of 74

the *Center for Biological Diversity* decision was released, Agency Defendants likely did not have an opportunity to consider the Ninth Circuit's holding when conducting that sale. Because the Ninth Circuit's holding governs the greenhouse gas analysis necessary for an oil and gas program to proceed in accordance with NEPA, it is reasonable for Agency Defendants to pause the Program to reconsider its underlying NEPA analysis in light of the recent holding.[243] It is particularly reasonable to pause the Program at this early stage where "no irreparable and irretrievable commitment of resources has occurred"[244] given the lessees' opportunity to receive refunds of their bid and rental payments and the lack of mobilization to conduct exploration or development activities.[245]

Given the above, the Court finds that Agency Defendants' explanation in Secretarial Order 3401 and the SOP Letter satisfies the requirements for a reasoned explanation articulated in *Fox*. Their explanation is not, as the State puts it, a set of conclusory, "generic statements" concerning the Program's possible legal deficiencies.[246] And where Agency Defendants' explanation contradicts

---

[243] *Cf. Citizens for Clean Energy v. U.S. Dep't of the Interior*, 621 F. Supp. 3d 1165, 1175 (D. Mont. 2022) (reinstating previously issued coal leasing moratorium until BLM performed a sufficient NEPA analysis).

[244] *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 324 F. Supp. 3d 597, 624 (E.D.N.C. 2018) (citing *Nat'l Audubon Soc'y v. U.S. Dep't of Navy*, 422 F.3d 174, 206 (4th Cir. 2005)), *aff'd*, 914 F.3d 213 (4th Cir. 2019).

[245] *See* AR 3782–92 (agreements and notices regarding rescission of leases and refund of payments).

[246] Docket 59 at 28.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 59 of 74

earlier positions expressed in the ROD, EIS, and prior litigation, they provide reasons that reflect "a rational connection" to their decision to implement the temporary Moratorium.[247]

The cases that Plaintiffs and the State cite in which courts have deemed an agency's explanations to be inadequate are inapposite.[248]  Plaintiffs and the State assert that *Village of Kake* involved a similar circumstance to the present case.[249]  But *Village of Kake* involved a policy change that rested on changed factual findings.[250]  Under the Supreme Court's *Fox* jurisprudence, if an agency's new policy rests upon factual findings that contradict those contained in a prior decision, a "more substantial justification" is required.[251]  In *Village of Kake*, the Ninth Circuit affirmed the district court's vacatur of a 2003 ROD and reinstatement of a 2001 ROD because the 2003 ROD "did not simply rebalance old facts to arrive at the

---

[247] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

[248] Docket 59 at 30 (first citing *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022); and then citing *California v. Bernhardt* [sic], 286 F. Supp. 3d 1054, 1065–68 (N.D. Cal. 2020 [sic])); Docket 59 at 33 (citing *Vill. of Kake*, 795 F.3d at 966); Docket 60 at 38 (first citing *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 776 F. Supp. 2d 960, 974 (D. Alaska 2011); and then citing *Vill. of Kake*, 795 F.3d at 966).  It appears that the State incorrectly named one of these cases in its briefing.  The case located at 286 F. Supp 3d 1054 is *California v. Bureau of Land Management*, not *California v. Bernhardt*, although there is a 2020 decision from the Northern District of California with that name.  *California v. Bernhardt*, 472 F. Supp. 3d 573 (N.D. Cal. 2020).

[249] Docket 59 at 33 (citing *Vill. of Kake*, 795 F.3d at 966, 969); Docket 60 at 38 (citing *Vill. of Kake*, 795 F.3d at 966).

[250] *Vill. of Kake*, 795 F.3d at 968.

[251] *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 60 of 74

new policy" but instead "made factual findings directly contrary to the 2001 ROD and expressly relied on those findings to justify the policy change."[252]  *Village of Kake* is inapposite because Agency Defendants did not base the Moratorium on new factual findings that contradict their prior factual findings.  Rather, any contradiction lies in Agency Defendants' position regarding the legality of the Program's NEPA review.

In *Los Padres ForestWatch*, the U.S. Forest Service "fail[ed] to provide evidence of the average or median" diameter of trees that would qualify as "generally small diameter timber" pursuant to federal regulations.[253]  The memorandum approving the project "contain[ed] a bare assertion—with no supporting analysis—that . . . 21-inch [diameter-at-breast-height] trees are 'smaller trees' consistent with the Roadless Area Conservation Rule."[254]  Not only did the Forest Service fail entirely to explain its conclusion regarding the trees at issue, but its conclusion also contradicted other evidence in the record, such as an Environmental Assessment prepared for a nearby project that concluded that "larger diameter" trees have a diameter at breast height exceeding 10 inches.[255]  Here, Agency Defendants did not leave their policy change unexplained, and their

---

[252] *Vill. of Kake*, 795 F.3d at 968.

[253] 25 F.4th at 657.

[254] *Id.*

[255] *Id.* at 658.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 61 of 74

rationale did not contradict explicit factual findings contained elsewhere in the record.

In *California*, BLM promulgated a rule, referred to by the district court as "the Suspension Rule," that suspended certain provisions of BLM's Waste Prevention Rule, a rule which had sought to "reduce waste of natural gas from venting, flaring, and leaks during oil and natural gas production activities."[256]  The court found that the Suspension Rule's reasoning was "untethered to evidence contradicting the reasons for implementing the Waste Prevention Rule" because BLM had initially found that the Waste Prevention Rule imposed "economical, cost-effective, and reasonable measures . . . to minimize gas waste," but in the Suspension Rule found that it had "concerns regarding the statutory authority, cost, complexity, feasibility, and other implications" of the Waste Prevention Rule.[257]  Because the Suspension Rule contained factual findings that appeared to "contradict those underlying its prior policy," lacked other factual support, and were "not properly tailored" to address the concerns BLM identified with respect to the prior rule, the court enjoined enforcement of the rule due to BLM's failure to meet the "more detailed justification" standard.[258]

---

[256] 286 F. Supp. 3d at 1058 (citation omitted).

[257] *Id.* at 1058, 1065.

[258] *Id.* at 1065–67 (quoting *Fox*, 556 U.S. at 515).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 62 of 74

Again, *California* is not directly applicable to the case at hand because the reasons Agency Defendants offered for their policy change are not contradictory factual findings about the Program's operation; rather, they are contradictory legal conclusions as to the EIS's compliance with NEPA.  For example, the ROD concluded that the Tax Act's provision that the Interior Secretary "shall authorize up to 2,000 surface acres" means that BLM "cannot" consider "[a]n alternative that allowed less than 2,000 acres of surface facilities"; Agency Defendants announced the Moratorium in part because they determined the ROD's interpretation was incorrect, which had a significant impact on the NEPA review since it eliminated from consideration any alternative with lesser surface acreage.[259]

Even though *California* is not directly applicable to the instant case, it still lends support to Agency Defendants' primary justification for the Moratorium—to ensure that the NEPA analysis accounts for subsequently identified legal errors so the Program can proceed in accordance with the law.[260]  As the court in *California* observed, a "concern for judicial review may serve to justify a suspension or delay."[261]  There, BLM's stated concern for judicial review was insufficient to justify the Suspension Rule because BLM tailored the Suspension Rule "to achieve its

---

[259] AR 76, 3365.  The Court expresses no opinion in this order as to this legal issue.

[260] AR 3364–65.

[261] 286 F. Supp. 3d at 1068.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 63 of 74

goal of relieving operators and the agency of the burden of complying with a rule that may shortly change."[262]

Here, by contrast, BLM's stated concern was that the Program may be based on a "specific legal error" implicated in then-pending court cases.[263]  The reasons for the Moratorium expressed in Secretarial Order 3401 and the SOP Letter therefore are tethered to a concern about legality and judicial review and not to some unrelated concern, such as a political motivation or desire to address climate change.  Political and climate-inspired motivations may have also been present, but Agency Defendants appropriately tailored the Moratorium to address specifically identified legal concerns that, once addressed, should facilitate Agency Defendants' efforts to implement the Program in accordance with the law.

In sum, the Court finds that Agency Defendants' explanation for the Moratorium satisfies their obligations pursuant to *Fox*.

### 3.    The State's Related Arguments

The State raises two related arguments concerning Agency Defendants' policy change, which the Court addresses in turn.

### a.    The Moratorium does not rescind the ROD.

The State contends that the Moratorium "functionally rejects, suspends, and even rescinds the ROD . . . without any independent lawful authorization nor with

---

[262] *Id.* (citation omitted).

[263] AR 3362–63 (noting "legal deficiencies"); AR 3365 (describing potential implications to NEPA analysis after the Ninth Circuit issued *Center for Biological Diversity* in December 2020).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 64 of 74

any process that would otherwise be required for such an action."[264]  The State characterizes the Moratorium as "simply abandon[ing] an otherwise valid decision."[265]  But as noted throughout this order, the Moratorium is a *temporary* pause in Agency Defendants' implementation of the Program.  Nothing in Secretarial Order 3401 or the SOP Letter "abandons" the ROD.  At some future time, Agency Defendants may choose to "reject[], suspend[], [or] even rescind[] the ROD" based on the results of their ongoing supplemental NEPA analysis, but they have not done so at this time.[266]  Instead, the final agency action properly challenged in this suit is Agency Defendants' decision to pause the Program's implementation, not a rejection or rescission of the ROD.

### b.    The Moratorium's purpose is valid.

The State next alleges that the Moratorium is founded on an invalid purpose.[267]  But the State fundamentally misconstrues the Moratorium's purpose.  The purpose of the Moratorium is not, as the State contends, to "determine whether to reaffirm or void the Coastal Plain leases."[268]  That may be part of the purpose of the supplemental NEPA review, but the issues of whether Agency Defendants have the authority to cancel any leases and under what circumstances

---

[264] Docket 59 at 20.

[265] Docket 59 at 20.

[266] Docket 59 at 20.

[267] Docket 59 at 23.

[268] Docket 59 at 24.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 65 of 74

are not before this Court.[269]  The purpose of the Moratorium—the agency action that is properly challenged and currently before the Court—is to provide time for Agency Defendants to ensure that the Program is implemented in accordance with applicable laws.[270]  It is well within DOI's authority to issue leases pursuant to the Program and to pause lease implementation to address legal errors that could lead a federal court to reject the Program and remand it to Agency Defendants, triggering another years-long NEPA process.[271]

The State acknowledges this authority in its reply but asserts that an agency cannot reconsider a decision "when Congress has provided a mechanism capable of rectifying mistaken actions."[272]  The State asserts that Congress, through NEPA,

---

[269] Regardless, as discussed above, the leases clearly provide authority for Agency Defendants to cancel the leases if, for example, a "lessee fails to comply with any provisions of" the lease. *E.g.*, AR 3312.

[270] *See* AR 3362 ("Based on th[e] identified deficiencies, the Department . . . will conduct a new, comprehensive analysis of the potential environmental impacts of the Program and address the identified legal deficiencies. While that analysis is pending, I direct a temporary halt on all Department activities related to the Program . . . ."); AR 3365 ("[T]he Department has concluded that it is necessary to suspend the above-referenced lease(s) . . . . The BLM will undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures.").

[271] *See Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion." (citations omitted)); discussion *supra* Section I.C.3 (citing *Boesche v. Udall*, 373 U.S. 472 (1963)).  Likewise, "notions of administrative autonomy require that [an] agency be given a chance to discover and correct its own errors." *See McKart v. United States*, 395 U.S. 185, 195 (1969) (discussing reasons underlying the administrative exhaustion doctrine).  This includes "giving the agency an opportunity to fix its own mistakes before it is brought to court."  *William Loveland Coll. v. Distance Educ. Accreditation Comm'n*, 347 F. Supp. 3d 1, 13 (D.D.C. 2018), *aff'd sub nom. William Loveland Coll. v. Distance Educ. Accrediting Comm'n*, 788 F. App'x 5 (D.C. Cir. 2019).

[272] Docket 66 at 8 (quoting *Ivy Sports*, 767 F.3d at 86).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 66 of 74

provided "a detailed process that federal agencies can and do use to modify or replace an existing ROD—a process that involves input by the public and other stakeholders."[273]  But this contention again mischaracterizes the Moratorium, which does not modify or replace the Program's formal NEPA review or associated documentation; it instead pauses the Program's implementation so Agency Defendants can conduct additional NEPA analysis and correct the Program's alleged legal deficiencies.  To the extent Agency Defendants develop a new EIS or ROD in an effort to rectify the alleged deficiencies, those efforts would require adherence to the applicable procedures established by Congress in NEPA and any applicable implementing regulations.

In light of the above, the Court concludes that the Moratorium's purpose, and Agency Defendants' authority to pursue that purpose, are each valid.

### C. Agency Defendants Have Not Unlawfully Delayed or Unreasonably Withheld Agency Action

Plaintiffs' remaining argument is that Agency Defendants "are unlawfully and unreasonably delaying the completion of . . . discrete, required actions" pursuant to the Tax Act.[274]  They focus primarily on the statute's directive that the Interior Secretary "shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out

---

[273] Docket 66 at 8 (first citing 42 U.S.C. § 4332(C); and then citing 40 C.F.R. §§ 1501–06).

[274] Docket 60 at 39–40.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 67 of 74

this section."[275]  Plaintiffs maintain that the Court "shall compel" these actions pursuant to Section 706(1) of the APA.[276]

Agency Defendants counter that they are not unlawfully withholding action because they satisfied the requirement to hold the Program's first lease sale and are "well within the statutory timeline for the second required sale."[277]  With regard to the issuance of easements and rights-of-way, Agency Defendants maintain that a court can only invoke Section 706(1) of the APA when an agency has failed "to perform a ministerial or non-discretionary act," not an action over which the agency is accorded discretion.[278]

The APA provides that a court "shall compel agency action unlawfully withheld or unreasonably delayed," including a failure to act.[279]  Judicial review of an agency's failure to act is limited, however, in order "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."[280]  It follows that a court may not compel agency action

---

[275] Tax Act § 20001(c)(2).

[276] Docket 60 at 39 (citing 5 U.S.C. § 706(1)).

[277] Docket 63 at 28; *see also* Docket 64 at 23 ("Interior did not . . . miss deadlines in the Tax Act.").

[278] Docket 63 at 26–27 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) [hereinafter *SUWA*]).

[279] 5 U.S.C. § 706(1); *see also* 5 U.S.C. § 551(13) (defining "agency action" to "include[] the . . . failure to act").

[280] *SUWA*, 542 U.S. at 66.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 68 of 74

whenever an agency is withholding or delaying *any* action.[281]  Rather, a court's authority to compel agency action "is carefully circumscribed to situations where an agency has ignored a specific legislative command."[282]  To prevail on a Section 706(1) claim, a plaintiff must establish "that an agency failed to take a *discrete* agency action that it is *required to take*."[283]  A court must leave "the manner of its action . . . to the agency's discretion" since a court "has no power to specify what the action must be."[284]

In the Ninth Circuit, an action is "unlawfully withheld" if "Congress has specifically provided a deadline for performance" and the agency has not met that deadline.[285]  When there is no set deadline by which an agency must act, a court evaluates whether the agency's delay is unreasonable by applying the six factors established by the D.C. Circuit in *Telecommunications Research & Action Center v. FCC*[286] and adopted by the Ninth Circuit in *Independence Mining Co. v. Babbitt*:[287]

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other

---

[281] *Or. Nat. Desert Ass'n v. Bushue*, Case No. 3:19-cv-1550-SI, 2022 WL 17487065, at *2 (D. Or. Dec. 7, 2022).

[282] *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).

[283] *SUWA*, 542 U.S. at 64 (emphasis in original).

[284] *Id.* at 65.

[285] *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002).

[286] 750 F.2d 70 (D.C. Cir. 1984) [hereinafter *TRAC*].

[287] 105 F.3d 502, 507 (9th Cir. 1997).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 69 of 74

Case 3:21-cv-00245-SLG   Document 72   Filed 08/07/23   Page 69 of 74          ER-097

indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.[288]

The rule of reason is the most important factor in this analysis because, in determining an "appropriate timeline for agency action, the Ninth Circuit has instructed district courts to follow a standard of reasonableness."[289] Although "there is no *per se* rule as to how long is too long" for agency action,[290] the Ninth Circuit has observed that a delay of more than six years may be "nothing less than egregious."[291] Similarly, the Ninth Circuit held that an eight-year delay with no concrete timeline to reach a final ruling was a "roadmap for further delay" that "stretched the 'rule of reason' beyond its limits."[292]

Plaintiffs rely on one Supreme Court case supporting the proposition that when an agency fails to take a discrete step it is required to take, a court must

---

[288] *TRAC*, 750 F.2d at 80 (internal quotation marks and citations omitted).

[289] *Audubon Soc'y of Portland v. Jewell*, 104 F. Supp. 3d 1099, 1102 (D. Or. 2015) (citations omitted); *see also Or. Nat. Desert Ass'n*, 2022 WL 17487065, at *17 ("Although not dispositive, the first factor in the *TRAC* analysis is the most important." (citing *In re A Community Voice*, 878 F.3d 779, 786 (9th Cir. 2017))).

[290] *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992).

[291] *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139 (9th Cir. 2020) (citations omitted).

[292] *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 814 (9th Cir. 2015).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 70 of 74

invoke the APA to compel that action.[293]   However, the operative statutes governing the Program—primarily the Tax Act—do not prescribe any discrete steps that Agency Defendants have yet failed to take.  The Tax Act requires DOI to hold "the initial lease sale under the oil and gas program . . . not later than 4 years after the date of enactment of this Act."[294]  Agency Defendants conducted the Program's first lease sale on January 6, 2021.[295]  Congress enacted the Tax Act on December 22, 2017, so Agency Defendants handily met this deadline.[296]  Agency Defendants have not cancelled, rescinded, nullified, or otherwise undone the first lease sale.[297]  And the second lease sale deadline of December 22, 2024, has not yet passed.[298]

As for the Tax Act's mandate to the Secretary to "issue any rights-of-way or easements . . . necessary to carry out this section," this provision does not specify a timeframe by which Agency Defendants must act, and the Tax Act provides them

---

[293] Docket 60 at 39–40 (citing *SUWA*, 542 U.S. at 64).  In *SUWA*, the Supreme Court held that statements in a land use plan reflecting BLM's intention to conduct supervision and monitoring activities were "not a legally binding commitment enforceable under § 706(1)," and, as such, the Supreme Court did not decide whether the statements were "sufficiently discrete to be amenable to compulsion under the APA."  *SUWA*, 542 U.S. at 72.

[294] Tax Act § 20001(c)(1)(B)(ii)(I).

[295] AR 3227–28 (Notice of Lease Sale).

[296] *See generally* Tax Act.

[297] To the extent Plaintiffs suggest that the Moratorium is a de facto rescission of the lease sale, they have not pointed to any authority indicating that this is the case.  Also, for the reasons the Court discussed above in response to the State's argument that the Moratorium functionally rescinded the ROD, there has not been a "functional" rescission of the lease sale.  *See* discussion *supra* Section II.B.3.a.

[298] *See* Tax Act § 20001(c)(1)(B)(ii)(II).

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 71 of 74

discretion through use of the phrase "necessary to carry out this section."[299]  Thus, apart from the lease sales themselves, there are no other "discrete agency action[s]" for which Agency Defendants have an explicit deadline.[300]

Plaintiffs' briefing does not address the *TRAC* factors and instead only superficially alleges an unreasonable delay.[301]  Regardless, none of the factors weigh heavily in favor of Plaintiffs.  First, the most important factor, the "rule of reason," weighs in favor of Agency Defendants given the temporary nature of the Moratorium and their desire to address legal issues that could stymie the Program while balancing ANILCA's conservation goals.  Second, Congress has not provided any timetable for implementation of the Program beyond the requirements to conduct two lease sales within set periods of time, neither deadline of which Agency Defendants have violated.  Third, the delays have resulted only in possible economic harm, as human health and welfare are not directly impacted by the Moratorium.  Fourth, Agency Defendants delayed the Program for the

---

[299] *Id.* § 20001(c)(2).  Because Agency Defendants identified legal deficiencies in the Program's implementation, no rights-of-way or easements are necessary at this time to "carry out" Section 20001 of the Tax Act.  *Cf. W. Energy All. v. Biden*, Case No. 21-CV-13-SWS, 2022 WL 18587039, at *9 (D. Wyo. Sept. 2, 2022) (finding that, because "recent caselaw created a cloud over the sufficiency of many of the" Environmental Assessments underlying a leasing program, none of the lands subject to the program were properly "available for leasing" pursuant to the MLA and its implementing regulations).

[300] *SUWA*, 542 U.S. at 64.

[301] *See generally* Docket 60 at 39–40.  The State identifies two cases in which courts have held that agencies violated the APA by delaying agency action, but the State's filing likewise does not separately address APA § 706(1) or discuss the *TRAC* factors.  Docket 59 at 22–23.  Plaintiffs' and the State's replies do not address these factors either.  *See generally* Docket 66; Docket 67.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 72 of 74

purpose of ensuring that their NEPA review comports with the law.  Indeed, Agency Defendants are attempting to balance the constraints imposed on them through multiple federal statutes: the Tax Act, ANILCA, and NEPA.  There is no indication from Congress that any of these statutes should be prioritized over any other, and it cannot be said that a temporary delay in the Program's implementation represents an unreasonable prioritization of NEPA over the Tax Act or ANILCA when Agency Defendants have already begun to implement the Program and have only temporarily paused it to ensure compliance with NEPA.  These efforts ultimately should further both the Tax Act and ANILCA's goals as well as NEPA's goals.  Fifth, Plaintiffs have articulated some degree of prejudice from the delay, but there is no indication that, when the Moratorium ends, they will not be able to fulfill their objectives at that point.  The sixth factor is largely irrelevant in this case, as there is no evidence that Agency Defendants have acted with impropriety.[302]  At worst, their actions are rooted in political motivations, which are not by themselves reason to find a delay unreasonable.  Accordingly, the Court finds that Agency Defendants' delay in implementing the Program is reasonable and that to date Agency Defendants have not unlawfully withheld any action.[303]

---

[302] *See TRAC*, 750 F.2d at 80 (listing six factors relevant to the question of whether an agency's delay is unreasonable).

[303] Because the Court finds that the Moratorium complies with the law, it does not reach the parties' arguments concerning the proper remedy in this case.  Docket 60 at 40.

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 73 of 74

## CONCLUSION

In light of the foregoing, the State's and Plaintiffs' motions for summary judgment at Docket 59 and Docket 60, respectively, are DENIED. Defendants' responses in opposition—which the Court interprets as cross-motions for summary judgment—at Docket 63, Docket 64, and Docket 65 are GRANTED. All claims against Federal Defendants are DISMISSED with prejudice. The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 7th day of August, 2023 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:21-cv-00245-SLG, *AIDEA, et al. v. Biden, et al.*
Order re Motions for Summary Judgment
Page 74 of 74

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, *et al.*, | |
| Plaintiffs, | |
| and | Case No. 3:21-cv-00245-SLG |
| STATE OF ALASKA, | |
| Intervenor-Plaintiff, | |
| v. | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, | |
| Defendants, | |
| and | |
| NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, *et al.*, | |
| Intervenor-Defendants. | |

## JUDGMENT IN A CIVIL ACTION

☐ **JURY VERDICT.** This action came before the court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **DECISION BY COURT.** This action came to trial or decision before the Court. The issues have been tried or determined and a decision has been rendered.

IT IS ORDERED AND ADJUDGED:

THAT all claims against Federal Defendants are dismissed with prejudice.

APPROVED:

**s/Sharon L. Gleason**

Sharon L. Gleason
United States District Judge

Date: August 7, 2023

**Brian D. Karth**
Brian D. Karth
Clerk of Court

*Note: Award of prejudgment interest, costs and attorney's
fees are governed by D.Ak. LR 54.1, 54.2, and 58.1.*



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

Mr. Mathew Rexford
President
Kaktovik Iñupiat Corporation
P.O. Box 73
Kaktovik, Alaska 99747

Dear Mr. Rexford:

We write further to our previous letter and conversations regarding consideration of Kaktovik Iñupiat Corporation's (KIC's) applications and Plan of Operations for a seismic permit and associated incidental harassment authorization (IHA) for 2022 instead of 2021.

As you are aware, the Secretary of the Interior issued Secretary's Order (SO) number 3401 on June 1, 2021. The Order identifies legal deficiencies in the analysis for the Coastal Plain Oil and Gas Leasing Program (Program), including, but not limited to, compliance with the National Environmental Policy Act (NEPA), and, consistent with applicable law, suspends all activities related to implementing the Program in the Arctic National Wildlife Refuge (Arctic Refuge) and specifically prohibits BLM and FWS from processing any pending or future applications for (among other things) exploration activities under the Program until a comprehensive environmental analysis is complete. In order to ensure compliance with NEPA and other statutory requirements and any additional mitigation measures that may be integrated into the Program, the BLM and FWS will delay processing your applications pending completion of that analysis and the Department's issuance of a new Program decision.

We appreciate your patience as we work through further analysis, and would like to further discuss to answer any questions you may have. Please be in touch with Nada Culver at your convenience and we will prioritize this conversation on our schedules.

Sincerely,

Martha Williams
Principal Deputy Director, Exercising
the delegated Authority of the Director,
U.S. Fish and Wildlife Service

Nada Wolff Culver
Deputy Director, Policy and Programs
Bureau of Land Management

## Correspondence with the Department of the Interior

Richardson, Carrie M <crichardson@blm.gov>

Wed 8/18/2021 3:58 PM

To: nvkaktovik@gmail.com <nvkaktovik@gmail.com>

📎 1 attachments (68 KB)

Response to Pres Rexforn Signed by FWP and BLM.pdf;

Hello President Rexford,

Please see the attached response from the U.S. Fish and Wildlife Service and Bureau of Land Management to the Kaktovik Inupiat Corporation.  Thank you.

Carrie M. Richardson
Bureau of Land Management
National Advisory Committee Coordinator
External Affairs (HQ - 640)
1849 C Street NW, MS 5614
Washington, DC  20240



# United States Department of the Interior
## OFFICE OF THE SECRETARY
### Washington, DC 20240

**August 19, 2022**

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

DECISION

| Alaska Industrial Development | : | Oil and Gas Leases |
| and Export Authority | : | AA095889 |
| 813 West Northern Lights Blvd. | : | AA095890 |
| Anchorage, Alaska 99503 | : | AA095893 |
| | : | AA095897 |
| | : | AA095898 |
| | : | AA095900 |
| | : | AA095901 |

### Addendum to Suspension of Operations and Production

In the Suspension of Operations and Production, dated June 1, 2021, the Department identified two legal defects and also several areas involving a potential legal defect, specifically including the treatment of foreign greenhouse gas (GHG) emissions in the Environmental Impact Statement (EIS). The Department recognized that the recent Ninth Circuit opinion involving the Liberty Project in Alaska, *Center for Biological Diversity v. Bernhardt*, issued on December 7, 2020, had implications for the analysis of foreign GHG emissions in the Coastal Plain Oil and Gas Leasing Program. The Department noted it was carefully evaluating its approach to this issue and that it might later identify this issue as an additional specific legal error depending on the resolution of pending court cases involving similar issues.

Two of those pending court cases involving similar issues are the cases challenging the Willow Project in the National Petroleum Reserve in Alaska. On August 18, 2021, the U.S. District Court for the District of Alaska, Judge Sharon Gleason presiding, concluded that BLM's exclusion of foreign GHG emissions in its alternatives analysis in the Willow Project EIS was arbitrary and capricious. Recognizing that the BLM also excluded foreign GHG emissions from its analysis of alternatives in the Coastal Plain EIS for the same basic reasons cited in the Willow Project EIS, the Department, in consultation with the Solicitor's Office, has now identified this exclusion as an additional specific legal defect. The Coastal Plain EIS did not give a quantitative estimate of the downstream GHG emissions that would result from changes in consumption of oil abroad due to the foreseeable production of Coastal Plain oil nor did it sufficiently explain why it could not do so and provide a more thorough discussion of how changes in foreign oil consumption might

change the GHG emissions analysis.

The Department has concluded that this legal defect provides an additional basis to continue to suspend the above-referenced leases and complete further environmental analysis under NEPA. On August 4, 2021, the BLM issued a *Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program*, 86 Fed. Reg. 41989, which contains a schedule for completion of a Supplemental EIS and issuance of a new decision. The BLM is conducting this additional NEPA analysis to determine whether the leases should be affirmed, voided or subject to additional mitigation measures.  Once sufficient information is developed, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases.

This SOP remains effective from the first day of June 2021. While this SOP remains in place, no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended.  If you have any questions, please contact Nada Wolff Culver at nculver@blm.gov.

Sincerely,

Laura
Daniel-Davis

Digitally signed by Laura
Daniel-Davis
Date: 2022.08.19
08:50:51 -04'00'

Laura Daniel-Davis
Principal Deputy Assistant Secretary
Land and Minerals Management



THE SECRETARY OF THE INTERIOR
WASHINGTON

ORDER NO. 3401

**Subject:** Comprehensive Analysis and Temporary Halt on all Activities in the Arctic National Wildlife Refuge Relating to the Coastal Plain Oil and Gas Leasing Program

Sec. 1 **Purpose.** This Order is taken in furtherance of Section 4(a) of Executive Order (EO) 13990, entitled, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis" (January 20, 2021).

Sec. 2 **Authorities.** This Order is issued under the authority of Section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended, and other applicable statutory authorities.

Sec. 3 **Background.** Section 4(a) of EO 13990, provides, in full:

> *In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.*

My review of the Coastal Plain Oil and Gas Leasing Program (Program) as directed by EO 13990 has identified multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under the National Environmental Policy Act (NEPA), including failure to adequately analyze a reasonable range of alternatives in the environmental impact statement (EIS); and (2) failure in the August 17, 2020, Record of Decision (ROD) to properly interpret Section 20001 of Public Law 115-97 (Tax Act).

Sec. 4 **Directive.** Based on those identified deficiencies, the Department of the Interior (Department) will conduct a new, comprehensive analysis of the potential environmental impacts of the Program and address the identified legal deficiencies. While that analysis is pending, I direct a temporary halt on all Department activities related to the Program in the Arctic Refuge.

Sec. 5 **Implementation**. Consistent with EO 13990 and governing laws and regulations, I direct the following actions:

a. Within 60 days of the issuance of this Order, the Assistant Secretary for Land and Minerals Management will, in coordination with the Assistant Secretary for Fish and Wildlife and Parks and the Solicitor's Office, publish a notice of intent in the Federal Register to initiate the process to conduct a comprehensive environmental analysis, complete necessary consultation, and correct the identified legal deficiencies.

b. Until the analysis in Sec. 5(a) above is complete, the Directors of the Bureau of Land Management (BLM) and the U.S. Fish and Wildlife Service shall not take any action to authorize any aspect of the Program, including, but not limited to, any leasing, exploration, development, production, or transportation, and shall not process any pending or future applications for such activities.

c. The Assistant Secretary for Land and Minerals Management and the Director of the BLM shall, as appropriate and consistent with applicable law, take appropriate action with respect to existing leases in light of the direction provided herein. To the extent not already redelegated, I hereby redelegate the authority to take such action or to exercise any authority granted to the Secretary of the Interior by Section 20001 of Pub. L. No. 115-97 (December 20, 2017) to the Assistant Secretary for Land and Minerals Management, the Principal Deputy Assistant Secretary for Land and Minerals Management, the Director of the BLM, and the Deputy Director for Policy and Programs for the BLM.

d. The Solicitor's Office will work with the Department of Justice to seek additional stays on litigation until the analysis in Sec. 5(a) is complete.

Sec. 6 **Effect of the Order**. This Order is intended to improve the internal management of the Department. This Order and any resulting report or recommendations are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officer or employees, or any other person. To the extent there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the laws or regulations will control.

Sec. 7 **Expiration Date**. This Order is effective immediately and will remain in effect until it is amended, superseded, or revoked, whichever occurs first.

Secretary of the Interior

Date: June 1, 2021

Federal Register / Vol. 86, No. 14 / Monday, January 25, 2021 / Presidential Documents    7037

# Presidential Documents

Executive Order 13990 of January 20, 2021

## Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1**. *Policy*. Our Nation has an abiding commitment to empower our workers and communities; promote and protect our public health and the environment; and conserve our national treasures and monuments, places that secure our national memory. Where the Federal Government has failed to meet that commitment in the past, it must advance environmental justice. In carrying out this charge, the Federal Government must be guided by the best science and be protected by processes that ensure the integrity of Federal decision-making. It is, therefore, the policy of my Administration to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.

To that end, this order directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis.

**Sec. 2**. *Immediate Review of Agency Actions Taken Between January 20, 2017, and January 20, 2021*. (a) The heads of all agencies shall immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (agency actions) promulgated, issued, or adopted between January 20, 2017, and January 20, 2021, that are or may be inconsistent with, or present obstacles to, the policy set forth in section 1 of this order. For any such actions identified by the agencies, the heads of agencies shall, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding the agency actions. In addition, for the agency actions in the 4 categories set forth in subsections (i) through (iv) of this section, the head of the relevant agency, as appropriate and consistent with applicable law, shall consider publishing for notice and comment a proposed rule suspending, revising, or rescinding the agency action within the time frame specified.

(i) Reducing Methane Emissions in the Oil and Gas Sector: ''Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Reconsideration,'' 85 FR 57398 (September 15, 2020), by September 2021.

(ii) Establishing Ambitious, Job-Creating Fuel Economy Standards: ''The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program,'' 84 FR 51310 (September 27, 2019), by April 2021; and ''The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks,'' 85 FR 24174 (April 30,

2020), by July 2021. In considering whether to propose suspending, revising, or rescinding the latter rule, the agency should consider the views of representatives from labor unions, States, and industry.

(iii) Job-Creating Appliance- and Building-Efficiency Standards: ''Energy Conservation Program for Appliance Standards: Procedures for Use in New or Revised Energy Conservation Standards and Test Procedures for Consumer Products and Commercial/Industrial Equipment,'' 85 FR 8626 (February 14, 2020), with major revisions proposed by March 2021 and any remaining revisions proposed by June 2021; ''Energy Conservation Program for Appliance Standards: Procedures for Evaluating Statutory Factors for Use in New or Revised Energy Conservation Standards,'' 85 FR 50937 (August 19, 2020), with major revisions proposed by March 2021 and any remaining revisions proposed by June 2021; ''Final Determination Regarding Energy Efficiency Improvements in the 2018 International Energy Conservation Code (IECC),'' 84 FR 67435 (December 10, 2019), by May 2021; ''Final Determination Regarding Energy Efficiency Improvements in ANSI/ASHRAE/IES Standard 90.1–2016: Energy Standard for Buildings, Except Low-Rise Residential Buildings,'' 83 FR 8463 (February 27, 2018), by May 2021.

(iv) Protecting Our Air from Harmful Pollution: ''National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units—Reconsideration of Supplemental Finding and Residual Risk and Technology Review,'' 85 FR 31286 (May 22, 2020), by August 2021; ''Increasing Consistency and Transparency in Considering Benefits and Costs in the Clean Air Act Rulemaking Process,'' 85 FR 84130 (December 23, 2020), as soon as possible; ''Strengthening Transparency in Pivotal Science Underlying Significant Regulatory Actions and Influential Scientific Information,'' 86 FR 469 (January 6, 2021), as soon as possible.

(b) Within 30 days of the date of this order, heads of agencies shall submit to the Director of the Office of Management and Budget (OMB) a preliminary list of any actions being considered pursuant to section (2)(a) of this order that would be completed by December 31, 2021, and that would be subject to OMB review. Within 90 days of the date of this order, heads of agencies shall submit to the Director of OMB an updated list of any actions being considered pursuant to section (2)(a) of this order that would be completed by December 31, 2025, and that would be subject to OMB review. At the time of submission to the Director of OMB, heads of agencies shall also send each list to the National Climate Advisor. In addition, and at the same time, heads of agencies shall send to the National Climate Advisor a list of additional actions being considered pursuant to section (2)(a) of this order that would not be subject to OMB review.

(c) Heads of agencies shall, as appropriate and consistent with applicable law, consider whether to take any additional agency actions to fully enforce the policy set forth in section 1 of this order. With respect to the Administrator of the Environmental Protection Agency, the following specific actions should be considered:

(i) proposing new regulations to establish comprehensive standards of performance and emission guidelines for methane and volatile organic compound emissions from existing operations in the oil and gas sector, including the exploration and production, transmission, processing, and storage segments, by September 2021; and

(ii) proposing a Federal Implementation Plan in accordance with the Environmental Protection Agency's ''Findings of Failure To Submit State Implementation Plan Revisions in Response to the 2016 Oil and Natural Gas Industry Control Techniques Guidelines for the 2008 Ozone National Ambient Air Quality Standards (NAAQS) and for States in the Ozone Transport Region,'' 85 FR 72963 (November 16, 2020), for California, Connecticut, New York, Pennsylvania, and Texas by January 2022.

(d) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order and any actions taken pursuant to section 2(a) of this order to any court with jurisdiction over pending litigation related to those agency actions identified pursuant to section (2)(a) of this order, and may, in his discretion, request that the court stay or otherwise dispose of litigation, or seek other appropriate relief consistent with this order, until the completion of the processes described in this order.

(e) In carrying out the actions directed in this section, heads of agencies shall seek input from the public and stakeholders, including State local, Tribal, and territorial officials, scientists, labor unions, environmental advocates, and environmental justice organizations.

**Sec. 3**. *Restoring National Monuments.* (a) The Secretary of the Interior, as appropriate and consistent with applicable law, including the Antiquities Act, 54 U.S.C. 320301 *et seq.,* shall, in consultation with the Attorney General, the Secretaries of Agriculture and Commerce, the Chair of the Council on Environmental Quality, and Tribal governments, conduct a review of the monument boundaries and conditions that were established by Proclamation 9681 of December 4, 2017 (Modifying the Bears Ears National Monument); Proclamation 9682 of December 4, 2017 (Modifying the Grand Staircase-Escalante National Monument); and Proclamation 10049 of June 5, 2020 (Modifying the Northeast Canyons and Seamounts Marine National Monument), to determine whether restoration of the monument boundaries and conditions that existed as of January 20, 2017, would be appropriate.

(b) Within 60 days of the date of this order, the Secretary of the Interior shall submit a report to the President summarizing the findings of the review conducted pursuant to subsection (a), which shall include recommendations for such Presidential actions or other actions consistent with law as the Secretary may consider appropriate to carry out the policy set forth in section 1 of this order.

(c) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to the Grand Staircase-Escalante, Bears Ears, and Northeast Canyons and Seamounts Marine National Monuments, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) of this section.

**Sec. 4**. *Arctic Refuge.* (a) In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.

(b) In Executive Order 13754 of December 9, 2016 (Northern Bering Sea Climate Resilience), and in the Presidential Memorandum of December 20, 2016 (Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf From Mineral Leasing), President Obama withdrew areas in Arctic waters and the Bering Sea from oil and gas drilling and established the Northern Bering Sea Climate Resilience Area. Subsequently, the order was revoked and the memorandum was amended in Executive Order 13795 of April 28, 2017 (Implementing an America-First Offshore Energy Strategy). Pursuant to section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), Executive Order 13754 and the Presidential Memorandum of December 20, 2016, are hereby reinstated in their original form, thereby restoring the original withdrawal of certain offshore areas in Arctic waters and the Bering Sea from oil and gas drilling.

(c) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to the Coastal Plain Oil and Gas Leasing Program in the Arctic National Wildlife Refuge and other related programs, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) of this section.

**Sec. 5.** *Accounting for the Benefits of Reducing Climate Pollution.* (a) It is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account. Doing so facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues. The "social cost of carbon" (SCC), "social cost of nitrous oxide" (SCN), and "social cost of methane" (SCM) are estimates of the monetized damages associated with incremental increases in greenhouse gas emissions. They are intended to include changes in net agricultural productivity, human health, property damage from increased flood risk, and the value of ecosystem services. An accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions.

(b) There is hereby established an Interagency Working Group on the Social Cost of Greenhouse Gases (the "Working Group"). The Chair of the Council of Economic Advisers, Director of OMB, and Director of the Office of Science and Technology Policy shall serve as Co-Chairs of the Working Group.

(i) Membership. The Working Group shall also include the following other officers, or their designees: the Secretary of the Treasury; the Secretary of the Interior; the Secretary of Agriculture; the Secretary of Commerce; the Secretary of Health and Human Services; the Secretary of Transportation; the Secretary of Energy; the Chair of the Council on Environmental Quality; the Administrator of the Environmental Protection Agency; the Assistant to the President and National Climate Advisor; and the Assistant to the President for Economic Policy and Director of the National Economic Council.

(ii) Mission and Work. The Working Group shall, as appropriate and consistent with applicable law:

(A) publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies shall use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published;

(B) publish a final SCC, SCN, and SCM by no later than January 2022;

(C) provide recommendations to the President, by no later than September 1, 2021, regarding areas of decision-making, budgeting, and procurement by the Federal Government where the SCC, SCN, and SCM should be applied;

(D) provide recommendations, by no later than June 1, 2022, regarding a process for reviewing, and, as appropriate, updating, the SCC, SCN, and SCM to ensure that these costs are based on the best available economics and science; and

(E) provide recommendations, to be published with the final SCC, SCN, and SCM under subparagraph (A) if feasible, and in any event by no later than June 1, 2022, to revise methodologies for calculating the SCC, SCN, and SCM, to the extent that current methodologies do not adequately take account of climate risk, environmental justice, and intergenerational equity.

(iii) Methodology. In carrying out its activities, the Working Group shall consider the recommendations of the National Academies of Science, Engineering, and Medicine as reported in Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide (2017) and other pertinent scientific literature; solicit public comment; engage with the public and stakeholders; seek the advice of ethics experts; and ensure that the SCC, SCN, and SCM reflect the interests of future generations in avoiding threats posed by climate change.

**Sec. 6**. *Revoking the March 2019 Permit for the Keystone XL Pipeline.* (a) On March 29, 2019, the President granted to TransCanada Keystone Pipeline, L.P. a Presidential permit (the ''Permit'') to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada (the ''Keystone XL pipeline''), subject to express conditions and potential revocation in the President's sole discretion. The Permit is hereby revoked in accordance with Article 1(1) of the Permit.

(b) In 2015, following an exhaustive review, the Department of State and the President determined that approving the proposed Keystone XL pipeline would not serve the U.S. national interest. That analysis, in addition to concluding that the significance of the proposed pipeline for our energy security and economy is limited, stressed that the United States must prioritize the development of a clean energy economy, which will in turn create good jobs. The analysis further concluded that approval of the proposed pipeline would undermine U.S. climate leadership by undercutting the credibility and influence of the United States in urging other countries to take ambitious climate action.

(c) Climate change has had a growing effect on the U.S. economy, with climate-related costs increasing over the last 4 years. Extreme weather events and other climate-related effects have harmed the health, safety, and security of the American people and have increased the urgency for combatting climate change and accelerating the transition toward a clean energy economy. The world must be put on a sustainable climate pathway to protect Americans and the domestic economy from harmful climate impacts, and to create well-paying union jobs as part of the climate solution.

(d) The Keystone XL pipeline disserves the U.S. national interest. The United States and the world face a climate crisis. That crisis must be met with action on a scale and at a speed commensurate with the need to avoid setting the world on a dangerous, potentially catastrophic, climate trajectory. At home, we will combat the crisis with an ambitious plan to build back better, designed to both reduce harmful emissions and create good clean-energy jobs. Our domestic efforts must go hand in hand with U.S. diplomatic engagement. Because most greenhouse gas emissions originate beyond our borders, such engagement is more necessary and urgent than ever. The United States must be in a position to exercise vigorous climate leadership in order to achieve a significant increase in global climate action and put the world on a sustainable climate pathway. Leaving the Keystone XL pipeline permit in place would not be consistent with my Administration's economic and climate imperatives.

**Sec. 7**. *Other Revocations.* (a) Executive Order 13766 of January 24, 2017 (Expediting Environmental Reviews and Approvals For High Priority Infrastructure Projects), Executive Order 13778 of February 28, 2017 (Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the ''Waters of the United States'' Rule), Executive Order 13783 of March 28, 2017 (Promoting Energy Independence and Economic Growth), Executive Order 13792 of April 26, 2017 (Review of Designations Under the Antiquities Act), Executive Order 13795 of April 28, 2017 (Implementing an America-First Offshore Energy Strategy), Executive Order 13868 of April 10, 2019 (Promoting Energy Infrastructure and Economic Growth), and Executive Order 13927 of June 4, 2020 (Accelerating the Nation's Economic Recovery from the COVID–19 Emergency by Expediting Infrastructure Investments and Other Activities), are hereby revoked. Executive Order 13834 of May 17, 2018

(Efficient Federal Operations), is hereby revoked except for sections 6, 7, and 11.

(b) Executive Order 13807 of August 15, 2017 (Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects), is hereby revoked. The Director of OMB and the Chair of the Council on Environmental Quality shall jointly consider whether to recommend that a replacement order be issued.

(c) Executive Order 13920 of May 1, 2020 (Securing the United States Bulk-Power System), is hereby suspended for 90 days. The Secretary of Energy and the Director of OMB shall jointly consider whether to recommend that a replacement order be issued.

(d) The Presidential Memorandum of April 12, 2018 (Promoting Domestic Manufacturing and Job Creation Policies and Procedures Relating to Implementation of Air Quality Standards), the Presidential Memorandum of October 19, 2018 (Promoting the Reliable Supply and Delivery of Water in the West), and the Presidential Memorandum of February 19, 2020 (Developing and Delivering More Water Supplies in California), are hereby revoked.

(e) The Council on Environmental Quality shall rescind its draft guidance entitled, ''Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions,'' 84 FR 30097 (June 26, 2019). The Council, as appropriate and consistent with applicable law, shall review, revise, and update its final guidance entitled, ''Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews,'' 81 FR 51866 (August 5, 2016).

(f) The Director of OMB and the heads of agencies shall promptly take steps to rescind any orders, rules, regulations, guidelines, or policies, or portions thereof, including, if necessary, by proposing such rescissions through notice-and-comment rulemaking, implementing or enforcing the Executive Orders, Presidential Memoranda, and draft guidance identified in this section, as appropriate and consistent with applicable law.

**Sec. 8.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

**Federal Register** / Vol. 86, No. 14 / Monday, January 25, 2021 / Presidential Documents     **7043**

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2021.*

[FR Doc. 2021–01765
Filed 1–22–21; 11:15 am]
Billing code 3295–F1–P

**From:** King, Robert (Bob) <r2king@blm.gov>
**Sent:** Thursday, August 19, 2021 11:17:34 AM
**To:** Richard Reanier <reanier@att.net>
**Cc:** Keeney, Joseph W <jkeeney@blm.gov>; Jones, Nichelle (Shelly) <njones@blm.gov>; Pendergast, Kevin J <kpendergast@blm.gov>; Hayes, Miriam (Nicole) <mnhayes@blm.gov>
**Subject:** Re: [EXTERNAL] Archaeological permit for ANWR

Hi Rick,

Thank you for your 8/15/21 permit application to conduct cultural resources work in the Coastal Plain of ANWR. This work would be located on the AIDEA lease tracts and would support seismic data acquisition.  Please note that the Secretary of the Interior issued Secretary's Order (SO) 3401 on June 1, 2021. Per SO 3401, we at the BLM are directed to temporarily place a "…halt on all Department activities related to the Program in the Arctic Refuge" pending completion of a new comprehensive environmental analysis of the Coastal Plain oil and gas leasing program.  This new analysis will take the form of a Supplemental EIS, which we recently initiated with a notice in the Federal Register on August 4.  Until that Supplemental EIS is complete, "…the Directors of the Bureau of Land Management (BLM) and the U.S. Fish and Wildlife Service shall not take any action to authorize any aspect of the Program, including, but not limited to, any leasing, exploration, development, production, or transportation, and shall not process any pending or future applications for such activities."

Based on the above, we will delay the processing of your application until the Supplemental EIS process is complete, and the Department of the Interior issues a new decision on the Coastal Plain oil and gas leasing program.  We appreciate your patience as we work through the new analysis.

Sincerely,

Robert King
BLM-AK State Archaeologist
222 W. 7th Ave., #13
Anchorage, AK 99513
(907) 271-5510

---

**From:** Richard Reanier <reanier@att.net>
**Sent:** Sunday, August 15, 2021 9:40 PM
**To:** King, Robert (Bob) <r2king@blm.gov>
**Cc:** Keeney, Joseph W <jkeeney@blm.gov>; Jones, Nichelle (Shelly) <njones@blm.gov>
**Subject:** [EXTERNAL] Archaeological permit for ANWR

This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.

Hi Bob-

Attached is the permit application we discussed for cultural resources work in ANWR on the AIDEA lease tracts in support in support of seismic data acquisition.

I am leaving for other work on the North Slope tomorrow, but I will have internet and cell phone (█████) access so I will be able to answer any questions you might have.

Thanks very much,

-Rick

_____

Richard E. Reanier, Ph.D.
Reanier & Associates, Inc.
1215 SW 170th Street
Seattle, Washington 98166
Phone/FAX: (206) 242-7817
e-mail: reanier@att.net
_____



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Alaska State Office
222 West Seventh Avenue, #13
Anchorage, Alaska 99513-7504
www.blm.gov/alaska

In Reply Refer To:
3132 (932)
AA095889, AA095890
AA095893, AA095897
AA095898, AA095900
AA095901

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

JAN 1 3 2021

## NOTICE OF DECISION

Alaska Industrial Development
and Export Authority
813 West Northern Lights Blvd.
Anchorage, Alaska 99503

## Coastal Plain Oil and Gas Leases Issued

On January 12, 2021, the Bureau of Land Management received your signed lease documents, bond information and the remainder of the money due for 7 tracts for which the Alaska Industrial Development and Export Authority was the high bidder at the January 6, 2021 Coastal Plain lease sale. Enclosed is the Departmental Approval and the following issued leases: AA095889, AA095890, AA095893, AA095897, AA095898, AA095900, AA095901, which are effective January 1, 2021. BLM Alaska will process your remaining high bids upon timely receipt of requested information.

If you have any questions, you may contact Wayne Svejnoha at 907-271-4407, or at the address on the letterhead.

Chad Padgett
State Director

Enclosures:   Department Approval Executed Leases

# Decision to Issue Coastal Plain Leases

Under the authority of Section 20001 of the Tax Cuts and Jobs Act, Public Law 115-97 (Dec. 22, 2017); 131 Stat. 2235, I hereby approve issuance of the following leases located in the Coastal Plain of the Arctic National Wildlife Refuge to the Alaska Industrial Development and Export Authority. The leases are to be executed by the BLM Alaska State Director.

AA095889 (Tract 016)
AA095890 (Tract 017)
AA095893 (Tract 024)
AA095897 (Tract 026)
AA095898 (Tract 027)
AA095900 (Tract 030)
AA095901 (Tract 031)

My approval constitutes the final decision of the Department of the Interior and, in accordance with the regulations at 43 CFR § 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 CFR Part 4.

Departmental Approval:

David L. Bernhardt
Secretary of the Interior

DATE: 1/13/2021

| UNITED STATES<br>DEPARTMENT OF THE INTERIOR<br>BUREAU OF LAND MANAGEMENT<br>ALASKA STATE OFFICE<br>**OFFER TO LEASE AND LEASE FOR OIL AND GAS** | Serial No<br><br>AA095889 |
|---|---|

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017, 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name   Alaska Industrial Development and Export Authority

   Street   813 West Northern Lights Boulevard

   City, State, Zip Code   Anchorage, Alaska  99503

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:   *Tract No.  2021-CP-016   *Sale Date  Jan / 06 / 2021 (m/d/y):

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 5 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 1-3, 10-15, 22-27, 34-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 5 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 5 N. | R. 26 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Amount remitted: Filing fee $_____170.00        Rental fee $____575,070

Total acres applied for_____57,507
Total $____575,240

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 5 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 1-3, 10-15, 22-27, 34-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 5 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 5 N. | R. 26 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____57,507
Rental retained $ ____575,070

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years.

THE UNITED STATES OF AMERICA

by _____
(Signing Officer)

_____ (Title)     _____ (Date)

EFFECTIVE DATE OF LEASE  _1 January 2021_

---

4.   (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

### NOTICE

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you are furnished with the following information:

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this _12th_ day of _January_, 20_21_   _____
(Signature of Lessee or Attorney-in-fact)

## LEASE TERMS

Sec. 1 Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2 Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701). Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority.

Sec. 3 Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4 Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor

Sec. 5 Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552)

Sec. 6 Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7 Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas Lessee shall include in any contract of sale of gas the provision of this section

Sec. 8 Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9 Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920

Lessee shall comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors shall maintain segregated facilities During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1 4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation

Sec. 10 Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties

Sec. 11 Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells

Sec. 12 Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease may be subject to cancellation unless or until the leasehold contains:
    (a)  a well capable of production of oil and gas in paying quantities or
    (b)  meets criteria under 43 CFR 3135 1-5 or

The lease is committed to an approved cooperative or unit plan or communitization agreement, which,
    (a)  contains a well capable of production of unitized substances in paying quantities or
    (b)  meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82.

This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default. As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U.S.C 1701)

Sec. 13 Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto

Sec. 14 Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

---

## INSTRUCTIONS

A. General

1. The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

2. Entries must be typed or printed plainly. Offeror must sign Item 4.

3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations.

4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Special

Item 1 - Enter offeror's name and billing address.

Item 2 - A single tract number and Sale Date shall be the only acceptable description.

Item 3 - This space will be completed by the United States.

**PAPERWORK REDUCTION ACT STATEMENT**

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1. This information is being collected pursuant to the law.

2. This information will be used to create and maintain a record of oil and gas lease activity.

3. Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

| | |
|---|---|
| **UNITED STATES**<br>**DEPARTMENT OF THE INTERIOR**<br>**BUREAU OF LAND MANAGEMENT**<br>**ALASKA STATE OFFICE**<br>**OFFER TO LEASE AND LEASE FOR OIL AND GAS** | Serial No.<br><br>AA095890 |

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name    Alaska Industrial Development and Export Authority

   Street    813 West Northern Lights Blvd

   City, State, Zip Code    Anchorage, Alaska 99503

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:          *Tract No.:    2021-CP-017          *Sale Date    Jan / 06 / 2021
                                                                                       (m/d/y):

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 5 N. | R. 23 E. | Umiat Meridian | Alaska | |
| Sections 1-5, 8-17, 21-28, 35 & 36<br>Stipulations: 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 6 N. | R. 23 E. | Umiat Meridian | Alaska | |
| Sections 1-3, 9-17, 20-29, 32-36<br>Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 7 N. | R. 23 E. | Umiat Meridian | Alaska | |
| Sections 12, 13, 23-27, 34-36<br>Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 5 N. | R. 24 E. | Umiat Meridian | Alaska | |
| Sections 4-9, 16-21, 28-33<br>Stipulations: 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |

Amount remitted: Filing fee $    170.00          Rental fee $    438,760

Total acres applied for    43,876
Total $    438,930

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease:

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 5 N. | R. 23 E. | Umiat Meridian | Alaska | |
| Sections 1-5, 8-17, 21-28, 35 & 36<br>Stipulations: 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 6 N. | R. 23 E. | Umiat Meridian | Alaska | |
| Sections 1-3, 9-17, 20-29, 32-36<br>Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 7 N. | R. 23 E. | Umiat Meridian | Alaska | |

Sections 12, 13, 23-27, 34-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 5 N. | R. 24 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 4-9, 16-21, 28-33
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 43,876 _____

Rental retained $ _____ 438,760 _____

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years.

THE UNITED STATES OF AMERICA

by _____
(Signing Officer)

_____ State Director _____       _1/13/200_
(Title)                                      (Date)

EFFECTIVE DATE OF LEASE ___ 1 January 2021 ___

4.    (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**NOTICE**

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information:

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this _12th_ day of _January_, 20_21_     _____
(Signature of Lessee or Attorney-in-fact)

## LEASE TERMS

Sec. 1 Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2 Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701) Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority

Sec. 3 Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4 Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor

Sec. 5 Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552)

Sec. 6 Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7 Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas Lessee shall include in any contract of sale of gas the provision of this section

Sec. 8 Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9 Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920

Lessee shall comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto Neither lessee nor lessee's subcontractors shall maintain segregated facilities During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1 4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation

Sec. 10 Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties

Sec. 11 Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells

Sec. 12 Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:
    (a)  a well capable of production of oil and gas in paying quantities or
    (b)  meets criteria under 43 CFR 3135 1-5 or
The lease is committed to an approved cooperative or unit plan or communitization agreement which,
    (a)  contains a well capable of production of unitized substances in paying quantities or
    (b)  meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82.
This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U.S.C. 1701)

Sec. 13 Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto

Sec. 14 Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

---

## INSTRUCTIONS

A. General

1. The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

2. Entries must be typed or printed plainly. Offeror must sign Item 4.

3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations.

4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Special

Item 1 - Enter offeror's name and billing address

Item 2 - A single tract number and Sale Date shall be the only acceptable description.

Item 3 - This space will be completed by the United States.

**PAPERWORK REDUCTION ACT STATEMENT**

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1. This information is being collected pursuant to the law.

2. This information will be used to create and maintain a record of oil and gas lease activity.

3. Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

| | | | UNITED STATES | Serial No. |
| | | | DEPARTMENT OF THE INTERIOR | |
| | | | BUREAU OF LAND MANAGEMENT | |
| | | | ALASKA STATE OFFICE | AA095893 |
| | | | OFFER TO LEASE AND LEASE FOR OIL AND GAS | |

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1.   Name    Alaska Industrial Development and Export Authority

     Street    813 West Northern Lights Blvd.

     City, State, Zip Code    Anchorage, Alaska 99503

2.    This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:      *Tract No.:    2021-CP-024      *Sale Date    Jan / 06 / 2021
(m/d/y):

| T. | R. | Meridian | State | County |
|----|----|----------|-------|--------|
| T. 6 N. | R. 27 E. | Umiat Meridian | Alaska | |

Sections 19-36
Stipulations: 1(fiv), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 6 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 1(fiv), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 2-36
Stipulations: 1(fiv), 2-6, 8, 9, 11
Required Operating Procedures

| T. 8 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 17-20, 28-32
Stipulations: 2-6, 8, 9, 11
Required Operating Procedures

Total acres applied for    58,176

Amount remitted: Filing fee $    170.00      Rental fee $    581,760      Total $    581,930

**DO NOT WRITE BELOW THIS LINE**

3.    Land included in lease:

| T. | R. | Meridian | State | County |
|----|----|----------|-------|--------|
| T. 6 N. | R. 27 E. | Umiat Meridian | Alaska | |

Sections 19-36
Stipulations: 1(fiv), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 6 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 1(fiv), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 2-36
Stipulations: 1(fiv), 2-6, 8, 9, 11
Required Operating Procedures

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 8 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 17-20, 28-32
Stipulations: 2-6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 58,176 _____

Rental retained $ _____ 581,760 _____

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years.

THE UNITED STATES OF AMERICA

by _____ (Signing Officer)

State Director (Title)    1/13/2021 (Date)

EFFECTIVE DATE OF LEASE    1 January 2021

4.    (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**NOTICE**

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information:

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this 12th day of _____ January _____, 20 21 _____
(Signature of Lessee or Attorney-in-fact)

LEASE TERMS

Sec. 1  Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2  Royalties – Royalties shall be paid to the proper office of lessor.  Royalties shall be computed in accordance with regulations on production removed or sold  The royalty rate is 16 67 percent

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U S C  1701)  Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority

Sec. 3  Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4  Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources  Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands  Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor

Sec. 5  Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production  At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost  Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs  In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required  Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands  Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs  All such records shall be maintained in lessee's accounting office for future audit by lessor  Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U S C  552)

Sec. 6  Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources  Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor  Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7  Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas  Lessee shall include in any contract of sale of gas the provision of this section

Sec. 8  Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations

Sec. 9  Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920

Lessee shall comply with Executive Order No  11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto  Neither lessee nor lessee's subcontractors shall maintain segregated facilities  During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1 4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation

Sec. 10  Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties

Sec. 11  Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells

Sec. 12  Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:
  (a)  a well capable of production of oil and gas in paying quantities or
  (b)  meets criteria under 43 CFR 3135 1-5 or
The lease is committed to an approved cooperative or unit plan or communitization agreement which,
  (a)  contains a well capable of production of unitized substances in paying quantities or
  (b)  meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82.
This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default  As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time  Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U S C 1701)

Sec. 13  Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto

Sec. 14  Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

---

## INSTRUCTIONS

A  General

1.  The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

2  Entries must be typed or printed plainly. Offeror must sign Item 4.

3.  An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations.

4.  If more space is needed, additional sheets must be attached to each copy of the form submitted.

B.  Special:

Item 1 - Enter offeror's name and billing address

Item 2 - A single tract number and Sale Date shall be the only acceptable description.

Item 3 - This space will be completed by the United States.


**PAPERWORK REDUCTION ACT STATEMENT**

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1.  This information is being collected pursuant to the law.

2.  This information will be used to create and maintain a record of oil and gas lease activity.

3.  Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

| | | | Serial No. |
|---|---|---|---|
| **UNITED STATES**<br>**DEPARTMENT OF THE INTERIOR**<br>**BUREAU OF LAND MANAGEMENT**<br>**ALASKA STATE OFFICE**<br>**OFFER TO LEASE AND LEASE FOR OIL AND GAS** | | | AA095897 |

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name **Alaska Industrial Development and Export Authority**

   Street **813 West Northern Lights Blvd.**

   City, State, Zip Code **Anchorage, Alaska 99503**

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:    \*Tract No.: __2021-CP-026__    \*Sale Date __Jan__ /.06 / _2021_ (m/d/y):

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 6 N. | R. 25 E. | Umiat Meridian | Alaska | |
| Sections 1-36<br>Stipulations: 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 7 N. | R. 25 E. | Umiat Meridian | Alaska | |
| Sections 31-36<br>Stipulations: 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 6 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 1-36<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 7 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 31-36<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |

| | | | | Total acres applied for __53,412__ |
|---|---|---|---|---|
| Amount remitted: Filing fee $ __170.00__ | | Rental fee $ __534,120__ | | Total $ __534,290__ |

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease:

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 6 N. | R. 25 E. | Umiat Meridian | Alaska | |
| Sections 1-36<br>Stipulations: 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 7 N. | R. 25 E. | Umiat Meridian | Alaska | |
| Sections 31-36<br>Stipulations: 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 6 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 1-36<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |

| T. | R. | Meridian | State | County |
|----|----|----------|-------|--------|
| T. 7 N. | R. 26 E. | Umiat Meridian | Alaska | |

Sections 31-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 53,412

Rental retained $ _____ 534,120

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years.

THE UNITED STATES OF AMERICA

by _____
(Signing Officer)

State Director _____ (Title) _____ 1/13/2021 (Date)

EFFECTIVE DATE OF LEASE _____ 1 January 2021

4.      (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**NOTICE**

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information:

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this 12th day of _____ January _____ , 20 21 _____
(Signature of Lessee or Attorney-in-fact)

## LEASE TERMS

Sec. 1  Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2  Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701). Lessee shall be liable for royalty payments on oil and gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority.

Sec. 3  Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4  Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

Sec. 5  Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552).

Sec. 6  Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7  Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee shall include in any contract of sale of gas the provision of this section.

Sec. 8  Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9  Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920.

Lessee shall comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors shall maintain segregated facilities. During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1.4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation.

Sec. 10  Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties.

Sec. 11  Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells.

Sec. 12  Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:

    (a)  a well capable of production of oil and gas in paying quantities or

    (b)  meets criteria under 43 CFR 3135.1-5 or

The lease is committed to an approved cooperative or unit plan or communitization agreement, which,

    (a)  contains a well capable of production of unitized substances in paying quantities or

    (b)  meets the criteria under 43 CFR 3137.70 and 43 CFR 3137.82.

This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default. As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U.S.C. 1701).

Sec. 13  Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto.

Sec. 14  Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

---

## INSTRUCTIONS

A  General

1.  The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

2  Entries must be typed or printed plainly. Offeror must sign Item 4.

3.  An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations.

4.  If more space is needed, additional sheets must be attached to each copy of the form submitted.

B.  Special

Item 1 - Enter offeror's name and billing address

Item 2 - A single tract number and Sale Date shall be the only acceptable description.

Item 3 - This space will be completed by the United States.

## PAPERWORK REDUCTION ACT STATEMENT

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1  This information is being collected pursuant to the law.

2.  This information will be used to create and maintain a record of oil and gas lease activity.

3  Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

| | | Serial No. |
|---|---|---|
| **UNITED STATES** | | |
| **DEPARTMENT OF THE INTERIOR** | | |
| **BUREAU OF LAND MANAGEMENT** | | |
| **ALASKA STATE OFFICE** | | **AA095898** |
| **OFFER TO LEASE AND LEASE FOR OIL AND GAS** | | |

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name   Alaska Industrial Development and Export Authority

   Street   813 West Northern Lights Blvd.

   City, State, Zip Code   Anchorage, Alaska 99503

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:      *Tract No.: _____ 2021-CP-027 _____      *Sale Date   Jan / 06 / 2021
(m/d/y):

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 6 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 24 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 8 N. | R. 24 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 12-14, 21-28, 32-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Amount remitted: Filing fee $ _____ 170.00      Rental fee $ _____ 524,470      Total acres applied for _____ 52,447 _____
Total $ _____ 524,640 _____

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease:

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 6 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 24 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 8 N. | R. 24 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 12-14, 21-28, 32-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 52,447 _____

Rental retained $ _____ 524,470 _____

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years.

THE UNITED STATES OF AMERICA

by _____ (Signing Officer)

_State Director_ (Title)   _1/13/2021_ (Date)

EFFECTIVE DATE OF LEASE   _1 January 2021_

4.   (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**NOTICE**

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information:

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this _12th_ day of _January_, 20_21_ _____
(Signature of Lessee or Attorney-in-fact)

## LEASE TERMS

Sec. 1  Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2  Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold  The royalty rate is 16 67 percent

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U S C  1701)  Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority

Sec. 3  Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4  Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor

Sec. 5  Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production  At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required  Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor  Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U S C  552)

Sec. 6  Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary  Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources  Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor  Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7  Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas  Lessee shall include in any contract of sale of gas the provision of this section

Sec. 8  Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9  Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920

Lessee shall comply with Executive Order No  11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto  Neither lessee nor lessee's subcontractors shall maintain segregated facilities  During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1 4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation

Sec. 10  Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease  Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties

Sec. 11  Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment; reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells

Sec. 12  Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains;

    (a)  a well capable of production of oil and gas in paying quantities or

    (b)  meets criteria under 43 CFR 3135 1-5 or

The lease is committed to an approved cooperative or unit plan or communitization agreement which,

    (a)  contains a well capable of production of unitized substances in paying quantities or

    (b)  meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82.

This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default  As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time  Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U S C  1701)

Sec. 13  Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to  the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto

Sec. 14  Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

---

## INSTRUCTIONS

A. General

1.  The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

2.  Entries must be typed or printed plainly. Offeror must sign Item 4.

3.  An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations.

4.  If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Special

Item 1 - Enter offeror's name and billing address

Item 2 - A single tract number and Sale Date shall be the only acceptable description.

Item 3 - This space will be completed by the United States.

## PAPERWORK REDUCTION ACT STATEMENT

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1.  This information is being collected pursuant to the law.

2.  This information will be used to create and maintain a record of oil and gas lease activity.

3.  Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
ALASKA STATE OFFICE
**OFFER TO LEASE AND LEASE FOR OIL AND GAS**

Serial No.

AA095900

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name    Alaska Industrial Development and Export Authority

   Street    813 West Northern Lights Blvd.

   City, State, Zip Code    Anchorage, Alaska 99503

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:    *Tract No.: ___2021-CP-030___    *Sale Date (m/d/y): __Jan__ /_06_ / __2021__

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 9 N. | R. 25 E. | Umiat Meridian | Alaska | |
| Sections 14, 23-26, 35, 36<br>Stipulations: 1(a), 2-6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 7 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 1-30<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 8 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 1-36<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 9 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 29-34<br>Stipulations: 1(a), 2-6, 8, 9, 11<br>Required Operating Procedures | | | | |

Amount remitted: Filing fee $ ___170.00___    Rental fee $ ___467,910___    Total acres applied for ___46,791___
Total $ ___468,080___

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease:

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 9 N. | R. 25 E. | Umiat Meridian | Alaska | |
| Sections 14, 23-26, 35, 36<br>Stipulations: 1(a), 2-6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 7 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 1-30<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 8 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 1-36<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 11<br>Required Operating Procedures | | | | |

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 9 N. | R. 26 E. | Umiat Meridian | Alaska | |

Sections 29-34
Stipulations: 1(a), 2-6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 46,791

Rental retained $ _____ 467,910

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years.

THE UNITED STATES OF AMERICA

by _____

(Signing Officer)

State Director (Title)   1/13/2021 (Date)

EFFECTIVE DATE OF LEASE   1 January 2021

4.   (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**NOTICE**

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information:

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this 12th day of _____January_____, 20 21   _____

(Signature of Lessee or Attorney-in-fact)

LEASE TERMS

Sec. 1 Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2 Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701). Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority.

Sec. 3 Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4 Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

Sec. 5 Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552).

Sec. 6 Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7 Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee shall include in any contract of sale of gas the provision of this section.

Sec. 8 Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9 Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920.

Lessee shall comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors shall maintain segregated facilities. During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1.4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation.

Sec. 10 Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties.

Sec. 11 Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells.

Sec. 12 Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:
    (a) a well capable of production of oil and gas in paying quantities or
    (b) meets criteria under 43 CFR 3135 1-5 or
The lease is committed to an approved cooperative or unit plan or communitization agreement which,
    (a) contains a well capable of production of unitized substances in paying quantities or
    (b) meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82.
This provision shall not be construed to prevent the exercise by lessee of any other legal and equitable remedy, including waiver of the default. As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U.S.C. 1701)

Sec. 13 Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto.

Sec. 14 Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

---

## INSTRUCTIONS

A. General

1. The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

2. Entries must be typed or printed plainly. Offeror must sign Item 4.

3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations

4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Special

Item 1 - Enter offeror's name and billing address

Item 2 - A single tract number and Sale Date shall be the only acceptable description.

Item 3 - This space will be completed by the United States.

## PAPERWORK REDUCTION ACT STATEMENT

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1. This information is being collected pursuant to the law.

2. This information will be used to create and maintain a record of oil and gas lease activity.

3. Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

| | | | | Serial No. |
|---|---|---|---|---|
| | **UNITED STATES**<br>**DEPARTMENT OF THE INTERIOR**<br>**BUREAU OF LAND MANAGEMENT**<br>**ALASKA STATE OFFICE**<br>**OFFER TO LEASE AND LEASE FOR OIL AND GAS** | | | AA095901 |

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1.  Name    Alaska Industrial Development and Export Authority

    Street    813 West Northern Lights Blvd.

    City, State, Zip Code    Anchorage, Alaska 99503

2.  This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:    *Tract No.: ___2021-CP-031___    *Sale Date (m/d/y): __Jan__ / _06_ / _2021_

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 9 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 24, 25, 35, 36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-30
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 8 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 9 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 4, 5, 7-10, 15-22, 27-34
Stipulations: 1(a), 2-6, 8, 9, 11
Required Operating Procedures

Total acres applied for _____ 53,546 _____

Amount remitted: Filing fee $ _____ 170.00    Rental fee $ _____ 535,460 _____    Total $ _____ 535,630 _____

**DO NOT WRITE BELOW THIS LINE**

3.  Land included in lease:

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 9 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 24, 25, 35, 36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-30
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 8 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 9 N. | R. 25 E. | Umiat Meridian | Alaska | |

Sections 4, 5, 7-10, 15-22, 27-34
Stipulations: 1(a), 2-6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 53,546 _____

Rental retained $ _____ 535,460 _____

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, and the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years.

THE UNITED STATES OF AMERICA

by _____ (Signing Officer)

_____ State Director _____ (Title) _____ 1/15/2021 _____ (Date)

EFFECTIVE DATE OF LEASE _____ 1 January 2021 _____

4.  (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof, (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**NOTICE**

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information:

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this _12th_ day of _January_, 20 _21_ _____

(Signature of Lessee or Attorney-in-fact)

## LEASE TERMS

Sec. 1. Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2. Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U S C  1701). Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority.

Sec. 3. Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4. Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

Sec. 5. Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U S C  552)

Sec. 6. Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7. Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessor shall include in any contract of sale of gas the provision of this section

Sec. 8. Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9. Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920

Lessee shall comply with Executive Order No  11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto  Neither lessee nor lessee's subcontractors shall maintain segregated facilities  During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1 4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation

Sec. 10. Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties

Sec. 11. Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells

Sec. 12. Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:

    (a)  a well capable of production of oil and gas in paying quantities or

    (b)  meets criteria under 43 CFR 3135 1-5 or

The lease is committed to an approved cooperative or unit plan or communitization agreement which,

    (a)  contains a well capable of production of unitized substances in paying quantities or

    (b)  meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82

This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default. As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U S C 1701)

Sec. 13. Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto

Sec. 14. Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

---

## INSTRUCTIONS

A. General

1. The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

2. Entries must be typed or printed plainly. Offeror must sign Item 4.

3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations

4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Special

Item 1 - Enter offeror's name and billing address

Item 2 - A single tract number and Sale Date shall be the only acceptable description.

Item 3 - This space will be completed by the United States.

**PAPERWORK REDUCTION ACT STATEMENT**

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1. This information is being collected pursuant to the law.

2. This information will be used to create and maintain a record of oil and gas lease activity.

3. Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

*America* v. *State of Alaska,* Civil Action No. A91–081 CV.

The EVOS PAC meeting agenda will include the FY22 Work Plan. An opportunity for public comments will be provided. The final agenda and materials for the meeting will be posted on the EVOS Trustee Council website at *www.evostc.state.ak.us.* All EVOS PAC meetings are open to the public.

**Public Input**

Interested persons may choose to make oral comments at the meeting during the designated time. Depending on the number of people wishing to comment and the time available, the amount of time for oral comments may be limited. Interested parties should contact the Designated Federal Officer (see **FOR FURTHER INFORMATION CONTACT**) for advance placement on the public speaker list for this meeting.

*Submitting Written Information or Questions*

Interested members of the public may submit relevant information or questions for the Committee to consider during the public meeting. Written statements must be received by September 22, 2021, so that the information may be made available to the Committee for their consideration prior to this meeting. Written statements must be supplied to the Designated Federal Officer via email at *philip_johnson@ios.doi.gov.*

*Public Disclosure of Comments*

Before including your address, phone number, email address, or other personal identifying information in your comments, please be aware that your entire comment, including your personal identifying information, may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Authority:* 5 U.S.C. appendix 2.

**Philip Johnson,**

*Regional Environmental Officer, Office of Environmental Policy and Compliance.*

[FR Doc. 2021–16570 Filed 8–3–21; 8:45 am]

**BILLING CODE 4334–63–P**

**DEPARTMENT OF THE INTERIOR**

**Bureau of Land Management**

**[21X.LLAK930100.L16100000.PN0000]**

## Notice of Intent To Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program, Alaska

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of intent.

**SUMMARY:** In accordance with Secretary's Order 3401, *Comprehensive Analysis and Temporary Halt on all Activities in the Arctic National Wildlife Refuge Relating to the Coastal Plain Oil and Gas Leasing Program,* the Bureau of Land Management (BLM) Alaska State Office, Anchorage, Alaska, intends to prepare a Supplemental Environmental Impact Statement (EIS) to the September 2019 Coastal Plain Oil and Gas Leasing Program EIS. The Supplemental EIS will provide a comprehensive analysis of the potential environmental impacts of the Program, including by addressing the deficiencies identified in Secretary's Order 3401.

**DATES:** This Notice initiates the public scoping process for the Supplemental EIS. Comments on issues, impacts, and potential new alternatives to be analyzed may be submitted in writing until October 4, 2021. The BLM will announce on its website any additional venues for commenting during scoping.

**ADDRESSES:** You may submit comments by any of the following methods:

- *Website: https://eplanning.blm.gov/eplanning-ui/project/102555/510.*
- *Mail:* BLM, Alaska State Office, Attention—Coastal Plain Supplemental EIS, 222 West 7th Avenue, #13, Anchorage, AK 99513–7599.

**FOR FURTHER INFORMATION CONTACT:** Serena Sweet, Project Lead, via email at *blm_ak_coastalplain_supplementalEIS@blm.gov,* or via telephone at 907–271–5960; or by mail at Bureau of Land Management, 222 West 7th Avenue, #13, Anchorage, Alaska 99513–7599. You may also request to be added to the mailing list for the Supplemental EIS. Additional background information and supporting documents may be found at the *https://eplanning.blm.gov/eplanning-ui/project/102555/510.*

Persons who use a telecommunications device for the deaf (TDD) may call the Federal Relay Service (FRS) at 1–800–877–8339 to contact the above individual during normal business hours. FRS is available 24 hours a day, 7 days a week, to leave a message or question with the above individual. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** The area comprising the Coastal Plain includes approximately 1.6 million acres within the approximately 19.3 million-acre Arctic National Wildlife Refuge. In September 2019 and in connection with Public Law 115–97, Dec. 22, 2017, the BLM completed the Coastal Plain Oil and Gas Leasing Final EIS. The BLM then issued a Record of Decision (ROD) for the Coastal Plain Oil and Gas Leasing Program on August 8, 2020 (85 FR 51754). The ROD approved a program to implement Section 20001 of Public Law 115–97, which directed the BLM to manage the oil and gas leasing program on the Coastal Plain in a manner similar to lease sales under the Naval Petroleum Reserves Production Act of 1976 (including regulations).

On June 1, 2021, the Secretary of the Interior issued Secretary's Order 3401, Section 4 of which directed ''a temporary halt on all Department activities related to the [Leasing] Program in the Arctic Refuge'' pending ''a new, comprehensive analysis of the potential environmental impacts of the Program'' to ''address . . . identified legal deficiencies.''

The purpose of this public scoping process is to determine the scope of issues to be addressed and to identify the significant issues, including any legal deficiencies in the Final EIS, related to an oil and gas leasing program within the Coastal Plain. Information received during this process will influence the development of the Supplemental EIS and guide the scope of the environmental analysis. The BLM will work collaboratively with interested parties to identify the management decisions best suited to local, regional, and national needs and concerns.

The purpose and need of the Supplemental EIS is bound by statute and remains the same as for the September 2019 Final EIS, *i.e.,* to implement Section 20001 of Public Law 115–97. Potential new alternatives to be considered in the Supplemental EIS include, but are not limited to, those that would: Designate certain areas of the Coastal Plain as open or closed to leasing; permit less than 2,000 acres of surface development throughout the Coastal Plain; prohibit surface infrastructure in sensitive areas; and otherwise avoid or mitigate impacts from oil and gas activities.

The Supplemental EIS will evaluate impacts to various surface resources including, but not limited to, caribou, polar bears, birds, vegetation, and

surface waters including wetlands, as well as to other uses of the Coastal Plain, including subsistence uses. The Supplemental EIS will also consider impacts from greenhouse gas emissions from any Leasing Program.

After the scoping comment period is closed, the BLM will review and consider the scoping comments received and will develop a Draft Supplemental EIS, which BLM estimates will be completed approximately 6 to 8 months after the scoping comment ends. At that time the Draft Supplemental EIS will be made available for public comment for at least 45 days. After the close of the Draft Supplemental EIS comment period, BLM will develop a Final Supplemental EIS incorporating comments received on the Draft, which BLM estimates will be completed approximately 6 months after the Draft Supplemental EIS comment period ends. A record of decision selecting a program alternative from the Final Supplemental EIS would be issued no sooner than 30 days after notice of the availability of the Final Supplemental EIS is published in the **Federal Register**.

*Authority:* 40 CFR 1501.9(d), 40 CFR 1501.7 (2019).

**Laura Daniel-Davis,**

*Principal Deputy Assistant Secretary, Land and Minerals Management.*

[FR Doc. 2021–16572 Filed 8–3–21; 8:45 am]

**BILLING CODE 4310–JA–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Reclamation

**[RR85672000, 21XR0680A2, RX.31480001.0040000; OMB Control Number 1006–0003]**

### Agency Information Collection Activities; Bureau of Reclamation Use Authorization Application

**AGENCY:** Bureau of Reclamation, Interior.

**ACTION:** Notice of information collection; request for comment.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, we, the Bureau of Reclamation (Reclamation) are proposing to renew an information collection.

**DATES:** Interested persons are invited to submit comments on or before October 4, 2021.

**ADDRESSES:** Send your comments on this information collection request (ICR) by mail to Jason Kirby, Bureau of Reclamation, P.O. Box 25007, Denver, CO 80225–0007; or by email to *jkirby@usbr.gov.* Please reference Office of

Management and Budget (OMB) Control Number 1006–0003 in the subject line of your comments.

**FOR FURTHER INFORMATION CONTACT:** To request additional information about this ICR, contact Jason Kirby by email at *jkirby@usbr.gov,* or by telephone at (303) 445–2895. Individuals who are hearing or speech impaired may call the Federal Relay Service at (800) 877–8339 for TTY assistance.

**SUPPLEMENTARY INFORMATION:** In accordance with the Paperwork Reduction Act of 1995 (PRA, 44 U.S.C. 3501 *et seq.*) and 5 CFR 1320.8(d)(1), all information collections require approval under the PRA. We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid OMB control number.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on new, proposed, revised, and continuing collections of information. This helps us assess the impact of our information collection requirements and minimize the public's reporting burden. It also helps the public understand our information collection requirements and provide the requested data in the desired format.

We are especially interested in public comment addressing the following:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) How might the agency minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of response.

Comments that you submit in response to this notice are a matter of public record. We will include or summarize each comment in our request to OMB to approve this ICR. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may

be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Abstract:* Reclamation is responsible for approximately 6.5 million acres of land which directly support Reclamation's Federal water projects in the 17 Western States. Under Title 43 CFR part 429, individuals or entities wanting to use Reclamation's lands, facilities, or waterbodies must apply Form 7–2540. Examples of such uses are:

—Agricultural uses such as grazing and farming;
—commercial or organized recreation and sporting activities;
—other commercial activities such as ''guiding and outfitting'' and ''filming and photography;'' and,
—resource exploration and extraction, including sand and gravel removal and timber harvesting.

We review applications to determine whether granting individual use authorizations are compatible with Reclamation's present or future uses of the lands, facilities, or waterbodies. When we find a proposed use compatible, we advise the applicant of the estimated administrative costs and estimated application processing time. In addition to the administrative costs, we require the applicant to pay a use fee based on a valuation or by competitive bidding. If the application is for construction of a bridge, building, or other significant construction project, Reclamation may require that all plans and specifications be signed and sealed by a licensed professional engineer.

*Title of Collection:* Bureau of Reclamation Use Authorization Application.

*OMB Control Number:* 1006–0003.

*Form Number:* Form 7–2540.

*Type of Review:* Extension of a currently approved collection.

*Respondents/Affected Public:* Individuals, corporations, companies, and State and local entities who want to use Reclamation lands, facilities, or waterbodies.

*Total Estimated Number of Annual Respondents:* 225.

*Total Estimated Number of Annual Responses:* 225.

*Estimated Completion Time per Response:* 2 hours.

*Total Estimated Number of Annual Burden Hours:* 450 hours.

*Respondent's Obligation:* Required to obtain or retain a benefit.

*Frequency of Collection:* Each time a use authorization is requested.



# United States Department of the Interior
## OFFICE OF THE SECRETARY
### Washington, DC 20240

**June 1, 2021**

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

DECISION

| | | |
|---|---|---|
| Alaska Industrial Development | : | Oil and Gas Leases |
| and Export Authority | : | AA095889 |
| 813 West Northern Lights Blvd. | : | AA095890 |
| Anchorage, Alaska 99503 | : | AA095893 |
| | : | AA095897 |
| | : | AA095898 |
| | : | AA095900 |
| | : | AA095901 |

<u>Suspension of Operations and Production</u>

On January 20, 2021, Executive Order 13990 directed that the Secretary of the Interior "place a temporary moratorium on activities of the Federal Government relating to the Coastal Plain Oil and Gas Leasing Program" and "review the program and … conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program."

After conducting the required review of the program, the Department identified defects in the underlying record supporting the leases, including, but not limited to: insufficient analysis under the National Environmental Policy Act (NEPA), including failure to adequately analyze a reasonable range of alternatives in the environmental impact statement (EIS); and failure in the August 17, 2020, Record of Decision (ROD) to properly interpret Section 20001 of Public Law 115-97 (Tax Act). In addition to these specific defects, the Department has identified several areas for which additional analysis may either address a potential legal defect or, at a minimum, serve NEPA's purpose to meaningfully inform the decisionmaker as to the environmental consequences of federal action. These include, but are not limited to, the EIS's treatment of foreign greenhouse gas (GHG) emissions and compliance with section 810 of the Alaska National Interest Lands Conservation Act (ANILCA). Further, any new NEPA analysis involving an additional alternative may also involve connected reviews, such as under section 106 of the National Historic Preservation Act and consultation under section 7 of the Endangered Species Act.

Specifically, the Coastal Plain Leasing Program EIS failed to analyze a reasonable range of alternatives in that it did not analyze an alternative, besides the no action alternative, that involved fewer than 2,000 acres of surface development.  The Tax Act provides for authorization of *up to* 2,000 acres to be covered by "production and support facilities."[1]  However, inclusion of the phrase "up to" indicates that less than 2,000 acres may be authorized in appropriate circumstances, such as for alternatives that make large areas unavailable for leasing or surface development and thus may require fewer production and support facilities.  The explanation in the ROD for not considering such an alternative – that the Tax Act provides a *mandate* to the BLM requiring it to approve production and support facilities up to that limit – is both implausible and contrary to Congressional intent, which is itself a legal error.

While not identified as a legal defect at this point, the Department recognizes that the recent Ninth Circuit opinion involving the Liberty Project in Alaska, *Center for Biological Diversity v. Bernhardt*, issued on December 7, 2020, has implications for the analysis of foreign greenhouse gas emissions in many of its programs and projects, including those already in litigation, like the Coastal Plain Oil and Gas Leasing Program.  The Department is carefully evaluating its approach to this issue and may later identify this issue as an additional specific legal error depending on the resolution of pending court cases involving similar issues.

Based on the identified defects noted above with the NEPA documents underlying the competitive lease sale that resulted in the issuance of the lease(s) referenced above, and in exercise of the Department's inherent authority to correct legal errors, the Department has concluded that it is necessary to suspend the above-referenced lease(s) and complete further environmental analysis under NEPA, consistent with the direction provided in Executive Order 13990 and Secretarial Order 3401.  The BLM will undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures. The BLM will publish a notice of intent to begin this process to undertake additional analysis, complete necessary consultation, and correct defects in the EIS and ROD.  When complete, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases.

This SOP is effective the first day of June 2021.  While this SOP is in place, no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended. If you have any questions, please contact Nada Wolff Culver at nculver@blm.gov.

Sincerely,

Laura Daniel-Davis
Digitally signed by Laura Daniel-Davis
Date: 2021.06.01 16:17:14 -04'00'

Laura Daniel-Davis
Principal Deputy Assistant Secretary
Land and Minerals Management

---

[1] Section 20001(c)(3) of the Tax Act provides: "SURFACE DEVELOPMENT—In administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section."

## Re: [EXTERNAL] Pre application meeting request

Franks, Sierra E <sierra_franks@fws.gov>

Fri 12/3/2021 1:52 PM

**To:** Rick Trupp <rtrupp@saexploration.com>
**Cc:** Lemons, Patrick R <Patrick_Lemons@fws.gov>; Routhier, Michael P <michael.routhier@sol.doi.gov>
**Bcc:** Deam, Seth R <seth.deam@sol.doi.gov>; Crane, Drew <drew_crane@fws.gov>; Fasbender, Peter <peter_fasbender@fws.gov>; Berendzen, Steve <steve_berendzen@fws.gov>

Hello Rick,

The Service has reviewed your request to schedule a pre-application meeting to discuss your expected ITR petition and IHA application in advance of a seismic program on AIDEA lease tracts in the Arctic Refuge.

As you may be aware, on June 1, 2021, the Principal Deputy Assistant Secretary for Land and Minerals Management issued to AIDEA a "Suspension of Operations and Production," suspending AIDEA's leases issued on the Coastal Plain pending completion of further NEPA analysis. While this suspension is in place, "no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended." That includes the exploration activities that are the basis of your expected petition and application. Even if the suspension were not in place, it would be implausible in the available timeframe to sufficiently evaluate and process the expected petition and application in a manner that would allow activity to proceed in the 2021-2022 winter season. The Coastal Plain Oil and Gas Leasing Program decision documents contemplate exploration for years and production over a decades-long timeframe.

In light of the foregoing, we will delay conducting any pre-application meetings associated with lease operations as the risk of FWS providing incomplete guidance while this further NEPA analysis is ongoing outweighs any potential benefit in conducting such a meeting at this time. We will delay processing any petition or application associated with lease operations until the NEPA analysis is complete and the Department of the Interior issues a new decision concerning the Suspension of Operations and Production.

Sierra E. Franks (*she/her*)
Regulatory Program Branch Manager
DOI Diversity Change Agent
U.S. Fish and Wildlife Service
Marine Mammals Management
Alaska Regional Office
1011 East Tudor Road, MS-341
Anchorage, Alaska 99503
Work Cell #: 907-268-0577
sierra_franks@fws.gov

https://www.fws.gov/alaska/pages/MMM-regulatory-program
doi.gov/pmb/eeo/diversity-change-agents

"You don't have to be one of, to stand with"



Kaktovik Inupiat Corporation
P.O. Box 73
Kaktovik, AK 99747
Phone: (907) 640-6120
Fax: (907) 640-6217

September 7, 2020

Bureau of Land Management
Nichelle (Shelly) Jones
222 University Avenue
Fairbanks, Alaska 99709

Subject:  Permit Application for Marsh Creek East 3D Seismic Program, North Slope, Alaska

Dear Ms. Jones,

Kaktovik Iñupiat Corporation (KIC) as the private landowner, hereby submits this application, Form 3150 and Plan of Operations, which includes details of seismic acquisition activities in the coastal plain area (Coastal Plain) of the Arctic National Wildlife Refuge (ANWR) for the period of one year from December 1, 2020 through November 30, 2021.

KIC is focused on seismic acquisition over its lands and other adjacent Federal lands for purposes of local economic benefit and development. KIC proposes to conduct a three-dimensional (3D) seismic survey within the Marsh Creek East Program Area (Program Area) for one winter season beginning in 2020. KIC intends to conduct operations through a third-party acquisition company (Operator). The Program Area includes Alaska Native Corporation (ANC) surface land owned by KIC, ANC subsurface land owned by Arctic Slope Regional Corporation (ASRC), and adjacent land and waters owned by the Department of Interior (DOI). The geographic region of activity extends from the Kajutakrok Creek on the west to Pokok Bay on the east and approximately 40 km (25 mi) inland.

The seismic acquisition activities will occur when the area is covered by snow and ice. KIC requests the permit for December 1, 2020 to allow for the first aerial infrared survey for maternal dens to occur in early December. Dates will depend on tundra opening but would begin no earlier than December 31, 2020 and continue through May 2021 or until tundra closing and sea ice deterioration. The summer cleanup activities will occur when the area is no longer covered by snow and ice, generally July through August. The cleanup activities are expected take up to 15 days in the summer.

We appreciate your prompt review of the application. We further request that this application remain confidential within the agency until such time it needs to become public.  This program is important to the economic needs for our community and we hope that there will be no leaks of information to the press.  Along these lines we also request a meeting first with you to discuss document controls and second with your staff in the next two weeks to discuss the details of the application and timing of the various steps of this process.

2



Please contact me at <u>matthew.rexford@gmail.com</u> or 907-640-1517 or Teresa Imm as our representative at <u>Teresa-imm@outlook.com</u> or 907-519-5057 to arrange for this meeting.

Sincerely,

Matthew Rexford
President

Attachments: BLM Form 3150 & Attachment
Plan of Operations

2

response options should be parallel between the two items. Moreover, we cannot add additional open-ended questions to the survey without increasing participant fatigue. Thus, we will maintain the closed-ended nature of the question. We recognize that this will be a difficult question for participants, and therefore, we prefer not to provide an option for ''don't know.''

FDA estimates the burden of this collection of information as follows:

TABLE 3—ESTIMATED ANNUAL REPORTING BURDEN [1]

| Activity | Number of respondents | Number of responses per respondent | Total annual responses | Average burden per response | Total hours |
|---|---|---|---|---|---|
| Study 1 Screener | 933 | 1 | 933 | 0.08 (5 minutes) | 74.64 |
| Study 1 Pretest | 249 | 1 | 249 | 0.33 (20 minutes) | 82.17 |
| Study 1 Main Test | 405 | 1 | 405 | 0.33 (20 minutes) | 133.65 |
| Study 2 Screener | 1,417 | 1 | 1,417 | 0.08 (5 minutes) | 113.36 |
| Study 2 Pretest | 266 | 1 | 266 | 0.33 (20 minutes) | 87.78 |
| Study 2 Main Test | 432 | 1 | 432 | 0.33 (20 minutes) | 142.56 |
| Total | | | | | 634.16 |

[1] There are no capital costs or operating and maintenance costs associated with this collection of information.

## II. References

The following references are on display with the Dockets Management Staff (HFA–305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852, 240–402–7500, and are available for viewing by interested persons between 9 a.m. and 4 p.m., Monday through Friday; these are not available electronically at *https://www.regulations.gov* as these references are copyright protected. Some may be available at the website address, if listed. FDA has verified the website addresses, as of the date this document publishes in the **Federal Register**, but websites are subject to change over time.

1. LaTour, C. and M. Smith (1986). ''A Study of Expert Endorsement of OTC Pharmaceutical Products.'' *Journal of Pharmaceutical Marketing & Management,* vol. 1(2), pp. 117–128.
2. Bhutada, N.S. and B.L. Rollins (2015). ''Disease-Specific Direct-to-Consumer Advertising of Pharmaceuticals: An Examination of Endorser Type and Gender Effects on Consumers' Attitudes and Behaviors.'' *Research in Social Administrative Pharmacy,* vol. 11(6), pp. 891–900.
3. Boerman, S.C., L.M. Willemsen, and E.P. Van der Aa (2017). '' 'This post is sponsored': Effects of Sponsorship Disclosure on Persuasion Knowledge and Electronic Word of Mouth in the Context of Facebook.'' *Journal of Interactive Marketing,* vol. 38, pp. 82–92.
4. Cohen, J. (1988). ''Statistical Power Analysis for the Behavioral Sciences.'' Routledge. ISBN 978–1–134–74270–7.
5. Faul, F., E. Erdfelder, A.G. Lang, et al. (2007). ''G*Power 3: A Flexible Statistical Power Analysis Program for the Social, Behavioral, and Biomedical Sciences.'' *Behavior Research Methods,* vol. 39, pp. 175–191.
6. Woods, C.B., S. Baxter, E. King, et al. (2017). ''Celebrity? Doctor? Celebrity doctor? Which Spokesperson Is Most Effective for Cancer Prevention?'' In E. Kendal and B. Diug (Eds.) *Teaching Medicine and Medical Ethics Using Popular Culture* (pp. 71–98). Palgrave Studies in Science and Popular Culture. Cham, Switzerland: Palgrave Macmillan. doi:10.1007/978–3–319–65451–5_5.
7. *https://www.statista.com/statistics/398166/us-instagram-user-age-distribution/.*
8. Zaichkowsky, J.L. (1994). ''The Personal Involvement Inventory: Reduction, Revision, and Application to Advertising.'' *Journal of Advertising,* vol. 23(4), pp. 59–70.
9. Ohanian, R. (1990). ''Construction and Validation of a Scale to Measure Celebrity Endorsers' Perceived Expertise, Trustworthiness, and Attractiveness.'' *Journal of Advertising,* vol. 19(3), pp. 39–52.
10. Kamins, M.A. and K. Gupta (1994). ''Congruence Between Spokesperson and Product Type: A Matchup Hypothesis Perspective.'' *Psychology & Marketing,* vol. 11(6), pp. 569–586.
11. Phua, J., J.S.E. Lin, and D.J. Lim (2018). ''Understanding Consumer Engagement with Celebrity-Endorsed E-Cigarette Advertising on Instagram.'' *Computers in Human Behavior,* vol. 84, pp. 93–102.
12. Brown, W.J. and M.C. Bocarnea (2007). ''Celebrity-Persona Interaction Scale.'' In R.A. Reynolds, R. Woods, and J.D. Baker (Eds.) *Handbook of Research on Electronic Surveys and Measurements* (pp. 302–305). Hershey, PA: Idea Group Reference.
13. Brown, W.J. and M.A.C. De Matviuk (2010). ''Sports Celebrities and Public Health: Diego Maradona's Influence on Drug Use Prevention.'' *Journal of Health Communication,* vol. 15(4), pp. 358–373.
14. Huh, J., D.E. DeLorme, and L.N. Reid (2005). ''Factors Affecting Trust in On-Line Prescription Drug Information and Impact of Trust on Behavior Following Exposure to DTC Advertising.'' *Journal of Health Communication,* vol. 10(8), pp. 711–731.
15. Till, B.D. and M. Busler (2000). ''The Match-Up Hypothesis: Physical Attractiveness, Expertise, and the Role of Fit on Brand Attitude, Purchase Intent and Brand Beliefs.'' *Journal of Advertising,* vol. 29(3), pp. 1–13.
16. Biswas, D., A. Biswas, and N. Das (2006). ''The Differential Effects of Celebrity and Expert Endorsements on Consumer Risk Perceptions: The Role of Consumer Knowledge, Perceived Congruency, and Product Technology Orientation.'' *Journal of Advertising,* vol. 35(2), pp. 17–31.
17. Bocarnea, M.C. and W.J. Brown (2007). ''Celebrity-Persona Parasocial Interaction Scale.'' In R.A. Reynolds, R. Woods, and J.D. Baker (Eds.) *Handbook of Research on Electronic Surveys and Measurements* (pp. 309–312). Hershey, PA: Idea Group Reference.

Dated: December 1, 2020.

**Lauren K. Roth,**

*Acting Principal Associate Commissioner for Policy.*

[FR Doc. 2020–26799 Filed 12–4–20; 8:45 am]

**BILLING CODE 4164–01–P**

---

## DEPARTMENT OF THE INTERIOR

**Bureau of Land Management**

**[19X.LLAK930000.L13100000. EI0000.241A]**

## Notice of 2021 Coastal Plain Alaska Oil and Gas Lease Sale and Notice of Availability of the Detailed Statement of Sale

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of sale.

**SUMMARY:** The Bureau of Land Management (BLM) Alaska State Office will hold an oil and gas lease sale bid opening for tracts in the Coastal Plain of the Arctic National Wildlife Refuge.

**DATES:** The oil and gas lease sale bid opening will be at 10 a.m. Alaska Standard Time (AKST) on January 6,

**78866** Federal Register / Vol. 85, No. 235 / Monday, December 7, 2020 / Notices

2021. The BLM must receive all sealed bids by 4 p.m. AKST, Thursday, December 31, 2020. The Detailed Statement of Sale for the 2021 Coastal Plain Alaska Oil and Gas Lease Sale will be available to the public immediately after publication of this notice.

**ADDRESSES:** Sealed bids must be received at the BLM Alaska State Office, Attn: BLM Energy and Minerals Branch Chief; Bureau of Land Management, Alaska State Office, 222 West 7th Avenue, Mailstop 13, Anchorage, Alaska 99513–7504. The Detailed Statement of Sale for the 2021 Coastal Plain Alaska Oil and Gas Lease Sale will be available at the BLM Alaska website at *https://www.blm.gov/alaska,* and copies are available from the BLM Alaska Public Information Center (Public Room), 222 West 7th Avenue, Mailstop 13, Anchorage, Alaska 99513– 7504; telephone 907–271–5960.

**FOR FURTHER INFORMATION CONTACT:** BLM Alaska Energy and Minerals Branch Chief, 907–271–4407. People who use a telecommunications device for the deaf (TDD) may call the Federal Relay Service (FRS) at 1–800–877–8339 to contact the above individual during normal business hours. The FRS is available 24 hours a day, 7 days a week, to leave a message or question with the above individual. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** The January 2021 Coastal Plain Alaska Oil and Gas Lease Sale will include tracts and acreage (no less than 400,000 acres) identified in the Detailed Statement of Sale and available for leasing under the Coastal Plain Oil and Gas Leasing Program Record of Decision issued in August 2020. The opening and reading of the bids for the 2021 Coastal Plain Alaska Oil and Gas Lease Sale will be available via video livestreaming at *https://www.blm.gov/live.* The Detailed Statement of Sale includes a description of the areas the BLM is offering for lease, as well as the lease terms, conditions, special stipulations, required operating procedures, and directions about how to submit bids. If you plan to submit one or more bids, please note that all bids must be sealed in accordance with the provisions identified in the Detailed Statement of Sale.

(Authority: Section 20001 of the Tax Cuts and Jobs Act (Public Law 115–97))

**Chad B. Padgett,**
*State Director, Alaska.*
[FR Doc. 2020–26788 Filed 12–4–20; 8:45 am]
**BILLING CODE 4310–JA–P**

# INTERNATIONAL TRADE COMMISSION

**[Investigation No. 332–582]**

# Monitoring of Fresh or Chilled Bell Peppers

**AGENCY:** International Trade Commission.

**ACTION:** Notice of Investigation and Scheduling of a Public Hearing.

**SUMMARY:** Following receipt on November 4, 2020, of a request from the U.S. Trade Representative (USTR), the Commission instituted Investigation No. 332–582, Monitoring of Fresh or Chilled Bell Peppers, under section 332(g) of the Tariff Act of 1930 for the purpose of collecting and analyzing information that would expedite an investigation under section 202(b) of the Trade Act of 1974 (Trade Act) (the U.S. global safeguard law). For purposes of this investigation, the fresh or chilled bell peppers are those provided for in statistical reporting numbers 0709.60.4015, 0709.60.4025, 0709.60.4065, and 0709.60.4085 of the Harmonized Tariff Schedule of the United States (HTS).

**DATES:** (date of publication in the **Federal Register**): Commencement of monitoring.

**ADDRESSES:** All Commission offices, including the Commission's hearing rooms, are located in the U.S. International Trade Commission Building, 500 E Street SW, Washington, DC. All written submissions should be submitted electronically and addressed to the Secretary, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. The public record for this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Project Leader Steven LeGrand (202– 205–3094 or *steven.legrand@usitc.gov*) for information specific to this investigation. For information on the legal aspects of this investigation, contact William Gearhart of the Commission's Office of the General Counsel (202–205–3091 or *william.gearhart@usitc.gov*). The media should contact Margaret O'Laughlin, Office of External Relations (202–205– 1819 or *margaret.olaughlin@usitc.gov*). Hearing-impaired individuals may obtain information on this matter by contacting the Commission's TDD terminal at 202–205–1810. General information concerning the Commission may also be obtained by accessing its website (*https://www.usitc.gov*).

Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000.

**SUPPLEMENTARY INFORMATION:** On October 6, 2020, the Florida Fruit and Vegetable Association, and the Florida Farm Bureau requested that U.S. imports of bell peppers be monitored under the perishable agricultural product provisions of section 202(d)(1) of the Trade Act (19 U.S.C. 2252(d)(1). In response to that request, the USTR determined that imports of bell peppers satisfy the requirements of section 202(d)(1)(A) of the Trade Act.

Accordingly, in accordance with section 202(d)(1)(B) of the Trade Act, the USTR requested, under section 332(g) of the Tariff Act of 1930, that the Commission monitor and investigate imports of fresh or chilled bell peppers, provided for in statistical reporting numbers 0709.60.4015, 0709.60.4025, 0709.60.4065, and 0709.60.4085 of the HTS. He further requested that the monitoring and investigation include the collection and analysis of information that would expedite an investigation under section 202(b) of the Trade Act. He further stated that the product in question consists of all imports that fall within the product description under the above HTS statistical reporting numbers.

Section 202(d)(1)(C) of the Trade Act provides procedures under which domestic producers of a perishable agricultural product may, in a petition filed under section 202(a) of the Trade Act, request provisional relief. Under those procedures, if the Commission has monitored imports of the article for at least 90 days, the domestic industry may, in such a petition, request a preliminary determination and provisional relief pending completion of a full Commission investigation. Should that occur, the Commission would have 21 days, from the day on which the request was received, to make a preliminary injury determination, and if in the affirmative, to recommend provisional relief to the President.

*Public Hearing:* No public hearing is planned at this time in connection with this investigation. However, should a public hearing or conference be scheduled, the Commission will publish a notice in the **Federal Register** and post information about the hearing on the Commission's website at (*https:// usitc.gov/research_and_analysis/what_ we_are_working_on.htm*). Once on that web page, scroll down to the entry for Investigation No. 332–582, Monitoring of Fresh or Chilled Bell Peppers, and

# Record of Decision

## SUMMARY

On December 22, 2017, after decades of congressional consideration regarding whether oil and gas development should take place on any area of the 1.56 million-acre Coastal Plain within the 19.3 million-acre Arctic National Wildlife Refuge (ANWR), Congress looked to the oil and gas potential of this area for needed federal revenues and enacted Section 20001 of the Tax Cuts and Jobs Act (Public Law [PL] 115-97). The law was considered pursuant to rules contained in the Congressional Budget Act of 1974 (2 United States Code (U.S.C.) 644) that limited the scope of the text to matters necessary for establishing an oil and gas program that would generate revenue for the treasury.

Section 20001(b)(1) of PL 115-97 lifted a prior prohibition on oil and gas leasing and development in the ANWR that had been established by Section 1003 of the Alaska National Interest Lands Conservation Act (ANILCA), as that prohibition pertained to the Coastal Plain. Section 20001(b)(2)(A) of PL 115-97 went further to *require* the Secretary of the Interior (Secretary), acting through the Bureau of Land Management (BLM)[1], to establish and administer a competitive oil and gas program for the "leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." The Secretary is required to manage the oil and gas program on the Coastal Plain "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et. seq.) (including regulations)."

In addition to directing the establishment of a new competitive oil and gas program in the Coastal Plain, the statute also includes additional mandates to the Secretary, acting through the BLM, to expedite and provide certainty toward establishment and development of the program in order to meet the statute's revenue-generating purpose. First, Section 20001(c)(1) requires that at least two lease sales be held by December 22, 2024, including the first by December 22, 2021, and that each sale offer for lease at least 400,000 acres of the highest hydrocarbon potential lands within the Coastal Plain. Section 20001(c)(2) requires that the BLM issue any rights-of-way or easements across the Coastal Plain "for the exploration, development, production, or transportation" necessary to carry out the oil and gas program. Finally, Section 20001(c)(3) requires the Secretary, acting through the BLM, to authorize up to 2,000 surface acres of federal land on the Coastal Plain to be covered by production and support facilities during the term of the leases under the oil and gas program.

In summary, exercising its plenary authority over the management of federal lands, Congress's enactment of Section 20001 of PL 115-97 decided the question of whether activities related to leasing, exploration, development, production and transportation of oil and gas would take place on the Coastal Plain. In doing so, Congress, among other things: (1) directed the Secretary, acting through the BLM, to "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain"; (2) included a Coastal Plain oil and gas program as a refuge purpose on equal footing with the other refuge purposes; (3) directed the Secretary, acting through the BLM, to manage the program in a manner similar to the administration of lease sales on the National Petroleum Reserve-Alaska

---

[1]This provision grants authority to the Secretary but prevents the Secretary from re-delegating his authority to an agency within Interior other than the Bureau of Land Management. *See Trustees for Alaska v. Watt*, 524 F. Supp. 1303 (D. Alaska 1981) (holding that certain delegations of authority to the US Geological Survey were invalid because Congress had required those functions to be performed by the U.S. Fish and Wildlife Service).

(the NPR-A); (4) directed the Secretary, acting through the BLM, to issue rights-of-way or easements "for the exploration, development, production, or transportation necessary" to carry out the program; and (5) directed the Secretary, acting through the BLM, to authorize up to 2,000 surface acres to be covered by production and support facilities.

This Record of Decision (ROD or Decision) approves a program to carry out this statutory directive. By determining *where and under what terms and conditions* leasing will occur, this Decision takes into account the requirements of PL 115-97 and other applicable law. To inform this Decision, the BLM prepared the Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement (Leasing EIS).

As explained further in the Leasing EIS, there is tremendous uncertainty regarding future potential exploration and development on the Coastal Plain. Any development scenario at this point is highly speculative because: it is unknown whether or where leases will be issued, it is unknown whether or where exploratory drilling may occur under such leases, and it is unknown whether or where commercially developable oil and gas discoveries may be made.

Despite these vast uncertainties, to meet its obligations under the National Environmental Policy Act (NEPA) the BLM endeavored to develop a hypothetical development scenario in a good faith effort to identify plausible indirect effects of leasing that are not known at this time but nonetheless might be theoretically considered "reasonably foreseeable" if leasing was to result in the exploration and development of oil and gas resources (40 Code of Federal Regulations [CFR] Section 1508.8(b)) (see Appendix B to the Leasing EIS). Further, in order to minimize the chance that the resultant impact analysis would understate potential impacts, the hypothetical scenario described in the Leasing EIS represents a successful discovery and optimistic high-production development scenario in a situation of favorable market prices.

Given the uncertainty, and the hypothetical, speculative and aggressive nature of the development scenario analyzed, the potential impacts described in the Leasing EIS are necessarily uncertain and likely overstated. At some future stage in the administration of the oil and gas program where impacts from proposed actions are actually reasonably foreseen, i.e., if and when the BLM is presented with proposals for exploration or development, those decisions by the BLM for specific authorizations will also be subject to project-specific analysis, including compliance with NEPA and other laws.

This Decision adopts Alternative B of the Leasing EIS as to where and under what terms and conditions leasing may occur subject to future specific environmental analysis and permitting decisions, except clarifications have been provided for required operating procedures (ROP) 11 and 17, as well as Lease Notice 2.[2] The ROD also does not adopt the interpretive assumptions made in the Leasing EIS as to the implementation of Section 20001(c)(3) of PL 115-97. Rather, it provides guidance regarding certain general principles for the future application of that section of the law. As explained in further detail below, this is not a substantial change in the proposed action.

This Decision implements the requirement that the Secretary, acting through the BLM, provide for a competitive oil and gas program for the leasing, production, development, and transportation of oil and gas in and from the Coastal Plain. This Decision takes into account protection of important surface resources and other uses of the Coastal Plain in consideration of the purposes of the ANWR set out in Section 303(2)(B) of ANILCA, as amended by Section 20001(b)(2)(B) of PL 115-97.

---

[2] See Section 3.4 and Appendix A of the ROD.

Record of Decision

This Decision makes approximately 1,563,500 acres, or the entire program area,[3] available for oil and gas leasing, and consequently for potential future exploration, development, and transportation. While providing these opportunities, the program adopted in this ROD also provides protections for surface resources and other uses, including subsistence use, through a comprehensive package of lease stipulations and ROPs, listed in **Appendix A**, that will apply to future oil and gas activities. Together these lease stipulations and ROPs build on, without frustrating, the statutorily-mandated oil and gas program taking into account other refuge purposes, which include conservation of fish and wildlife populations and habitats, fulfillment of international treaty obligations, allowance for continued subsistence use, and protection of water quality and quantity necessary to meet fish and wildlife conservation needs. This Decision also takes into account that any future specific exploration and development proposals will be subject to further environmental analysis and additional, project-specific ROPs as appropriate and necessary.

This Decision establishes a program to achieve the statutory oil and gas program while still providing that approximately 359,400 acres (23 percent of lands available) will be subject to No Surface Occupancy (NSO) stipulations within barrier islands and important aquatic habitats, including rivers and streams, nearshore marine waters, and lagoons, and that approximately 721,200 acres (46 percent of lands available) will be subject to operational timing limitations (TLs) in the primary calving habitat area for the Porcupine caribou herd. Together, these partially overlapping lease stipulations cover more than 60 percent of the program area. Additional lease stipulations and the 44 ROPs that apply to oil and gas activities throughout the program area provide further protections for important resources and uses, as discussed in **Section 3.3**, below.[4]

This Decision was reached after an extensive review and is made after an outreach effort where the BLM and the Department of the Interior heard and benefited from a wide variety of perspectives. The U.S. Fish and Wildlife Service (USFWS), U.S. Environmental Protection Agency (EPA), State of Alaska, North Slope Borough (NSB), Native Village of Kaktovik, Native Village of Venetie Tribal Government, Venetie Village Council, and Arctic Village Council participated in the NEPA process as cooperating agencies. These agencies worked with the BLM by providing input as to what should be analyzed in the Leasing EIS, including suggestions for alternatives, lease stipulations, and ROPs, and by reviewing in-house drafts of the Draft and Final Leasing EISs; however, as the lead agency for the Leasing EIS, the BLM is ultimately responsible for the analysis therein, as well as this ROD.

In addition, the BLM met with Canadian government officials in Canada and conducted tribal consultation throughout the NEPA process with tribes in northern Alaska, including the four tribes that served as cooperating agencies and other tribes whose members have the potential to be substantially impacted by implementation of the Coastal Plain oil and gas leasing program. The BLM also held Native consultations with Alaska Native Claims Settlement Act (ANCSA) corporations during development of the EIS. See Appendix C of the Leasing EIS for complete listings of consultations.

The BLM provided for public involvement in the development of the Leasing EIS. Public meetings, both during scoping and on the Draft EIS, were held in Anchorage, Arctic Village, Fairbanks, Kaktovik, Utqiaġvik, and Venetie, Alaska, and Washington, DC. A public meeting on the Draft EIS was also held in Fort Yukon,

---

[3] The program area includes all lands within the Coastal Plain for which the federal government owns the mineral interest, with the exception of Air Force-administered lands near Kaktovik and approximately 4,400 acres of federal lands selected for conveyance under the Alaska Native Claims Settlement Act.

[4] The specific conditions of those stipulations and ROPs are contained in Table 2-3 in Chapter 2 of the Final EIS. As noted therein, PL 115-97 requires that the BLM issue rights-of-way for essential roads and pipeline crossings, and other necessary access, even in areas subject to an NSO stipulation.

Alaska. In addition to receiving public comments at the scoping and Draft EIS public meetings, comments were also taken online, by email, and through the mail. Altogether, during the public scoping period and public review period for the Draft EIS, the BLM received more than 1.8 million comment submissions, containing more than 8,000 unique substantive comments. Additionally, the BLM and Departmental officials met with representatives of a broad range of stakeholders, including local and state governments, tribes, Canadian government, Alaska Native corporations, and industry and environmental organizations.

## 1. DECISION

An environmental impact statement informs a decision-maker before the decision is made. See 40 CFR 1502.1, 1505.2. To facilitate this outcome, the Council on Environmental Quality's (CEQ) NEPA regulations establish a minimum 30-day period after notice is published that the Final EIS has been filed with EPA before the agency may make a decision on a proposed action. See 40 CFR 1506.10. During this period, the decisionmaker completes its own internal final review, and the public and other agencies may comment on the Final EIS prior to the agency's final action on the proposal. See CEQ's NEPA's Forty Most Asked Questions (Q&A 34b). Consistent with this process, this Decision is rendered after carefully reviewing the Draft EIS and the Final EIS, public comments, and the BLM's response to public comments submitted on the Draft EIS.

The Decision described and adopted in this ROD implements the Congressional directive to the BLM in Section 20001(b)(2)(A) of PL 115-97 to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area of the ANWR, as that area is defined by Section 20001(a)(1) of PL 115-97 (see **Map 1-1** in **Appendix B**).

In accordance with the provisions of PL 115-97 and for the reasons stated in more detail below,[5] this Decision adopts Alternative B in the Leasing EIS as to where and under what terms and conditions leasing may occur subject to future specific environmental analysis and permitting decisions, except clarifications have been provided for ROPs 11 and 17, as well as Lease Notice 2. The ROD also does not adopt the interpretive assumptions made in the Leasing EIS as to the implementation of Section 20001(c)(3) of PL 115-97. The Decision makes the entire "program area" covered by the Congressional directive in PL 115-97, approximately 1,563,500 acres, available for oil and gas leasing, and consequently, for potential oil and gas exploration and development (**see Map 1-2 in Appendix B**), subject to the lease stipulations and ROPs listed in **Appendix A**.

**Map 1-3** in **Appendix B** illustrates the geographic scope of some of these lease stipulations. These stipulations and ROPs are derived from those listed for Alternative B in Table 2-3 of the Leasing EIS. This Decision expressly establishes the program to carry out the statutorily-required lease sales as described in **Section 1.5** below, including the issuance of necessary rights-of-way and easements and the authorization of up to 2,000 surface acres to be covered by production and support facilities as mandated by PL 115-97.

As noted above, the program area includes all lands within the Coastal Plain for which the federal government owns the mineral interest, with the exception of Air Force-administered lands near Kaktovik and approximately 4,400 acres of federal lands selected for conveyance under ANCSA; however, while the BLM may lease the subsurface mineral interest underlying Native allotments, which comprise approximately 900 acres of the program area (0.06 percent), lease stipulations and ROPs will not apply on Native allotments,

---

[5] This section describes how the Decision conforms to the applicable provisions of PL 115-97. Additional considerations, including compliance with other applicable laws, are discussed in **Section 3**, *Management Considerations*.

except for Lease Stipulation 11, which requires written consent from allotment owners for the construction and maintenance of improvements on allotments. Instead, as the surface owners of these privately-owned lands, Native allotment owners have the authority to establish conditions for oil and gas operators' surface use of their allotments.

Future on-the-ground actions requiring BLM approval, including potential exploration, development, production and transportation proposals, will require further NEPA analysis based on site-specific proposals. For example, before drilling on any lease, a leaseholder will be required to submit an application for permit to drill, which will require appropriate NEPA analysis (as well as compliance with other applicable laws) before any drilling may be authorized. Potential applicants will be subject to the terms of the lease; however, the BLM Authorized Officer may require additional project-specific terms and conditions before authorizing any oil and gas activity based on the required project-level environmental, marine mammal, endangered species and subsistence impact analyses.

As described in more detail in **Section 1.5** below, this Decision provides guidance for potential future permitting purposes, regarding Section 20001(c)(3) of PL 115-97. The determination as to whether particular surface acreage must be authorized to be covered by "production and support facilities" is necessarily left to future fact specific determinations. This Decision determines where and under what conditions to apply to the statutorily-required lease sales that will benefit from the statutory mandate for authorizing production and support facilities covering up to the 2,000 acres of federal land. In so doing, this Decision takes a conservative approach to the highly speculative oil and gas program analyzed under the Leasing EIS that could span more than five decades.

## 1.1 Statutory Background

The ANWR established by ANILCA (PL 96-487) on December 2, 1980, consists of approximately 19.3 million acres in northeast Alaska. Section 303(2) of ANILCA established the ANWR, converting and expanding by approximately 9.2 million acres of public domain lands to the south and west the prior Arctic National Wildlife Range established by the Secretary of the Interior in 1960. Section 702(3) of ANILCA designated approximately 8 million acres of the ANWR as wilderness. Section 1002 of ANILCA excluded the Coastal Plain from wilderness designation, setting aside 1.56 million acres for study of all the resources of what is referred to commonly as the "1002 area" in recognition of the area's potential for oil and gas resources. Section 1003 of ANILCA prohibited oil and gas development throughout the ANWR until authorized by Congress.

Pursuant to Section 1002(a) of ANILCA, the Secretary was required to conduct ". . . an analysis of the impacts of oil and gas exploration, development, and production, and to authorize exploratory activity within the coastal plain in a manner that avoids significant adverse effects on the fish and wildlife and other resources." Section 1002(c)(D) of ANILCA required the Secretary to analyze the potential impacts of oil and gas exploration, development, and production on such wildlife and habitats, and Section 1002(c)(E) of ANILCA required the Secretary to analyze the potential effects of such activities on the culture and lifestyle (including subsistence) of affected Native and other people.

Section 1002(h) of ANILCA required the Secretary to prepare and submit a report to Congress with recommendations with respect to whether further exploration for, and the development and production of, oil and gas within the coastal plain should be permitted and, if so, what additional legal authority is necessary to ensure that the adverse effects of such activities on fish and wildlife, their habitats, and other resources are avoided or minimized.

On April 21, 1987, the Department of the Interior's *Arctic National Wildlife Refuge, Alaska, Coastal Plain Resource Assessment: Report and Recommendation to the Congress of the United States and Final Legislative Environmental Impact Statement* was published in accordance with Section 1002(h) of ANILCA. The report analyzed the environmental consequences of five management alternatives, ranging from opening the entire Coastal Plain area to oil and gas leasing, to wilderness designation. Therein, after 5 years of scientific study by the USFWS, U.S. Geological Survey (USGS) and BLM, the Secretary of the Interior selected as the preferred alternative making available for consideration the entire ANWR Coastal Plain for oil and gas leasing.

On December 22, 2017, following more than three decades of Congressional debate and consideration of the Secretary's recommendation to Congress, Congress enacted the Tax Cuts and Jobs Act (PL 115-97). Section 20001(b)(1) of PL 115-97 amends ANILCA to provide that Section 1003, which prohibited oil and gas development in the ANWR unless authorized by Congress, does not apply to the Coastal Plain. Section 20001(b)(2)(A) directs the Secretary, acting through the BLM, to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area of the ANWR, as that area is defined by Section 20001(a)(1).

Section 20001(b)(2)(B) amended Section 303(2)(B) of ANILCA to add as a purpose of the ANWR: "to provide for an oil and gas program on the Coastal Plain." Section 20001(b)(3) requires the Secretary, acting through the BLM, to "manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)." Section 20001(b)(4) sets a royalty rate of 16.67 percent for leases, and Section 20001(b)(5) requires 50 percent of revenues from lease bonus bids, rentals, and royalties to be paid to the State of Alaska and the other 50 percent to be deposited into the Federal Treasury.

Section 20001(c)(1) of PL 115-97 requires that at least two lease sales be held by December 22, 2024, with the first sale conducted by December 22, 2021, and that each sale offer for lease not fewer than 400,000 acres of the highest hydrocarbon potential lands within the Coastal Plain. Section 20001(c)(2) requires the Secretary, acting through the BLM, to issue any rights-of-way or easements across the Coastal Plain for "exploration, development, production, or transportation necessary to carry out the program." Additionally, Section 20001(c)(3) requires the Secretary, acting through the BLM, to authorize up to 2,000 surface acres of federal land to be covered by production and support facilities.

As set forth more fully below, this Decision takes into account and is fully consistent with all the foregoing provisions of Section 20001 of PL 115-97.

## 1.2    Section 20001(b)(2)(A) of PL 115-97—Establishment of the Program

As noted above, this Decision establishes a competitive oil and gas program. Section 20001(b)(2)(A) of PL 115-97 requires the Secretary, acting through the BLM, to both establish and to administer "a competitive oil and gas program for leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." This broad directive by Congress plainly gives the Secretary, acting through the BLM, both a directive and the express authority necessary to carry out all elements typically associated with a competitive oil and gas program, including leasing, exploration, development, production, and transportation of oil and gas in and from the Coastal Plain. The lease stipulations and ROPs adopted in this ROD provide terms and conditions applicable to each such aspect of the program, from lease sales through reclamation of resulting oil and gas developments.

### 1.3   Section 20001(b)(2)(B) of PL 115-97—The Purposes of the ANWR

After the amendment by Section 20001(b)(2)(B) of PL 115-97, Section 303(2)(B) of ANILCA now provides (emphasis added in italic):

> The purposes for which the Arctic National Wildlife Refuge is established and shall be managed include—
>
> (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd (including participation in coordinated ecological studies and management of this herd and the Western Arctic caribou herd), polar bears, grizzly bears, muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling;
>
> (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
>
> (iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents;
>
> (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge; *and*
>
> *(v) to provide for an oil and gas program on the Coastal Plain.*

Under Section 20001 of PL 115-97, Congress directed the Secretary, acting through the BLM, to implement the Coastal Plain oil and gas program in the ANWR. See Sections 20001(a)(2) and (b)(2)(A). Thus, under Section 20001 of PL 115-97 and, acting through the BLM, the Secretary's administration of the Coastal Plain oil and gas program, the USFWS does not have jurisdiction over matters related to administration of the oil and gas program within the Coastal Plain, but exercises its authorities and responsibilities with regard to all other matters not related to the oil and gas program throughout the entire ANWR, under the National Wildlife Refuge System Administration Act (NWRSAA), ANILCA, and various other applicable fish and wildlife and conservation-related statutes.

Jurisdiction for the authorization and administration of uses related to the oil and gas program rests with the Secretary, acting through the BLM. The specific requirements of Section 20001 and its directive to establish an oil and gas program on the Coastal Plain in accordance with the terms set by Congress requires, among other things, that the Secretary, acting through the BLM, hold lease sales and authorize all uses necessary to carry out the Coastal Plain oil and gas program.

By adding an oil and gas program on the 1.56 million-acre Coastal Plain as a purpose of the ANWR, Congress itself balanced the purposes of the 19.3 million-acre refuge, a balance which is now law. Although the ANWR has multiple purposes, Congress has mandated more specific management within particular areas. Just as Congress has mandated that 8 million acres of the ANWR be managed as wilderness, it has mandated that the 1.56 million-acre Coastal Plain be managed for an oil and gas program. Following the statutory directive, should leasing, exploration, development, production, and transportation activities actually take place on the Coastal Plain, those actions would potentially be limited in scope to only approximately 8 percent of the ANWR, with some potential impact on the other four refuge purposes.

Within this statutory framework, this Decision takes into account the other purposes of the ANWR. In developing lease stipulations and ROPs for evaluation in the Leasing EIS, and for purposes of adopting Alternative B's lease stipulations and ROPs in this Decision, the Secretary, acting through the BLM, implements purpose (v) of the ANWR in a way that takes into consideration that Congressional direction in light of the other four purposes of the ANWR.

This Decision provides consideration to the other refuge purposes so that the fifth purpose does not defeat the other four. In this way, the oil and gas program can take into account all of the purposes of the ANWR. For example, Alternative B, as adopted by this ROD, incorporates several lease stipulations and ROPs for the protection of the types of resources and uses that are cited in the statutory purposes of the ANWR. Such lease stipulations and ROPs include for example, but are not limited to: Lease Stipulation 9 and ROP 4, which provide protection for polar bears and their habitat, consistent with purpose (i); Lease Stipulation 7 and ROP 23, which provide protections for Porcupine herd caribou and their habitat, consistent with purpose (ii); Lease Stipulation 4 and ROP 18, which protect subsistence uses, consistent with purpose (iii); and Lease Stipulation 1 and ROP 8, which protect water quality and quantity, consistent with purpose (iv).

## 1.4  Section 20001(b)(3) of PL 115-97—Management in a Manner Similar to the Administration of Lease Sales in the NPR-A

This Decision follows the statutory direction to "manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)," required by Section 20001(b)(3) of PL 115-97, except as otherwise provided. In this regard, where appropriate, and except as otherwise provided in Section 20001, the elements of the Coastal Plain oil and gas leasing program adopted by this Decision follow the NPR-A program statutory and regulatory scheme. For example, both programs determine which areas are available for leasing in future lease sales, and both establish the terms and conditions under which oil and gas activities will be conducted.

In many cases the terms and conditions (i.e., lease stipulations and ROPs) that will apply to oil and gas activities in the Coastal Plain pursuant to this Decision are derived from (with appropriate adjustments relevant to the Coastal Plain) lease stipulations and required best management practices contained in the February 2013 ROD for the current NPR-A Integrated Activity Plan, which governs the NPR-A program. Additionally, future on-the-ground oil and gas activities will be evaluated through additional, project-specific NEPA analysis, as is the case with the NPR-A program.

The words "similar to," in this context means consistent except where the statutory goals and mandates or differences in circumstances between the NPR-A and the Coastal Plain support a departure. For example, special areas, as that term is used by the BLM in its management of the NPR-A, including in its current NPR-A Integrated Activity Plan, are not established for the Coastal Plain.

In the NPR-A, the BLM is both the oil and gas program manager and the surface manager of the entire Petroleum Reserve. The term special area is used by the BLM to describe areas in the NPR-A that contain significant surface resource values which require specialized management prescriptions in order to adequately protect those values (see 42 U.S.C. 6504(a)).

Given that the USFWS is responsible for management of the ANWR, except for implementation of the oil and gas program, this Decision declines to establish special areas in the Coastal Plain. Nevertheless, the Decision treats much of the Coastal Plain as special, adopting particular, location-specific management

8      *Coastal Plain Oil and Gas Leasing Program*
*Record of Decision*
Case 3:21-cv-00245-SLG    Document 48-10    Filed 06/03/22    Page 16 of 91      ER-166

prescriptions in certain areas where appropriate, in a manner similar to the BLM's management of the NPR-A oil and gas program.

In this regard, the Leasing EIS considered, and this Decision adopts, the use of special, particularly stringent lease stipulations described in **Appendix A** that apply in certain large areas containing significant surface values. These include Lease Stipulations 1 and 4, establishing NSO prohibitions on 359,400 acres within barrier islands and important aquatic habitats, including rivers and streams, nearshore marine waters, and lagoons, and Lease Stipulation 7, which applies operational timing limitations on 721,200 acres of the program area within the primary calving habitat area for the Porcupine caribou herd during the calving season, prohibiting construction activities using heavy equipment (except drilling from established pads), and applying ground and air traffic restrictions.

In applying the NPR-A statutory and regulatory framework to the Coastal Plain oil and gas program, the BLM has determined that Section 202 of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. 1712, which applies to lands managed by the BLM and provides for its development of land use plans, does not apply to the surface management of the ANWR. In particular, the Naval Petroleum Reserves Production Act explicitly exempts the NPR-A program from the land use planning requirements of Section 202 of FLPMA. See 42 U.S.C. 6506a(c). Thus, similar to its management of the NPR-A, the Secretary, acting through the BLM, is not preparing land use plans under FLPMA for the Coastal Plain program. Moreover, as stated above, and except for jurisdiction over the oil and gas program on the Coastal Plain, the USFWS is responsible for management of the entire ANWR, as governed by its Comprehensive Conservation Plan (CCP) and in accordance with the NWRSAA and ANILCA.[6]

## 1.5   Section 20001(c) of PL 115-97

### In General

To reduce uncertainty for prospective leaseholders and thereby increase the likelihood of achieving revenue goals for the ANWR oil and gas program, Congress went beyond the authorizations applicable to the NPR-A and required that necessary rights of way, easements and production and support facilities be authorized; thus, in contrast to the legislation and regulations establishing an oil and gas leasing program for the NPR-A, Section 20001(c) provides three striking differences. First, unlike in the NPR-A, where the timing of lease sales is left to the BLM's discretion, Section 20001(c)(1) directs the Secretary, acting through the BLM, to conduct "not fewer than 2 lease sales area-wide" by not later than December 22, 2024, each sale offering not fewer than 400,000 acres in areas with the highest hydrocarbon potential. The question as to whether or not to offer oil and gas leases in the Coastal Plain of the ANWR is not an open one. The BLM will comply with these mandatory provisions for lease sales under this ROD.

Second, Section 20001(c)(2) states that the Secretary, acting through the BLM, "shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." The BLM interprets the plain language of this provision as requiring that it authorize any such rights-of-way necessary to carry out the Coastal Plain oil and gas program established by Section 20001 of PL 115-97.

---

[6] Subsections (b)(4) and (b)(5) of 16 U.S.C. 3143 provide that the royalty rate for leases will be 16.67 percent and that 50 percent of adjusted bonus, rental and royalty receipts derived from the program shall go to the State of Alaska, respectively. These provisions will be appropriately implemented for leases issued under the program. These provisions are not significantly different from the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et. seq.), which sets a 12.5 percent minimum royalty rate for low potential areas and a 16.67 percent rate in high potential areas. As under subsection (b)(5), 50 percent of NPR-A receipts are paid to the State.

Clearly Congress intended that successful implementation of the mandated oil and gas program should not be frustrated by an unavailability of necessary access. This directive is unlike the NPR-A, where issuance of such rights-of-way are at the BLM's discretion. This directive is not limited to development under a particular *lease*, but rather any right-of-way necessary to carry out the *section*. It would, for example, apply to a request for a road or pipeline right-of-way, even if sought by a non-leaseholder.

Finally, Section 20001(c)(3) provides:

> SURFACE DEVELOPMENT—In administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

This provision requires the Secretary, acting through the BLM, to authorize up to 2,000 surface acres of federal land to be covered by production and support facilities during the term of the leases under the oil and gas program. Just as with the rest of Section 20001, Congress's use of the term "shall" constitutes a directive to the Secretary, acting through the BLM, that he or she must: (1) establish and administer a competitive oil and gas program (Section 20001(b)), (2) hold lease sales within certain timeframes (Section 20001(c)(1)), (3) issue certain rights-of-way (Section 20001(c)(2)), and (4) authorize production and support facilities consistent with those leases (Section 20001(c)(3)).

In a letter dated October 21, 2019, after publication of the Final EIS, Region 10 of the EPA commented on several aspects of the document. As relevant here, Region 10 reiterated its comment on the Draft EIS that the BLM should have considered an alternative to reduce the impact area to less than 2,000 acres of production and support facilities.[7]

Such an interpretation is inconsistent with the mandate in Section 20001(c)(3), and, as described in the Final EIS, therefore inconsistent with the purpose and need for action. This mandate, requiring the authorization of up to 2,000 surface acres of federal land to be covered by production and support facilities during the term of the leases, will be carried out through leases that allow for regulation of facilities but may not preclude such infrastructure.

If a lessee discovers oil or gas, it may seek approval to develop the resources by submitting an application for a permit to drill that includes a drilling plan and a surface use plan of operations. In addition to the stipulations and ROPs included in this Decision, the BLM may require additional project-specific measures to further protect surface resources.

Consistent with Congress's objective to achieve revenue from the Coastal Plain oil and gas program, the "shall authorize" language in (c)(3) functions as a directive to the BLM that it must not deny or unreasonably limit development of production and support facilities on the Coastal Plain until 2,000 surface acres are covered by production and support facilities.

---

[7] The October 21 letter actually states that the BLM should "reduce the impact area" to less than 2,000 surface acres where practicable. Given the reference to 2,000 acres and EPA's prior comments on the draft, the BLM interprets this comment to suggest that the BLM consider an alternative of less than 2,000 acres of production and support facilities, not "impact area."

While Congress clearly mandated that the Secretary, acting through the BLM, authorize up to 2,000 acres to be covered by production and support facilities, it did not define the terms "covered by" or "production and support facilities." There are a broad range of actions potentially carried out during the entire life of an oil and gas program which may necessitate authorization of facilities related to exploration, development, transportation, production, and related facilities. In implementing the mandate of Section 20001(c)(3), the Secretary, acting through the BLM, will have to determine whether each type of proposed facility constitutes a "production and support facility," and if so, whether such proposed facilities would cover federal land on the Coastal Plain.

Future BLM determinations about which facilities benefit from the 2,000-surface acre mandate, and which do not, could potentially influence the total extent of development in the Coastal Plain and, thus, the potential environmental impacts stemming from the leasing program. Recognizing this, the BLM included in its Leasing EIS several preliminary interpretative assumptions that facilitated the creation of a more detailed reasonably foreseeable development (RFD) scenario and thus provided a clearer picture of how much total development is reasonably foreseeable at this preliminary stage. For example, all transportation facilities were included whether or not they supported production, the authorization of gravel mines was considered discretionary in the Draft EIS and mandatory in the Final EIS, and the reclamation of covered land over time was considered to increase the required authorization of surface acres covered by production and support facilities beyond 2,000 acres.

The analytical assumptions contained in Section 1.9.1 of the Leasing EIS generally had the effect of assuring that overall program impacts from the hypothetical RFD scenario would be evaluated in the EIS.

### *Statutory Interpretation and Guidance for Future Project-Specific Decisions*

This Decision does not need to adopt the Leasing EIS's interpretive assumptions concerning Section 20001(c)(3) for several reasons. First, interpreting the language "covered by production and support facilities" is unnecessary at this preliminary stage of the leasing program, which focuses on broader issues such as which federal lands within the Coastal Plain are suitable for leasing, and under what general terms and conditions. To accomplish a good faith effort to meet its obligation under NEPA, the BLM reached these interpretive assumptions regarding the phrase "production and support facilities," to apply the mandatory authorization requirement to the hypothetical development scenario. This Decision does not actually authorize any surface acreage to be covered by "production and support facilities," so whether a particular facility will or will not fall within the 2,000-acre mandate is speculative at this stage and merely illustrative to provide an understanding of the hypothetical impacts.

Second, adopting and applying interpretive assumptions at this initial stage of the program would be premature. It is currently unknown whether any leases will ever be issued, it is unknown if any exploration will take place,[8] and if so, it is unknown whether eventually any lessees will ever apply to the BLM for authorization of any production and support facilities. It bears repeating that as we make this Decision all aspects of a future oil and gas program are highly speculative and dependent on unpredictable circumstances that will play out over decades. If leases are issued, if exploration takes place, and if lessees apply for BLM authorization of any production and support facilities, the types of facilities and technologies deployed may be very different than what is foreseeable today. It is, at this stage, not possible, reasonable or necessary to

---

[8] ROP 17, as amended by this Decision, prohibits construction of gravel roads and pads for exploratory drilling, and geophysical exploration does not result in the construction of production and support facilities.

establish for future administration the interpretive assumptions contained in the Leasing EIS regarding the treatment of each hypothetical facility for purposes of applying the mandate under Section 20001(c)(3).

Third, further review and consideration of the Leasing EIS's interpretive assumptions concerning Section 20001(c)(3) have highlighted several opportunities for improvement. Certain interpretive principles can be gleaned from the plain language of the statute, some of which may differ in some respects from the interpretive assumptions made in the Leasing EIS. Accordingly, this Decision provides the following guidance to help inform future project specific decisions about what does and does not qualify as "covered by production and support facilities":

- First, a proposal to cover surface acreage must be a facility; that is, under that term's ordinary dictionary definition, something that is built, installed, or established to serve a particular purpose.

- Second, under the plain language of the statute, the facility must be a "production and support facility." The term "production" is used elsewhere in Section 20001, but, in contrast to Section 20001(c)(3), in each of those other paragraphs the term is included as part of a longer list of various aspects that will likely occur with a successful oil and gas program. For example, Section 20001(c)(2) requires the issuance of rights-of-way or easements for necessary "exploration, development, production, or transportation," and Section 20001(b)(2)(A), refers to "leasing, development, production, and transportation." Had Congress decided to encompass a broad range of facilities for various aspects of an oil and gas program into 20001(c)(3) it knew how to do so. "Production and support facilities" are not "exploration and support facilities," nor are they "transportation and support facilities," or facilities that support some other aspect of the program that is not "production and support."

  This understanding of Section 20001(c)(3) is particularly clear, given Congress's use of the conjunctive "and" rather than the disjunctive "or." Further, Congress's inclusion of the parenthetical reference in Section 20001(c)(3) to "airstrips and any area covered by gravel berms or piers for support of pipelines" supports this understanding of 20001(c)(3). Depending upon particular factual circumstances, such facilities may necessarily constitute "production and support facilities," and they should be included in the 2,000-acre mandate if they are a facility for production or a facility supporting production, but otherwise they would not. With respect to airstrips in particular—which outside of the context of oil and gas development in Alaska could on their face seem to be "transportation" facilities –production of oil and gas in Alaska often requires an airstrip at the actual site of production. In such a case, an airstrip would reasonably be considered a facility in support of production benefitting from the 2,000-acre mandate, but an airstrip that is not incident to the actual site of production, and which generally supports transportation in support of the program, may not.

- Third, the BLM's authorization of a qualifying facility above must be to cover the surface of the federal land supporting that facility. This follows from the plain language of the provision, which provides that the Secretary, acting through the BLM, shall authorize up to 2,000 acres to be covered by the qualifying facilities.

- Fourth, the inclusion of the phrase "during the term of the leases under the oil and gas program under this section" should be reasonably read to mean the 2,000-acre mandate must be authorized throughout the term of all of the leases issued under the program. The interpretive assumption reached in the Leasing EIS that the phrase could reasonably be read to mean at any point in time during the term of all the leases is not supported by the plain meaning of the statutory language.

Although, again, no definitive application of these principles to particular types of development need be reached at this early stage given the uncertainty and hypothetical nature of projected development, the future application of these principles may differ in some respects from some of the assumptions made in the Leasing EIS as to their interpretation. In particular:

- Although the EIS assumed for analytical purposes that reclaimed acreage of federal land formerly containing production and support facilities would free up additional acreage to be subject to the 2,000-acre mandate in Section 20001(c)(3) once they are reclaimed, this would not be the case given the fourth sideboard referenced above.

- Ice roads and pads are not production and support facilities. Although the EIS assumed that such roads would not be such facilities within the meaning of Section 20001(c)(3) because they are temporary, as noted above, they are also reasonably understood to be a transportation or exploration facility, not a "production and support" facility.

- Depending on the precise facts of a future proposal, certain other types of facilities that the BLM assumed were included within the 2,000 acre limit in the EIS, such as gravel roads not required for production,[9] barge landing and storage, and gravel pits and stockpiles, may or may not be "production and support facilities," depending on particular circumstances at issue.

That this ROD does not adopt the assumptions made in the Final EIS as to the interpretation of 20001(c)(3) now and instead provides general guidance and principles for the future is not a change in the proposed action. Although the Leasing EIS made certain hypothetical development assumptions for purposes of analysis, the decision made in this ROD, consistent with the description in the EIS of the BLM's decisions to be made, are where and under what terms and conditions lease sales will occur. See Final EIS, Section 1.3. That decision need not, and does not here, adopt a particular interpretation of 20001(c)(3) or attempt to apply it to hypothetical future development. Providing guidance on how the BLM may interpret 20001(c)(3) in a potential subsequent permitting phase does not constitute a change to the BLM's present leasing action.

For the purpose of proceeding with the lease sales required to be offered by the statutorily-mandated oil and gas program, the hypothetical RFD reasonably projects that development so that the Leasing EIS can project what the effects might be of potential future development associated with oil and gas leases that will benefit from statutory mandates related to rights of way, easements and surface use for production and support facilities. See *Conner v. Burford*, 848 F.2d 1441, 1449 (9th Cir. 1988); see also *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969 (2006). The resulting analysis informs decision-making to the best of the agency's current abilities by providing a general but sufficient understanding (i.e., a reasonable "picture") of the potential types and potential extent of environmental impacts that may occur if leases are developed all the way up to the 2,000-surface acre mandate of 20001(c)(3).

## 2. ALTERNATIVES

Under the NEPA, an agency is required to take a "hard look" at the environmental effects of an agency action and its reasonable alternatives, including foreseeable direct, indirect, and cumulative impacts. The Leasing EIS presents four alternatives that were analyzed in detail. The alternatives focus on the questions of which areas within the Coastal Plain to make available for oil and gas leasing, and which terms and conditions (i.e., lease stipulations and ROPs) to apply to future oil and gas activities in order to avoid, minimize, and mitigate adverse impacts on Coastal Plain resources and uses, including subsistence use.

---

[9] That is, roads connecting production facilities to barge landings or other facilities, as opposed to roads connecting satellite well pads to the central processing facility. See Final EIS Appendix B, Figure B-1.

# Executive Summary

## INTRODUCTION

The United States (US) Department of the Interior (DOI), Bureau of Land Management (BLM), Alaska State Office, has prepared this environmental impact statement (EIS) in accordance with the National Environmental Policy Act of 1969, as amended (NEPA), to implement an oil and gas leasing program in the Arctic National Wildlife Refuge (Arctic Refuge) Coastal Plain. Congress identified the Coastal Plain in Section 1002 of the Alaska National Interest Lands Conservation Act of 1980 (ANILCA) for its oil and natural gas potential; legislation was passed in December 2017 lifting a prohibition on oil and gas development imposed by Section 1003 of ANILCA and requiring the BLM to implement an oil and gas leasing program. The Coastal Plain program area is composed of approximately 1,563,500 acres in the approximately 19.3-million-acre Arctic Refuge (**Map 1-1**, Program Area, in **Appendix A**). The oil and gas leasing program must also consider the Arctic Refuge purposes set out in Section 303(2)(B) of ANILCA, as amended, and modified by Section 20001 of Public Law (PL) 115-97 (Dec. 22, 2017) (PL 115-97).

## PURPOSE AND NEED

Section 20001 of PL 115-97 requires the Secretary of the Interior, acting through the BLM, to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area within the Arctic Refuge. Further, Section 20001 of PL 115-97 requires that at least two lease sales be held by December 22, 2024, and that each sale offer for lease at least 400,000 acres of the highest hydrocarbon potential (HCP) lands within the Coastal Plain, allowing for up to 2,000 surface acres of Federal land to be covered by production and support facilities.

The BLM has undertaken this Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement (Leasing EIS) to implement the leasing program consistent with PL 115-97. The Leasing EIS will serve to inform the BLM's implementation of PL 115-97, Section 20001(c)(1), which is the requirement to hold multiple lease sales. It may also inform post-lease activities, including seismic and drilling exploration, development, and transportation of oil and gas in and from the Coastal Plain. Specifically, the Leasing EIS considers and analyzes the environmental impact of various leasing alternatives, including the areas to offer for sale, and the indirect impacts that could result in consideration of the hypothetical development scenario. All action alternatives are designed to meet Section 20001 of PL 115-97 and to account for all purposes of the Arctic Refuge. The alternatives analyze various terms and conditions (i.e., lease stipulations and required operating procedures [ROPs]) to be applied to leases and associated oil and gas activities, to properly balance oil and gas development with protection of surface resources.

This Leasing EIS evaluates which lands to offer to lease and what terms and conditions to apply to those leases; it does not in itself authorize on-the ground exploration or development. Future on-the-ground actions requiring BLM approval, including potential exploration and development proposals, would require further NEPA analysis based on the site-specific proposal. For example, before drilling on any lease, an operator would be required to submit an application for permit to drill, which would require appropriate NEPA analysis (as well as compliance with other applicable laws) before any drilling could be authorized. Potential applicants would be subject to the terms of the lease; however, the BLM Authorized Officer may require additional site-specific terms and conditions before authorizing any oil and gas activity based on the project-level NEPA analysis.

## DECISIONS TO BE MADE

The BLM's decisions will include which tracts of land to offer for lease and the terms and conditions to be applied to such leases and subsequent authorizations for oil and gas activities. The decisions evaluated in this Leasing EIS and its record of decision (ROD) would not authorize any on-the-ground activity associated with the exploration or development of oil and gas resources on the Coastal Plain.

The US Fish and Wildlife Service (USFWS) continues managing all federal lands in the Coastal Plain as part of the Arctic Refuge, including both leased and unleased areas; however, the BLM manages all aspects of the oil and gas program, including issuing and administering oil and gas leases and issuing permits for all oil and gas activities. Although the BLM intends to consult with the USFWS, as noted in **Table 2-3** (footnote 1) when making oil and gas program decisions, Section 20001(a)(2) and (b)(2)(A) of the Tax Act assigns the BLM the sole responsibility for making such decisions.

## PROGRAM AREA

The USFWS is the predominant land manager in the program area. Other lands in the Coastal Plain include Alaska Native lands conveyed pursuant to the Alaska Native Claims Settlement Act (ANCSA) and Native allotments (see **Table ES-1** and **Map 1-1** in **Appendix A**). The program area excludes a northern coastal portion of Air Force-administered lands near Kaktovik. Lands outside the BLM's oil and gas leasing authority are those excluded from the definition of the Coastal Plain in PL 115-97, Native conveyed, and Native selected lands.

### Table ES-1
### Land Administration Included in PL 115-97 Coastal Plain

| Subject to the BLM's Oil and Gas Leasing Authority | Acres | Outside the BLM's Oil and Gas Leasing Authority | Acres |
|---|---|---|---|
| USFWS-managed lands, including submerged lands | 1,562,600 | Native-conveyed | 24,400 |
| Native allotment | 900 | Native-selected | 4,400 |
| **Total** | **1,563,500** | **Total** | **28,800** |

Source: BLM Geographic Information Systems (GIS) 2018
Note: Acreages are rounded to the nearest 100.

## SCOPING AND ISSUES

As part of the scoping process, the BLM considered public comments provided during scoping meetings held in Anchorage, Arctic Village, Fairbanks, Kaktovik, Utqiaġvik, and Venetie, Alaska, and in Washington, DC, during May and June 2018, when developing the alternatives for analysis in the Leasing EIS. It also considered input from cooperating agencies, tribes, and ANCSA corporations. For more information on the scoping process, see the final scoping report on the BLM's project website: https://goo.gl/HVo5Mj.

Issues such as fish and wildlife, including the Porcupine caribou herd (PCH), special status species, including polar bear, analysis of oil and gas activities, and subsistence use and traditional ways of life, were identified during scoping and addressed in this Leasing EIS. The full list of issue summaries is available in the final scoping report.

## DRAFT EIS PUBLIC COMMENTS

The US Environmental Protection Agency (EPA) published the Notice of Availability of the Draft EIS in the *Federal Register* on December 28, 2018, initiating a 45-day public comment period. The Draft EIS comment period was extended to March 13, 2019, for a total of 75 days. In February 2019, the BLM held public

meetings to receive comments on the Draft EIS in Anchorage, Arctic Village, Fairbanks, Fort Yukon, Kaktovik, Utqiagvik, and Venetie, Alaska, and Washington, DC. The BLM received written comments by mail, fax, email, online comment form via ePlanning, and handwritten and verbal testimony at public meetings. Comments received covered a wide spectrum of thoughts, opinions, ideas, and concerns. A total of 1,066,803 comment letter submissions were received; 3,709 of these were considered unique submissions and 1,063,094 were part of form letter campaigns.

## ALTERNATIVES

### Alternative A—No Action Alternative

Under Alternative A (No Action Alternative), no federal minerals in the Coastal Plain would be offered for future oil and gas lease sales after the ROD for this EIS is signed. Alternative A would not comply with the directive under PL 115-97 to establish and administer a competitive oil and gas program for leasing, developing, producing, and transporting oil and gas in and from the Coastal Plain. It also would not meet the purpose of the Arctic Refuge to provide for an oil and gas program on the Coastal Plain, set out in Section 303(2)(B)(v) of ANILCA. Under this alternative, current management actions would be maintained, and resource trends are expected to continue, as described in the Arctic National Wildlife Refuge Revised Comprehensive Conservation Plan (CCP) (USFWS 2015a).

Alternative A would not meet the purpose and need of the action, which is the BLM's implementation of PL 115-97, including the requirement to hold multiple lease sales and to permit associated post-lease oil and gas activities; however, Alternative A is being carried forward for analysis to provide a baseline for comparing impacts under the action alternatives, in accordance with the Council on Environmental Quality (CEQ) NEPA regulations.

### Alternative B (Preferred Alternative)

Alternative B is the BLM's preferred alternative. It offers the opportunity to lease the entire program area, and there would be the fewest acres with no surface occupancy (NSO) stipulations. In addition to applicable lease stipulations, several ROPs would apply to post-lease oil and gas activities to reduce potential impacts. Approximately 1,563,500 acres would be offered for lease, of which 359,400 acres would be subject to NSO stipulations, and 585,400 acres would be subject to timing limitations (TLs). Standard terms and conditions only would apply to approximately 618,700 acres.

### Alternative C

The entire program area could also be offered for lease sale under Alternative C; however, a large portion of the program area would be subject to NSO. The BLM would rely on the same ROPs as under Alternative B to reduce potential impacts from post-lease oil and gas activities. Approximately 1,563,500 acres would be offered for lease, of which 932,500 acres would be subject to NSO, and 317,100 acres would be subject to TLs. Standard terms and conditions only would apply to approximately 313,900 acres.

### Alternative D

Under Alternative D, portions of the Coastal Plain would not be offered for lease sale. In addition, a large portion of the remaining area would be subject to NSO. In some instances, more prescriptive ROPs are analyzed under Alternative D, than under Alternatives B and C.

Alternative D contains two sub-alternatives, Alternatives D1 and D2, which use different approaches to mitigate impacts on resources through lease stipulations. Under Alternatives D1, approximately 1,037,200 acres would be offered for lease, of which 708,600 acres would be subject to NSO, and 123,900 acres would

be subject to controlled surface use (CSU). Alternative D1 would have no areas subject to TLs but would have approximately 204,700 acres subject to only standard terms and conditions.

Under Alternative D2, 800,000 acres would be offered for lease. Of those acres, 505,800 acres would be subject to NSO, 105,200 acres would be subject to controlled surface use (CSU), 189,000 acres would be subject to TLs, and no areas subject to standard terms and conditions. The BLM reduced the amount of land available for leasing under Alternative D2, based on public comments received on the Draft EIS. This revision prioritizes high potential areas available for lease, while providing additional consideration for caribou calving and post-calving habitat (areas along the coast of Camden Bay and east of the mouth of the Niguanak River), expansion of existing buffers, and expansion of lands adjacent to springs and aufeis[1] habitats. Alternative D2 reflects the total minimum acreage that PL 115-97 requires to be offered in two mandated lease sales.

The complete list of lease stipulations and ROPs under each alternative is presented in **Table 2-3** in **Chapter 2**.

### HYPOTHETICAL DEVELOPMENT SCENARIO

The BLM developed a hypothetical development scenario for oil and gas exploration, development, production, and abandonment in the PL 115-97 Coastal Plain. This hypothetical development scenario projects the reasonably foreseeable oil and gas exploration, development, production, and abandonment/reclamation over the expected life of the program. Of the approximately 1,563,500 acres of federal land in the Coastal Plain, an estimated 427,900 acres are projected to have high potential for petroleum resources, 658,400 acres have medium potential, and 477,200 acres have low potential. The hypothetical baseline scenario assumes all potentially productive areas can be open under standard lease terms and conditions, except those areas outside the BLM's oil and gas leasing authority. This unconstrained scenario represents the maximum level of development that could occur in the program area with no management restrictions except those mandated by law. **Appendix B** contains a more detailed description of these activities and the resources that would be required under each phase.

The BLM used the unconstrained hypothetical development scenario for each alternative, based on differing terms and conditions relating to environmental protection. It did this so that it could analyze a range of impacts on resources. Section 20001(c)(3) of PL 115-97 states that the Secretary shall authorize up to 2,000 surface acres of federal land on the Coastal Plain to be covered by production and support facilities during the term of the leases (see **Section 1.9.1**). **Table ES-2**, below, shows the hypothetical projected facilities and the associated surface disturbance estimates by alternative that would occur after applying discretionary management decisions.

The program area contains an estimated mean of 7.687 billion barrels of technically recoverable oil and 7.04 trillion cubic feet (TCF) of technically recoverable natural gas (Attanasi 2005). Due to high costs associated with operating in the Arctic, it is extremely unlikely that all technically recoverable resources would be produced. The US Energy Information Administration estimated that a total mean of approximately 3.4 billion barrels of oil (BBO) would be produced in the Arctic Refuge by 2050 (Van Wagner 2018). Estimated natural gas production from the Coastal Plain ranges from 0 to 7 TCF of gas produced (Attanasi 2005). See **Appendix B** for more information on development potential, assumptions behind potential estimates, and estimates for the baseline future hypothetical development scenario for petroleum.

---

[1] German for "ice on top"; it is a sheet-like mass of layered ice that forms from successive flows of groundwater during freezing temperatures.

*Coastal Plain Oil and Gas Leasing Program*
*Final Environmental Impact Statement*

David Karl Gross, ABA #9611065
James Lister, ABA #1611111
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, Alaska 99501
dgross@bhb.com
jlister@bhb.com
Telephone 907.276.1550
Facsimile 907.276.3680

Attorneys for Plaintiffs Alaska Industrial Development and Export Authority, North Slope Borough, Arctic Slope Regional Corporation, and Kaktovik Inupiat Corporation

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, ET AL, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, et al., <br><br> Defendants, <br><br> And <br><br> NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, et al. <br><br> Intervenor-Defendants. | Case No.: 3:21-cv-00245-SLG |

## <u>PLAINTIFFS' NOTICE OF APPEAL</u>

Plaintiffs Alaska Industrial Development and Export Authority, North Slope Borough, Arctic Slope Regional Corporation, and Kaktovik Inupiat Corporation, by and through counsel, hereby provide notice of their appeal to the U.S. Court of Appeals for the Ninth Circuit of this Court's August 7, 2023, Order re Motions for Summary Judgment, ECF No. 72, and this Court's February 22, 2024, Order denying Plaintiffs' post-judgment motions, ECF No. 97.  Final Judgment on the parties' motions for summary judgment was entered on August 7, 2023.  On September 5, 2023, Plaintiffs and Intervenor-Plaintiff filed a joint Motion to Alter or Amend Summary Judgment Order (ECF No. 76) and on October 17, 2023 Plaintiffs' and Intervenor-Plaintiff filed a joint Motion for Relief from Final Judgment (ECF No. 84).  This Court issued its Order denying both the motion to alter or amend summary judgment and the motion for relief from final judgment on February 22, 2024.  ECF No. 97.

This notice of appeal is timely filed in accordance with Federal Rule of Appellate Procedure 4(a)(1)(B) and 4(a)(4)(A).  Appellants' Representation Statement is included with this notice pursuant to Federal Rule of Appellate Procedure 12(b) and Ninth Circuit Rules 3-2(b) and 12-2.

DATED this 15th day of April, 2024.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiffs Alaska Industrial
Development and Export Authority, North

Slope Borough, Arctic Slope Regional
Corporation, and Kaktovik Inupiat Corporation

By:  */s/ James H. Lister*
James H. Lister, ABA #1611111
Brian V. Gerd, ABA #1810097
1150 Connecticut Ave NW, Suite 350
Washington, DC 20036
Telephone:  202.862.8375
Facsimile:  202.659.1027
jlister@bhb.com
bgerd@bhb.com

David Karl Gross, ABA #9611065
Zoe A. Eisberg, ABA #1911094
510 L Street, Suite 700
Anchorage, Alaska 99501
Telephone:  907.802.2998
Facsimile:  907.276.3680
dgross@bhb.com
zeisberg@bhb.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 15th, 2024, a copy of the foregoing was served by
electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ James H. Lister*
James H. Lister

**REPRESENTATION STATEMENT**

**Counsel for Plaintiffs Alaska Industrial Development and Export Authority, North Slope Borough, Arctic Slope Regional Corporation, and Kaktovik Inupiat Corporation.**

> David Karl Gross, ABA #9611065
> Zoe A. Eisberg, ABA #1911094
> 510 L Street, Suite 700
> Anchorage, Alaska 99501
> Telephone:  907.802.2998
> Facsimile:  907.276.3680
> dgross@bhb.com
> zeisberg@bhb.com

> James H. Lister, ABA #1611111
> Brian V. Gerd, ABA #1810097
> 1150 Connecticut Ave NW, Suite 350
> Washington, DC 20036
> Telephone:  202.862.8375
> Facsimile:  202.659.1027
> jlister@bhb.com
> bgerd@bhb.com

**Counsel for Plaintiff-Intervenor State of Alaska.**

> Treg Taylor
> Attorney General
> Ronald Walter Opsahl
> Assistant Attorney General
> Ryan Farnsworth
> Alaska Department of Law
> 1031 W 4th Ave, Ste 200
> Anchorage, AK 99501
> ron.opsahl@alaska.gov
> ryan.farnsworth@alaska.gov
> Telephone: (907) 269-5232
> Fax: (907) 276-3697

> Gail L Wurtzler (pro hac vice)
> Kathleen C Schroder (pro hac vice)
> Mark E Champoux (pro hac vice)
> Nicholas R. Peppler (pro hac vice)

AIDEA, ET AL. V BIDEN, ET AL.                                  CASE NO. 3:21-CV-00245-SLG
PLAINTIFFS' NOTICE OF APPEAL                                              PAGE 4 OF 6

Davis Graham & Stubbs LLP
gail.wurtzler@dgslaw.com
katie.schroder@dgslaw.com
mark.champoux@dgslaw.com
nick.peppler@dgslaw.com

**Counsel for Defendants Joseph R. Biden, Jr. in his official capacity as President of the United States, United States Department of the Interior, Deb Haaland in her official capacity as Secretary of the Department of the Interior, Laura Daniel-Davis in her official capacity as Principal Deputy Assistant Secretary Land and Minerals Management, Bureau of Land Management, Tracy Stone-Manning in her official capacity as Director of the Bureau of Land Management, and Thomas Heinlein in his official capacity as Direct of the Bureau of Land Management Alaska.**

Paul A. Turcke
DOJ-Enrd
C/O U.S. Attorney'S Office
1290 West Myrtle Street
Suite 500
Boise, ID 83702
202-532-5994
Fax: 202-305-0275
Email: paul.turcke@usdoj.gov

**Counsel for Intervenor-Defendants Native Village of Venetie Tribal Government, Venetie Village Council, and Arctic Village Council.**

Matthew Neil Newman
Megan Rachel Condon
Native American Rights Fund
745 W 4th Avenue, Suite 502
Anchorge, AK 99501
907-276-0680
Fax: 907-276-2466
Email: mnewman@narf.org
Email: mcondon@narf.org

Karen E. Schmidt
Peter H. Van Tuyn
Bessenyey & Van Tuyn, LLC
310 K Street, Suite 200
Anchorage, AK 99501

AIDEA, ET AL. V BIDEN, ET AL.
PLAINTIFFS' NOTICE OF APPEAL

CASE NO. 3:21-CV-00245-SLG
PAGE 5 OF 6

907-360-6476
Fax: 907-287-2004
Email: karen@bvt-law.com
Email: peter@bvt-law.com

**Counsel for Intervenor-Defendants Gwich'in Steering Committee, Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, and Wilderness Watch.**

Brook Brisson
Suzanne Bostrom
Victoria Clark
Bridget Earley Psarianos
Trustees for Alaska
1026 W. 4th Avenue Suite 201
Anchorage, AK 99501
907-276-4244
Email: bbrisson@trustees.org
Email: sbostrom@trustees.org
Email: vclark@trustees.org
Email: bpsarianos@trustees.org

Karimah Schoenhut
Sierra Club Environmental Law Program
50 F Street NW, 8th Floor
Washington, DC 20001
205-548-4584
Fax: 202-547-6009
Email: karimah.schoenhut@sierraclub.org

Query    Reports     Utilities     Help    Log Out

APPEAL,CLOSED

# U.S. District Court
## United States District Court for the District of Alaska (Anchorage)
## CIVIL DOCKET FOR CASE #: 3:21-cv-00245-SLG

| | |
|---|---|
| Alaska Industrial Development and Export Authority v. Biden et al | Date Filed: 11/04/2021 |
| Assigned to: Sharon L. Gleason | Date Terminated: 08/07/2023 |
| Case in other court: 9CCA, 24-02533 | Jury Demand: None |
| Cause: 05:551 Administrative Procedure Act | Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Alaska Industrial Development and Export Authority**

represented by **Bryson Campbell Smith**
Holland & Hart LLP
P.O. Box 68
Jackson, WY 83001
307-734-4507
Email: bcsmith@hollandhart.com
*TERMINATED: 08/28/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*

**David Karl Gross**
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, AK 99501
907-276-1550
Fax: 907-276-3680
Email: dgross@bhb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James H. Lister**
Birch Horton Bittner & Cherot, PC
1150 Connecticut Ave, NW
Suite 350
Washington, DC 20036-4142
202-659-5800
Fax: 202-659-1027
Email: jlister@dc.bhb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle W. Parker**
Holland & Hart LLP
420 L Street

Suite 550
Anchorage, AK 99501
907-865-2600
Email: kwparker@hollandhart.com
*TERMINATED: 08/28/2023*
*LEAD ATTORNEY*

**William G. Cason**
Holland & Hart LLP
420 L Street
Suite 550
Anchorage, AK 99501
907-865-2600
Email: wgcason@hollandhart.com
*TERMINATED: 08/28/2023*
*LEAD ATTORNEY*

**Plaintiff**

**North Slope Borough**                         represented by **Bryson Campbell Smith**
                                                (See above for address)
                                                *TERMINATED: 08/28/2023*
                                                *LEAD ATTORNEY*
                                                *PRO HAC VICE*

                                                **David Karl Gross**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **James H. Lister**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Kyle W. Parker**
                                                (See above for address)
                                                *TERMINATED: 08/28/2023*
                                                *LEAD ATTORNEY*

**Plaintiff**

**Arctic Slope Regional Corporation**           represented by **Bryson Campbell Smith**
                                                (See above for address)
                                                *TERMINATED: 08/28/2023*
                                                *LEAD ATTORNEY*
                                                *PRO HAC VICE*

                                                **David Karl Gross**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **James H. Lister**
                                                (See above for address)
                                                *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Kyle W. Parker**
(See above for address)
*TERMINATED: 08/28/2023*
*LEAD ATTORNEY*

**Plaintiff**

**Kaktovik Inupiat Corporation**                represented by     **Bryson Campbell Smith**
(See above for address)
*TERMINATED: 08/28/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*

**David Karl Gross**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James H. Lister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle W. Parker**
(See above for address)
*TERMINATED: 08/28/2023*
*LEAD ATTORNEY*

**William G. Cason**
(See above for address)
*TERMINATED: 08/28/2023*
*LEAD ATTORNEY*

V.

**Intervenor Plaintiff**

**State of Alaska**                           represented by     **Gail L Wurtzler**
Davis Graham & Stubbs LLP
1550 17th St., Suite 500
Denver, CO 80202
303-892-9400
Fax: 303-893-1379
Email: gail.wurtzler@dgslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathleen C Schroder**
Davis Graham & Stubbs LLP
1550 17th St., Suite 500
Denver, CO 80202
303-892-9400
Fax: 303-893-1379

Email: katie.schroder@davisgraham.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark E Champoux**
Davis Graham & Stubbs LLP
1550 17th St., Suite 500
Denver, CO 80202
303-892-9400
Fax: 303-893-1379
Email: mark.champoux@davisgraham.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas R Peppler**
Davis Graham & Stubbs LLP
1550 17th St., Suite 500
Denver, CO 80202
303-892-9400
Fax: 303-893-1379
Email: nick.peppler@davisgraham.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Walter Opsahl**
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
907-269-5232
Fax: 907-276-3697
Email: ron.opsahl@alaska.gov
*ATTORNEY TO BE NOTICED*

**Ryan Farnsworth**
State of Alaska
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
907-269-5232
Email: ryan.farnsworth@alaska.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Joseph R. Biden, Jr.**                     represented by     **Paul A. Turcke**
*in his official capacity as President of the*                  DOJ-Enrd
*United States*                                                 C/O U.S. Attorney'S Office
                                                                1290 West Myrtle Street
                                                                Suite 500
                                                                Boise, ID 83702
                                                                202-532-5994
                                                                Fax: 202-305-0275
                                                                Email: paul.turcke@usdoj.gov

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **United States Department of Interior** | represented by | **Paul A. Turcke** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Deb Halland** | represented by | **Paul A. Turcke** |
| *in her official capacity as Secretary of the Department of Interior* | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Laura Daniel-Davis** | represented by | **Paul A. Turcke** |
| *in her official capacity as Principal Deputy Assistant Secretary Land and Minerals Management* | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Bureau of Land Management** | represented by | **Paul A. Turcke** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Tracy Stone-Manning** | represented by | **Paul A. Turcke** |
| *in her official capacity as Director of the Bureau of Land Management* | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Thomas Heinlein** | represented by | **Paul A. Turcke** |
| *in his official capacity as Director of the Bureau of Land Management Alaska Office* | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Intervenor Defendant**

| | | |
|---|---|---|
| **Native Village of Venetie Tribal Government** | represented by | **Megan Rachel Condon** |
| | | Native American Rights Fund |
| | | 745 W 4th Avenue, Suite 502 |
| | | Anchorage, AK 99501 |
| | | 907-276-0680 |
| | | Fax: 907-276-2466 |
| | | Email: mcondon@narf.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

ER-186

**Karen E. Schmidt**
Bessenyey & Van Tuyn, LLC
310 K Street, Suite 200
Anchorage, AK 99501
907-360-6476
Fax: 907-287-2004
Email: karen@bvt-law.com
*ATTORNEY TO BE NOTICED*

**Matthew Neil Newman**
Native American Rights Fund
745 W 4th Avenue, Suite 502
Anchorge, AK 99501
907-276-0680
Fax: 907-276-2466
Email: newman@shriitsal.com
*TERMINATED: 09/26/2024*
*ATTORNEY TO BE NOTICED*

**Peter H. Van Tuyn**
Bessenyey & Van Tuyn, LLC
310 K Street, Suite 200
Anchorage, AK 99501
907-278-2000
Fax: 907-278-2004
Email: peter@bvt-law.com
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Venetie Village Council**                represented by  **Megan Rachel Condon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen E. Schmidt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Neil Newman**
(See above for address)
*TERMINATED: 09/26/2024*
*ATTORNEY TO BE NOTICED*

**Peter H. Van Tuyn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Arctic Village Council**                represented by  **Megan Rachel Condon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen E. Schmidt**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Neil Newman**
(See above for address)
*TERMINATED: 09/26/2024*
*ATTORNEY TO BE NOTICED*

**Peter H. Van Tuyn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

| | | |
|---|---|---|
| **Gwich'in Steering Committee** | represented by | **Brian Litmans** |

Trustees for Alaska
1026 W. 4th Avenue Suite 201
Anchorage, AK 99501
907-276-4244
Fax: 907-276-7110
Email: blitmans@trustees.org
*TERMINATED: 12/13/2022*
*LEAD ATTORNEY*

**Bridget Earley Psarianos**
Trustees for Alaska
1026 W. 4th Avenue Suite 201
Anchorage, AK 99501
907-334-2011
Email: bpsarianos@trustees.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brook Brisson**
Trustees for Alaska
1026 W. 4th Avenue Suite 201
Anchorage, AK 99501
907-276-4244
Fax: 907-276-7110
Email: bbrisson@trustees.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Suzanne Bostrom**
Trustees for Alaska
1026 W. 4th Avenue Suite 201
Anchorage, AK 99501
907-276-4244
Fax: 907-276-7110
Email: sbostrom@trustees.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria Clark**
Trustees For Alaska

ER-188

District of Alaska NextGen CM/ECF Release 1.7.1

121 W Fireweed Lane
Suite 105
Anchorage, AK 99503
907-433-2010
Email: vclark@trustees.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Alaska Wilderness League**          represented by   **Brian Litmans**
                                                       (See above for address)
                                                       *TERMINATED: 12/13/2022*
                                                       *LEAD ATTORNEY*

                                                       **Bridget Earley Psarianos**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Brook Brisson**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Suzanne Bostrom**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Victoria Clark**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Alaska Wildlife Alliance**          represented by   **Brian Litmans**
                                                       (See above for address)
                                                       *TERMINATED: 12/13/2022*
                                                       *LEAD ATTORNEY*

                                                       **Bridget Earley Psarianos**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Brook Brisson**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Suzanne Bostrom**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Victoria Clark**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Canadian Parks & Wilderness Society-Yukon**              represented by    **Brian Litmans**
(See above for address)
*TERMINATED: 12/13/2022*
*LEAD ATTORNEY*

**Bridget Earley Psarianos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brook Brisson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Suzanne Bostrom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria Clark**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Defenders of Wildlife**              represented by    **Brian Litmans**
(See above for address)
*TERMINATED: 12/13/2022*
*LEAD ATTORNEY*

**Bridget Earley Psarianos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brook Brisson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Suzanne Bostrom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria Clark**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Environment America, Inc.**                  represented by   **Brian Litmans**
                                                                (See above for address)
                                                                *TERMINATED: 12/13/2022*
                                                                *LEAD ATTORNEY*

                                                                **Bridget Earley Psarianos**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Brook Brisson**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Suzanne Bostrom**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Victoria Clark**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Friends of Alaska National Wildlife**        represented by   **Brian Litmans**
**Refuges**                                                     (See above for address)
                                                                *TERMINATED: 12/13/2022*
                                                                *LEAD ATTORNEY*

                                                                **Bridget Earley Psarianos**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Brook Brisson**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Suzanne Bostrom**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Victoria Clark**
                                                                (See above for address)

ER-191

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**National Wildlife Federation**                 represented by   **Brian Litmans**
(See above for address)
*TERMINATED: 12/13/2022*
*LEAD ATTORNEY*

**Bridget Earley Psarianos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brook Brisson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Suzanne Bostrom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria Clark**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**National Wildlife Refuge Association**          represented by   **Brian Litmans**
(See above for address)
*TERMINATED: 12/13/2022*
*LEAD ATTORNEY*

**Bridget Earley Psarianos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brook Brisson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Suzanne Bostrom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Northern Alaska Environmental Center**          represented by   **Brian Litmans**
(See above for address)
*TERMINATED: 12/13/2022*

*LEAD ATTORNEY*

**Bridget Earley Psarianos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brook Brisson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Suzanne Bostrom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria Clark**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Sierra Club**                          represented by **Brian Litmans**
                                         (See above for address)
                                         *TERMINATED: 12/13/2022*
                                         *LEAD ATTORNEY*

                                         **Bridget Earley Psarianos**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Brook Brisson**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Suzanne Bostrom**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Victoria Clark**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Karimah Schoenhut**
                                         Sierra Club Environmental Law Program
                                         50 F Street NW, 8th Floor
                                         Washington, DC 20001
                                         205-548-4584
                                         Fax: 202-547-6009

Email: karimah.schoenhut@sierraclub.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**The Wilderness Society**                    represented by    **Brian Litmans**
(See above for address)
*TERMINATED: 12/13/2022*
*LEAD ATTORNEY*

**Bridget Earley Psarianos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brook Brisson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Suzanne Bostrom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria Clark**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Wilderness Watch**                          represented by    **Brian Litmans**
(See above for address)
*TERMINATED: 12/13/2022*
*LEAD ATTORNEY*

**Bridget Earley Psarianos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brook Brisson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Suzanne Bostrom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria Clark**
(See above for address)

LEAD ATTORNEY
ATTORNEY TO BE NOTICED

| Date Filed | # | Docket Text |
|---|---|---|
| 11/04/2021 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number 097--3157945.), filed by Alaska Industrial Development and Export Authority.(Parker, Kyle) (Entered: 11/04/2021) |
| 11/04/2021 | 2 | Civil Cover Sheet. (Parker, Kyle) (Entered: 11/04/2021) |
| 11/05/2021 | 3 | Unissued summons re Defendant US DOI, (Attachments: # 1 Unissued Summons re Defendant Manning, # 2 Unissued Summons re Defendant Heinlein, # 3 Unissued Summons re Defendant Haaland, # 4 Unissued Summons re Defendant Daniel-Davis, # 5 Unissued Summons re Defendant BLM, # 6 Unissued Summons re Defendant Biden) (LMH, COURT STAFF) (Entered: 11/05/2021) |
| 11/05/2021 | | Summons Issued as to Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Thomas Heinlein, Tracy Stone-Manning, United States Department of Interior, U.S. Attorney and U.S. Attorney General (LMH, COURT STAFF) (Entered: 11/05/2021) |
| 11/09/2021 | 4 | Unissued summons re Defendant J. Biden, (Attachments: # 1 Unissued Summons re Defendant BLM, # 2 Unissued Summons re Defendant Daniel-Davis, # 3 Unissued Summons re Defendant Haaland, # 4 Unissued Summons re Defendant US DOI, # 5 Unissued Summons re Defendant Heinlein, # 6 Unissued Summons re Defendant Manning)(LMH, COURT STAFF) (Entered: 11/09/2021) |
| 11/09/2021 | | Summons Reissued as to Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Thomas Heinlein, Tracy Stone-Manning, United States Department of Interior. (LMH, COURT STAFF) Modified on 11/9/2021 to update filer and regenerate(LMH, COURT STAFF). (Entered: 11/09/2021) |
| 11/19/2021 | 5 | NOTICE of Appearance by Paul A. Turcke on behalf of All Defendants (Turcke, Paul) (Entered: 11/19/2021) |
| 11/29/2021 | 6 | **ADMINISTRATIVE APPEAL SCHEDULING ORDER:** The provisions of the District of Alaska Local Civil Rules 16.1(a)(8) and 16.3 shall apply to the briefing schedule in this case. Signed by Judge Sharon L. Gleason on 11/29/21. (JLH, COURT STAFF) (Entered: 11/29/2021) |
| 11/29/2021 | | Docket Annotation: For the purpose of tracking the briefing as ordered at docket 6 , when filing the Opening Brief the attorney shall file the document using the event Motion Miscellaneous Relief and text in the relief being sought. Responsive filings should be filed using the event Response in Opposition to Motion or Response to Motion (Non-Opposition). The reply, if any, shall be filed using the event Reply to Response to Motion. (JLH, COURT STAFF) (Entered: 11/29/2021) |
| 12/08/2021 | 7 | AMENDED COMPLAINT *First Amended Complaint* against All Defendants, filed by All Plaintiffs.(Parker, Kyle) (Entered: 12/08/2021) |
| 01/18/2022 | 8 | MOTION for Extension of Time to File *the Administrative Record (Unopposed)* by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Thomas Heinlein, Tracy Stone-Manning, United States Department of Interior. (Attachments: # 1 Proposed Order)(Turcke, Paul) (Entered: 01/18/2022) |
| 01/19/2022 | 9 | First MOTION to Intervene by State of Alaska. (Attachments: # 1 Supplement Complaint in Intervention for Declaratory Judgment and Injunctive Relief, # 2 Proposed Order) |

ER-195

| | | |
|---|---|---|
| | | (Opsahl, Ronald) (Entered: 01/19/2022) |
| 01/19/2022 | | Docket Annotation re 9 Motion to Intervene: The parties are advised that the role of the proposed Intervenor has been changed from Intervenor to Movant until the Motion to Intervene has been decided. (JLH, COURT STAFF) (Entered: 01/19/2022) |
| 01/20/2022 | 10 | **SLG TEXT ORDER**: Defendants Unopposed Motion for Extension of Time to File the Administrative Record at Docket 8 is GRANTED. The Administrative Record shall be filed no later than **March 21, 2022**. (CFR, CHAMBERS STAFF) (Entered: 01/20/2022) |
| 01/24/2022 | 11 | Notice to Counsel re 7 Amended Complaint and 9 First MOTION to Intervene. A review of the documents submitted at dkts 7 and 9 confirms they are over 25 pages in length. If a CHAMBERS copy of the document has not been forwarded to the Court, counsel is reminded that, pursuant to D.Ak.LR 5.4 and the Administrative Policies and Procedures, you are required to provide the court with a CHAMBERS copy of your filings at dkt 7 and 9. The CHAMBERS copy must be attached to a copy of the Notice of Electronic Filing and must be printed with the ECF pdf footer on each page. (JLH, COURT STAFF) (Entered: 01/24/2022) |
| 01/25/2022 | 12 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Mark E. Champoux. ( Pro Hac Vice Admission fee $250.00 paid. Receipt number 097--3195661.) by State of Alaska. (Attachments: # 1 Exhibit Certificate of Good Standing)(Champoux, Mark) (Entered: 01/25/2022) |
| 01/25/2022 | 13 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Gail L. Wurtzler. ( Pro Hac Vice Admission fee $250.00 paid. Receipt number 097--3195664.) by State of Alaska. (Attachments: # 1 Exhibit Certificate of Good Standing)(Wurtzler, Gail) (Entered: 01/25/2022) |
| 01/25/2022 | 14 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Kathleen C. Schroder. ( Pro Hac Vice Admission fee $250.00 paid. Receipt number 097--3195667.) by State of Alaska. (Attachments: # 1 Exhibit Certificate of Good Standing)(Schroder, Kathleen) (Entered: 01/25/2022) |
| 01/25/2022 | 15 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Nicholas R. Peppler. ( Pro Hac Vice Admission fee $250.00 paid. Receipt number 097--3195670.) by State of Alaska. (Attachments: # 1 Exhibit Certificate of Good Standing)(Peppler, Nicholas) (Entered: 01/25/2022) |
| 01/26/2022 | 16 | CLERK'S NOTICE re 12 Application to Appear Pro Hac Vice. The Application to Appear Pro Hac Vice by Mark E Champoux, at docket 12 , is authorized under D.Ak. LR 83.1(d). (JLH, COURT STAFF) (Entered: 01/26/2022) |
| 01/26/2022 | 17 | CLERK'S NOTICE re 13 Application to Appear Pro Hac Vice. The Application to Appear Pro Hac Vice by Gail L Wurtzler, at docket 13 , is authorized under D.Ak. LR 83.1(d). (JLH, COURT STAFF) (Entered: 01/26/2022) |
| 01/26/2022 | 18 | CLERK'S NOTICE re 14 Application to Appear Pro Hac Vice. The Application to Appear Pro Hac Vice by Kathleen C Schroder, at docket 14 , is authorized under D.Ak. LR 83.1(d). (JLH, COURT STAFF) (Entered: 01/26/2022) |
| 01/26/2022 | 19 | CLERK'S NOTICE re 15 Application to Appear Pro Hac Vice. The Application to Appear Pro Hac Vice by Nicholas R Peppler, at docket 15 , is authorized under D.Ak. LR 83.1(d). (JLH, COURT STAFF) (Entered: 01/26/2022) |

ER-196

| | | |
|---|---|---|
| 02/02/2022 | 20 | RESPONSE to Motion (Non-Opposition) re 9 First MOTION to Intervene filed by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Thomas Heinlein, Tracy Stone-Manning, United States Department of Interior. (Turcke, Paul) (Entered: 02/02/2022) |
| 02/11/2022 | 21 | **ORDER** granting 9 Motion to Intervene. The State shall file a clean copy of its Complaint in Intervention within **7 days**. Signed by Judge Sharon L. Gleason on 2/11/22. (JLH, COURT STAFF) (Entered: 02/11/2022) |
| 02/17/2022 | 22 | Intervenor COMPLAINT , filed by State of Alaska.(Schroder, Kathleen) (Entered: 02/17/2022) |
| 03/14/2022 | 23 | MOTION to Intervene by Native Village of Venetie Tribal Government, Venetie Village Council, Arctic Village Council. (Attachments: # 1 Memo in Support, # 2 Proposed Answer to AIDEA First Amended Complaint, # 3 Proposed Answer to State of Alaska Complaint in Intervention, # 4 Affidavit Gemmill Declaration, # 5 Affidavit Sam Declaration, # 6 Affidavit Tritt Declaration, # 7 Proposed Order)(Condon, Megan) (Entered: 03/14/2022) |
| 03/14/2022 | 24 | MOTION to Intervene by Gwich'in Steering Committee, Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, Wilderness Watch. (Attachments: # 1 Exhibit List of Exhibits, # 2 Affidavit Decl. of L. Baraff, # 3 Affidavit Decl. of S. Blackledge, # 4 Affidavit Decl. of B. Demientieff, # 5 Affidavit Decl. of N. Whittington-Evans, # 6 Affidavit Decl. of G. Haskett, # 7 Affidavit Decl. of K. Itchoak, # 8 Affidavit Decl. of A. Lang, # 9 Affidavit Decl. of P. Mather, # 10 Affidavit Decl. of F. Mauer, # 11 Affidavit Decl. of K. Miller, # 12 Affidavit Decl. of G. Nickas, # 13 Affidavit Decl. of D. Raskin, # 14 Affidavit Decl. of C. Rider, # 15 Affidavit Decl. of D. Ritzman, # 16 Affidavit Decl. of N. Schmitt, # 17 Affidavit Decl. of R. Thompson, # 18 Affidavit Decl. of K. Whitten, # 19 Affidavit Decl. of D. Willms, # 20 Affidavit Decl. of R. Yarnell, # 21 Exhibit Ex. 1 - CCP, # 22 Exhibit Ex. 2 - PLO 2214, # 23 Exhibit Ex. 3 - AIDEA RFP, # 24 Exhibit Ex. 4 - AIDEA Press Release, # 25 Exhibit Ex. 5 - Secretarial Order No. 3401, # 26 Exhibit Ex. 6 - Lease Suspension Letters, # 27 [Proposed] Answer to First Amended Complaint, # 28 [Proposed] Answer to State of Alaska Complaint, # 29 Proposed Order)(Brisson, Brook) (Entered: 03/14/2022) |
| 03/14/2022 | 25 | Corporate Disclosure Statement by Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, Wilderness Watch. (Brisson, Brook) (Entered: 03/14/2022) |
| 03/14/2022 | 26 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Karimah Schoenhut. ( Pro Hac Vice Admission fee $250.00 paid. Receipt number AAKDC-3220997.) by Sierra Club. (Attachments: # 1 Exhibit DC Good Standing Certificate) (Schoenhut, Karimah) (Entered: 03/14/2022) |
| 03/14/2022 | 27 | AFFIDAVIT of *Rule 4 Service Affidavit* by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, North Slope Borough. (Attachments: # 1 Exhibit A)(Parker, Kyle) (Entered: 03/14/2022) |
| 03/14/2022 | | Docket Annotation re 23 Motion to Intervene as Defendants: The parties are advised that the role of the proposed Intervenor Defendants has been changed from Intervenor |

ER-197

| | | |
|---|---|---|
| | | Defendants to Movants until the Motion to Intervene has been decided. (JLH, COURT STAFF) (Entered: 03/14/2022) |
| 03/14/2022 | | Docket Annotation re 24 Motion to Intervene as Defendants: The parties are advised that the role of the proposed Intervenor Defendants has been changed from Intervenor Defendants to Movant until the Motion to Intervene has been decided. (JLH, COURT STAFF) (Entered: 03/14/2022) |
| 03/15/2022 | 28 | CLERK'S NOTICE re 26 Application to Appear Pro Hac Vice. The Application to Appear Pro Hac Vice by Karimah Schoenhut, at docket 26 , is authorized under D.Ak. LR 83.1(d). (JLH, COURT STAFF) (Entered: 03/15/2022) |
| 03/16/2022 | 29 | MOTION for Leave to File *Unopposed Motion For Leave To File Second Amended Complaint* by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, North Slope Borough. (Attachments: # 1 Exhibit Second Amended Complaint, # 2 Proposed Order)(Parker, Kyle) (Entered: 03/16/2022) |
| 03/17/2022 | 30 | Notice to Counsel re 23 MOTION to Intervene filed by Native Village of Venetie Tribal Government, Arctic Village Council, Venetie Village Council. A review of the document submitted at dkt 23 confirms that it is over 25 pages in length. If a CHAMBERS copy of the document has not been forwarded to the Court, counsel is reminded that, pursuant to D.Ak.LR 5.4 and the Administrative Policies and Procedures, you are required to provide the court with a CHAMBERS copy of your filing at dkt 23. The CHAMBERS copy must be attached to a copy of the Notice of Electronic Filing and must be printed with the ECF pdf footer on each page. (JLH, COURT STAFF) (Entered: 03/17/2022) |
| 03/17/2022 | 31 | NOTICE *of Stipulation to Address Scheduling* by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Thomas Heinlein, Tracy Stone-Manning, United States Department of Interior (Attachments: # 1 Proposed Order) (Turcke, Paul) (Entered: 03/17/2022) |
| 03/18/2022 | 32 | **SLG TEXT ORDER:** Plaintiff's unopposed Motion for Leave to File Second Amended Complaint at Docket 29 is GRANTED. Plaintiffs shall promptly file the Second Amended Complaint as a separate docket entry. (JLH, COURT STAFF) (Entered: 03/18/2022) |
| 03/18/2022 | 33 | **SCHEDULING ORDER:** The Court adopts the parties' proposed deadlines. The existing deadlines in this case are VACATED. Defendants answer to Plaintiffs' Second Amended Complaint and State of Alaska's Complaint in Intervention, is due **5/16/2022**. Administrative record due **6/3/2022**. See Order for additional deadlines. Signed by Judge Sharon L. Gleason on 3/18/22. (JLH, COURT STAFF) (Entered: 03/18/2022) |
| 03/18/2022 | 34 | AMENDED COMPLAINT *Second Amended Complaint* against All Defendants, filed by All Plaintiffs.(Parker, Kyle) (Entered: 03/18/2022) |
| 03/28/2022 | 35 | RESPONSE in Opposition re 24 MOTION to Intervene , 23 MOTION to Intervene filed by State of Alaska. (Schroder, Kathleen) (Entered: 03/28/2022) |
| 03/31/2022 | 36 | UNOPPOSED JOINT MOTION for Extension of Time to File Response/Reply as to 35 Response in Opposition to Motion *to Intervene by Gwichin Steering Committee et al. and Native Village of Venetie Tribal Government et al.* by Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, Wilderness Watch. (Attachments: # 1 Proposed Order)(Bostrom, Suzanne) Modified on 3/31/2022 to clarify docket text(PXS, COURT STAFF). (Entered: 03/31/2022) |

ER-198

| | | |
|---|---|---|
| 04/01/2022 | 37 | **SLG TEXT ORDER**: The *Unopposed Joint Motion for Extension of Time to File Replies to Intervenor-Plaintiff State of Alaskas Opposition to Applicants Motions to Intervene* at Docket <u>36</u> is GRANTED. The replies may be filed no later than **April 8, 2022.** (CFR, CHAMBERS STAFF) (Entered: 04/01/2022) |
| 04/08/2022 | <u>38</u> | REPLY to Response to Motion re <u>24</u> MOTION to Intervene filed by Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, Wilderness Watch. (Bostrom, Suzanne) (Entered: 04/08/2022) |
| 04/08/2022 | <u>39</u> | REPLY to Response to Motion re <u>23</u> MOTION to Intervene filed by Arctic Village Council, Native Village of Venetie Tribal Government, Venetie Village Council. (Condon, Megan) (Entered: 04/08/2022) |
| 04/18/2022 | <u>40</u> | **ORDER** granting <u>23</u> Motion to Intervene and <u>24</u> Motion to Intervene. Signed by Judge Sharon L. Gleason on 4/18/22. (JLH, COURT STAFF) (Entered: 04/18/2022) |
| 04/27/2022 | <u>41</u> | ANSWER to <u>34</u> Amended Complaint by Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, Wilderness Watch.(Bostrom, Suzanne) (Entered: 04/27/2022) |
| 04/27/2022 | <u>42</u> | ANSWER to <u>22</u> Intervenor Complaint by Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, Wilderness Watch.(Bostrom, Suzanne) (Entered: 04/27/2022) |
| 05/16/2022 | <u>43</u> | ANSWER to <u>34</u> Amended Complaint by Arctic Village Council, Native Village of Venetie Tribal Government, Venetie Village Council.(Condon, Megan) (Entered: 05/16/2022) |
| 05/16/2022 | <u>44</u> | ANSWER to <u>22</u> Intervenor Complaint by Arctic Village Council, Native Village of Venetie Tribal Government, Venetie Village Council.(Condon, Megan) (Entered: 05/16/2022) |
| 05/16/2022 | <u>45</u> | ANSWER to <u>34</u> Amended Complaint by All Defendants.(Turcke, Paul) (Entered: 05/16/2022) |
| 05/16/2022 | <u>46</u> | ANSWER to <u>22</u> Intervenor Complaint by All Defendants.(Turcke, Paul) (Entered: 05/16/2022) |
| 05/16/2022 | <u>47</u> | ANSWER to <u>34</u> Amended Complaint by Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, Wilderness Watch.(Brisson, Brook) (Entered: 05/16/2022) |
| 06/03/2022 | <u>48</u> | NOTICE *of Filing and Serving the Administrative Record* by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Tracy Stone-Manning, United States Department of Interior (Attachments: # <u>1</u> Exhibit Table of Exhibits, # <u>2</u> Exhibit Decl. Jason Robinson, # <u>3</u> Exhibit AR Index, # <u>4</u> Exhibit Doc. No. 1, # <u>5</u> Exhibit Doc. |

| | | |
|---|---|---|
| | | No. 2, # 6 Exhibit Doc. No. 3, # 7 Exhibit Doc. No. 4, # 8 Exhibit Doc. No. 5, # 9 Exhibit Doc. No. 6, # 10 Exhibit Doc. Nos. 7-9, # 11 Exhibit Doc. Nos. 10-14, # 12 Exhibit Doc. Nos. 15, 17-26)(Turcke, Paul) (Entered: 06/03/2022) |
| 06/30/2022 | 49 | Joint MOTION Joint Motion to Modify Schedule re 33 Order, *Unopposed Joint Motion To Modify Schedule* by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough. (Attachments: # 1 Proposed Order [Proposed] Order Regarding Case Schedule)(Parker, Kyle) (Entered: 06/30/2022) |
| 07/01/2022 | 50 | **ORDER** re 49 Motion to Modify Schedule. See Order for new deadlines. Signed by Judge Sharon L. Gleason on 7/1/22. (JLH, COURT STAFF) (Entered: 07/01/2022) |
| 08/12/2022 | 51 | MOTION for Extension of Time to File *Finalized Administrative Record (Unopposed)* by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Tracy Stone-Manning, United States Department of Interior. (Attachments: # 1 Proposed Order)(Turcke, Paul) (Entered: 08/12/2022) |
| 08/15/2022 | 52 | **ORDER** granting 51 Unopposed Motion for Extension of Time to File. Any motion to supplement due by 9/19/2022. *See* Order for additional details. Signed by Judge Sharon L. Gleason on 8/15/2022. (JDS, COURT STAFF) (Entered: 08/15/2022) |
| 08/22/2022 | 53 | NOTICE *of Filing and Serving an Administrative Record Supplement and Privilege Log* by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Tracy Stone-Manning, United States Department of Interior (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Index AR Supplement, # 3 Exhibit Supplement, # 4 Exhibit Privilege Log)(Turcke, Paul) (Entered: 08/22/2022) |
| 09/28/2022 | 54 | STIPULATION *Stipulated Motion For Briefing Schedule* by Alaska Industrial Development and Export Authority, Alaska Wilderness League, Alaska Wildlife Alliance, Arctic Slope Regional Corporation, Arctic Village Council, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, Kaktovik Inupiat Corporation, National Wildlife Federation, National Wildlife Refuge Association, Native Village of Venetie Tribal Government, North Slope Borough, Northern Alaska Environmental Center, Sierra Club, State of Alaska, The Wilderness Society, Venetie Village Council, Wilderness Watch. (Attachments: # 1 Proposed Order)(Parker, Kyle) (Entered: 09/28/2022) |
| 09/30/2022 | 55 | **ORDER** granting 54 Stipulated Motion for Briefing Schedule. Plaintiffs and Intervenor-Plaintiff's opening summary judgment briefs due by **December 5, 2022**. See Order for additional deadlines. Signed by Judge Sharon L. Gleason on 9/30/2022. (JDS, COURT STAFF) (Entered: 09/30/2022) |
| 10/31/2022 | 56 | NOTICE *of Filing and Serving Administrative Record Second Supplement* by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Tracy Stone-Manning, United States Department of Interior (Attachments: # 1 Exhibit Third Decl. Jason Robinson, # 2 Exhibit Index AR Second Supplement, # 3 Exhibit Docs. 29-31, # 4 Exhibit Docs. 32-37, # 5 Exhibit Docs. 38-48)(Turcke, Paul) (Entered: 10/31/2022) |
| 12/02/2022 | 57 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Bryson C. Smith. ( Pro Hac Vice Admission fee $250.00 paid. Receipt number AAKDC-3352386.) by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough. (Attachments: # 1 Proposed Order)(Parker, Kyle) (Entered: 12/02/2022) |
| 12/02/2022 | 58 | CLERK'S NOTICE re 57 Application to Appear Pro Hac Vice. The Application to Appear Pro Hac Vice by Bryson C. Smith, at docket 57 , is authorized under L.Civ.R. 83.1(d). |

| | | |
|---|---|---|
| | | (JLH, COURT STAFF) (Entered: 12/02/2022) |
| 12/05/2022 | 59 | MOTION for Summary Judgment by State of Alaska. (Attachments: # 1 Exhibit A, Declaration of Vasilios Gialopsos)(Schroder, Kathleen) (Entered: 12/05/2022) |
| 12/05/2022 | 60 | MOTION for Summary Judgment by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough. (Attachments: # 1 Exhibit A - Declaration of Morgan Neff, # 2 Exhibit B - Declaration of Charles Lampe, # 3 Exhibit C - Declaration of Rex Rock Sr, # 4 Exhibit D - Declaration of Harry Brower Jr, # 5 Exhibit E - Declaration of Matthew Rexford) (Parker, Kyle) (Entered: 12/05/2022) |
| 12/13/2022 | 61 | NOTICE *of Withdrawal and Substitution of Counsel* by Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, Wilderness Watch (Bostrom, Suzanne) (Entered: 12/13/2022) |
| 01/09/2023 | 62 | NOTICE of Change of Address by Paul A. Turcke (Turcke, Paul) (Entered: 01/09/2023) |
| 02/03/2023 | 63 | RESPONSE in Opposition re 60 MOTION for Summary Judgment , 59 MOTION for Summary Judgment filed by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Tracy Stone-Manning, United States Department of Interior. (Turcke, Paul) (Entered: 02/03/2023) |
| 02/17/2023 | 64 | RESPONSE in Opposition re 60 MOTION for Summary Judgment , 59 MOTION for Summary Judgment filed by Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, Wilderness Watch. (Brisson, Brook) (Entered: 02/17/2023) |
| 02/17/2023 | 65 | RESPONSE in Opposition re 60 MOTION for Summary Judgment , 59 MOTION for Summary Judgment filed by Arctic Village Council, Native Village of Venetie Tribal Government, Venetie Village Council. (Newman, Matthew) (Entered: 02/17/2023) |
| 03/20/2023 | 66 | REPLY to Response to Motion re 59 MOTION for Summary Judgment filed by State of Alaska. (Schroder, Kathleen) Modified on 3/20/2023 to correct dkt text. (RMC, COURT STAFF). (Entered: 03/20/2023) |
| 03/20/2023 | 67 | REPLY to Response to Motion re 60 MOTION for Summary Judgment filed by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough. (Parker, Kyle) (Entered: 03/20/2023) |
| 04/17/2023 | 68 | NOTICE *of Availability For Oral Argument* by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough (Parker, Kyle) (Entered: 04/17/2023) |
| 04/19/2023 | 69 | **SLG TEXT ORDER**: Oral Argument on the pending motions for summary judgment is scheduled for **June 20, 2023 at 3:00 p.m.** in Anchorage Courtroom 2 before District Judge Sharon L. Gleason. Each side shall be accorded up to 20 minutes to present their arguments. (CFR, CHAMBERS STAFF) (Entered: 04/19/2023) |

10/16/24, 11:34 PM                     District of Alaska NextGen CM/ECF Release 1.7.1

| 06/16/2023 | 70 | **SLG TEXT ORDER** Oral Argument on June 20th, 2023 at 3:00 p.m. Public Listen Line is available. To listen please dial: 1-571-353-2301 and enter Guest Meeting ID: 275666327. (SRL) (Entered: 06/16/2023) |
|---|---|---|
| 06/20/2023 | 71 | MINUTE ENTRY for proceedings held before Judge Sharon L. Gleason: Hearing on 59 Motion for Summary Judgment and 60 Motion for Summary Judgment held 3:00 p.m. to 3:42 p.m. on 6/20/2023. Oral arguments heard. Matters taken **UNDER ADVISEMENT**; written ruling to issue. APPEARANCES: Bryson Smith for Plaintiffs; Kathleen C. Schroder and Ronald Walter Opsahl, for Intervenor Plaintiff;Paul A. Turcke for Defendants; Brook Brisson and Matthew Neil Newman for Intervenor Defendants; Sonja L. Reeves, Official Court Reporter. (RMC, COURT STAFF) (Entered: 06/20/2023) |
| 08/07/2023 | 72 | **ORDER** denying 59 and 60 Motions for Summary Judgment; granting 63 , 64 and 65 cross-motions for summary judgment. Signed by Judge Sharon L. Gleason on 8/7/23. (RMC, COURT STAFF) (Entered: 08/07/2023) |
| 08/07/2023 | 73 | **JUDGMENT**: all claims against Federal Defendants are dismissed with prejudice. Signed by Judge Sharon L. Gleason on 8/7/23. (RMC, COURT STAFF) (Entered: 08/07/2023) |
| 08/25/2023 | 74 | MOTION to Substitute Attorney *& Entry of Appearance* by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough. (Attachments: # 1 Proposed Order)(Gross, David) (Entered: 08/25/2023) |
| 08/28/2023 | 75 | **ORDER** granting 74 Motion to Substitute Attorney & Entry of Appearance. David Karl Gross and James Lister are substituted for Kyle Parker, William Cason and Bryson Campbell South. Signed by Judge Sharon L. Gleason on 8/28/23. (RMC, COURT STAFF) (Entered: 08/28/2023) |
| 09/05/2023 | 76 | MOTION to Alter Judgment *Motion to Alter or Amend Summary Judgment Order and Judgment* by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough, State of Alaska.(Lister, James) (Entered: 09/05/2023) |
| 09/05/2023 | 77 | MOTION for Leave to File Excess Pages *for Plaintiffs' Motion to Alter or Amend, UNOPPOSED* by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough, State of Alaska. (Attachments: # 1 Proposed Order Proposed Order Granting Unopposed Motion) (Lister, James) (Entered: 09/05/2023) |
| 09/08/2023 | 78 | **SLG TEXT ORDER**: Plaintiffs' Unopposed Motion for Leave to File Over-Length Motion to Alter or Amend at Docket 77 is DENIED as moot. The motion is accepted as filed. The Court does not treat the Motion to Alter or Amend as a Motion for Reconsideration, and Defendants may file a response pursuant to Local Rule 7.2(b)(2) without a request by the Court. The Court appreciates Plaintiffs pointing out this ambiguity in the local rules and intends to rectify it. (RMC, COURT STAFF) (Entered: 09/08/2023) |
| 09/19/2023 | 79 | RESPONSE in Opposition re 76 MOTION to Alter Judgment *Motion to Alter or Amend Summary Judgment Order and Judgment* filed by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Tracy Stone-Manning, United States Department of Interior. (Attachments: # 1 Exhibit Decision)(Turcke, Paul) (Entered: 09/19/2023) |
| 09/19/2023 | 80 | RESPONSE in Opposition re 76 MOTION to Alter Judgment *Motion to Alter or Amend Summary Judgment Order and Judgment (Joint)* filed by Alaska Wilderness League, Alaska Wildlife Alliance, Arctic Village Council, Canadian Parks & Wilderness Society, |

| | | |
|---|---|---|
| | | Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, National Wildlife Federation, National Wildlife Refuge Association, Native Village of Venetie Tribal Government, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, Venetie Village Council, Wilderness Watch. (Brisson, Brook) (Entered: 09/19/2023) |
| 09/22/2023 | 81 | MOTION for Extension of Time to File Response/Reply *in Support of Plaintiffs' Motion to Alter or Amend, UNOPPOSED* by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough, State of Alaska. (Attachments: # 1 Proposed Order Proposed Order Granting Unopposed Motion For Extension of Time)(Lister, James) (Entered: 09/22/2023) |
| 09/26/2023 | 82 | **SLG TEXT ORDER**: Plaintiffs' and Intervenor-Plaintiffs' Unopposed Motion for Extension of Time to File Reply in Support of Motion to Alter or Amend Summary Judgment Order and Judgment at Docket 81 is **GRANTED**. The deadline for the reply is extended through **October 17, 2023**.(SCD, COURT STAFF) (Entered: 09/26/2023) |
| 10/17/2023 | 83 | REPLY to Response to Motion re 76 MOTION to Alter Judgment *Motion to Alter or Amend Summary Judgment Order and Judgment* filed by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough, State of Alaska. (Lister, James) (Entered: 10/17/2023) |
| 10/17/2023 | 84 | MOTION to Vacate *Motion for Relief from Final Judgment* by Alaska Industrial Development and Export Authority. (Attachments: # 1 ORDER GRANTING MOTION FOR RELIEF FROM FINAL JUDGMENT)(Gross, David) Modified on 10/18/2023 to create relationship to dkt 73. (RMC, COURT STAFF). (Entered: 10/17/2023) |
| 10/24/2023 | 85 | NOTICE *of Filing of New Lawsuit Relating to Lease Cancellation* by Alaska Industrial Development and Export Authority re 83 Reply to Response to Motion, 76 MOTION to Alter Judgment *Motion to Alter or Amend Summary Judgment Order and Judgment* (Attachments: # 1 Exhibit A - Complaint)(Gross, David) (Entered: 10/24/2023) |
| 10/24/2023 | 86 | MOTION for Extension of Time to File Response/Reply as to 84 MOTION to Vacate *Motion for Relief from Final Judgment (Unopposed)* by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Tracy Stone-Manning, United States Department of Interior. (Attachments: # 1 Proposed Order)(Turcke, Paul) (Entered: 10/24/2023) |
| 10/24/2023 | 87 | NOTICE *of Filing of New Lawsuit Relating to Lease Cancellation AMENDED* by Alaska Industrial Development and Export Authority re 85 Notice (Other), (Gross, David) (Entered: 10/24/2023) |
| 10/26/2023 | 88 | **SLG TEXT ORDER**: The Unopposed Motion for Extension of Time at Docket 86 is GRANTED. The deadline for all responses to the Motion for Relief from Final Judgment under Federal Rule of Civil Procedure 60 is extended to **November 7, 2023.** (RMC, COURT STAFF) (Entered: 10/26/2023) |
| 11/07/2023 | 89 | RESPONSE in Opposition re 84 MOTION to Vacate *Motion for Relief from Final Judgment* filed by Joseph R. Biden, Jr, Bureau of Land Management, Laura Daniel-Davis, Deb Halland, Tracy Stone-Manning, United States Department of Interior. (Turcke, Paul) (Entered: 11/07/2023) |
| 11/07/2023 | 90 | RESPONSE in Opposition re 84 MOTION to Vacate *Motion for Relief from Final Judgment* filed by Alaska Wilderness League, Alaska Wildlife Alliance, Arctic Village Council, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Environment America, Inc., Friends of Alaska National Wildlife Refuges, Gwich'in Steering Committee, National Wildlife Federation, National Wildlife Refuge Association, Native Village of Venetie Tribal Government, Northern Alaska Environmental Center, |

ER-203

| | | Sierra Club, The Wilderness Society, Venetie Village Council, Wilderness Watch. (Brisson, Brook) (Entered: 11/07/2023) |
|---|---|---|
| 11/09/2023 | 91 | MOTION to Amend/Correct 88 Order,, Terminate Motions,, Set Motion and R&R Deadlines/Hearings, *UNOPPOSED* by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough. (Attachments: # 1 Proposed Order Granting Request for Clarification)(Gross, David) (Entered: 11/09/2023) |
| 11/13/2023 | 92 | **SLG TEXT ORDER**: The Unopposed Request for Clarification Regarding Briefing Schedule for Motion for Relief from Final Judgment at Docket 91 is GRANTED. The deadline for Plaintiffs and Intervenor-Plaintiffs reply in support of the Motion for Relief from Final Judgment is hereby extended to **November 21, 2023**. (CFR, CHAMBERS STAFF) (Entered: 11/13/2023) |
| 11/21/2023 | 93 | REPLY to Response to Motion re 84 MOTION to Vacate *Motion for Relief from Final Judgment* filed by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough, State of Alaska. (Gross, David) (Entered: 11/21/2023) |
| 11/21/2023 | 94 | MOTION for Leave to File *Overlength Reply in Support of Motion for Relief from Final Judgment* by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough, State of Alaska. (Attachments: # 1 Proposed Order Granting Motion for Leave to File Overlength Reply) (Gross, David) (Entered: 11/21/2023) |
| 11/22/2023 | 95 | **SLG TEXT ORDER**: Plaintiffs and Intervenor-Plaintiffs Motion for Leave to File Overlength Reply in Support of Motion for Relief from Final Judgment at Docket 94 is GRANTED. The Brief at Docket 93 is ACCEPTED as filed. (CFR, CHAMBERS STAFF) (Entered: 11/22/2023) |
| 12/20/2023 | 96 | NOTICE of Appearance by Ryan Farnsworth on behalf of State of Alaska (Farnsworth, Ryan) (Entered: 12/20/2023) |
| 02/22/2024 | 97 | **ORDER** denying 76 Motion to Alter Judgment; denying 84 Motion to Vacate. Signed by Judge Sharon L. Gleason on 2/22/24. (RMC, COURT STAFF) (Entered: 02/22/2024) |
| 04/15/2024 | 98 | NOTICE of APPEAL as to 97 Order on Motion to Alter Judgment, Order on Motion to Vacate, 73 Judgment, 72 Order on Motion for Summary Judgment, by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough. Filing fee $ 605, receipt number CAKDC-3592119. (Lister, James) (Entered: 04/15/2024) |
| 04/22/2024 | 99 | USCA Case Number 24-2533 for 98 Notice of Appeal, filed by Alaska Industrial Development and Export Authority, Arctic Slope Regional Corporation, Kaktovik Inupiat Corporation, North Slope Borough. (SXH, COURT STAFF) (Entered: 04/25/2024) |
| 04/22/2024 | 100 | USCA Scheduling Order as to 98 Notice of Appeal. 24-2533: Mediation Questionnaire due (Appellant) 4/29/2024, Appeal Opening Brief (No Transcript Due) (Appellant) 6/10/2024, Appeal Answering Brief (No Transcript Due) (Appellee) 7/10/2024. All briefs shall be served and filed pursuant to FRAP 31 and 9th Cir. R. 31-2.1. Failure of the petitioner(s)/appellant(s) to comply with this briefing schedule will result in automatic dismissal of the appeal. See 9th Cir. R. 42-1. (SXH, COURT STAFF) (Entered: 04/25/2024) |
| 09/26/2024 | 101 | NOTICE *OF WITHDRAW OF COUNSEL* by Arctic Village Council, Native Village of Venetie Tribal Government, Venetie Village Council (Newman, Matthew) (Entered: 09/26/2024) |

ER-204

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/16/2024 19:34:17 | | |
| **PACER Login:** | Bhb002014 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cv-00245-SLG |
| **Billable Pages:** | 23 | **Cost:** | 2.30 |