No. 24-2533

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT
AUTHORITY, et. al.,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, et al.,

*Defendants-Appellees*,

and

NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, et al.,

*Intervenor-Defendants-Appellees*.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF ALASKA,

No. 3:21-cv-00245-SLG (Honorable Sharon L. Gleason)

———————————

## APPELLANTS' UNOPPOSED MOTION TO DISMISS FOR
## MOOTNESS, OR IN THE ALTERNATIVE, MOTION FOR
## VOLUNTARY WITHDRAWAL OF THIS APPEAL

Plaintiff-Appellants Alaska Industrial Development and Export Authority ("AIDEA"), North Slope Borough ("NSB"), Arctic Slope Regional Corporation ("ASRC"), and Kaktovik Iñupiat Corporation ("KIC") (collectively referred to as "Plaintiffs") hereby move the Court to dismiss this appeal due to mootness. In the alternative, Plaintiff-Appellants move to voluntarily dismiss their appeal pursuant to Federal Rule of Appellant Procedure 42(b). The Final Record of Decision for ANWR's Coastal Plain Oil and Gas Program issued by Defendant-Appellee Department of the Interior ("DOI") on December 8, 2024 completed DOI's supplemental environmental review and expressly lifts the Moratorium for the oil and gas program rendering all claims in this appeal moot.

Federal Defendant-Appellees and Intervenor Defendant-Appellees non-oppose dismissal of the appeal and take no position on the question of mootness. As such, this is an unopposed motion to dismiss.

## I.   The Issuance of a New Record of Decision for the Coastal Plain Oil and Gas Program Rendered this Appeal Moot and Requires Dismissal.

This appeal concerns Plaintiffs' challenge to two related actions taken by DOI in June, 2021: (1) the implementation of a moratorium through Secretarial Order 3401 that froze any and all DOI or sub-agency actions arising from or relating to the oil and gas leasing program on the Arctic National Wildlife Refuge's Coastal Plain ("the Program" and the "Moratorium") [ER 109-110]; and (2) DOI's suspension of the oil and gas lease agreements issued to AIDEA in January 2021 as part of the

Program's first lease sale, in reliance on the Moratorium [ER 152-153]. In their Opening Brief (Dkt. 16.1 at 25-30) and the accompanying Motion to Hold Appellate Proceedings in Abeyance (Dkt. 15.1), Plaintiffs advised the Court that impending events would likely soon transpire materially altering the status of this appeal, potentially rendering this matter moot. Precisely such events have come to pass.[1]

DOI in June, 2021 imposed the Moratorium and suspended AIDEA's leases in order to provide the agency with time to "conduct a new, comprehensive analysis of the potential environmental impacts of the Program" that addresses alleged legal deficiencies identified by DOI in the prior 2020 ROD.[2] On December 8, 2024 DOI completed its supplemental environmental review process through the issuance of the 2024 Record of Decision for the Coastal Plain Oil and Gas Leasing Program ("ROD").[3] In the ROD, Defendant-Appellee DOI established new terms and

---

[1] Federal Defendants-Appellees also acknowledged this possibility in their Reply Brief stating that "the parties may inform the Court of new developments through the filing of a letter, a motion to dismiss all or portions of the appeal, or a request for supplemental briefing." Dkt. 29.1 at 19, n.3. *See also* Opp. to Motion to Hold Appeal in Abeyance, Dkt. 23.1 at 3 ("If some portion of the appeal becomes moot…the parties may move to dismiss all or portions of this appeal.").

[2] S.O. 3401, Sec. 4., ER-109.

[3] Coastal Plain Oil and Gas Leasing Program Record of Decision, December 2024. Plaintiffs include as Exhibit 1 to this motion, relevant excerpts from the Record of Decision. The ROD is available in its entirety electronically at the U.S. Department of the Interior; Bureau of Land Management's Website: https://eplanning.blm.gov/public_projects/2015144/200492847/20124527/2510245 07/CoastalPlainSEIS_ROD_20241208_508.pdf

conditions for the Program and lifted the Moratorium that had halted any Program actions for the duration of this supplemental environmental review. Consequently, the ROD also rendered moot Plaintiffs' claims in this appeal, which challenged DOI's halt on program activities (including but not limited to lease suspension) during the duration of the supplemental review. Because the appeal is now moot, it must be dismissed.

DOI also represents in the ROD that this supplemental review resolved the alleged errors the agency identified as grounds for the Moratorium and lease suspension orders.[4] In other words, the agency determined in June, 2021 that it (under the prior Administration) might have erred, and it imposed a Moratorium and related lease suspension while it determined what to do. Now, in December, 2024, the agency has determined that it has fixed those errors, and so lifted the Moratorium.[5] In the meantime, in September, 2023, the agency cancelled the suspended leases.

The doctrine of mootness restricts judicial power to active cases and controversies, "[a] claim is moot when 'the issues presented are no longer live or the

---

[4] December, 2024 ROD at 5 and 11, (explaining that the December, 2024 ROD and November, 2024 SEIS "correct" various "legal deficienc[ies]" in the 2019 EIS and 2020 ROD and reviewing those deficiencies one by one). *See* Ex. 1, pages 4 and 8.

[5] While Appellants maintain that the agency did not err in 2020 and early January, 2021, what matters for mootness analysis is that, as of December 8, 2024, the agency now believes it has fixed those errors it says it made.

parties lack a legally cognizable interest in the outcome.' The basic question is whether there exists a 'present controversy as to which effective relief can be granted.'"[6] "Federal courts lack power to make a decision unless the plaintiff has suffered an injury in fact, traceable to the challenged action, and likely to be redressed by a favorable decision."[7] Mootness is not evaluated solely at the initiation of a lawsuit or appeal, it must be assessed throughout the course of litigation.[8] "If one of these required prerequisites to the exercise of judicial power disappears while the litigation is pending … the judicial branch loses its power to render a decision on the merits of the claim."[9]

Although Plaintiffs disagree with DOI's purported justifications for and the lawfulness of the Moratorium and suspension of AIDEA's leases, "[t]he mootness doctrine does not turn on whether the plaintiff continues to believe that some unlawful conduct occurred. Rather, 'the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights."[10]

---

[6] *People of Vill. of Gambell v. Babbitt*, 999 F.2d 403, 406 (9th Cir. 1993) (internal citations omitted).

[7] *Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 815 (9th Cir. 1995).

[8] *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477 (1990).

[9] *Nome Eskimo Cmty.* at 815.

[10] *Timbisha Shoshone Tribe v. U.S. Dep't of Interior*, 824 F.3d 807, 812 (9th Cir. 2016) (omitting internal citation).

To that end, "if there is no longer a possibility that an appellant can obtain relief for his claim, that claim is moot and must be dismissed for lack of jurisdiction."[11]  With DOI's recent action releasing the new 2024 ROD for the Coastal Plain Program, this Court can no longer provide any relief for Plaintiffs' claims.

A. DOI Lifted the Moratorium on the Coastal Plain Rendering Plaintiffs' Claims Moot.

Plaintiffs' claims challenging the lawfulness of the Moratorium imposed in June, 2021 by Secretarial Order 3401 are now plainly moot.  As the District Court repeatedly emphasized in its August, 2023 decision, DOI's moratorium was implemented as a "temporary halt."  The subsequent release of the December, 2024 ROD marked its endpoint.  The ROD explicitly resolves the Moratorium stating:

> In so deciding [to select Alternative D2 from the Supplemental Environmental Impact Statement], **the ROD has the effect of lifting the halt of the leasing program imposed by SO 3401**, which directed the temporary halt on leasing program activities while the new, comprehensive analysis of the leasing program's environmental impacts (i.e., the Leasing SEIS) was pending.  That new analysis is now complete.[12]

By lifting the Moratorium and ending the freeze on all activities arising from and related to the Coastal Plain Program—Plaintiffs' requested relief—DOI mooted the

---

[11] *Id.*  To the extent Appellants disagree with other actions taken by DOI in the December, 2024 ROD, their remedy is to seek judicial review, agency reconsideration, or legislative relief as to that new agency action.  This appeal concerns only the now superseded June, 2021 agency action.

[12] ROD at 5 (emphasis added), *See* Ex. 1 at 4.

claims challenging the Moratorium. This Court can grant no effective relief, because there is no longer a Moratorium in effect and thus no longer an active case or controversy.

Three of the four Appellants (KIC, NSB, and ASRC) only challenged the Moratorium, so the ending of the Moratorium has clearly concluded their legal interest in this matter. Those Appellants were not parties to the leases that DOI entered with Appellant AIDEA that DOI suspended in conjunction with the Moratorium.

B. Lifting the Moratorium Resolved All Remaining, Contingent Interests in Challenging DOI's Lease Suspension Order.

Appellant AIDEA's claims challenging DOI's suspension of its lease agreements, an agency action based on the now-concluded supplemental review and Moratorium, are also moot.

The same day the Secretary of the Interior issued S.O. 3401 instituting the general moratorium on the Program, DOI also issued notice to AIDEA of the suspension of all operations and production under its lease agreements. [ER 152-153]. In the order suspending AIDEA's leases, DOI cited the imposition of the Moratorium in Secretarial Order 3401 and listed potential alleged legal defects in the issuance of the leases that it would be investigating in the supplemental environmental review ordered by Secretarial Order 3401. Thus, although the lease suspension and the Moratorium may have been two agency actions rather than one,

they were closely related actions taken on the same day for the same reasons. Both temporarily halted activities pending the same supplemental NEPA review.

On August 6, 2023, the District Court affirmed both the Moratorium and the lease suspension order; that judgment is on appeal in this case. [ER 29-102]. Subsequently, on September 6, 2023, DOI issued a final decision cancelling AIDEA's Coastal Plain oil and gas leases. [ER 22-28]. AIDEA filed suit challenging lease cancellation in separate litigation that is now fully briefed in the District Court. The Moratorium remained in effect after the lease cancellation and DOI continued its supplemental environmental review.

The permanent cancellation of the lease agreements superseded DOI's prior, temporary suspension order. However, there has been debate over whether the lease suspension issue remained justiciable. The theory was that if AIDEA prevailed in its related case challenging the lease cancellation decision while the Moratorium remained in place, the Court may have reinstated its leases with the previous suspended status while DOI completed its supplemental environmental review. This contingent justiciability seemed to be endorsed by the District Court in its February 2024 ruling that denied Appellant's post-judgment motion for an order declaring that the lease cancellation mooted challenges to the earlier lease suspension and the Moratorium. [ER 15-16]. The District Court held that despite the cancellation of its leases, AIDEA retained a legal interest because of the possibility that its leases could

be reinstated while the Moratorium was still in place. This possible outcome was enough to prevent mootness to AIDEA, at least while the Moratorium remained in effect.

This theory of contingent justiciability, that perhaps just barely kept AIDEA's claims challenging the superseded lease suspension from being moot, evaporated once DOI completed its supplemental environmental review and formally ended the Moratorium on December 8, 2024.[13] If AIDEA prevails in its separate lawsuit challenging lease cancellation, the ongoing NEPA analysis and Moratorium relied upon in the June, 2021 lease suspension order can no longer be a basis for bringing the leases back to life with suspended status because DOI has completed its supplemental environmental review. DOI might issue a new order suspending or otherwise modifying the revived leases to comport with its new ROD, but that would be a new agency action, not the June, 2021 suspension order challenged in this lawsuit, which was based on the now-concluded Moratorium. Thus, there is no longer an active case or controversy tied to suspension, nor could this Court grant effective relief addressing lease suspension.

---

[13] In concluding that lease cancellation did not render AIDEA's claim moot the District Court cited the still-in-effect Moratorium as the basis for this contingent justiciability, noting that if AIDEA's leases are reinstated its interests in the Moratorium, and thus relatedly any possible suspended lease status, are revived. The Court made no reference of the potential justiciability of the suspension order separate from its discussion of AIDEA's legal interests in the Moratorium. ER-15.

Accordingly, because AIDEA's challenges to the suspension of its leases are moot, this court should dismiss the appeal in its entirety for lack of jurisdiction, rather than just dismissing the challenged to the now-concluded Moratorium as moot.

## II. In the Alternative, Plaintiffs Move to Voluntarily Dismiss their Appeal.

The mootness of Plaintiffs' claims challenging the now-terminated Moratorium cannot seriously be questioned. The superseding cancellation of AIDEA's oil and gas leases in September 2023 and DOI's completion of its supplemental environmental review, addressing the alleged legal deficiencies and lifting the Moratorium that the agency used to justify suspension, render any remaining claims challenging DOI's 2021 order suspending AIDEA's leases moot. Moreover, if somehow the lease suspension is still not moot, there is no longer any good reason to continue litigating this appeal when the issue is at most barely justiciable due to the contingent possibility that AIDEA may prevail in separate litigation reinstating the agreements.

Accordingly, if, the Court declines to dismiss any aspect of this appeal as moot, it should instead grant this motion to dismiss any remaining non-moot aspects of this appeal through a voluntary dismissal under Appellate Rule 42(b). While appellees take no position on the question of mootness, all represent that they do not oppose dismissal. Rule 42(b) states "an appeal may be dismissed on the appellant's motion on terms agreed to by the parties or fixed by the court" and such motions are generally

granted unless the interests of justice demand otherwise.[14]  The Ninth Circuit is "reluctant to determine an issue presented in the abstract, and we should be especially cautious of doing so when it appears that one of the parties is not willing to fully contest the issue."[15]

Any potentially remaining legal interests are academic in nature at this point in time.  Plaintiff-Appellants filed this appeal to preserve their claims challenging the moratorium and lease suspension decision, knowing a strong possibility existed that their interests could evaporate if DOI timely completed its environmental review. With the release of the ROD in December, 2024, little is to be gained in devoting further of the Parties' and the Court's time and resources in completing briefing, proceeding with oral argument, and deciding any remaining issues.  Dismissal is unopposed, no compounding factors suggest that the interests of justice or fairness should foreclose dismissal, and the cognizable legal interests driving forth Plaintiffs' appeal have been effectively eliminated.

Finally, in their response briefs, Appellees asserted that the arguments raised by Appellants in their opening brief were "waived" or "forfeited" by not being

---

[14] *Shellman v. U.S. Lines, Inc.*, 528 F.2d 675, 678 (9th Cir. 1975); *Am. Auto. Mfrs. Ass'n v. Comm'r, Massachusetts Dep't of Env't Prot.*, 31 F.3d 18, 22 (1st Cir. 1994).

[15] *United States v. State of Wash., Dep't of Fisheries*, 573 F.2d 1117, 1118 (9th Cir. 1978).

adequately presented to the District Court below.[16]  Because Appellees have taken the position that the legal arguments in Appellants opening brief were ***not*** presented to the District Court in this case concerning the June, 2021 Moratorium and June, 2021 lease suspension order, Appellees will be hard pressed to assert in other litigation challenging separate DOI actions related to the oil and gas program that those same arguments were presented, fully litigated, and conclusively resolved in this case.   Accordingly, rather than contesting a threshold question of issue preservation and pressing for a resolution of the legal claims in this case that addresses actions superseded by subsequent events, it makes more sense for Appellants to accept DOI's assertion that these issues are fully presented in the related litigation challenging DOI's subsequent lease cancellation decision and seek to resolve these matters in that litigation where there is no question of mootness.[17]

Appellants' motion to dismiss is not prejudicial or unexpected.  Appellants moved in October, 2024 to stay this appeal [Dkt 15.1] because upcoming agency actions were expected to moot or largely moot this appeal by December, 2024. Appellees elected to successfully oppose that motion for a stay and filed their answering briefs in November, 2024, knowing that the agency actions substantially

---

[16]     *See* Dkt. 29.1 at 23, n.4; Dkt. 32.1 at 14, 18, 33; and Dkt. 33.1 at 22, n. 89 and 27, n. 114.

[17]     *See* Dkt. 29.1, at 23, n. 4.

impacting justiciability could, and did, occur just a few weeks later.  This decision ultimately proved helpful to the resolution of this appeal for the reasons stated above. Accordingly, the Court should grant the unopposed motion for voluntary dismissal.

## III.  Conclusion.

As such, for the reasons set forth above, Plaintiffs respectfully request that this Court grant their motion to dismiss the appeal.

DATED this 20th day of January, 2025.

Respectfully submitted,

/s/ *James H. Lister*
James Lister, ABA #1611111
Brian V. Gerd, ABA #1810097
David Karl Gross, ABA #9611065
Birch Horton Bittner & Cherot
1150 Connecticut Ave, N.W. Suite 350
Washington, DC 20036
jlister@bhb.com
bgerd@bhb.com
dgross@bhb.com
zeisberg@bhb.com
Telephone 202.862-8368
Facsimile 202.659.1027

Attorneys for Plaintiffs-Appellants Alaska Industrial Development and Export Authority, North Slope Borough, Arctic Slope Regional Corporation, and Kaktovik Iñupiat Corporation

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 20th day of January, 2025, a true and correct copy of the foregoing

was served on the following via the Court's CM/ECF electronic delivery system:

BIRCH HORTON BITTNER & CHEROT

By:    /s/  *James H. Lister*_____

EXHIBIT 1

# Coastal Plain Oil and Gas Leasing Program

# Record of Decision

**Prepared by:**
**U.S. Department of the Interior**
**Bureau of Land Management**

**December 2024**

BLM/AK/PL-25/002+1610_933

# Coastal Plain Oil and Gas Leasing Program Record of Decision

## 1.   INTRODUCTION

This document constitutes the United States (U.S.) Department of the Interior (DOI) Record of Decision (ROD or Decision) for the November 2024 Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement (hereafter Leasing SEIS) prepared by the Bureau of Land Management (BLM) and U.S. Fish and Wildlife Service (USFWS) under the National Environmental Policy Act (NEPA). This ROD describes the leasing program Decision made herein, background and rationale for the approved Decision, and other related information.

## 1.1   Background

Section 20001 of the Tax Cuts and Jobs Act of 2017 (Public Law [PL] 115-97; Dec. 22, 2017) (hereafter Tax Act or PL 115-97) requires the Secretary of the Interior, acting through the BLM, to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area within the Arctic National Wildlife Refuge (Arctic Refuge). The Tax Act requires the BLM to offer two lease sales by December 22, 2021 and 2024, respectively, and for each sale to offer at least 400,000 acres containing those areas that have the highest potential for discovery of hydrocarbons.

The BLM and USFWS, as joint lead agencies, prepared the Leasing SEIS in accordance with NEPA, as amended, to address and cure deficiencies in the initial NEPA analysis in the 2019 Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement (2019 EIS; BLM 2019) and the associated 2020 ROD. The BLM issued the Final Coastal Plain EIS in September 2019, and former Secretary of the Interior Bernhardt signed a ROD for the leasing program on August 17, 2020 (85 *Federal Register* 51754; DOI 2020), adopting Alternative B from the 2019 EIS and thereby making the entire approximately 1,563,500-acre "Coastal Plain," as defined in the Tax Act, available for oil and gas leasing and potential exploration and development. In late 2020, four lawsuits were brought in U.S. District Court for the District of Alaska by several environment organizations, tribes, and States, challenging the adequacy and lawfulness of the 2019 EIS and 2020 ROD under NEPA and other statutes. Those cases have been stayed while the Leasing SEIS and this ROD were pending. Following issuance of the 2020 ROD, the BLM conducted its first lease sale in the Coastal Plain, publishing a notice of sale in the *Federal Register* on December 7, 2020, and opening bids on January 6, 2021. A total of nine tracts were leased to three lessees.

On June 1, 2021, Secretary of the Interior Haaland issued Secretary's Order (SO) 3401, directing: (1) a new, comprehensive analysis of the environmental impacts of the leasing program (i.e., what came to be the Leasing SEIS) to address identified legal deficiencies in the 2019 EIS and 2020 ROD; and (2) a temporary halt on all leasing program activities in the Coastal Plain while the new environmental analysis was pending. SO 3401 identified multiple legal deficiencies in the underlying record supporting the program and leases, including, but not limited to: (1) insufficient analysis under NEPA, including failure to adequately analyze a reasonable range of alternatives in the 2019 EIS; and (2) failure in the 2020 ROD to properly interpret Section 20001 of the Tax Act. That same day, and in light of the identified legal deficiencies, the Principal Deputy Assistant Secretary for Land and Minerals Management issued decisions

EXHIBIT 1, PAGE 2

to the three lessees, suspending operations on the leases while the new environmental analysis was conducted. One lessee, the Alaska Industrial Development and Export Authority (AIDEA), along with the Arctic Slope Regional Corporation, Kaktovik Iñupiat Corporation, and North Slope Borough, filed a lawsuit in U.S. District Court for the District of Alaska challenging the temporary halt of the program and lease suspensions. In August 2023, the District Court issued a decision upholding the temporary halt and lease suspensions, and the plaintiffs appealed the decision to the Ninth Circuit Court of Appeals, where the case is currently pending.

Two leases were subsequently cancelled and rescinded at the two lessees' request, and their lease payments were refunded. On August 19, 2022, the Principal Deputy Assistant Secretary for Land and Minerals Management issued an addendum to the remaining lessee's (AIDEA) suspension of operations decision, identifying an additional legal deficiency in the 2019 EIS regarding analysis of foreign greenhouse gas emissions.

On September 6, 2023, the Draft Leasing SEIS was released for public comment. That day the Deputy Secretary of the Interior issued a decision cancelling the remaining seven oil and gas leases, held by AIDEA, due to the pre-leasing legal deficiencies, and directed a refund of AIDEA's lease payments. AIDEA filed a lawsuit in U.S. District Court for the District of Columbia challenging cancellation of the leases. The case was subsequently transferred to the District of Alaska where the Court's decision is currently pending. There are currently no leased tracts within the Coastal Plain program area.

Pursuant to the Tax Act, the Coastal Plain leasing program area is composed of approximately 1,563,500 acres located within the approximately 19.3-million-acre Arctic Refuge (refer to **Map 1,** Coastal Plain Oil and Gas Leasing Program Area). Accordingly, the leasing program must consider and balance each of the Arctic Refuge purposes set out in section 303(2)(B) of Alaska National Interest Lands Conservation Act (ANILCA), as amended by Section 20001 of PL 115-97.

The Leasing SEIS serves to inform the BLM's implementation of the leasing program under PL 115-97, including the requirement to offer a second lease sale by December 22, 2024. The Leasing SEIS evaluates a broader range of leasing program alternatives than the 2019 EIS (**Chapter 4**, Alternatives) and addresses which lands to offer for lease and what terms and conditions to apply to leases and oil and gas activities. However, neither the Leasing SEIS nor this ROD authorizes specific on-the-ground oil and gas exploration or development activities. Future on-the-ground actions requiring BLM approval, including potential exploration and development proposals, would require further NEPA analysis based on the project-specific proposal.

## 2.    DECISION

This ROD selects Alternative D2 from the November 2024 Final Leasing SEIS to govern the BLM's further administration of the Coastal Plain oil and gas leasing program. The Decision  continues implementation of the Congressional directive to the Secretary in Section 20001(b)(2)(A) of PL 115-97 to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area of the Arctic Refuge, as that area is defined by Section 20001(a)(1) of PL 115-97.

In so deciding, the ROD has the effect of lifting the halt of the leasing program activities imposed by SO 3401, which directed the temporary halt on leasing program activities while the new, comprehensive analysis of the leasing program's environmental impacts (i.e., the Leasing SEIS) was pending. That new analysis is now complete.

By adopting Alternative D2 from the Final Leasing SEIS, this Decision provides that the statutory minimum of 400,000 acres of the lands with highest hydrocarbon potential within the approximately 1,563,500-acre federally managed Coastal Plain program area will be available for leasing in the second lease sale mandated by the Tax Act, and potentially for subsequent seismic and drilling exploration and development. The remaining 1,163,500 acres will not be available for leasing or exploration in order to protect and conserve important surface resources and resource uses in these areas (refer to **Map 2**, Alternative D2, below). To further protect important surface resources and resource uses, of the 400,000 acres available for leasing, approximately 231,700 acres (58 percent) will be subject to no surface occupancy (NSO) stipulations, 84,300 acres (21 percent) will be subject to controlled surface use stipulations, and 3,100 acres (0.78 percent) will be subject to timing limitations. Approximately 80,900 acres (20 percent) will be subject to standard lease terms and conditions. Under Alternative D2 surface disturbance from oil and gas development activities is projected to occur on no more than 995 acres, the fewest of any action alternative analyzed in the Final Leasing SEIS.

The Decision in this ROD includes which lands to make available for leasing under the Coastal Plain program and the terms and conditions (i.e., lease stipulations and required operating procedures [ROPs]) to be applied to leases and authorizations for specific oil and gas activities. This ROD does not authorize any specific on-the-ground activity associated with the exploration for or development of oil and gas resources on the Coastal Plain. Future on-the-ground actions requiring BLM approval, including potential exploration and development proposals, would require further NEPA analysis based on the project-specific proposal and would be addressed in separate decisions.

The lease stipulations and ROPs listed in **Appendix A** are derived from Table 2-3 (Lease Stipulations and Required Operating Procedures by Action Alternative) of the Final Leasing SEIS, as applicable to Alternative D2, and are adopted by and incorporated into this Decision. **Map 3** illustrates the geographic scope of Alternative D2's lease stipulations.

The USFWS continues to manage all federal lands in the Coastal Plain as part of the Arctic Refuge, including both potential leased and unleased areas; however, the BLM manages all aspects of the oil and gas program, including issuing and administering oil and gas leases and issuing authorizations for all oil and gas activities conducted under the program.

Although Section 20001(a)(2) and (b)(2)(A) of PL 115-97 assigns sole responsibility to the BLM for administering the oil and gas program, all activities—including plan development; study development; and consideration of exceptions, modifications, and waivers for any operations that would be conducted on the surface of the Arctic Refuge—shall include coordination with the USFWS to ensure that its considerations as the surface management agency are taken into account. In addition, the BLM will coordinate with other appropriate federal, state, and North Slope Borough agencies, tribal governments, Alaska Native Claims Settlement Act (ANCSA) corporations, and other Native organizations as appropriate.

## 3.    DECISION RATIONALE

This ROD reflects statutory, regulatory, and national policy considerations (refer to Appendix E of the Final Leasing SEIS). It is also based on review and substantive comments from federal, tribal, state, and local governments and agencies, the public, industry, and the cooperating agencies that participated in the Leasing SEIS process.

Compared with the other action alternatives, Alternative D2 provides the most comprehensive framework for addressing the diverse management needs of the Coastal Plain and its resources. It protects important subsistence resources and uses and recognizes important cultural links between tribes and the Coastal Plain and seeks to protect lands for values and resources important to the tribes. It contains lease stipulations and ROPs designed to maximize protection of key resources such as polar bears, caribou, vegetation, surface waters, ice-rich soils, and yedoma deposits.

Alternative D2 provides the best combination of management options to meet the purpose of and need for the Coastal Plain oil and gas leasing program in consideration of the statutory requirements and management concerns identified through the Leasing SEIS process. It fulfills the directive of Section 20001 of PL 115-97 to administer an oil and gas leasing program on the Coastal Plain and ensures a proper balance of that statutory purpose with the other statutory purposes of the Arctic Refuge set out in Section 303(2)(B) of ANILCA, as amended by Section 20001 of PL 115-97.

### 3.1    Complies with Section 20001 of PL 115-97

This Decision complies with Section 20001 of PL 115-97, which requires the Secretary of the Interior, acting through the BLM, to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain, and to offer a second lease sale of at least 400,000 acres of lands with the highest hydrocarbon potential within the Coastal Plain by December 22, 2024. Alternative D2, adopted by this ROD, allows for continued administration of the leasing program and makes the statutorily required minimum of 400,000 acres of lands with the highest hydrocarbon potential available to be offered for lease in the second lease sale.

The Leasing SEIS and this Decision also correct the legal deficiency from the 2019 EIS and 2020 ROD related to interpretation of the 2,000-acre surface development provision in Section 20001(c)(3) of PL 115-97,[1] as identified in SO 3401, whereby the provision was incorrectly interpreted as imposing a 2,000-acre minimum that must be developed and action alternatives were accordingly limited to those having 2,000 acres of surface disturbance. The Leasing SEIS and this ROD correctly interpret this provision as imposing a 2,000-acre *limit* on the amount of allowable surface development in the Coastal Plain, not a *minimum*, and consequently consider new alternatives that are projected to result in less than 2,000 acres of surface development, including Alternative D2, adopted by this Decision, which the Final Leasing SEIS estimates could result in 995 acres of surface development. In particular, the inclusion of the phrase "up to" in Section 20001(c)(3) plainly indicates that less than 2,000 acres *may be* authorized in appropriate circumstances, such as for alternatives that make large areas unavailable for leasing or surface development and thus may

---

[1] Section 20001(c)(3) provides: SURFACE DEVELOPMENT—In administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

require fewer production and support facilities. In other words, that phrase makes clear that the provision is a limit, as explained more fully in the Lease Cancellation decision, dated September 6, 2023. The Leasing SEIS also revised the 2019 EIS's greenhouse gas analysis by considering changes in foreign consumption of oil and associated greenhouse gas emissions that may occur as a result of future Coastal Plain oil production, and thereby corrects the 2019 EIS's legal deficiency regarding its failure to consider such impacts, as identified in the August 19, 2022, addendum to AIDEA's suspension of operations decision.

## 3.2　Proper Balance of the Statutory Purposes of the Arctic Refuge

The Arctic National Wildlife Range (Range) was established in 1960 by Public Land Order (PLO) 2214 "[f]or the purpose of preserving unique wildlife, wilderness and recreational values.…" In 1980, ANILCA redesignated and expanded the Range as part of the larger Arctic Refuge. It also designated much of the original Range as wilderness under the 1964 Wilderness Act and provided four conservation and subsistence purposes to guide future management of the Refuge, superseding the purpose of PLO 2214.[2] Section 20001(b)(2)(B) of PL 115-97 amended Section 303(2)(B) of ANILCA by adding a fifth purpose to the Refuge: "(v) to provide for an oil and gas program on the Coastal Plain." Table 1-2 of the Leasing SEIS identifies the sections therein where impacts of oil and gas leasing on specific Arctic Refuge purposes are discussed.

While all of the action alternatives analyzed in the Leasing SEIS attempt to balance, to varying degrees, the conservation and subsistence purposes of the Arctic Refuge with oil and gas exploration and development, Alternative D2 best ensures the Refuge purposes will be carried out in conjunction with administration of an oil and gas leasing program in the Coastal Plain. This is the case because Alternative D2 contains lease stipulations and ROPs to protect resources and balance the uses addressed in the four pre-existing Arctic Refuge purposes while allowing surface occupancy use to support the fifth purpose. In this regard, Alternative D2's lease stipulations and ROPs are designed to maximize protection of key resources such as polar bears, caribou, vegetation, surface waters, ice rich soils, and yedoma deposits, while at the same time allowing the Coastal Plain's lands with the highest hydrocarbon potential to be accessed for oil and gas exploration and development.

## 3.3　Practicable and Reasonable Mitigation Measures

This Decision adopts all practicable and reasonable means to avoid or minimize environmental harm consistent with the directives in PL 115-97, including potential adverse direct, indirect, and cumulative impacts, through the lease stipulations and ROPs listed in **Appendix A**, which are designed to provide protection for a wide range of surface resources and non-oil and gas uses throughout the program area,

---

[2] The four purposes are:
    (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd (including participation in coordinated ecological studies and management of this herd and the Western Arctic caribou herd), polar bears, grizzly bears, muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling;
    (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
    (iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and
    (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

including subsistence use. The lease stipulations and ROPs adopted herein will apply to all oil and gas activities authorized by the BLM in the Coastal Plain.

## 4. ALTERNATIVES

NEPA requires the development and consideration of a reasonable range of alternatives, including a No Action Alternative, to analyze potential impacts and guide decision-makers. Three key components to the alternatives were revisited for the Leasing SEIS: (1) the lease stipulations and ROPs; (2) the interpretation and application of the 2,000-acre surface development provision from PL 115-97; and (3) the areas to make available for leasing and seismic exploration activities.

The BLM held a 60-day public scoping period to solicit public input on the Leasing SEIS. Commenters suggested a variety of alternative concepts and revisions to the lease stipulations and ROPs that had been included in the 2019 EIS. To begin development of alternatives for analysis in the Leasing SEIS, the BLM and USFWS reviewed public comments that were submitted on the 2019 EIS, as well as those submitted during scoping for the Leasing SEIS, for any alternative concepts that may have been previously excluded from consideration but might now be relevant following SO 3401.

The BLM and USFWS held an alternatives development workshop with cooperating agencies to reexamine key concerns regarding the range of alternatives, develop a new suite of lease stipulations and ROPs that would address deficiencies from the 2019 EIS, and incorporate new information and data. After the initial alternatives workshop, the joint lead agencies convened 14 additional resource-focused meetings with representatives from the joint lead agencies and cooperating agencies to further refine and establish consensus on a revised suite of lease stipulations and ROPs for Alternative D in the Draft Leasing SEIS (refer to **Section 5.1**, Public Scoping).

The joint lead agencies updated the range of alternatives from the 2019 EIS, including the No Action Alternative (Alternative A) and Alternatives B, C, and D. Following public input and feedback received during the 2023 Draft Leasing SEIS comment period, the joint lead agencies developed a new alternative (Alternative D2, preferred alternative) based on Alternative D in the Draft Leasing SEIS.

To address the remaining components of the new range of action alternatives for the Leasing SEIS, the BLM revised the reasonably foreseeable development scenario to determine the effects of issuing leases. The acres of estimated surface disturbance for Alternatives C and D were revised to allow for analysis of less than 2,000 acres of disturbance (refer to Appendix C of the Leasing SEIS). The original hypothetical development assumptions were revised and applied proportionally across the new range of Leasing SEIS alternatives to estimate the number of acres that reasonably could be developed under each alternative. Alternative D2 was developed based on similar considerations. Additionally, under the new action alternatives seismic exploration activities would be limited to only those areas available for leasing, effectively reducing the areas where seismic exploration could occur under Alternatives C, D, and D2.

The action alternatives analyzed in the Leasing SEIS and described below include lease stipulations and ROPs that contain measures to avoid or mitigate surface damage and minimize ecological disturbance throughout the program area while balancing the five statutory purposes of the Arctic Refuge. The alternatives respond to the purpose of and need for action, including the statutory requirement to establish and administer a competitive oil and gas program in the Coastal Plain in the Arctic Refuge and to offer a second lease sale by December 22, 2024.

EXHIBIT 1, PAGE 7

## 4.1    Alternative A: No Action Alternative

Under Alternative A, the No Action Alternative, no federal minerals in the Coastal Plain would be offered for future oil and gas leasing. Alternative A would not comply with the directive under PL 115-97 to establish and administer a competitive oil and gas program for leasing, developing, producing, and transporting oil and gas in and from the Coastal Plain in the Arctic Refuge and to offer at least two lease sales by December 22, 2024. It also would not meet the purpose of the Arctic Refuge to provide for an oil and gas program in the Coastal Plain, set out in Section 303(2)(B)(v) of ANILCA, as amended by PL 115-97. Under this alternative, current management actions would be maintained, and resource trends would be expected to continue, as described in the Arctic Refuge Revised Comprehensive Conservation Plan (USFWS 2015).

Alternative A would not meet the purpose and need of the action, which is the BLM's implementation of PL 115-97, including the requirement to offer a total of two lease sales and to permit associated oil and gas activities; however, Alternative A was carried forward for analysis to provide a baseline for comparing impacts under the action alternatives, as required by NEPA.

## 4.2    Alternative B

Alternative B uses the same lease stipulations and ROPs as Alternative B from the 2019 EIS, with minor edits where appropriate. Land within the program area that would be available for lease sale and applicable stipulations are shown in Map 2-1, Alternative B, and Map 2-2, Alternative B, Lease Stipulations, of the Leasing SEIS. Alternative B from the 2019 EIS was the alternative that was adopted by the 2020 ROD. This alternative would offer the opportunity to lease the entire program area with the fewest acres with NSO stipulations; it would provide certain protections in the form of other lease stipulations and ROPs that would apply to oil and gas activities to reduce potential impacts. An estimated 2,000 acres of surface development would occur under Alternative B. Once 2,000 acres of surface development was reached, then no additional development would be allowed pursuant to Section 20001(c)(3) of the Tax Act. Seismic exploration would be allowed to occur across the entire Coastal Plain program area.

## 4.3    Alternative C

Alternative C includes the same lease stipulations and ROPs as Alternative D1 in the 2019 EIS, with minor edits where appropriate. Land within the program area that would be available for lease sale and applicable stipulations are shown in Map 2-3, Alternative C, and Map 2-4, Alternative C, Lease Stipulations, of the Leasing SEIS. As compared with Alternative D1 in the 2019 EIS, the key changes under this alternative for the Leasing SEIS include the following: seismic exploration would only be allowed in areas available for lease sale, and the estimated total area of surface development is 1,464 acres (a reduction of 536 acres). Under Alternative C, portions of the Coastal Plain would not be available for lease sale (refer to Table 2-1 of the Leasing SEIS). In addition, a large portion of the area available for lease sale would be subject to NSO stipulations. In some instances, more prescriptive ROPs are included under Alternative C than under Alternative B.

## 4.4    Alternative D

Alternative D addresses the NEPA deficiency identified by the Secretary in SO 3401 regarding the failure of the 2019 EIS to adequately analyze a reasonable range of alternatives and is derived from Alternative D2 in the 2019 EIS. Land within the program area that would be available for lease sale and applicable stipulations are shown in Map 2-5, Alternative D, and Map 2-6, Alternative D, Lease Stipulations, of the Leasing SEIS. This alternative incorporates more protective lease stipulations and ROPs than any

EXHIBIT 1, PAGE 8

alternative previously analyzed, has the most acres with NSO stipulations, and stresses adherence to the four conservation and subsistence-oriented statutory purposes of the Arctic Refuge. Alternative D also includes considerations for climate change impacts through facility location and construction, and coordination with local communities to help ensure protections for public health, safety, and the environment. Alternative D was developed collaboratively by the joint lead agencies, with input from cooperating agencies, and Indigenous knowledge from tribal representatives. The estimated area of surface development under Alternative D is 1,040 acres. Additionally, seismic exploration would only be allowed in areas available for leasing.

## 4.5    Alternative D2

In response to public comments on the Draft Leasing SEIS, the BLM and USFWS developed a new alternative for the Final Leasing SEIS offering the Tax Act's statutory minimum acreage of 400,000 acres for a second lease sale in the northwest portion of the program area, which has the highest potential for the discovery of hydrocarbons. Lands in the medium and low hydrocarbon potential areas are closed to leasing under this alternative. Alternative D2 is derived from Alternative D (above) while focusing on the area that has the highest hydrocarbon potential. The alternative also addresses additional public requests to expand protections for key resources, including polar bears and caribou. Alternative D2 includes new areas of no leasing in the coastal areas around the Canning and Staines Rivers and around Camden Bay to provide additional protections for maternal polar bear denning and coastal movement (Lease Stipulation 5) and expands the no leasing area in the medium hydrocarbon potential area, that corresponds to critical Porcupine Caribou Herd calving areas. The U.S. Fish and Wildlife Service received a submission from the Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council that the core Porcupine Caribou Herd Habitat calving grounds is a Sacred Site under Executive Order 13007.

To ensure a proper balance of the five statutory purposes of the Arctic Refuge and to allow for a feasible oil and gas leasing program, Alternative D2 refines three specific stipulations from Alternative D to allow for more surface occupancy in the high hydrocarbon potential area. Stipulation 1 (Rivers) removes a 0.25-mile buffer around "all unnamed rivers" due to constraints on surface occupancy, given that ROP 3, which is designed to minimize the impact of contaminants from refueling operations on fish, wildlife, and the environment, in effect protects the unnamed rivers from contamination due to a 500-foot setback identified in the ROP. Lease Stipulation 3 (Springs and Aufeis) was modified to decrease the no leasing buffer from 3 miles to 1 mile, which prohibits leasing and infrastructure adjacent to or above the perennial Tamayariak Spring and associated aufeis field.

Lease Stipulation 12 (Ice Rich Soils and Yedoma Deposits) was revised to remove NSO restrictions but retains the key consideration for climate change impacts through facility design and construction to accommodate the thaw subsidence anticipated over the design life in areas of ice-rich soils and yedoma deposits.

The estimated amount of surface development under Alternative D2 is 995 acres, the lowest of the four action alternatives. Seismic exploration would only be allowed in areas available for leasing. Areas of the Coastal Plain  available for lease sale and applicable stipulations for Alternative D2 are shown in **Map 2**, Alternative D2, and **Map 3**, Alternative D2, Lease Stipulations.